1  Peter A. Arhangelsky, Esq. (SBN 025346)
   Peter.Arhangelsky@gtlaw.com
2  Ashley M. Repka, Esq. (SBN 035416)
   Ashley.Repka@gtlaw.com
3  GREENBERG TRAURIG, LLP
   2375 E. Camelback Rd.
4  Suite 800
   Phoenix, AZ 85016
5  Ph: (602) 445-8017
6  *Attorneys for Plaintiff Stenson Tamaddon, LLC*

7

8              **IN THE UNITED STATES DISTRICT COURT**

9                **FOR THE DISTRICT OF ARIZONA**

10

11   Stenson Tamaddon, LLC                  Case No. 2:24-cv-01123-SPL

12                        Plaintiff,
                                            **PLAINTIFF'S MOTION FOR**
13            v.                            **PRELIMINARY INJUNCTION AND**
                                            **MEMORANDUM OF LAW IN**
14   United States Internal Revenue Service; **SUPPORT**
     et al.,
15                                          **[Oral Argument Requested]**
                         Defendants.
16                                          Hon. Steven P. Logan

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ...................................................................................................................2

    A.  The Statutory Scheme .....................................................................................2

    B.  The IRS Looks to Limit ERC Refunds .........................................................3

    C.  The IRS Abruptly and Indefinitely Suspends ERC Claims
       Processing.......................................................................................................5

III.  ARGUMENT .........................................................................................................8

    A.  Plaintiff has a Strong Likelihood of Success on the Merits ..........................8

       1.   The CARES Act Imposes a Clear, Non-Discretionary Duty on
           the IRS .................................................................................................9

       2.   Administrative Convenience Does Not Justify Abdication of
           Statutory Obligation...........................................................................11

    B.  Plaintiff Will Suffer Irreparable Harm Without an Injunction......................13

       1.   The Moratorium Threatens StenTam's Financial Viability ...............13

       2.   The Deadline to File ERC Claims Will Lapse in April 2025 ......................14

       3.   The Moratorium Threatens Reputational Harm ...........................................15

    C.  The Balance of Equities and Public Interest Favor Preliminary
       Injunctive Relief ...........................................................................................16

IV.   CONCLUSION ....................................................................................................17

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

## **TABLE OF AUTHORITIES**

**Cases**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166 (9th Cir. 2018) ............................................................................................ 8

*Abdo v. Comm'r of Internal Revenue*, No. 5514-20, 2024 WL 1406440 (T.C. Apr. 2, 2024) .......................................................................... 9, 12

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) .................................. 8

*Brian A. C. v. Kijakazi*, No. 3:21-CV-710-BN, 2022 WL 3648571 (N.D. Tex. Aug. 24, 2022) ...................................................................... 11

*Chu Drua Cha v. Noot*, 696 F.2d 594 (8th Cir. 1982) ............................................... 1

*City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019) ................................. 9

*District of Columbia v. Dep't of Lab.*, 819 F.3d 444 (D.C. Cir. 2016) .......................... 12

*Facebook, Inc. v. Internal Revenue Serv.*, No. 17-CV-06490-LB, 2018 WL 2215743 (N.D. Cal. May 14, 2018) ....................................... 7

*Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir. 2000) ......................... 10

*Forefront Dermatology S.C. v. Crossman*, 642 F. Supp. 3d 947 (D. Ariz. 2022) ........................................................................ 13

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) ...................................... 10

*Gaylor v. Mnuchin*, 919 F.3d 420 (7th Cir. 2019) ........................................... 11

*Gibson v. United States*, 761 F. Supp. 685 (C.D. Cal. Apr. 4, 1991) ............................ 14

*Hu v. Reno*, No. 3-99-CV-1136-BD, 2000 WL 425174 (N.D. Tex. Apr. 18, 2000) ............................................................................. 11

*In re Pigott*, 330 B.R. 797 (Bankr. S.D. Ala. 2005) ................................................. 10

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 17

*Minney v. U.S. Off. of Pers. Mgmt.*, 130 F. Supp. 3d 225 (D.D.C. 2015)...................... 17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) ............................................... 9

*Nicholas Acoustics & Specialty Co. v. United States*, 718 F. Supp. 2d 764

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

(S.D. Miss. 2010) ................................................................................................ 2

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) ............................................... 12

*Oregon Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813 (D. Or. 2022) ......... 8, 10

*P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492
(D.D.C. 2020) ........................................................................... 9, 12, 16, 17

*Patriot v. U.S. Dept. of Housing and Urban Dev.*, 963 F. Supp. 1 (D.D.C.
1997) ............................................................................................. 14, 15

*Polk v. United States*, 167 Fed. Cl. 731 (2023) .............................................. 2

*R.V. v. Mnuchin*, No. 20-cv-1148, 2020 WL 3402300 (D. Md. June 19, 2020) ............. 9

*Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511
(9th Cir. 1984) ................................................................................... 8

*Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020) ............................................... 16

*Santa Cruz Lesbian and Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521
(N.D. Cal. 2020) ............................................................................. 13, 16

*Scholl v. Mnuchin*, 494 F. Supp. 3d 661 (N.D. Cal. 2020) ........................................ 8, 9

*Serv. Emps. Int'l Union v. United States*, 598 F.3d 1110 (9th Cir. 2010) ........................ 10

*Stang v. I.R.S.*, 788 F.2d 564 (9th Cir. 1986) ........................................... 10

*Timbisha Shoshone Tribe v. Salazar*, 697 F. Supp. 2d 1181 (E.D. Cal. 2010) ............... 15

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ........................................ 9

*Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191 (E.D.
Wash. 2019) ................................................................................ 13, 16

*Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280 (RC), 2021 WL 950144
(D.D.C. Mar. 12, 2021) ................................................................... 15, 16

*Yount v. Salazar*, No. CV11-8171, 2013 WL 93372 (D. Ariz. Jan. 8, 2013) ................ 16

## Statutes

26 U.S.C. § 3134 ...................................................................... 1, 3, 9, 10

26 U.S.C. § 6402(a) ........................................................................ 10

26 U.S.C. § 6511(a) .......................................................................... 2

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

26 U.S.C. § 6532(a)(1) ........................................................................... 11

26 U.S.C. § 6532(b) .................................................................................. 11

26 U.S.C. § 7422 ...................................................................................... 17

26 U.S.C. § 7508A .................................................................................... 12

26 U.S.C. § 7803(a)(2) ............................................................................. 11

26 U.S.C. § 7803(C) ................................................................................. 10

26 U.S.C. §§ 6501(a) ............................................................................... 11

5 U.S.C. § 553 ............................................................................................ 3

5 U.S.C. § 555(b) ..................................................................................... 10

5 U.S.C. § 706 ........................................................................................ 1, 8

## Other Authorities

Carmen Reinicke, "Biden encourages businesses to take advantage of the
    employee retention credit" CNBC (May 12, 2021), *at*
    https://tinyurl.com/CNBC-Reinicke .................................................. 3

Cutler DM, Summers LH. The COVID-19 Pandemic and the $16 Trillion
    Virus. JAMA. 2020;324(15):1495–1496, *at* https://tinyurl.com/JAMA-2020 ............ 2

Economic Advisors Council, "Evaluating the Effects of the Economic
    Response to COVID-19" (Aug. 2020), *available at*,
    https://tinyurl.com/EAC-Economic-Effects ......................................... 2

IR-2023-201, *IRS opens 2023 Dirty Dozen with warning about [ERC] claims*,
    IRS.Gov (Mar. 20, 2023), https://tinyurl.com/IR-2023-49 ...................... 4

IRS Press Release, IR-2024-78, *IRS Employee Retention Credit compliance
    effort tops $1 billion threshold since fall* (Mar. 22, 2024),
    https://tinyurl.com/IR-2024-78 ................................................. 5, 6

Lucas Goodman, "Take-up of Payroll Tax-Based Subsidies During the
    COVID-19 Pandemic" Working Paper 121, Office of Tax Analysis (Nov.
    2021), *at* https://home.treasury.gov/system/files/131/WP-121.pdf ............ 4

White House, "Fact Sheet" (May 10, 2021), https://tinyurl.com/FactSheet-
    WhiteHouse ....................................................................... 3

**Rules**

Fed. R. Civ. P. 65(a) ................................................................................. 1

**8**

Consol. Approp. Act, 2021, Pub. L. No. 116-260, Div. EE, § 270(i) .............................. 3

H.R. 7024, Rep. No. 118-353 (118th Congress, 2nd Session) ....................................... 12

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I.   **INTRODUCTION**

Plaintiff Stenson Tamaddon, LLC ("StenTam") moves for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure on Counts IV and V of StenTam's Complaint for declaratory and injunctive relief [Dkt. 1].

Congress created the employee retention tax credit ("ERC") through the CARES Act of 2020.  *See* 26 U.S.C. § 3134.  The IRS has a duty to process refund claims under that statute, and it lacks legislative power to suspend the ERC program.  Yet in September 2023, the IRS announced an unlawful "moratorium" on all new ERC claims received after September 14, 2023.  In the months since, the IRS has stopped processing ERC claims altogether and thousands of businesses have been barred from statutorily guaranteed tax credits as a result.  Businesses nationwide have suffered and will continue to suffer financial stress due to the IRS's unilateral decision to stop processing ERC claims and issuing refunds.  Taxpayers with legitimate ERC claims risk losing their right to participate in that program because of expiring limitations periods.  Those circumstances imperil StenTam's business and threaten losses that cannot be recovered later in litigation.

Preliminary injunctive relief is appropriate to resolve whether the IRS has statutory authority to stop processing ERC claims under the statute.  *See Chu Drua Cha v. Noot*, 696 F.2d 594 (8th Cir. 1982) (Where an issue is one of law and the plaintiff will be irreparably harmed, preliminary relief is appropriate if the plaintiff will prevail on the merits of the legal question). Plaintiff has a substantial likelihood of success under the Administrative Procedure Act, 5 U.S.C. § 706(1)-(2), because the IRS acts beyond its Congressionally delegated powers by suspending a program Congress ordered it to administer.  Plaintiff is likely to suffer irreparable harm absent an injunction because the IRS gives no timeline to resume processing ERC claims without this Court's intervention.  In the meantime, money, goodwill, and entire businesses will be lost and rendered unrecoverable.  It is always in the public interest for agencies to follow the law, and ending the moratorium will serve the interests of small businesses nationwide. The Court should ensure continued availability of the ERC refund pending a final decision.  The Court should compel the IRS to process refund claims under 26 U.S.C. § 3134.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

## II.   FACTS

### A. The Statutory Scheme

COVID-19 swept through the country in 2020 and resulted in governmental orders that disrupted local and national economies. Deemed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVD-19 were forecast at $16 trillion.[1] The governmental response involved historically unprecedented measures, including lockdown orders, social distancing mandates, and business closures.

The federal government enacted remedial economic measures to help businesses survive the pandemic. That included the CARES Act of 2020, which authorized direct payments to households and business, and created the Employee Retention Credit. The ERC is a refundable payroll tax credit designed to help businesses endure economic shutdowns in 2020 and 2021. When discussing the CARES Act ahead of its passage, and specifically the ERC, multiple voting members of Congress emphasized the need for broadly applied, sweeping, prompt emergency relief. *See* Declaration of Eric Stenson ¶¶6-7 ("Stenson Decl.").

The ERC is only available for certain quarters in 2020 and 2021. But taxpayers can retroactively claim ERC for the quarters in 2020 and 2021 in which that business was eligible by filing a Form 941-X (Adjusted Quarterly Return) for the relevant quarters. Stenson Decl. ¶16. Time is running out for eligible businesses to claim ERC. The limitations period for filing a Form 941-X amended return is three years from the date the original return was filed. *See* 26 U.S.C. § 6511(a); *Nicholas Acoustics & Specialty Co. v. United States*, 718 F. Supp. 2d 764, 776 (S.D. Miss. 2010), *aff'd,* 644 F.3d 254 (5th Cir. 2011); *Polk v. United States*, 167 Fed. Cl. 731, 756 (2023). For purposes of that limitations period, a taxpayer's original "Forms 941 for a calendar year are considered

---

[1] *See* Cutler DM, Summers LH. The COVID-19 Pandemic and the $16 Trillion Virus. *JAMA.* 2020;324(15):1495–1496, *at* https://tinyurl.com/JAMA-2020; *see also* Economic Advisors Council, "Evaluating the Effects of the Economic Response to COVID-19" (Aug. 2020), *available at,* https://tinyurl.com/EAC-Economic-Effects.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

filed on April 15 of the succeeding year if filed before that date."[2]  So, businesses must have submitted Forms 941-X for eligible 2020 quarters by <u>April 15, 2024</u>.  And businesses must submit Forms 941-X for eligible 2021 quarter by <u>April 15, 2025</u>—less than one year from now.  Stenson Decl. ¶62.

Although Congress granted the IRS authority to issue regulations as necessary to advance payment of the credit to businesses, the IRS never did so.  26 U.S.C. § 3134(m); Dkt. 1-3 at 18.  Instead, it administered the ERC through "guidance" documents that were legislative.  One such document was a 102-page document titled "Notice 2021-20" published in March 2021.  *See* Dkt. 1-1.  Notice 2021-20 was made up of "guidance" that improperly narrowed the scope of Section 3134.  *See id.*  The IRS did not subject these rules to notice-and-comment required by the APA, 5 U.S.C. § 553.  Yet the guidance, and in particular Notice 2021-20, improperly narrowed the scope of the ERC program in conflict with Section 3134. The IRS has since applied its improperly issued guidance to withhold credits due businesses across the country.  Dkt. 1 at ¶¶43-75.[3]

### B.  The IRS Looks to Limit ERC Refunds

Congress consistently supported the ERC program.[4]  In fact, through amendments to the CARES Act after its passage, Congress required the IRS to work with the Small Business Administration to disseminate information about the ERC through a public information campaign.  *See* Consol. Approp. Act, 2021, Pub. L. No. 116-260, Div. EE, § 270(i) (requiring government "outreach" to business through "notice about the credit allowed under this section and the requirements for eligibility to claim the claim"). The Biden administration also encouraged businesses to file, with President Biden instructing agencies to quickly "prioritize actions that provide the greatest relief to individuals,

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

---

[2] *See* IRS Instructions for Form 941-X (Apr. 2023) *at* https://www.irs.gov/instructions/i941x#en_US_202204_publink1000300104.

[3] Plaintiff challenges the legality of Notice 2021-20 in Counts I through III, which are not before the Court on this Motion.

[4] *See, e.g.*, White House, "Fact Sheet" (May 10, 2021), https://tinyurl.com/FactSheet-WhiteHouse ("[T]he Biden-Harris Administration is working to increase awareness of and participation in this beneficial program"); Carmen Reinicke, "Biden encourages businesses to take advantage of the employee retention credit" CNBC (May 12, 2021), *at* https://tinyurl.com/CNBC-Reinicke.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

families, and small businesses[.]"   *See* Exh. A (EO 14002, Jan. 22, 2021).   The Department of Treasury followed this lead at first by, among other things, commissioning research to address "the low take-up of a very broad, generous credit."[5]   The IRS did not.

Rather than publicizing the ERC program, the IRS undermined its success through a fear mongering campaign.   In March 2023, the IRS added claims about the ERC program to its "Dirty Dozen" list of "tax scams."[6]   The Service later announced a "Voluntary Disclosure Program" meant to encourage taxpayers to pay back "improper" credits that might not have been owed under Notice 2021-20.[7]   The IRS also scheduled public meetings to discuss its "freeze on ERC claims," hosted by members of the IRS Office of Criminal Investigation.[8]   The agency's campaign against the credit, including public collaboration with criminal divisions, caused widespread concern over the ERC. Stenson Decl. ¶¶53-56.   That messaging has caused eligible StenTam clients to fear ERC specialists and avoid ERC claims.   *Id*.

What's more, the IRS's frenzy over claims it deems "ineligible" is created by its own unlawful guidance.   For example, the Service cautioned businesses about IRS concerns with taxpayers relying on "[g]overnment orders that don't qualify" and "businesses citing supply chain issues."[9]   Section 3134 does not delineate which government orders "qualify," and does not disqualify supply chain issues as a basis for eligibility; both of those limitations were unilaterally imposed by the IRS when it improperly  narrowed the statute through Notice 2021-20.   Critically, a claim that fails

---

[5] *See* Lucas Goodman, "Take-up of Payroll Tax-Based Subsidies During the COVID-19 Pandemic" Working Paper 121, Office of Tax Analysis (Nov. 2021), *at* https://home.treasury.gov/system/files/131/WP-121.pdf.

[6] *See* IR-2023-201, *IRS opens 2023 Dirty Dozen with warning about [ERC] claims*, IRS.Gov (Mar. 20, 2023), https://tinyurl.com/IR-2023-49.

[7] The IRS incentivized these disclosures by requiring taxpayers to pay back only 80% of the total ERC received.   *See Employee Retention Credit – Voluntary Disclosure Program*, IRS.gov (Mar. 23, 2024), https://www.irs.gov/coronavirus/employee-retention-credit-voluntary-disclosure-program.

[8] *See* IR-2023-201, *Free IRS webinar shares latest details on the [ERC] including options for withdrawing or correcting previously filed claims amid aggressive marketing*, IRS.gov (Oct. 31, 2023), https://tinyurl.com/IR-2023-201.

[9] IRS Press Release, IR-2024-85, *Dirty Dozen: Beware of aggressive promoters who dupe taxpayers into making questionable [ERC] claims* (Mar. 29, 2024), *at* https://tinyurl.com/IR-2024-85.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

under the IRS's unlawful restrictions in Notice 2021-20 is not necessarily a "fraudulent" claim, but the IRS makes no effort to distinguish the two.

The IRS has also not shown that the rate of purported fraud within the ERC program legally justifies discontinuing the credit. Deficiencies in tax submissions occur across all tax programs. The IRS closed 708,309 general tax return audit investigations in 2022, resulting in nearly $30.2 billion in recommended additional tax.[10] IRS claims that it received 3.6 million ERC claims leading into the moratorium in late 2023. *See* Dkt. 1-2 at 4. But as of summer 2023, when the IRS conceived the moratorium, it had 252 investigations resulting in 15 federally charged cases and 6 convictions with an average sentence of 21 months per offender. *Id.* The IRS decried the rate of new ERC claims on a weekly basis, but those numbers when properly interpreted are not significant. Stenson Decl. ¶¶10, 12. Plaintiff does not minimize the significance of fraudulent tax practices, which should be pursued if warranted. But even if IRS's numbers are underinclusive, several hundred investigations out of nearly 3.6 million claims does not rise to a level that justifies cessation of the program to the detriment of small businesses nationwide. Those numbers have remained consistent since the moratorium began. Of the now 352 criminal investigations into ERC initiated by IRS, only 18 have resulted in charges, 11 of which resulted in conviction.[11] As of March 2024, the IRS identified 22,000 claims that it viewed as "improper" under the ERC, which represents well under 1% of the total claims filed. *See* IR-2024-78 (March. 22, 2024).[12]

**C. The IRS Abruptly and Indefinitely Suspends ERC Claims Processing**

On September 14, 2023, the IRS announced "an immediate moratorium through at least the end of the year on processing new claims for the pandemic-era relief program…." *See* Dkt. 1-2 at 2. The Service cited "growing concerns inside the tax agency, from tax professionals as well as media reports that a substantial share of new claims from the aging program are ineligible[.]" *Id.* But the IRS did not support those

---

[10] *See* Compliance Presence, IRS, *at* https://tinyurl.com/CompliancePresence.
[11] *See* IRS IR-2024-21, *at* https://tinyurl.com/IR-2024-21.
[12] *At* https://tinyurl.com/IR-2024-78.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

"concerns" with data or meaningful explanation.

The IRS first pledged that its moratorium would "run through at least Dec. 31," but it offered no assurance that claim processing would resume thereafter.  By early 2024, the Service had not resumed processing ERC claims, and the IRS recently extended its moratorium "into late spring."[13]   The moratorium persists as of this Motion, with Commissioner Werfel stating as recently as May 7, 2024 that the IRS has no end date.

As to claims submitted before the moratorium, the IRS originally said it would still process existing ERC claims but at "greatly reduced speed." Dkt. 1-2 at 5.   To the contrary, the data shows the IRS shuttered the program and has not processed even backlogged claims.  Stenson Decl. ¶¶18-33.   For example, between January 1, 2022 and December 31, 2022, the IRS processed 4,199 of Stenson clients' claims.  *Id.*  ¶21. Similarly, between January 1, 2023 and September 25, 2023, the IRS processed another 4,200 StenTam client claims.  *Id.* ¶22.  After September 25, 2023, however, StenTam has not received a <u>single</u> CP210 Notice indicating that the IRS processed payment for any client's ERC claim.  *Id.* ¶25.  Other tax advisory services have reported similar data.  *Id.* ¶27.  That data reflects a complete cessation of payment activity on ERC claims by the IRS over a period of almost nine months.

The Moratorium harms businesses Congress intended to protect.  Even before the moratorium, the IRS's protracted review times led to a backlog that peaked in Summer 2023 at around one million.  *See* Exh. B at 44 (chart titled "IRS Backlog of Form 941-X").  Businesses made financial plans based on funds promised by Congress.  In the nine months since the moratorium began, businesses have run out of resources to keep them afloat while awaiting ERC relief.  StenTam clients have entered bankruptcy. Stenson Decl. ¶¶14-15, 38, 40.  Others have closed, unable to survive long enough to benefit from relief guaranteed under Section 3134.  *Id.* ¶¶36, 38-39; Exh. E; Exh. B at 68 ("[T]here are just scores and scores and scores of first-person accounts of people who closed their

---

[13] *See* IRS Press Release, IR-2024-78, *IRS Employee Retention Credit compliance effort tops $1 billion threshold since fall* (Mar. 22, 2024), https://tinyurl.com/IR-2024-78 ("A specific resumption date hasn't been determined but, at this point, the IRS anticipates it will be sometime in late spring").

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

business, moved their manufacturing operation, shut it down, refinanced their homes, gave up their pensions, everything for this."); Exh. B at 126 (Calvert Statement).

The Taxpayer Advocate Service (TAS) shares Plaintiff's concerns. The TAS found that the IRS's public statements about its handling of ERC refunds were inaccurate and overstated the work done by the IRS. Exh. C at 38 (the IRS's "[h]igh-profile statements on the status or [ERC] claims have also not always matched reality"). In the TAS's 2023 Annual Report to Congress, it expressed concern with the IRS "freeze [on] the processing of all claims[.]" *See id.* at iv; *id.* at 10 ("[s]tarting in mid-July, the IRS all but stopped processing these returns"); *id.* at 11 ("Though it indicated it would continue to process ERC claims filed before the moratorium at a slower pace due to stricter compliance reviews, the IRS has all but ceased processing").[14] "[M]any taxpayers who are entitled to the ERC will have to wait extended periods of time to receive their funds, regardless of whether they submitted their claims before or after the IRS imposed the moratorium. While the IRS needs to stop improper or fraudulent claims, it must continue to process and pay refunds to eligible employers." *Id.* It then identified "refund-related processing delays" as the "most serious problem" with the IRS in 2023. *Id.* at 8 ("Delayed responses and processing actions hinder individual and business taxpayers, affecting their *rights to be informed, to finality,* and to *quality service*") (emphasis original).

The TAS estimates that at least 800k Form 941-X refund claims were still pending at the end of 2023, "95 percent (762,000) of which contained claims for ERC credit." *Id.* at 11. "These stoppages and delays have left taxpayers with legitimate ERC claims no way to check on the status of their claims and no idea how long processing might take." *Id.* Yet "business taxpayers experiencing financial hardship [cannot] afford to wait for illegitimate claims to be voluntarily withdrawn before the IRS addresses and processes legitimate claims." *Id.* "To provide the relief Congress intended, it is critical that the IRS

---

[14] The TAS is "an independent organization within the IRS that advocates on behalf of taxpayers at the IRS." *Facebook, Inc. v. Internal Revenue Serv.*, No. 17-CV-06490-LB, 2018 WL 2215743, at *3 (N.D. Cal. May 14, 2018). "[T]he TAS submits two reports to Congress each year:  an annual report that analyzes problems encountered by taxpayers…, and an objectives report that describes the goals and activities planned by the Office of the Taxpayer Advocate for the coming fiscal year." *Id.*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

… significantly increase the volume of ERC claims it processes[.]" *Id.*

## III.   ARGUMENT

"A plaintiff seeking a preliminary injunction must establish (1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in [its] favor, and (4) that an injunction is in the public interest." *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018).  A plaintiff can also show "serious questions go to the merits of its claims and a balance of hardships that tips 'sharply' towards the plaintiff, so long as it makes a showing on the other two factors." *Id.*

Plaintiff seeks an injunction that will restore the status quo by compelling the IRS to process amended returns under the ERC.  "Status quo" for purposes of an injunction "refers to the legally relevant relationship between the parties before the controversy arose." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014); *see also Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 514 (9th Cir. 1984) (for purposes of injunctive relief, the status quo means "the last uncontested status which preceded the pending controversy").  The IRS disrupted the status quo by through the Moratorium.  *See Ariz. Dream*, 757 F.3d at 1061 (Arizona policy that rendered applications ineligible under DACA called for prohibitory injunction).  The Court should correct this disruption and return the Parties to the status quo.

### A.   Plaintiff has a Strong Likelihood of Success on the Merits

The Court can compel action under the APA when an agency refuses to follow statutory law.  *See Oregon Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 822 (D. Or. 2022); *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 673 (N.D. Cal. 2020).  Defendants have a duty to process refunds, including those under the ERC.  Because Defendants have no legal basis to cease activity under Section 3134, the agency acts ultra vires in violation of the APA, 5 U.S.C. § 706(2)(C).  The IRS has also unreasonably delayed action under 5 U.S.C. § 706(1) by refusing to process ERC-related tax returns for nearly nine months.  As such, Plaintiff has a strong likelihood of success.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

### 1. The CARES Act Imposes a Clear, Non-Discretionary Duty on the IRS

Agencies are creatures of legislation that are limited to actions authorized by law. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). "An agency literally has no power to act … unless and until Congress confers power upon it." *City of Los Angeles v. Barr*, 941 F.3d 931, 938 (9th Cir. 2019). "When an agency is charged with administering a congressional statute, both its power to act and how it is to act are authoritatively prescribed by Congress." *Id.* "[E]nabling legislation is generally not an open book to which the agency may add pages and change the plot line." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022).

The "interpretation of [a statutory provision] begins where all such inquiries must begin: with the language of the statute." *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 535 (D.D.C. 2020). In Section 3134, Congress enacted a comprehensive statute that governed the IRS's authority to oversee the ERC. *See* 26 U.S.C. § 3134. Congress granted the IRS authority to "issue such forms, instructions, regulations, and other guidance" necessary to manage the credit. 26 U.S.C. § 3134(m). It did not grant the IRS authority to suspend or terminate the ERC program.

Section 3134 creates a *mandatory* obligation to process ERC; that section includes the word "shall" no less than 43 times. 26 U.S.C. § 3134(a) ("In the case of an eligible employer, there shall be allowed as a credit…") (emphasis added). "If the amount of the credit under subsection (a) exceeds the limitation of paragraph (2) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." 26 U.S.C. § 3134(b)(3) (emphasis added). Where Congress used similar mandatory language in the Tax Code, that terminology "indicate[d] a mandatory command." *See Scholl*, 494 F. Supp. 3d at 686-687 ("Defendants fail to proffer any authority or grammar-based justification to limit the reach of the 'shall' verb…"); *R.V. v. Mnuchin*, No. 20-cv-1148, 2020 WL 3402300, at *7 (D. Md. June 19, 2020). The mandatory commands in Section 3134 must be followed by the IRS. *Abdo v. Comm'r of Internal Revenue*, No. 5514-20, 2024 WL 1406440, *8-9 (T.C. Apr. 2, 2024); *Scholl*, 489 F. Supp. 3d at 1033; *Serv. Emps. Int'l Union v. United States*, 598 F.3d

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

9

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1110, 1113 (9th Cir. 2010) (the text, "[t]here shall be paid $X," was a statutory command because "[t]his language does not confer on the agency discretion" to determine whether to pay).

"A refund is an obligation of the IRS to pay the taxpayer an overpayment."  *In re Pigott*, 330 B.R. 797, 800 (Bankr. S.D. Ala. 2005).  The statute characterizes the ERC as an "overpayment that shall be refunded under sections 6402(a) and 6413(b)."  26 U.S.C. § 3134(b)(3).  The IRS lacks discretion to withhold refunds under that language.  *See* 26 U.S.C. § 6402(a) (the IRS "shall … refund any balance to such person").  Taxpayers also have a congressionally established "right" to pay only the correct amount of tax owed. *See* 26 U.S.C. § 7803(C).  That necessarily includes the right to a refund of amounts overpaid, including money overpaid under the employee retention credit.

"In the context of compelling agency action, '[t]he term 'shall' is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary.'" *Oregon Nat.*, 644 F. Supp. 3d at 821 (quoting *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 573-74 (9th Cir. 2000)).  Section 3134 therefore imposed a clear, certain, and mandatory duty on the IRS to at least process claims for refund under the ERC and, where appropriate, to refund money to eligible businesses.  *Id.*; 26 U.S.C. §§ 3134(b)(3), (m)(1); 5 U.S.C. § 555(b); *see also Stang v. I.R.S.*, 788 F.2d 564, 565 (9th Cir. 1986) ("The IRS is 'required to make the inquiries, determinations, and assessments of all taxes' imposed by title 26"). To find that the IRS has discretion to suspend the ERC program would nullify that statutory mandate by granting the agency the capacity to selectively process ERC only when convenient to the IRS.  "Shall" means "shall," and the IRS must act accordingly.  *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1188 (10th Cir. 1999) (collecting cases) ("[O]ur 'shall'-means-shall approach has been implicitly recognized by the Ninth Circuit").

The law distinguishes the obligation to process refund claims from the discretion to allow the credit.  *See Hu v. Reno*, No. 3-99-CV-1136-BD, 2000 WL 425174, at *3

(N.D. Tex. Apr. 18, 2000) ("Although the INS is vested with broad discretion in making the ultimate decision whether to grant an application …, it has a non-discretionary duty to process the application" and "courts have not hesitated to exercise jurisdiction to compel the performance of this duty."). StenTam does not seek payment of any ERC refund. It asks to compel IRS to process ERC claims alongside other payroll tax returns.

Defendant Werfel's duty to oversee IRS processing of refund claims is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt. *See* 26 U.S.C. § 7803(a)(2). These ministerial duties are part of the IRS's core function. The agency must process ERC refund claims "within a reasonable time." *See, e.g.*, *Brian A. C. v. Kijakazi*, No. 3:21-CV-710-BN, 2022 WL 3648571, at *4 (N.D. Tex. Aug. 24, 2022) ("[U]nder Section 555(b) of the APA … the necessary implication is that adjudication must occur within a reasonable time."). Congress determined that a reasonable time for processing refund claims is within six months. *See, e.g.*, 26 U.S.C. § 6532(a)(1) (permitting suit for refund action where the IRS fails to act on refund claim "before the expiration of 6 months from the date of filing the claim"); *Gaylor v. Mnuchin*, 919 F.3d 420, 426 (7th Cir. 2019) ("Several courts of appeals have cited the six-month filing requirement approvingly"). After six months, taxpayers can sue IRS in district court even if the agency has yet to review those claims. The six-month limitations period is at least an implied obligation to process refund claims administratively within that time. Because of the Moratorium, most ERC claims are older than six months.

## 2. Administrative Convenience Does Not Justify Abdication of Statutory Obligation

The IRS has resources available to combat tax fraud and examine tax claims retrospectively. It can use those resources to evaluate the propriety of ERC refunds for up to five years when fraud or misrepresentation is involved. *See* 26 U.S.C. §§ 6501(a), 6532(b). But the agency may not abdicate its responsibility to process ERC claims on grounds that those activities are inconvenient or burdensome.

Even if the IRS faces burdens in administering the statute as written, administrative convenience is never valid justification to depart from statutory obligation. *See Niz-*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

*Chavez v. Garland*, 593 U.S. 155, 169 (2021) ("[P]leas of administrative inconvenience … never justify departing from the statute's clear text."). When the IRS is given discretion to manipulate obligations and deadlines, Congress makes that point clear. For example, in Section 7508A, Congress afforded the Secretary discretion to "disregard" certain timeframes for taxpayers affected by federally declared disasters. *See* 26 U.S.C. § 7508A(a), (d); *Abdo*, 2024 WL 1406440, at *8-9 (contrasting the statute's mandatory language from discretionary portions); *P.J.E.S.*, 502 F. Supp. 3d at 538 ("[W]hen Congress wants to grant the power …, it does so plainly"). Congress did not grant that sort of authority here.

"[A]gencies are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *P.J.E.S.*, 502 F. Supp. 3d at 543–44. "To the extent those means seem insufficient, 'the proper approach under our system of separation of powers is for Congress to amend the statute, not for the Executive Branch and the courts to rewrite the statute beyond what the statute's terms can reasonably bear.'" *Id.* (quoting *District of Columbia v. Dep't of Lab.*, 819 F.3d 444, 450 (D.C. Cir. 2016)).

Congress considered whether to sunset the ERC in January 2024, and the IRS lobbied at the time for legislation that would bar additional ERC claims after January 31, 2024. The House of Representatives memorialized the IRS's efforts in a Bill that passed on January 31, 2024. *See* H.R. 7024, Rep. No. 118-353 (118th Congress, 2nd Session). But those efforts failed in the Senate, leaving the ERC program intact. If Congress agreed with the IRS that ERC claims should be suspended, it could have enacted legislation to that effect when given the clear opportunity. It did not. Instead, members of Congress expressed concern that the IRS was not timely processing legitimate ERC claims as-is.[15]

---

[15] *See, e.g.,* Ways and Means Committee Republicans, *Markup of H.R. 7024, the Tax Relief for American Families and Workers Act of 2024*, YouTube (Jan. 19, 2024), https://www.youtube.com/live/O_4Lg3aj2LM?si=Yh0rVmLqdyDzG0pR&t=10387 (Rep. Van Duyne).

**B.**     **Plaintiff Will Suffer Irreparable Harm Without an Injunction**

StenTam demonstrates "immediate threatened injury as a prerequisite to preliminary injunctive relief." *Forefront Dermatology S.C. v. Crossman*, 642 F. Supp. 3d 947, 951 (D. Ariz. 2022).  The moratorium creates inherently time-sensitive concerns. It threatens StenTam with irreparable harm by eliminating payment for prior work, reducing business opportunities, impairing StenTam's lender and partner relationships, and tarnishing StenTam's reputation.

**1.     The Moratorium Threatens StenTam's Financial Viability**

Economic harm is irreparable where "there is no adequate remedy to recover" financial damages, "such as in APA cases." *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1037 (N.D. Cal. Sept. 24, 2020).   This includes situations where the response to defendants' action has a damaging downstream effect on the plaintiff.  *See Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1220-21 (E.D. Wash. 2019) (finding disenrollment from benefits program caused by fear of noncompliance with pending Public Charge Rule caused irreparable harm); *Santa Cruz Lesbian and Gay Community Ctr. V. Trump*, 508 F. Supp. 3d 521, 546 (N.D. Cal. 2020) ("Plaintiffs have lost opportunities and income as a result of others' understanding of the effect of the Executive Order.").

The Moratorium poses an immediate threat to StenTam's viability.   StenTam invested heavily in the early days of the ERC program to develop tax software, programs, and relationships needed to help taxpayers evaluate eligibility and submit claims.  Stenson Decl. ¶¶4-5, 51-52.   Under StenTam's agreements with clients, its tax services are compensated out of clients' ERC refund receipts.  *Id.* ¶41.  Simply put, if clients do not receive ERC payments, StenTam does not get paid for the work it performed for clients.

The Moratorium comes at the expense of businesses with legitimate ERC claims that now face extreme delays in receiving funds guaranteed by Congress.  *See* Exh. C at iv.   Data confirms that since the IRS's unlawful moratorium began, clients are not receiving ERC refunds and StenTam is therefore not getting paid for its work on at least

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

13
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1,973 client files.  Stenson Decl. ¶42.  For a subset of its client files, the moratorium will permanently foreclose StenTam's ability to recover payment owed on work performed years earlier.  *Id.* ¶¶55-56, 61-63; *see also* Exh. B at 68, 126.  More of these instances will follow without intervention.  These are not temporary losses to be recovered at the close of litigation.  StenTam has no claim for financial relief here and its loss of revenue threatens to permanently impair partner and lending relationships.  Stenson Decl. ¶¶37, 44-45; Decl. of Nathan Preuss; *see also Scholl*, 489 F. Supp. 3d at 1037.

StenTam entered financing arrangements based on expected ERC payments. Stenson Decl. ¶¶44-45.  It purchased rights to certain ERC claims using borrowed funds with the underlying ERC refund as collateral.  *Id.*  Under the extended Moratorium, that borrowing base is aging out and forcing StenTam into breach of various financing agreements.  StenTam must now enter more complex and costly lending arrangements to cover liabilities.  *Id.*  Unless the IRS resumes processing ERC soon, StenTam will suffer inflated finance charges that can never be reimbursed.  *See Gibson v. United States*, 761 F. Supp. 685 (C.D. Cal. Apr. 4, 1991) ("plaintiff would be unable to recover compensation for all of the costs they would incur"); *Patriot v. U.S. Dept. of Housing and Urban Dev.*, 963 F. Supp. 1, 4-6 (D.D.C. 1997) ("If HUD is not enjoined from enforcing the terms of the March 17 letter, plaintiffs will suffer economic harm in not being reimbursed for their assistance in obtaining hundreds of loans.").

### 2.    The Deadline to File ERC Claims Will Lapse in April 2025

For eligible quarters in 2020, the deadline to file a claim for ERC was April 15, 2024.  For eligible quarters in 2021, the deadline is April 15, 2025.[16]  Without preliminary relief, businesses with legitimate ERC claims may lose their ability to pursue those refunds.  This case is unlikely to reach a decision by April 15, 2025.  Even if it did, the Court's decision would come near the end of that period, leaving taxpayers no time to prepare submissions and burdened with additional compliance costs.  Stenson Decl. ¶¶57-

---

[16] *See supra* at Section II.A.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

60, 63.

Without a preliminary injunction, businesses with legitimate ERC claims are likely to avoid those filings within the deadline for 2021 quarters.  Because the ERC is a finite program of limited duration, these business opportunities cannot be recovered.

### 3. The Moratorium Threatens Reputational Harm

Injunctive relief is appropriate where a plaintiff faces the threat of "intangible injuries, such as damage to … goodwill," which can qualify as irreparable harm. *Timbisha Shoshone Tribe v. Salazar*, 697 F. Supp. 2d 1181, 1189 (E.D. Cal. 2010).  The Moratorium threatens irreparable harm to StenTam's business reputation and goodwill. Businesses testified that the IRS's warnings "only further[ed] business owners' confusion and frustration" with the ERC program.  Exh. B at 115-116 (Boston Growth Partners, LLC, Statement) ("[T]he IRS's warnings about fraud, which have been picked up by major news outlets and read by prospective ERTC recipients, have generated fear and confusion.  An article by a newspaper cautioning against fraud committed through the ERTC is unlikely to stop a determined fraudster who has already decided to commit the act, but will deter honest business owners from applying to the ERTC when they deserve it.").  Government messaging can indeed impose reputational harm when an agency withholds reimbursement under federal programs while condemning industry practices. *See Patriot*, 963 F. Supp. at 4-6 ("Plaintiffs' reputation will be damaged by HUD's characterization of them."); *see also Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280 (RC), 2021 WL 950144, at *9-12 (D.D.C. Mar. 12, 2021).

StenTam clients have expressed confusion and concern over the ERC program following the Moratorium.  Stenson Decl. ¶¶48-56.  Because the IRS based its Moratorium on alleged "fraud" in the program, clients are led to believe all ERC claims are suspicious—an obviously incorrect assumption given the broad scope of ERC statute. The IRS characterized third-party ERC specialists as fraudulent "mills" and warned taxpayers about working with them.[17]  The IRS failed to acknowledge that, even if a small

---

[17] *See, e.g.,* IRS IR-2023-170 (Sep. 14, 2023), *at* https://tinyurl.com/IR-2023-170.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

subset of ERC specialists acted inappropriately, many others filled the void of communication left by the IRS's inaction and served vital roles helping to connect eligible companies with needed financial relief.  The IRS's messaging, disconnected from any particular ERC specialists' actions, has led StenTam clients to withdraw pending claims out of unjustified fear that they may later be penalized.  *See* Stenson Decl. ¶¶48-56; Exh. D (Werfel Testimony) at 8-9.  As to clients who were eligible but avoided the ERC or withdrew, StenTam will not be paid for its work.  *See, e.g.*, *Yount v. Salazar*, No. CV11-8171, 2013 WL 93372, at \*7-8 (D. Ariz. Jan. 8, 2013) (finding irreparable harm where regulatory scheme that caused severe delays in claims process had a "chilling effect … on their pursuit of claims," resulting in "both immediate and ongoing financial injury to their investments"); *see also Xiaomi Corp.*, 2021 WL 950144, at \*9-12 (irreparable harm where government's designation caused banks to suspend trading of plaintiff's shares).

The IRS's messaging deters businesses from submitting claims by stoking mistrust of all ERC specialists and fear of penalties if the business's claim is disallowed or found to contain an inadvertent error.  *See Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1222 (E.D. Wash. 2019) (significant threat of irreparable injury shown through applicant's "fear or confusion" regarding the public benefits program); *Yount*, 2013 WL 93372, at \*7-8.  Although the damage caused by this chilling effect cannot be precisely calculated, its existence is evident and foreseeable. *See* Stenson Decl. ¶¶49-50, 53-56; *Washington.*, 408 F. Supp. 3d at 1222.

### C.    The Balance of Equities and Public Interest Favor Preliminary Injunctive Relief

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Santa Cruz Lesbian and Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521, 546 (N.D. Cal. 2020) (quoting *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020)).  Although the IRS may argue the Moratorium furthers the public interest by protecting the public fisc, *ultra vires* agency action is never justified through good cause or administrative convenience.

First, unlawful agency action is never in the public interest.  *P.J.E.S.*, 502 F. Supp.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

3d at 546 ("[t]here is no public interest in the perpetuation of an unlawful agency action"); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 11 (D.C. Cir. 2016) ("There is no harm to the [g]overnment when a court prevents unlawful practices"). "Rather, 'the public interest is harmed when the [g]overnment hamhandedly exercises its responsibilities.'" *P.J.E.S.*, 502 F. Supp. 3d at 546 (quoting *Minney v. U.S. Off. of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015)). "[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12. Here the IRS acts without legal authority.

Second, the Moratorium is likely to cause a run on the courts. Taxpayers that filed for ERC refunds but endured substantial delays are now eligible to file refund actions under Section 7422 after the IRS failed to act on claims for more than six months. *See* 26 U.S.C. § 7422; *supra* § III.B.1. The IRS's categorical position against processing ERC claims therefore threatens to shift the agency's responsibility onto the district courts. Stenson Decl. ¶64. A preliminary injunction will prevent that outcome.

Third, as noted *supra* at § II.B, Defendants have not shown that fraud within the ERC program justifies the financial harm imposed on businesses with legitimate ERC claims. The IRS has authority to retrospectively investigate and prosecute taxpayers that file fraudulent ERC claims. It commonly enforces tax violations following examinations at the administrative level. The IRS has never suspended the processing of tax refunds on the premise that a few bad actors might have abused the system. *See P.J.E.S.*, 502 F. Supp. 3d at 548 ("the government has many options available to it. It has tools at its disposal to limit [the harms alleged]"). The IRS has therefore not shown that a program-wide suspension is an appropriate means to limit fraud.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiff seeks an Order under Fed. R. Civ. P. 65(a) preliminarily enjoining the IRS from continuing its moratorium on the ERC program. Plaintiff attaches a Proposed Order for the Court's consideration.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1

2   DATED:  May 30, 2024.

3

4

5                                            Respectfully submitted,

6

7   By:   */s/ Peter A. Arhangelsky*
                Peter A. Arhangelsky, Esq. (SBN 025346)

8                Ashley M. Repka, Esq.
                GREENBERG TRAURIG, LLP

9                Em: peter.arhangelsky@gtlaw.com
                *Attorneys for Plaintiff Stenson Tamaddon,*

10               *LLC*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION