DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
KENTON MCINTOSH
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
Telephone:    (202) 307-6422
              (202) 514-3768
Fax:          (202) 307-0054
Email:   Amy.T.Matchison@usdoj.gov
         Kenton.McIntosh@usdoj.gov
         Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| StenTam Tamaddon, LLC,<br><br>          Plaintiff,<br><br>          v.<br><br>United States Internal Revenue Service;<br>the United States of America; United States<br>Department of Treasury; Daniel Werfel, in his<br>official capacity as Commissioner of the U.S.<br>Internal Revenue Service; and Janet Yellen, in<br>her official capacity as Secretary of the<br>Treasury,<br><br>          Defendants. | Case No. 2:24-cv-01123-SPL<br><br>**UNITED STATES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

I.     BACKGROUND ............................................................................................ 1

    A.   HOW TAXPAYERS CLAIM THE ERC ............................................................. 2
    B.   IRS ADMINISTERS THE ERC CREDIT AND DISCOVERS SURGE IN INELIGIBLE CLAIMS ...... 2
    C.   STENTAM AND ITS BUSINESS MODEL. ......................................................... 5
    D.   THIS LAWSUIT. ....................................................................................... 5

II.   ARGUMENT ............................................................................................ 6

    A.   STENTAM IS NOT LIKELY TO SUCCEED ON THE MERITS. ................................. 6
      1.   *StenTam lacks Article III standing.* ............................................. 7
        a)   StenTam fails to show standing from its claimed economic harm. ...... 7
        b)   StenTam fails to show standing from its claimed reputational harm. ...... 9
      2.   *StenTam lacks statutory standing.* ............................................ 10
      3.   *StenTam has failed to establish a waiver of sovereign immunity* ............ 11
        a)   The decision to order a moratorium is committed to agency discretion. .............. 12
        b)   The decision to order a moratorium is not a final agency action for which there is no other adequate remedy in a court. ......................... 14
      4.   *The decision to order a moratorium is not arbitrary and capricious* ...... 16
      5.   *StenTam is not entitled to mandamus relief* ................................. 16
    B.   STENTAM WILL NOT SUFFER IRREPARABLE HARM. ......................................... 17
        a)   StenTam's argument based on economic harm fails. ....................... 17
        b)   StenTam's argument based on reputational harm fails. ................... 18
    C.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT SUPPORT AN INJUNCTION. .. 20
    D.   ANY INJUNCTION SHOULD BE LIMITED TO STENTAM. ..................................... 21

III.   CONCLUSION ........................................................................................ 21

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .............................................................. 6

*Arizona v. United States Internal Revenue Serv.*,
    No. CV-24-00355-PHX-GMS, 2024 WL 1485958 (D. Ariz. Apr. 5, 2024) ............ 11

*Bank of Am. Corp. v. City of Miami, Fla.*,
   581 U.S. 189 (2017).................................................................................................... 10

*Bennett v. Spear*,
   520 U.S. 154 (1997).................................................................................................... 14

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988).................................................................................................... 15

*Brock v. Pierce Cty.*,
   476 U.S. 253 (1986).................................................................................................... 20

*Citizens of the Ebey's Rsrv. v. U.S. Dep't of the Navy*,
   122 F. Supp. 3d 1068 (W.D. Wash. 2015)................................................................. 17

*City of Oakland v. Lynch*,
   798 F.3d 1159 (9th Cir. 2015) ................................................................................... 15

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)...................................................................................................... 8

*Cnty. of Esmeralda v. United States*,
   925 F.2d 1216 (9th Cir. 1991) ................................................................................... 12

*Dep't of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020)............................................................................................ 13, 21

*Disney Enter., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ..................................................................................... 17

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ..................................................................................... 11

*Matter of E. Coast Foods, Inc.*,
   80 F.4th 901 (9th Cir. 2023) ........................................................................................ 7

*E.J. Friedman Co. v. United States*,
   6 F.3d 1355 (9th Cir. 1993) ....................................................................................... 13

*ERC Advance Fund I LLC v. Keystone Nat'l Grp. LLC*,
   Case No. 240904137 (3d Judicial Dist. Salt Lake County, Utah) ............................... 5

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   -- S. Ct. --, No. 23-235, 2024 WL 2964140 (U.S. June 13, 2024)........................... 7, 8

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992).................................................................................................... 14

*Gallo Cattle Co. v. U.S. Dep't of Agric.*,
    159 F.3d 1194 (9th Cir. 1998) ............................................................ 12, 14

*Green Rock LLC v. Internal Revenue Serv.*,
    No. 23-11041, 2024 WL 2821767 (11th Cir. June 4, 2024)...................... 21

*Gurnani v. United States Dep't of the Interior*,
    No. 1:23-CV-01293-ADA-SKO, 2023 WL 6215818 (E.D. Cal. Sept. 25,
    2023) ...................................................................................................... 19

*Hand v. Bibeault*,
    400 F. App'x 526 (11th Cir. 2010) ........................................................ 11

*Heckler v. Chaney*,
    470 U.S. 821 (1985)................................................................................ 12

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ................................................................. 20

*Hodge v. Dalton*,
    107 F.3d 705 (9th Cir. 1997) ................................................................. 11

*Hughes v. United States*,
    953 F.2d 531 (9th Cir. 1992) ................................................................. 12

*J&G Sales Ltd. v. Truscott*,
    473 F.3d 1043 (9th Cir. 2007) ............................................................... 16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................................................ 10

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
    751 F.3d 629 (D.C. Cir. 2014) ............................................................... 13

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ................................................................. 6

*Lowry v. Barnhart*,
    329 F.3d 1019 (9th Cir. 2003) ............................................................... 16

*Lujan v. Def. of Wildlife*,
    504 U.S. 555 (1992).............................................................................7, 10

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994)................................................................................ 21

*Makaryan v. Volkswagen Grp. of Am., Inc.*,
  No. CV 17-5086 PA (KSX), 2017 WL 6888254 (C.D. Cal. Oct. 13,
  2017) ......................................................................................................... 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) .................................................................................... 16

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................... 6

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) .................................................................................... 13

*Oregon Nat. Res. Council v. Harrell*,
  52 F.3d 1499 (9th Cir. 1995) .................................................................... 16

*Patriot, Inc., et al. v. U.S. Dep't of Hous. & Urb. Dev.*,
  963 F. Supp. 1 (D.D.C. 1997) ....................................................... 8, 10, 18

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................................... 17

*San Francisco Herring Ass'n v. Dep't of the Interior*,
  946 F.3d 564 (9th Cir. 2019) .................................................................... 14

*San Luis & Delta-Mendota Water Auth. V. Jewell*,
  747 F.3d 581 (9th Cir. 2014) .................................................................... 16

*Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ...................................................... 18

*Scholl v. Mnuchin, et al.*,
  489 F. Supp. 3d 1008 (N.D. Cal. 2020) ........................................ 13, 14, 17

*Smith v. S. Side Loan Co.*,
  567 F.2d 306 (5th Cir. 1978) .................................................................... 11

*Sorenson v. Sec'y of Treasury of U.S.*,
  752 F.2d 1433 (9th Cir. 1985) .................................................................. 15

*Townley v. Miller*,
  722 F.3d 1128 (9th Cir. 2013) .................................................................... 7

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) .................................................................................... 9

*Tucson v. City of Seattle*,
  91 F.4th 1318 (9th Cir. 2024) .................................................................... 9

*U.S. Army Corps of Engineers v. Hawkes Co.*,
  578 U.S. 590 (2016) .......................................................................... 14, 15

*United States v. Clintwood Elkhorn Min. Co.*,
  553 U.S. 1 (2003) .................................................................................. 15

*Wash. Toxics Coal. v. EPA*,
  413 F.3d 1024 (9th Cir. 2005) ............................................................. 14

*Washington v. U.S. Dep't of Homeland Sec.*,
  408 F. Supp. 3d 1191 (E.D. Wash. 2019) ............................................ 18

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................. 6, 19

**Statutes**

26 U.S.C. § 3134(a) ................................................................................ 2, 13

26 U.S.C. § 3134(b)(2) & (3) ........................................................................ 2

26 U.S.C. § 3134(b)(3) ................................................................................ 15

26 U.S.C. § 3134(m) ...................................................................................... 2

26 U.S.C. § 6428(f)(3) ................................................................................... 8

26 U.S.C. §§ 6532(a), 7422 ........................................................................... 2

26 U.S.C. § 6611 ........................................................................................... 8

26 U.S.C. § 7422 ...................................................................................... 8, 15

26 U.S.C. § 7803(a)(2)(A) ........................................................................... 12

28 U.S.C.§ 1331 ........................................................................................... 11

28 U.S.C.§ 1340 ........................................................................................... 11

Administrative Procedure Act (5 U.S.C. § 701 *et seq.*) ............................. *passim*

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, § 9651
  (2021) (codified at I.R.C. § 3134) ................................................ 1, 8, 11

Taxpayer Certainty and Disaster Tax Relief Act of 2020, Pub. L. No. 116-
  260, 134 Stat. 1182 ............................................................................... 1

The IRS has instituted a temporary moratorium on the processing of Employee Retention Credit (ERC) claims based on its legitimate concern that thousands of improper claims have been filed, many facilitated by unscrupulous promoters. Stenson Tamaddon, LLC (StenTam) asks this Court to order the IRS to immediately lift the moratorium thus substituting StenTam's judgment for the IRS's expertise and institutional knowledge on the best way to balance the interests of refund claimants with protection of the public fisc. This the Court should refuse to do.

StenTam's motion fails to demonstrate that it is entitled to a preliminary injunction directing how the IRS processes claims for the ERC. As explained below, first, StenTam cannot succeed on the merits. It has failed to establish standing to sue and has failed to identify a waiver of sovereign immunity. Second, StenTam has alleged it will suffer irreparable economic and reputational harms because (1) it will not get paid until its clients receive IRS refunds based on their ERC claims, and (2) the IRS has warned the public of unscrupulous actors encouraging meritless ERC claims. Neither of these purported harms is irreparable under the law. Finally, the equities favor the government. The public interest is best served by the IRS continuing to administer the ERC program as it deems best, without interference and instruction from StenTam. StenTam's motion should be denied.

## I.    BACKGROUND

The ERC is a tax credit designed to encourage employers who, during the Covid-19 pandemic, experienced a decline in gross receipts, or whose business was at least partially suspended because of a governmental order, to keep employees on their payroll. *See* Employee Retention Credit | Internal Revenue Service (irs.gov) [https://perma.cc/PRV8-RMM5].  In March 2020, Congress enacted section 2301 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020), making certain "eligible employers" who paid qualified wages to their employees in 2020 eligible for the ERC. *See* 134 Stat. 281, § 2301(a), (b)(1), (2). The ERC was later modified and extended for "eligible employers" to include calendar quarters in 2021. *See* Taxpayer Certainty and Disaster Tax Relief Act of 2020, Pub. L. No. 116-260, 134 Stat. 1182 (Div. EE) (2020), and American Rescue Plan

Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, § 9651 (2021) (codified at I.R.C. § 3134). These Acts included both retroactive and prospective changes to the ERC.

"Eligible employers" can claim the ERC against applicable employment taxes. I.R.C. § 3134(a). If the amount of the credit exceeds the amount paid in employment taxes for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b). I.R.C. § 3134(b)(2) & (3).

Congress required the Secretary of the Treasury to promulgate materials and guidance to implement the ERC, stating "The Secretary *shall* issue such forms, instructions, regulations, and other guidance as are necessary . . . to prevent the avoidance of the purposes of the limitations under this section." I.R.C. § 3134(m) (emphasis added). Accordingly, the IRS provided guidance, including FAQs, on its website. On March 1, 2021, the IRS issued Notice 2021-20, incorporating the FAQs along with additional information. Since then, the IRS has published additional guidance and information. Declaration of Douglas O'Donnell ("O'Donnell Decl.") ¶¶ 22–23, 26–29.

### A.     How taxpayers claim the ERC.

To receive a refund related to the ERC, taxpayers must submit a refund claim to the IRS. A refund claim must be "duly filed" in accordance with the requirements of I.R.C. § 6511 and 26 C.F.R. § 301.6402-2. If the IRS disallows the claim or fails to act on it after six months a taxpayer can pursue their refund claim by suing in federal district court. I.R.C. §§ 6532(a), 7422.

### B.     IRS administers the ERC credit and discovers surge in ineligible claims.

The IRS is committed to ensuring that all proper ERC claims are allowed. However, due to an unprecedented surge in claims and an unusually large number of claims that have been identified as ineligible, the IRS felt it necessary to temporarily halt the processing of new claims to ensure that improper claims were not approved. Many ERC claims are made on amended returns, which an IRS employee must manually review to determine whether it claims the ERC and must mark with special coding to indicate that it is an ERC claim. The large number of these complex claims strained IRS resources. The IRS was required to add resources to address the unusually high volume of claims. O'Donnell Decl. ¶ 16.

As the IRS processed more ERC-related refund claims, the IRS became aware that third parties were becoming aggressive in their marketing of ERC to businesses. *Id.* ¶ 14. Meanwhile, there was an increase in the number of ERC claims being filed.

In October 2022, ERC claims averaged 25,000-30,000 per week. By the summer of 2023, the number of filed ERC claims surged to average 50,000 to 60,000 a week. *Id.* ¶ 18. This surge created the current backlog. For context, for the week ending December 31, 2022, the IRS had over 60,000 ERC claims in inventory. *Id.* ¶ 19. Just a year later, for the week ending December 31, 2023, the inventory had grown to a little over 1.1 million. As of the week ending May 18, 2024, the inventory has grown to 1.4 million ERC claims, of which 880,000 had been filed pre-moratorium. *Id.*. The IRS has worked hard to administer the ERC, and as of May 2024, had processed about 3.6 million ERC claims worth approximately $230 billion to businesses. *Id.* ¶ 20.

This work has been complicated, however, by third-party promoters that have aggressively misled taxpayers who do not qualify for the ERC into claiming it. *Id.* ¶ 21. The IRS wants to protect businesses from being misled into making improper ERC claims while ensuring that businesses with legitimate ERC claims receive the refunds to which they are entitled. Balancing these concerns, in July 2023, the IRS announced that it was increasingly shifting its focus to reviewing ERC claims for compliance concerns, including intensifying audit work and criminal investigations of promoters and businesses filing dubious claims. *Id.* ¶ 22. The IRS also warned the taxpaying public of signs of aggressive ERC marketing. It urged businesses, tax-exempt organizations, and others considering applying for the ERC to carefully review the official requirements before claiming the credit. *Id.*

On September 14, 2023, amid rising concerns about a flood of improper ERC claims, the IRS announced a moratorium on processing new claims for the ERC. *Id.* ¶ 23. The IRS initiated the moratorium because of concerns inside the agency, as well as from tax professionals and media reports, that a substantial share of new ERC claims from the program were ineligible, and that businesses were increasingly being put at financial risk by being scammed by third-party promoters. *Id.* ¶ 24. The IRS also announced that hundreds of criminal cases were being worked,

and thousands of ERC claims had been referred for audit. Along with announcing the moratorium, the IRS Commissioner urged those being pressured by promoters to make ERC claims "to immediately pause and review their situation" and "seek out a trusted tax professional who actually understands the complex ERC rules." *Id.* ¶ 25. The IRS reminded taxpayers that anyone who improperly claimed ERC must pay it back, possibly with penalties and interest. *Id.* The IRS also encouraged taxpayers to review IRS guidance and tools for helping determine ERC eligibility, including frequently asked questions published on irs.gov and a new question and answer guide released the same day. *Id.* ¶ 26. The IRS also announced that it was developing new initiatives to help businesses who found themselves victims of aggressive promoters or had otherwise filed ineligible ERC claims. The IRS initiated the moratorium to better protect honest small business owners from scams and to protect the public fisc from improper claims for refunds. With the moratorium, weekly ERC claims dropped by more than half. *Id.* ¶ 23.

The moratorium was just one step the IRS took to protect the taxpaying public and the fisc. In October 2023, the IRS also announced a voluntary withdrawal process for any taxpayer whose ERC had not been paid, or who had received a check but had not yet cashed or deposited it. *Id.* ¶ 29. The IRS treats withdrawn claims as if they were never filed—imposing no penalties or interest. As of May 25, 2024, approximately 6,000 entities had withdrawn a total of $574 million in claims. *Id.*

Another step the IRS took to protect the public came in December 2023, when the IRS announced the ERC Voluntary Disclosure program. *Id.* ¶ 28. This program required participants to voluntarily pay back 80% of the ERC received; cooperate with any requests from the IRS for more information; and sign an agreement closing the claim. *Id.* The program, which was available through March 22, 2024, yielded more than $1 billion from over 2,600 taxpayers who opted to participate. *Id.* Also in December 2023, the IRS sent more than 14,000 letters to businesses notifying them of disallowed ERC claims. *Id.*

In addition to these actions, during the moratorium, the IRS has transcribed data from the backlog of ERC claims and a portion of the claims filed after the moratorium. *Id.* ¶ 31. It has used this data to develop ways to evaluate the risk of claim eligibility. During the moratorium,

the IRS has continued to process ERC claims received prior to the moratorium, to pay out valid claims, audit potentially ineligible claims, and issue notices of claim disallowance for ineligible claims, but at a slower pace due to enhanced compliance reviews. *Id.*

The IRS has further examined the transcribed data, and its initial analytics indicate that 60-70% of the claims fall into categories showing unacceptable risk of ineligibility. *Id.* ¶ 32. These findings have reinforced IRS concerns, and confirmed those raised by tax professionals and others, of a high rate of improper ERC claims amounting to billions of dollars. *Id.*

### C.    StenTam and its business model.

StenTam describes itself as a "multifaceted tax advisory and technology firm that assists businesses with tax credits and financial solutions." ECF 1 ¶ 14. Its clients are businesses across the nation, and it helps them file ERC claims. *Id.* ¶ 15. StenTam's compensation depends on the successful claims of its clients and is paid on a contingency basis from the proceeds of the ERC refunds. *Id.* StenTam also assists its clients in their pursuit of ERC claims at the administrative level, with an audit or other IRS inquiry. *Id.* ¶ 18. StenTam has advanced money to clients it believes qualify for the ERC while those clients wait for the IRS to process their claims. ECF 14-1 ¶ 44. "To fund that service, StenTam entered financing arrangements with third-party lenders, and those lending arrangements depend on" the ERC refunds of its clients. *Id.* ¶ 45; *see also ERC Advance Fund I LLC v. Keystone Nat'l Grp. LLC*, Case No. 240904137 (3d Judicial Dist. Salt Lake County, Utah). StenTam has 1,973 clients with ERC claims pending with the IRS. ECF 14-1 ¶ 42. Some of these clients have waited two years or more for an IRS determination on their claims. *Id.* ¶ 43.

### D.    This lawsuit.

On May 14, 2024, StenTam initiated the instant action and filed this motion on May 30, 2024. ECF 1 and 14. Although StenTam's complaint alleges five counts, it moves for a preliminary injunction based on only counts four and five. Count four alleges that the moratorium exceeds the IRS's authority and violates the Administrative Procedure Act (APA). Count five seeks a writ of mandamus compelling the IRS to resume processing new ERC claims.

Specifically, StenTam seeks an injunction ordering the IRS to (1) "resume processing amended tax returns implicating the employee retention credit"; (2) "retract and remove all publicly disseminated statements regarding the IRS Moratorium or suspension of ERC claims" and to instead "communicate to the public that the ERC program (a) remains an available tax credit" and "(b) can be pursued by eligible businesses"; (3) file a compliance report identifying the number of ERC refunds that have been paid; and (4) file a monthly report with the Court with the number of amended payroll returns processed, the number of refunds issued, the number of new ERC-related amended returns received, and a listing of refund cases initiated in federal courts where the plaintiff was seeking unpaid ERC refunds. ECF 14-10 ¶¶ 1-7.

## II.    ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To obtain a preliminary injunction, StenTam must establish that: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) the preliminary injunction "is in the public interest." *Winter*, 555 U.S. at 20. The last two "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). If a plaintiff raises "serious questions going to the merits," a court may grant interim relief if the balance of hardships "tips sharply towards the plaintiff," so long as the plaintiff also shows it is likely to suffer irreparable harm and the interim relief is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Here, as explained below, StenTam cannot establish any, much less all, of the four factors.

### A.    StenTam is not likely to succeed on the merits.

StenTam cannot succeed on the merits because it lacks standing, cannot identify a waiver of the United States' sovereign immunity, and, in any event, the IRS's decision to order a moratorium on the processing of ERC claims was not arbitrary and capricious.

1                        *1.     StenTam lacks Article III standing.*

2            The requested injunction should be denied because StenTam lacks standing under Article

3 III to challenge the moratorium. To establish such standing, StenTam must demonstrate (1) that

4 it suffered a concrete and actual or imminent injury in fact that (2) is fairly traceable to the

5 challenged action and (3) will likely be redressed by a favorable decision. *See Lujan v. Def. of*

6 *Wildlife*, 504 U.S. 555, 560-61 (1992). The party invoking federal jurisdiction has the burden of

7 establishing each element for standing. *Id.* at 561. In addition, "at the preliminary injunction

8 stage, plaintiffs must make a clear showing of each element of standing." *Townley v. Miller*, 722

9 F.3d 1128, 1133 (9th Cir. 2013) (vacating a preliminary injunction for lack of standing).

10                    a)   StenTam fails to show standing from its claimed economic harm.

11            StenTam fails to make a clear showing on any element of standing. First, StenTam

12 alleges it is suffering economic harm from the IRS moratorium because the IRS is not processing

13 some of its clients' refund claims within six months of submission. StenTam thus must wait

14 longer than it wishes to get paid for its services out of its clients' refunds. ECF 14 at 13-14. But

15 this alleged harm is not concrete, particularized, actual or imminent enough to confer standing.

16 It also cannot be causally connected to the IRS because the moratorium does not deprive

17 taxpayers of their rights to ERC, and StenTam's harm is self-inflicted because of its chosen

18 business model. And even then, the requested injunction would not redress this claimed harm.

19            There is no violation of StenTam's "legally protected interest" here. *Lujan*, 504 U.S. at

20 560. As the Supreme Court affirmed just yesterday "[a] citizen may not sue based only on an

21 asserted right to have the Government act in accordance with law." *Food & Drug Admin. v. All.*

22 *for Hippocratic Med.*, -- S. Ct. --, No. 23-235, 2024 WL 2964140, at *6 (U.S. June 13, 2024)

23 (cleaned up). Because the moratorium does not deprive StenTam of its right to be paid by its

24 clients, there is no true injury-in-fact for standing. In *Matter of E. Coast Foods, Inc.*, 80 F.4th

25 901, 909 (9th Cir. 2023), the Ninth Circuit specifically rejected an argument that timing of

26 payment amounted to an injury-in-fact, where there was not a guarantee of the payment's timing,

27 and the claimant was entitled to interest. That is precisely the scenario here. There is no guarantee

28 and certainly no mandate that the IRS act on ERC claims within six months. The ERC statute

(and the Tax Code in general) does not dictate that the IRS must act upon an ERC claim within a set timeframe or even promptly, and when Congress intends for the IRS to act promptly, it includes such language. *Compare* I.R.C. § 3134 *with* I.R.C. § 6428(f)(3) (mandating that the IRS shall act "as rapidly as possible"). To the contrary, Congress has decided that if a taxpayer files a claim for refund and the IRS fails to act on that claim, the taxpayer can seek a determination of their refund claim in district court. *See* I.R.C. § 7422. Moreover, and in acknowledgment of possible delay, Congress has provided that the longer a taxpayer waits to receive an overpayment of tax, the more interest the taxpayer is entitled to. *See* I.R.C. § 6611.

StenTam's clients can thus wait for the IRS to act on their ERC claims. Or if the claims have been pending for more than six months, those clients can file a refund suit in district court. Either way, if the claims are meritorious, the clients will receive a refund, and StenTam will collect its fee. The only question is when StenTam will collect its fee, which does not amount to an injury-in-fact for StenTam for purposes of establishing standing.[1]

Moreover, this economic "injury" is not fairly traceable to an IRS delay in acting on ERC claims. Proving traceability where challenging "regulation (or lack of regulation) of someone else . . . is substantially more difficult to establish." *Food & Drug Admin.*, 2024 WL 2964140, at *7. And here StenTam cannot do so because its claimed financial loss results from StenTam's own decision to offer services on a contingency-fee basis while also relying on IRS approval of every requested credit. This self-inflicted "injury" is only furthered by StenTam's decision to take on loans and advance payments to its clients. ECF 14-1 ¶ 44. Such "self-inflicted injuries are not fairly traceable to the" moratorium. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). "To the extent that an injury is self-inflicted or due to the plaintiff's own fault, the causal

---

[1] StenTam's reliance on *Patriot, Inc., et al. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1 (D.D.C. 1997), does not bolster its claim that it has suffered an injury-in-fact. ECF 14 at 14:16-19. In that case, the HUD had announced that the FHA would no longer insure reverse mortgages obtained with the assistance of services from plaintiffs and similar entities, specifically identifying Patriot. *Id.* at 3. The *Patriot* court held that there was an irreparable economic harm (the district court did not address Article III standing) in that case *because* HUD had stated it would not insure loans generated through the plaintiffs' work, including for 279 loan applications that the plaintiffs had submitted, which violated the plaintiffs' contractual rights. *Id.* at 4-5. Here, in contrast, the moratorium and the IRS's public statements have not identified StenTam and have only temporarily delayed StenTam's clients' rights to any refund for which they are eligible.

chain is broken and standing will not be established." *Makaryan v. Volkswagen Grp. of Am., Inc.*, No. CV 17-5086 PA (KSX), 2017 WL 6888254, at *6 (C.D. Cal. Oct. 13, 2017).

StenTam could have chosen to be paid for the work that it performed when it was performed. StenTam's decision to tie its compensation to its clients' refunds, and therefore take on the risk and any resulting harm of nonpayment or delayed payment, is not caused by the IRS's moratorium. Indeed, if this were an adequate injury for a plaintiff to allege for standing purposes, then parties with claims that are only derivative of taxpayer claims could manufacture standing to challenge any IRS position or delay. This would upend tax procedure and render Article III's injury and causation requirements meaningless.

Even more, this self-inflicted "injury" would not be redressed by a favorable decision. "Redressability asks whether the district court had the power to prevent the injury at the time the complaint was filed." *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024) (cleaned up). Even if the Court issued an injunction ending the moratorium today, that does not necessarily mean the IRS could act on any of StenTam's clients' ERC claims any sooner. As explained, the IRS is acting on ERC claims and continues to receive new ERC claims. The backlog of claims would remain, and the time necessary to determine whether the claims have merit would not change. *See* O'Donnell Decl. ¶ 19. And IRS action on the refund claims does not guarantee they would be granted. There is nothing the Court can do, therefore, to guarantee that StenTam would receive any payment at any particular time so as to prevent StenTam's "injury."

b)   StenTam fails to show standing from its claimed reputational harm.

StenTam alleges the moratorium has caused it a loss of business, reputation, and goodwill. In support, StenTam relies on IRS statements that ERC claims have been plagued with fraud. ECF 14 at 15-16. But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). For the attack on the moratorium, therefore, StenTam may only rely on the effects of the moratorium, not on the IRS's statements.

In a declaration, StenTam makes general and unsupported assertions: the moratorium has "steered away" clients from "pursuing legitimate ERC claims," ECF 14-1 ¶ 63, and caused

clients to withdraw legitimate ERC claims, *Id.* ¶ 56. These are the sort of general, unspecific claims that the Supreme Court has held cannot prove standing. *Lujan*, 504 U.S. at 561. StenTam also does not support its assertion that a purported drop (or withdrawal in legitimate claims[2]) is due to the moratorium (or even the IRS's statements). There are many potential reasons that ERC claims may have dropped since the moratorium. Most notably, the last quarter that most taxpayers could claim the ERC was the third quarter of 2021 (ending on September 30, 2021)— nearly three years ago. Regardless, the moratorium is merely a pause in acting on new claims, which does not impact taxpayers' entitlement to the ERC or their right to file ERC claims. StenTam cannot show that its claimed reputational harm resulted from the moratorium.[3]

Finally, even if StenTam were to get the injunction it seeks, and the IRS ended the moratorium today, and struck all content about the ERC from its website, that would not address the reputational harm that StenTam has alleged it has already suffered. None of the "injuries" StenTam has alleged can be redressed by the Court.

### 2. StenTam lacks statutory standing.

In a similar vein, even if the Court finds that StenTam has constitutional standing, StenTam nonetheless lacks statutory standing because it falls outside the zone of interests of the ERC statute. This "prudential" inquiry asks "whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 196-97 (2017). Courts "presume that a statute ordinarily provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 197 (cleaned up). Courts determine "[w]hether a plaintiff comes within the zone of interests . . . using traditional tools of statutory interpretation." *Lexmark Int'l, Inc. v. Static Control Components , Inc.*, 572

---

[2] Without elaboration, StenTam alleges that some of its clients have withdrawn legitimate ERC claims. (ECF 14-1 ¶ 56). The IRS is not responsible for StenTam's clients choosing to withdraw their claims. At any rate, taxpayers with legitimate ERC claims have no reason to withdraw them.

[3] Again, StenTam's reliance on *Patriot* is not persuasive. Unlike in that case, the IRS has warned that some promoters are encouraging taxpayers to file ineligible claims (*see* O'Donnell Decl. ¶ 25) but has never identified StenTam as a promoter. Instead, the IRS has acknowledged that because of the complicated nature of the ERC, taxpayers should consult with trusted tax professionals. *Id.* Nothing in the IRS's statements would cause a taxpayer to assume StenTam is the former and not the latter.

10

U.S. 118, 127 (2014) (cleaned up).

StenTam alleges its causes of action arise under the APA. The APA permits a claim to those "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Thus, the relevant zone of interests is not that of the APA itself, but "the zone of interests to be protected or regulated by the statute that [the plaintiff] says was violated." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767-68 (9th Cir. 2018) (cleaned up).

Here the relevant statute is I.R.C. § 3134, which provides for the right for certain employers to the ERC. Nowhere does the statute provide rights to tax advisors, like StenTam, nor does the statute seek to regulate such advisors. Thus, StenTam is outside the zone of interests.

StenTam may argue that it is indirectly benefitted by the statute because of its contingency fee arrangements. But courts have rejected similar attenuated arguments. *See, e.g.*, *Hand v. Bibeault*, 400 F. App'x 526, 528 (11th Cir. 2010) ("An attorney whose only interest in a case derives from her contingency fee arrangement with the plaintiff or from a statutory-fee provision does not herself have standing as a separate party to the suit."); *Smith v. S. Side Loan Co.*, 567 F.2d 306, 307 (5th Cir. 1978) ("Clearly, an attorney's interest in recovering a contingent fee is not within the zone of interests . . . ."); *see also Arizona v. United States Internal Revenue Serv.*, No. CV-24-00355-PHX-GMS, 2024 WL 1485958, at *4 (D. Ariz. Apr. 5, 2024) (denying preliminary injunction sought by State of Arizona against the United States, in part, because the Court was unconvinced that it had jurisdiction given that, in challenging the taxation of its residents, Arizona had a "wholly derived" claim). Just as attorneys cannot sue to recover potential contingency fees, StenTam cannot sue either.

3.    *StenTam has failed to establish a waiver of sovereign immunity.*

The United States can be sued only if it waives its sovereign immunity. The doctrine of sovereign immunity precludes suit against both federal agencies and their employees, if acting in their official capacities. *Hodge v. Dalton*, 107 F.3d 705, 707 (9th Cir. 1997). StenTam alleges jurisdiction under 28 U.S.C. § 1331. ECF 1 ¶ 25. Although 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution,

laws, or treaties of the United States," the United States has not waived its sovereign immunity to suit based on general jurisdictional statutes. *See Hughes v. United States*, 953 F.2d 531, 539 n.5 (9th Cir. 1992). And, although 5 U.S.C. § 702 can serve generally as a waiver for APA claims in suits against the United States "seeking relief other than monetary damages," it does not in this case.

Where, as here, StenTam seeks injunctive and mandamus relief and invokes not only the APA's waiver of sovereign immunity (§ 702), but also the APA's cause of action and review provisions (§§ 704 and 706), the suit is subject to certain limitations on judicial review. Namely the APA does not apply, and sovereign immunity is not waived, where agency action is committed to agency discretion by law. 5 U.S.C. § 701(a). In addition, the APA does not apply if the decision under review is not made reviewable by statute and if there is an alternative adequate remedy in a court. 5 U.S.C. § 704; *see also Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998).

> a) The decision to order a moratorium is committed to agency discretion.

StenTam challenges IRS action committed to agency discretion by law. The APA therefore does not apply. Indeed, the Supreme Court has indicated that the § 701(a) hurdle must be cleared "before any review at all may be had" under the APA. *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).

In *Heckler*, the Supreme Court held there cannot be APA review if a statute commits agency action to agency discretion and "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. at 830; *see also* 5 U.S.C. § 701(a)(2); *Cnty. of Esmeralda v. United States*, 925 F.2d 1216, 1218 (9th Cir. 1991). Here, I.R.C. § 7803(a)(2)(A) provides that the Commissioner shall have the power to "administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes and tax conventions to which the United States is a party." Consistent with that congressional grant of discretionary power, the Commissioner can "administer, manage, conduct, direct, and supervise" the ERC claims process, including ordering a moratorium on the processing of ERC claims received after September 14, 2023. The

moratorium—which is just a pause in the processing of *new* ERC claims to permit the IRS to address prior claims—is well within the Commissioner's § 7803 authority. Likewise, making public statements warning taxpayers that some unscrupulous actors were misleading businesses about their eligibility for the ERC is well within that same authority. While it is regrettable that protecting taxpayers and the public fisc may delay the IRS acting on certain ERC claims, that does not make it actionable under the APA.

In addition, StenTam has not identified an underlying statute providing any meaningful standard against which it could determine that the Commissioner's decision was an unlawful exercise of discretion. *See, e.g.*, *E.J. Friedman Co. v. United States*, 6 F.3d 1355, 1359 (9th Cir. 1993) (concluding that a statute that gave the IRS discretion over whether to discharge a lien was "drawn such that there is no standard against which to judge the IRS's exercise of discretion," and review was therefore precluded by § 701). StenTam points to what it calls § 3134's "*mandatory* obligation to process ERC claims" and the 43 uses of "shall." ECF 14 at 9:16-10:3. But none of these commands the IRS to act on ERC claims within a specified period.[4] On the contrary, the word appears to determine, for example, who is eligible for ERC and how the credit is to be calculated. *See, e.g.*, § 3134(a) ("In the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter . . . ."). StenTam argues that the six-month period in § 6532(a) suggests a "reasonable" time frame for the IRS to process a refund claim. But that statute provides a waiting period before a taxpayer can file a refund suit. Had Congress intended to make that a deadline for the IRS, it would have done so.

StenTam relies heavily on *Scholl v. Mnuchin, et al.*, 489 F. Supp. 3d 1008 (N.D. Cal. 2020), in support of its argument that the IRS has a duty to act quickly. But in that case, the

---

[4] Moreover, § 706(1) of the APA, which permits a court to "compel agency action unlawfully withheld," applies only to "discrete action" that is "legally required." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004). Absent an unequivocal statutory or regulatory duty to take a specified, discrete action,  a federal court cannot issue affirmative injunctive relief compelling an agency to take such action. *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 634 (D.C. Cir. 2014). Because StenTam cannot identify a statute or regulation that requires the IRS to act within a specified period, or at all, this Court cannot compel that action.

underlying statute said that the IRS "shall . . . refund or credit any overpayment attributable to this subsection as rapidly as possible." *Id.* at 1033 (quoting I.R.C. § 6428(f)(3).)[5] Here, in contrast, Congress did not mandate that the IRS was to act within a certain timeframe or even quickly.

> b)  The decision to order a moratorium is not a final agency action for which there is no other adequate remedy in a court.

The Ninth Circuit has consistently held that the limitations in § 704 are jurisdictional. *See San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 571 (9th Cir. 2019). Thus, a plaintiff proceeding under the APA must show that the agency action being challenged is "final," *see Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992), and that other provisions do not afford the plaintiff an adequate remedy, *see U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016). If the plaintiff fails to do so, the court is without jurisdiction over the APA claims and must dismiss them. *See id.* at 596-97; *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005)

Two conditions must be satisfied for an agency action to be final. The action must mark the consummation of the agency's decision-making process. And the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *See Gallo*, 159 F.3d at 1198-99; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (overruled on other grounds). As the Supreme Court has stated, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the results of the process directly affect the parties." *Franklin,* 505 U.S. at 797. The IRS's decision to order a moratorium is not a final agency action because it does not determine any of StenTam's rights or obligations. Nor are there any legal consequences to StenTam as a result. Instead, the moratorium is a procedural action that merely delays some of the IRS's decisions on whether *taxpayers* who filed ERC claims after September 14, 2023, are entitled to the tax treatment they have claimed. Under 5 U.S.C. § 704, therefore, the action is not reviewable.

---

[5] For the reasons it argued in *Scholl*, the United States maintains that this case was wrongly decided.

Even if the moratorium did constitute a final action, the Court would have no jurisdiction to review it because an adequate alternative remedy exists through a refund action. "Even if final, agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016); 5 U.S.C. § 704. This limitation is consistent with Congress's intent that the APA not duplicate or supersede preexisting "special statutory review proceeding[s]," even when a plaintiff alleges a violation of the APA's procedural requirements. 5 U.S.C. § 703; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (this principle applies with special force in the context of the "general grant of review in the APA," which was not "intend[ed] . . . to duplicate existing procedures for review of agency actions"); *City of Oakland v. Lynch*, 798 F.3d 1159, 1165 (9th Cir. 2015) ("[p]ermitting parties to file under the APA and circumvent" more specific review provisions established in other laws "would make mush of the law").

Congress has crafted a statutory scheme that channels federal tax litigation into refund suits. *See supra* p. 2:15–18. The Supreme Court has long held that claims for refund of an overpayment of tax must be asserted in a refund suit, for which the filing of an administrative claim (and waiting for the passage of six months or denial of the claim) is a prerequisite. *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 5-8 (2003)*.* Where available, a refund suit is an exclusive remedy. *Id.* at 7. Congress's statutory scheme also dictates that the administrative refund procedure, followed by a refund suit, is the remedy for taxpayers who seek to recover overpayments based on refundable credits. *Sorenson v. Sec'y of Treasury of U.S.*, 752 F.2d 1433, 1438 (9th Cir. 1985), *aff'd*, 475 U.S. 851 (1986). Here, Congress expressly stated that if the amount of the ERC exceeds the applicable employment taxes for "any calendar quarter, such excess *shall* be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." I.R.C. § 3134(b)(3) (emphasis added). Thus, in treating the ERC as "an overpayment that shall be refunded," Congress intended for the ERC to be subject to the requirements in § 7422.

Because StenTam's clients may bring a refund suit if the IRS disallows their ERC claims or does not act on their claims within six months, they have an adequate remedy in a court. Any

claims related to taxpayer ERC refund claims thus fall outside the APA's immunity waiver. Likewise, any attempt by StenTam to piggyback on those *taxpayer* claims, and assert them here, fails. Even though StenTam alleges it is not asserting any taxpayer refund claims (ECF 14 at 11:4-5), as discussed (*supra* p. 9:3–9), its alleged injury and harm are derivative of its clients' claims for refund.

### 4.   The decision to order a moratorium is not arbitrary and capricious.

Even if the IRS's decision to order a moratorium were reviewable under the APA, relief would not be warranted because it was not arbitrary and capricious. Under the "arbitrary and capricious" standard, a court may not set aside an agency decision that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983). Although the court's inquiry is thorough, this "standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity and we may not substitute our judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. V. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). "Where the agency's line-drawing does not appear irrational and the [party challenging the agency action] has not shown that the consequences of the line-drawing are in any respect dire . . . [courts] will leave that line-drawing to the agency's discretion." *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007) (citation omitted). As discussed above, (*supra* pp. 3:23–4:12), the IRS's decision that a moratorium was necessary to address a backlog of claims and protect taxpayers and the public fisc from improper ERC claims is based on the IRS's rational and reasoned analysis and is not arbitrary or capricious.

### 5.   StenTam is not entitled to mandamus relief.

Mandamus is an extraordinary equitable remedy. It may be granted only if (1) a plaintiff's claim is "clear and certain"; (2) the defendant's duty is "ministerial and so plainly prescribed as to be free from doubt"; and (3) "no other adequate remedy is available." *Oregon Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995) (citation omitted). "If a plaintiff has no legal entitlement to the relief sought, a 'clear and certain' claim cannot exist, and the writ will not lie." *Lowry v. Barnhart*, 329 F.3d 1019, 1021 (9th Cir. 2003). For the reasons articulated

16

above, StenTam's claims fail all three elements. *See supra* §§ II.A.3-4. Notably, the Court lacks jurisdiction to hear the case, the issuance of a moratorium is a discretionary act, and taxpayers, the parties the moratorium affects, have an adequate alternative remedy in district court.

**B.      StenTam will not suffer irreparable harm.**

StenTam is not entitled to a preliminary injunction because it cannot show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Disney Enter., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

a)   StenTam's argument based on economic harm fails.

StenTam claims an economic harm indirectly stemming from the IRS's moratorium decision and its statements about the ERC. ECF 14 at 13-15. As discussed, (*supra* pp. 8:13–9:2), this is a self-inflicted harm. And "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." *Citizens of the Ebey's Rsrv. v. U.S. Dep't of the Navy*, 122 F. Supp. 3d 1068, 1083 (W.D. Wash. 2015). This is alone is sufficient grounds to reject the economic harm argument.

Monetary harm normally does not constitute irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . . Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough."). StenTam latches onto an exception to this rule—that monetary damages may suffice where there is not an adequate remedy to recover those damages, such as in APA cases. *See* ECF 14 at 13:9-10 (citing *Scholl*, 489 F. Supp. 3d at 1037). StenTam ends the analysis there, claiming that its economic harm is thus irreparable. But as the *Scholl* Court noted, whether "the temporary loss of income constitutes an irreparable injury varies depending on the facts of the case." *Id.* (concluding that there was irreparable harm where not receiving stimulus funds would deprive inmates of basic necessities like communications with loved ones, food, and hygiene products). Here, in contrast, there is no irreparable deprivation. If StenTam's clients have meritorious refund claims, either the IRS will approve them or the clients can bring suit in district court to obtain the refunds plus interest. The

only conceivable harm to StenTam is delayed payment. Again, that is not irreparable harm here because it is self-inflicted (based on StenTam's chosen business model) and any payment is not guaranteed in any event. To the extent StenTam's clients have declined to invoke their statutory right to sue for refund in district court, that has contributed to at least some of the delay as well.[6]

StenTam also points to *Washington v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 1191, 1220-21 (E.D. Wash. 2019), and *Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 546 (N.D. Cal. 2020), to support its economic harm argument. But neither case found irreparable harm based on an economic injury. *Washington* relied on a chilling effect of families seeking benefits for medical treatment. 408 F. Supp. 3d at 1221. And *Santa Cruz Lesbian & Gay Cmty. Ctr.* relied on the likely success of proving a First Amendment violation. 508 F. Supp. 3d at 545.

In some rare cases, the loss of money in an APA case is sufficient, but in those cases, the funds would be lost without the injunction, unlike the temporary delay here. For example, in *California v. Azar*, the Ninth Circuit upheld a preliminary injunction based, in part, on economic harm because compliance with a challenged regulation would cost between $18.5 or $63.8 million per year. 911 F.3d 558, 572 (9th Cir. 2018). Again, StenTam is not arguing that it will lose any payment for its services that it is entitled to. Rather, it insists that the IRS act faster, so that it will get paid sooner. StenTam's claimed monetary harm fails to establish it will suffer an irreparable injury.

           b) StenTam's argument based on reputational harm fails.

StenTam also posits a reputational harm because the IRS has issued statements about ERC claims, for example, noting that ERC promoters are engaging in unscrupulous tactics to entice taxpayers into filing ERC claims they are not entitled to. O'Donnell Decl. ¶ 14. Yet StenTam has failed to show how these statements have harmed its business.[7]

---

[6] StenTam represents that some of its clients have waited two years or more for an IRS determination on their claims. ECF 14-1 ¶ 43. Assuming they meet the jurisdictional prerequisites, these clients could have brought refund suits in district court.

[7] As discussed, (*supra* p. 10 n.3), unlike the statements in *Patriot*, the IRS's statements have not identified any promoters by name and are directed at educating the taxpaying public of the possibility of aggressive marketing that might encourage the filing of ineligible ERC claims. *See* O'Donnell Decl. ¶ 25. This is exactly the kind of messaging the IRS should be sending

StenTam baldly claims that the moratorium "has dissuaded clients from conducting business with StenTam." ECF 14-1 ¶ 48. It also claims that clients have declined to file legitimate claims and some clients have even withdrawn legitimate claims because of the moratorium and IRS statements. ECF 14-1 ¶ 56. That said, StenTam's only support for these claims is conclusory, self-serving, and speculative assertions from its CEO.

If StenTam did have a drop in business since the moratorium and issuance of the contested IRS statements, StenTam has not shown that the drop resulted from the IRS's actions. Correlation is not causation. Any drop in claims could be attributed to the fact that the ability to claim the ERC is ending. Or maybe most of the eligible claimants have already filed claims? As for its allegations that StenTam's clients have withdrawn valid ERC claims because of the moratorium or IRS statements, StenTam's clients did so voluntarily. Even more, it makes no sense that StenTam's clients would withdraw truly legitimate claims, even if the IRS is taking longer to process them and cautioning against sending illegitimate claims. StenTam's speculative statements fail to demonstrate that it will suffer irreparable harm absent an injunction.

StenTam also tries to adopt as its own the harm caused to taxpayers for the delay in receiving any ERC refund. ECF 14-1 ¶¶ 38-40. These assertions are irrelevant to the issue before the court on this motion—whether StenTam, the only plaintiff to this action, would suffer irreparable harm absent the requested injunction. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief . . . .") (emphasis added); *Gurnani v. United States Dep't of the Interior*, No. 1:23-CV-01293-ADA-SKO, 2023 WL 6215818, at *5 (E.D. Cal. Sept. 25, 2023) (the plaintiff provided "no authority under which the Court may consider irreparable harm to third parties in lieu of or in addition to irreparable harm to" the plaintiff).

Finally, StenTam has not shown that its requested relief that the IRS "resume processing amended tax returns implicating the employee retention credit in the same manner, custom, and

---

taxpayers. These statements have not and will not irreparably harm StenTam, and an injunction should not issue to erase them from the public discourse.

practice as the IRS treats all amended payroll returns" and "shall not prejudice the processing of amended payroll returns submitted through Forms 941-X that implicating the ERC" would likely resolve its purported harm. ECF 14-10 ¶¶ 1-5. As stated above (*supra* p. 9:15–18), even if the Court were to order the IRS to continue acting on the backlog of ERC refund claims, this would not assure that the IRS would act on StenTam's clients' ERC claims any faster. And again, there is no guarantee that the IRS would find that all StenTam's clients' claims are eligible for the requested refund. Even more, if the IRS struck all content about the ERC from its website, even assuming that content had damaged StenTam, StenTam has not shown its alleged reputational harm would be repaired. StenTam has failed to establish that it has suffered irreparable harm.

### C.     The balance of equities and public interest do not support an injunction.

The balance of the equities and the public interest are best served by preserving the status quo. If the Court were to order the injunction StenTam seeks the harm to tax administration would be significant. O'Donnell Decl. ¶ 36. And "the protection of the public fisc is a matter that is of interest to every citizen." *Brock v. Pierce Cty.*, 476 U.S. 253, 262, 265 (1986). The "general public [has an] interest in the efficient allocation of the government's fiscal resources." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017). Dictating to the IRS how it can operate the ERC program is not in the national public interest.

StenTam alleges that unlawful agency action is never in the public interest. ECF 14 16:28. The United States agrees. But the IRS moratorium is not an unlawful agency action as explained (*supra* §§ II.A.3-4). StenTam alleges that the moratorium will cause a run on the courts. ECF 14 at 17:10. But this too is not a reason to order the extreme relief StenTam seeks. As discussed, (*supra* p. 2:15–18), Congress has provided taxpayers with a ticket to district court to challenge IRS action or inaction in cases such as these. If taxpayers seek relief in district courts, they would be doing so because Congress, not the IRS, provided for that means of obtaining relief. Finally, any authority the IRS has to pursue fraud investigations (ECF 14 at 17:16-24) does not foreclose its authority to also order a pause in the processing of new ERC claims so that it can better protect the taxpaying public and the fisc.

### D.   Any injunction should be limited to StenTam.

Even if StenTam is entitled to an injunction, the injunction should be limited to StenTam. StenTam seeks injunctive relief not just for itself, but for thousands of its clients and other ERC claimants unknown to it that are nonparties to this action. An injunction is an equitable remedy and "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (staying an order granting a preliminary injunction); *cf. Green Rock LLC v. Internal Revenue Serv.*, No. 23-11041, 2024 WL 2821767, at *1 (11th Cir. June 4, 2024) (affirming relief limited to the plaintiff in the APA context). By contrast, universal remedies "share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case." *Id.* Established limits on injunctive relief weigh against granting the kind of relief sought here because the general rule is that injunctions must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994). This Court should avoid ordering a universal injunction for this reason.

### III.   CONCLUSION

For the above reasons, StenTam's motion for a preliminary injunction should be denied. It has not carried its burden of persuasion with the clear showing that would entitle it to the drastic and extraordinary remedy sought. The government should be allowed the time to respond more fully to the complaint by filing a response within the time allowed by the Federal Rules of Civil Procedure.

DATED this 14th of June, 2024

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice