DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
KENTON MCINTOSH
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
Telephone:   (202) 307-6422
             (202) 514-3768
Fax:         (202) 307-0054
Email:    Amy.T.Matchison@usdoj.gov
          Kenton.McIntosh@usdoj.gov
          Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stenson Tamaddon, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>United States Internal Revenue Service; the United States of America; United States Department of Treasury; Daniel Werfel, in his official capacity as Commissioner of the U.S. Internal Revenue Service; and Janet Yellen, in her official capacity as Secretary of the Treasury,<br><br>　　　　Defendants. | Case No. 2:24-cv-01123-SPL<br><br>**DECLARATION OF DOUGLAS O'DONNELL** |

　　　　I, Douglas O'Donnell, pursuant to 28 U.S.C. § 1746, declare that:

　　　　1.　　I am the Deputy Commissioner of the Internal Revenue Service (IRS). The Deputy Commissioner oversees the four divisions of the IRS: Taxpayer Services, Tax Compliance, Information Technology and Operations. The four divisions heads - Chief, Taxpayer Services, Chief Tax Compliance Officer, Chief Information Officer, and Chief Operating Officer - report directly to the Deputy Commissioner, who reports to the Commissioner of the IRS.

　　　　2.　　The facts set forth in the paragraphs below are based on my review of Stenson Tamaddon, LLC's complaint (ECF No. 1) and motion for preliminary injunction

and supporting documents (ECF No. 14) filed in this action as well as my personal knowledge of IRS operations.

3.    In general, the term "processing" refers to taking an action, such as allowing a claim in full or part, disallowing a claim in full or part, or referring a claim for examination.

4.    The Employee Retention Credit (ERC) has had a complicated history. It was enacted March 27, 2020, under section 2301 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020) to encourage employers who were adversely impacted by the COVID-19 pandemic to keep employees on their payroll.

5.    When it was enacted by the CARES Act, the ERC was a refundable credit against applicable employment taxes of an eligible employer in an amount equal to 50% of the qualified wages (not to exceed $10,000) with respect to each employee for all calendar quarters in 2020.

6.    Under the CARES Act, as originally enacted, an eligible employer is one that was carrying on a trade or business during the 2020 calendar year and, with respect to the calendar quarter in which the employer is claiming the credit, either (1) the trade or business was fully or partially suspended because of a government order limiting commerce, travel or group meetings due related to the COVID-19 pandemic, or (2) the calendar quarter was within the period beginning with the first calendar quarter after December 31, 2019, in which the employer experienced a more than 50% reduction in gross receipts compared to the same calendar quarter in 2019 and, ending with the calendar quarter following the first calendar quarter after the one previously described in which the employer sustained less than a 20% reduction in gross receipts from the same calendar quarter in 2019 (gross receipts test). Tax-exempt organizations are treated as carrying on a trade or business for purposes of the ERC.

7.    Under the CARES Act, as originally enacted, for eligible employers with more than 100 full-time employees, the term qualified wages meant wages paid to employees who did not provide services due to the trade or business being suspended or

due to a reduction in gross receipts.  For other employers, all wages were considered qualified wages.

8. Under the CARES Act, as originally enacted, the ERC applied to eligible wages paid after March 12, 2020, and before January 1, 2021.  Some of the restrictions included: (1) the ERC was not available to governmental employers, (2) it was not available for employers who received a Paycheck Protection Program (PPP) loan, (3) certain employees could not be taken into account for purposes of the ERC, and (4) an employer could not use the wages taken into account for ERC to determine certain other credits.

9. Nine months after the ERC was enacted, on December 27, 2020, the CARES Act was amended and modified by the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act), enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020).  Section 206 of the Relief Act adopted *retroactive* amendments and technical changes for qualified wages paid after March 12, 2020, and before January 1, 2021.  The changes included but were not limited to: (1) removing the categorical restriction on employers who received a PPP loan from claiming the credit; (2) adding a restriction related to the ERC for employers affected by qualified disasters under section 303(d) of the Relief Act; and (3) providing that gross receipts for a tax-exempt employer are determined using the definition under section 6033 of the Internal Revenue Code (Code).

10. Section 207 of the Relief Act, effective for calendar quarters beginning after December 31, 2020, made additional changes to the ERC that applied *prospectively*.  Those changes included: (1) making the ERC available for eligible employers paying qualified wages that are paid after December 31, 2020, and before July 1, 2021; (2) increasing the maximum credit amount that may be claimed per employee to 70% (up from 50%) of $10,000 of qualified wages paid to an employee per calendar quarter; (3) allowing certain governmental employers to claim the credit; (4) modifying the gross receipts test; (5) modifying the definition of qualified wages; (6) broadening the denial of double benefit rule and applied it to certain sections of the Code; and (7) changing the eligibility to receive advance payments and limited the amount of the advances.

11. On March 11, 2021, the ERC was further extended by the enactment of section 3134 of the Code, which was enacted by section 9651 of the American Rescue Plan Act of 2021 (the ARP), Pub. L. No. 117-2, 135 Stat. 4 (March 11, 2021). Section 3134 of the Code provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022. Section 3134 of the Code generally maintained the structure of the ERC as provided under section 2301 of the CARES Act, and as amended, with certain changes. Among other changes, section 3134 of the Code: (1) made the ERC available for eligible employers that paid qualified wages after June 30, 2021, and before January 1, 2022; (2) applied the credit against taxes imposed under section 3111(b) of the Code (employer's share of Hospital Insurance (Medicare) tax), or so much of the taxes imposed under section 3221(a) of the Code that are attributable to the rate in effect under section 3111(b) of the Code; (3) expanded the types of eligible employers to include a "recovery startup business" (which is defined in section 3134(c)(5) of the Code); (4) modified the definition of qualified wages for "severely financially distressed employers" (see section 3134(c)(3)(C) of the Code); (5) modified the definition of qualified wages to exclude certain wages; (6) provided that the ERC shall not apply to so much of the qualified wages paid by an eligible employer as are taken into account as payroll costs in connection with a covered loan under section 7(a)(37) or 7A of the Small Business Act, a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Non-Profits, and Venues Act, or a restaurant revitalization grant under section 5003 of the ARP Act; and (7) extended the limitation on the time period for assessment from 3 years to 5 years.

12. Finally, the ERC was terminated for most employers in the fourth calendar quarter of 2021 by the Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117-58, 135 Stat. 429 (2021), enacted on November 15, 2021. The IIJA retroactively amended section 3134 of the Code so that only a recovery startup business may claim the ERC in the fourth calendar quarter of 2021.

13. The legislative history of the ERC that is detailed above spans only a short amount of time but demonstrates how complex the ERC is. The revisions to the ERC require taxpayers to carefully determine their eligibility for the credit. Accordingly, it is

4

reasonable that a taxpayer would seek professional advice to determine whether they qualify for the ERC, and to determine whether and how to file.

14. Unfortunately, aggressive marketing encouraged and continues to encourage abuses of the ERC. The complexity of the law and the lucrative nature of the credit led to a host of scams marketed by unscrupulous actors providing bad or misleading advice or encouraging small business owners to claim the credit regardless of eligibility. The IRS provided the public with warning signs of aggressive ERC marketing and urged businesses, tax-exempt organizations and others considering applying for this credit to carefully review the official requirements for this limited program before applying. The IRS warned taxpayers about potentially inappropriate ERC promotions. Warning signs to avoid included unsolicited calls or advertisements mentioning an "easy application process," statements that the promoter or company can determine ERC eligibility within minutes, large upfront fees to claim the credit, fees based on a percentage of the refund amount of ERC claimed, preparers seeking anonymity by refusing to sign the ERC return being filed by the business as well as refusing to supply their identifying information and a tax identification number, aggressive claims from the promoter that the business receiving the solicitation qualifies before any discussion of the group's tax situation.

15. The ERC can be claimed on an original employment tax return or on an amended return. Amended returns are filed on paper and are scanned into an aged Correspondence Image Inventory (CII) system. CII does not have any capability to analyze these claims or separate amended returns claiming ERC from amended returns claiming other adjustments. An IRS employee must manually review each amended return to determine whether it includes an ERC claim, and must mark it with special coding to indicate that it is an ERC claim.

16. The ERC increased the number of amended returns filed by employers or those purporting to be employers. The large number of these complex claims strained our resources. Given the complexities, additional resources were added to resolve, as quickly as possible, the backlog of claims.

17. As we processed more of these refund claims, we observed an increase in the number of ERC claims being filed that seemed to have been influenced by aggressive marketing.

18. During this same time, ERC claims being filed grew from a weekly average of 25,000-30,000 claims for the first quarter of fiscal year 2023 to an average of 50,000 to 60,000 claims per week in the summer of 2023.

19. For the week ending December 31, 2022, the IRS had over 60,000 ERC claims in inventory.  For the week ending December 31, 2023, the inventory had grown to a little over 1.1 million.  As of the week ending May 18, 2024, the inventory had grown to 1.4 million ERC claims, of which 880,000 had been filed prior to the moratorium beginning on September 14, 2023.

20. The IRS has worked hard to implement this credit, and as of May 2024 we have processed about 3.6 million ERC claims worth approximately $230 billion to businesses.

21. However, promoters have been aggressively misleading taxpayers into claiming the ERC, even though they do not qualify.  We want to prevent businesses from being misled while ensuring that businesses that make legitimate claims receive the credits they are entitled to receive.

22. On July 26, 2023, the IRS announced that, having cleared a backlog of claims for the ERC, it was increasingly shifting its focus to reviewing these claims for compliance concerns, including intensifying audit work and criminal investigations on promoters and businesses filing dubious claims. See IRS News Release IR-2023-135 (July 26, 2023) (attached as Exhibit A).

23. On September 14, 2023, amid rising concerns about a flood of improper ERC claims, the IRS announced an immediate moratorium (the moratorium) on processing claims for the ERC filed on or after September 14, 2023.  *See* IRS News Release IR-2023-169 (Sept. 14, 2023) (attached as Exhibit B).  The moratorium was initiated to protect honest small business owners from scams and to protect the public fisc from improper claims for tax refunds.  After announcing the moratorium, weekly receipts of ERC claims dropped by more than one-half.

24.     The IRS initiated the moratorium following growing concerns inside the agency, as well as from tax professionals and media reports, that a substantial share of new ERC claims, filed well after the legislation had passed were ineligible, and that businesses were increasingly being put at financial risk by aggressive promoters and marketing.  The IRS also announced that hundreds of criminal cases were being worked, and thousands of ERC claims had been referred for audit.

25.     In announcing the moratorium, the IRS Commissioner urged people being pressured by promoters to apply for the ERC, "to immediately pause and review their situation," and to "seek out a trusted tax professional who actually understands the complex ERC rules."  The IRS reminded taxpayers that anyone who improperly claims the ERC must pay it back, possibly with penalties and interest.

26.     The September 14, 2023, press release also encouraged taxpayers to review the IRS guidance and tools for helping determine ERC eligibility, including frequently asked questions published on irs.gov and a new question and answer guide released the same day to help businesses understand if they were eligible for the credit.

27.     The IRS also announced that it was developing new initiatives to help businesses who found themselves victims of aggressive promoters or otherwise filed ineligible ERC claims.

28.     In December 2023, the IRS announced the ERC Voluntary Disclosure program.  This program required participants to voluntarily pay back 80% of the ERC received; cooperate with any requests from the IRS for more information; and sign a closing agreement.  The program, which was available through March 22, 2024, has yielded more than $1 billion from over 2,600 taxpayers who opted to participate.

29.     The IRS also announced a voluntary withdrawal process in October 2023 for any taxpayer whose ERC claim has not been paid, or who has received a check but not cashed or deposited it.  Withdrawn claims are treated as if they were never filed, with no penalties or interest imposed.  As of May 25, 2024, approximately 6,000 entities have withdrawn a total of $574 million in claims so far.

30.     In December 2023, the IRS sent more than 14,000 letters to businesses notifying them of disallowed ERC claims.

31. During the moratorium, the IRS transcribed data from the approximately 1 million paper ERC claims and analyzed the data to evaluate the risk of ineligibility. Throughout the moratorium, the IRS continues to work ERC claims received prior to the moratorium and to pay out valid claims, select potentially ineligible claims for audit, and issue notices of claim disallowance for ineligible claims but at a slower pace due to enhanced compliance reviews.

32. The moratorium has provided valuable time to transcribe and analyze data from over 1 million paper ERC claims to determine the risk profile of those claims. This analysis showed that potentially 60-70% of current ERC claims have an unacceptable level of risk and cannot be processed without further analysis. These findings have confirmed concerns raised by tax professionals and others that our current ERC claim inventory potentially contains a high rate of improper ERC claims amounting to billions of dollars.

33. Knowing the significant risk of the paper claims in inventory, we will process claims that have the highest risk of ineligibility, looking on a first-in first-out basis starting with claims filed before the moratorium, by issuing notices of claim disallowance. We also will process claims that have the lowest risk of ineligibility, also looking on a first-in first-out basis starting with claims filed before the moratorium, by providing either a full allowance or a partial disallowance of the claim. The processing of those claims will occur over the summer. We expect the pace to go slowly and judiciously as we continue to refine our analytical tools.

34. We will continue to monitor the conditions in the market as we move towards ending the moratorium.

35. I understand that Plaintiff has asked this court for an injunction ordering the IRS to, among other things:

- Within 14 days, resume processing amended tax returns implicating the employee retention credit in the same manner, custom, and practice as the IRS treats all amended payroll returns.
- Not "prejudice the processing" of amended payroll returns submitted through Forms 941-X that implicate the ERC.

- Within 7 days, retract and remove all publicly disseminated statements regarding the moratorium or suspension of ERC claims, including such statements appearing on the IRS website hosted at www.irs.gov.
- File monthly status reports with the Court identifying or disclosing: (a) the efforts and procedures implemented by the IRS to comply with this Order; (b) the number of amended payroll tax returns (Form 941-X) that the IRS processed in the month preceding; (c) the number of refunds Defendants have issued under the ERC program (26 U.S.C. § 3134) in the month preceding; (d) the number of new ERC-related Form 941-X amended returns received by the IRS in the preceding month; and (e) to the extent known or reasonable knowable, a listing of matters initiated in federal courts against Defendants under 26 U.S.C. § 7422 in the preceding month where the plaintiff seeks unpaid ERC refunds under 26 U.S.C. § 3134.

36. Granting the Plaintiff's request at this time could result in significant harm to taxpayers and small businesses. Taxpayers who file claims for the ERC for which they are not entitled could be subject to audit and could face penalties. Since our data shows that an overwhelmingly large percentage of the claims have indicators of ineligibility, the IRS needs time to ensure that taxpayers who are indeed eligible for the ERC have a chance to have their claim reviewed. Additionally, granting the Plaintiff's request could harm the fisc. It is not in the public's interest for the IRS to pay billions of dollars of claims without proper review. Additionally, having to compile and file monthly reports detailing the processing of ERC claims and the IRS's efforts in that regard would only further tax the resources that the IRS is devoting to analyzing and addressing those claims.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 14th day of June 2024

DOUGLAS O'DONNELL
Deputy Commissioner
Internal Revenue Service