Peter A. Arhangelsky, Esq. (SBN 025346)
Peter.Arhangelsky@gtlaw.com
Ashley M. Repka, Esq. (SBN 035416)
Ashley.Repka@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Rd.
Suite 800
Phoenix, AZ 85016
Ph: (602) 445-8017
*Attorneys for Plaintiff Stenson Tamaddon, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stenson Tamaddon, LLC<br><br>　　　　　　Plaintiff,<br>　v.<br><br>United States Internal Revenue Service, et al.,<br><br>　　　　　　Defendants. | Case No. 2:24-cv-01123-SPL<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing: July 16, 2024 at 9:00am<br><br>Hon. Steven P. Logan |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

II. ARGUMENT ........................................................................................................ 3

   A. StenTam is Likely to Succeed on the Merits ................................................ 3

      1. StenTam Has Article III Standing ............................................................ 3

      2. StenTam has Statutory Standing .............................................................. 7

      3. Sovereign Immunity Does Not Bar Suit .................................................. 8

         a) The IRS Must Process Refund Claims ............................................. 8

         b) The IRS's Suspension is Final Agency Action and StenTam has no Alternative Remedy ........................................................................ 11

      4. The ERC Suspension is Without Statutory Right Under 5 U.S.C. § 706(2)(C) ............................................................................................... 12

   B. StenTam Suffers Irreparable Harm .............................................................. 13

   C. The Balance of Equities and Public Interest Support an Injunction ............ 14

   D. A Narrow Injunction is Impractical ............................................................. 15

III. CONCLUSION .................................................................................................. 15

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

# TABLE OF AUTHORITIES

**Cases**

*Benson v. Comm'r*, 91 T.C.M. (CCH) 925 (T.C. 2006) ...................................................... 5

*Castaneda v. Garland*, 562 F. Supp. 3d 545 (C.D. Cal. 2021) ......................................... 3

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ......................................................... 7

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) .............................. 8

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................................................................................................................................. 3

*Govig & Associates, Inc. v. United States*, No. CV-22-00579-PHX-DGC, 2023 WL 2614910 (D. Ariz. Mar. 23, 2023) ............................................................... 12

*Infracost Inc. v. Blinken*, No. 23-cv-2226-JLS, 2024 WL 1914368 (S.D. Cal. Apr. 30, 2024) ................................................................................................................ 11

*Jewell v. United States*, 548 F.3d 1168 (8th Cir. 2008) ................................................... 12

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004) ............................................................................... 9

*Louisiana v. Biden*, 622 F.Supp. 3d 267 (W.D. La. 2022) .......................................... 9, 11

*M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012) ................................................................. 13

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ....................................................................... 7

*Moghaddam v. Pompeo*, 424 F.Supp. 3d 104 (D.D.C. 2020) ......................................... 11

*Nat'l Wildlife Fed. v. Hodel*, 839 F.2d 694 (D.C. Cir. 1988) ............................................ 4

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109 (2022) ........................................................................................... 10

*Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075 (D. Or. 2018) .............................................................................................................................. 4

*Scholl v. Mnuchin*, 489 F. Supp. 3d 1008 (N.D. Cal. 2020) .............................. 3, 12, 13

*Texas v. Biden*, No. 6:22-cv-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023) .............................................................................................................................. 10

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021) ....................................... 11

*Umuoji Improvement Union (N. Am.), Inc. v. Umuoji Improvement Union (N.*

*Am.), Inc.*, 537 F. Supp. 3d 79 (D. Mass. 2021) ............................................................. 3

*United States v. Com. Nat. Bank of Peoria*, 874 F.2d 1165 (7th Cir. 1989) ..................... 5

*Van v. LLR, Inc.*, 962 F.3d 1160 (9th Cir. 2020) ............................................................. 3

*West Virginia v. EPA*, 597 U.S. 697 (2022) .................................................................. 10

**Statutes**

26 U.S.C. § 3134(b)(3) ................................................................................................ 1, 9

26 U.S.C. § 3134(c)(2)(A)(ii)(III) .................................................................................... 2

26 U.S.C. § 6402(a) ..................................................................................................... 1, 9

26 U.S.C. § 6511(a) ......................................................................................................... 5

26 U.S.C. § 6611 ............................................................................................................ 15

26 U.S.C. § 7422 ............................................................................................... 1, 10, 12

26 U.S.C. § 7803(a)(2)(A) ......................................................................................... 8, 10

5 U.S.C. § 555(b) ........................................................................................................... 11

5 U.S.C. § 706(2)(C) ............................................................................................ 2, 3, 12

**Other Authorities**

Internal Revenue Bulletin 2024-21 (IR-2024-21) (Jan. 5, 2024) ..................................... 6

Internal Revenue Bulletin 2024-78 (IR-2024-78) (Mar. 22, 2024) ............................... 15

IRS, "Guidance on Employee Retention Credit under Section 3134 of the
    Code and on Miscellaneous Issues Related to the [ERC]" (Dec. 2021) ..................... 4

I. **INTRODUCTION**

Plaintiff Stenson Tamaddon, LLC ("StenTam") submits this Reply in support of its Motion for Preliminary Injunction [Dkt. 14]. The IRS lacks statutory authority to suspend the Employee Retention Tax Credit. The Moratorium unlawfully shirks the agency's duty to process ERC refund claims. *See* 26 U.S.C. § 6402(a); 26 U.S.C. § 3134(b)(3).

Defendants concede that IRS stopped processing ERC refunds for at least nine months during the Moratorium. They provide no statutory basis for that action, or any concrete timeline for resumption of the ERC program. *See generally* Dkt. 19-1. Defendants do not dispute that StenTam, a tax preparation service that depends on ERC receipts, is directly impacted by the unlawful suspension. Defendants fail to address the impending ERC cutoff in April 2025 or the Moratorium's impact on income tax returns. They do not credibly rebut StenTam's loss of new ERC business during the Moratorium. Those impacts threaten irreparable losses. StenTam has no claim for monetary damages in this case. It therefore has no adequate remedy other than injunctive relief.

A preliminary injunction is in the public interest. Unpaid ERC claims accrue staggering interest values that will eventually be paid from the public fisc. Those interest payments will likely exceed whatever money the IRS saves through its ERC investigations. Meanwhile, businesses are starved of financial relief while IRS refuses to process their claims. The solution, according to IRS, is to force hundreds of thousands of taxpayers to sue for refunds in federal court under 26 U.S.C. § 7422. That option is inappropriate and a waste of resources for small businesses, the court system, and the Department of Justice. The IRS—not the district courts—has responsibility to process refunds in the first instance.[1] Taxpayers should not have to bear costs of civil litigation just to collect monetary relief intended by Congress to remedy COVID losses. The courts should not face an overburdened docket because of the IRS's deliberate inactivity.

The IRS initially justified its Moratorium by reference to widespread "fraud." But it

---

[1] *See* Exh. G (Ltr. from Rep. Claudia Tenney) ("The most basic tenant of the IRS' job is to process taxpayer returns and claims, including tax refunds"). "Preventing fraudulent claims from being realized and ensuring legitimate ERC claim filers seeking economic relief are receiving their refund in appropriate and timely fashion are not mutually exclusive objectives." *Id.* at 2; *see also* Exh. H (Wittman Ltr.).

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

now cites only the "potential" for "ineligible" ERC submissions as a justification to continue the Moratorium. Dkt. 19-1 at ¶32. "Ineligibility" is not "fraud," and the mere risk that a portion of claims will eventually be disallowed does not enable IRS to override an entire statutory scheme. Because the IRS lacks authority to suspend the ERC program, its justification for doing so is irrelevant. *See* 5 U.S.C. § 706(2)(C). Yet the IRS's bald conclusion that over 70% of the 1.4 million pending claims might be "ineligible" is nonetheless dubious and likely depends on the agency's unlawful attempt to narrow eligibility criteria.[2] That conclusory statement implies that somehow just a micro fraction of the 33 million small businesses in the United States were eligible for ERC—an implausible reality given the breadth of COVID orders during the pandemic.[3] Indeed, in 2022, IRS management anticipated that 70%-80% of small and medium businesses were "good candidates for the ERC."[4] Defendants now give no insight to their analysis of "potential" ineligible claims. The IRS simply asserts that a portion should be subject to "further analysis." Dkt. 19-1 ¶32. That invites the question, what is the point of a Moratorium on "processing" ERC claims if the IRS's principal concern is that those claims should be subject to additional "processing"? The Moratorium is not a tool that helps IRS clear its backlog of ERC submissions. It instead lets IRS reduce ERC filings, eliminate procedural rights for taxpayers awaiting payment, and funnels businesses into costly refund suits (a path IRS is betting most businesses are unlikely to take).

      Although the agency suggests that it might resume processing this "summer," it has not honored prior pledges. *See* Dkt. 1-2 at 2 (indicating that the suspension would last through December 31, 2023). Even if the agency intends to resume processing in response

---

[2] Although not at issue in this motion, StenTam also sues to invalidate IRS legislative rules that improperly narrowed the credit, allowing the IRS to erroneously declare many refund claims "ineligible" in conflict with Congressional intent. *See* Dkt. 1 at ¶¶43-75, 95-146.

[3] The ERC can be claimed by any business that suffered a partial suspension of business associated with governmental orders during the pandemic for any duration, including just a single day. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(III).

[4] *See* Dean Zerbe, "Employee Retention Credit—Still The One" (Feb. 15, 2022), *at* https://www.forbes.com/sites/deanzerbe/2022/02/15/employee-retention-credit---still-the-one-the-latest-update/.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

to this lawsuit, an injunction is appropriate to ensure those activities occur.[5]

## II. ARGUMENT

### A. StenTam is Likely to Succeed on the Merits

On a motion for preliminary injunction, the Court may accept as true the well-pleaded allegations in the complaint and uncontroverted affidavits. *See Castaneda v. Garland*, 562 F. Supp. 3d 545, 562 (C.D. Cal. 2021) (quoting *Umuoji Improvement Union (N. Am.), Inc. v. Umuoji Improvement Union (N. Am.), Inc.*, 537 F. Supp. 3d 79, 84 (D. Mass. 2021)). On the record before the Court, Plaintiff has a strong likelihood of success. The Moratorium is agency action short of statutory right. 5 U.S.C. § 706(2)(C).

### 1. StenTam Has Article III Standing

Defendants argue that "Because the Moratorium does not deprive StenTam of its right to be paid by its clients, there is no true injury-in-fact for standing." Dkt. 19 at 13. They say StenTam suffers no harm because the IRS will eventually pay interest on late refunds. *Id.* Defendants also argue that StenTam has a "self-inflicted" injury that cannot qualify under Article III. *Id.* at 14. But here Defendants set the Article III standards beyond reason. StenTam's injuries are sufficient.

Plaintiff is paid out of ERC funds received for tax preparation services. It has a direct financial interest in the prompt payout of ERC claims. But for the Moratorium, many of StenTam's clients would have already received ERC payouts, and StenTam would have been paid on those accounts. Dkt. 14-1 ¶¶44-45. The IRS's indefinite ERC suspension therefore causes StenTam financial loss, including the deprivation of money that would have been paid earlier—a cognizable Article III injury. *Van v. LLR, Inc.*, 962 F.3d 1160, 1161 (9th Cir. 2020) (a "temporary deprivation of money gives rise to an injury in fact for purposes of Article III standing" because "the inability to have and use money to which a party is entitled is a concrete injury"); *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1025 (N.D. Cal. 2020) (in context with an IRS refund claim, "wrongfully withheld money constitutes

---

[5] Defendants also cannot moot StenTam's claims through voluntary changes in response to this lawsuit. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("a defendant claiming that its voluntary compliance moots a case bears the formidable burden").

an injury in fact for standing purposes"). StenTam's uncontroverted data shows that IRS processed at least 80 of StenTam's claims per week before the Moratorium. Dkt. 14-1 ¶¶21-22. That number went to zero after September 2023. *Id.* ¶25. StenTam had projected millions in revenues but has instead received nothing since the Moratorium. While Defendants argue that StenTam suffers no harm because its clients might eventually receive interest on delinquent refunds [Dkt. 19 at 14], StenTam is paid only out of the base refund amount. It receives no benefit from that accruing interest. *See* Supp. Decl. E. Stenson ¶¶9-14. StenTam cannot collect monetary damages in this case, and lacks standing to bring a refund suit on behalf of its clients. *See infra* at Part II.A.3(b).

StenTam also advanced ERC loans to clients. *Id.* ¶44. The Moratorium caused StenTam to enter default on those financing arrangements, which required it to take out loans at higher interest rates to cover. *Id.* ¶¶44-45. Financial shortfalls are a foreseeable result of a government-ordered suspension on refund payouts. The mere fact that causation is indirect does not bar standing. *See, e.g.*, *Nat'l Wildlife Fed. v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988). For Article III purposes, "[c]ausation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." *Parents for Priv. v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1088 (D. Or. 2018), *aff'd sub nom. Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020).

The Moratorium also chills new ERC business and threatens StenTam with unrecoverable compliance costs. The ERC program required taxpayers to preemptively amend their income tax returns to ensure they were not claiming deductions or refundable credits for the same wages covered by the ERC. Dkt. 14-1 ¶¶57-58. An ERC claim in 2020 and 2021 therefore required amended corporate and personal tax returns to reduce wage and salary expenses that would otherwise be deducted on federal income tax returns for the applicable tax year. *Id.*[6] StenTam clients took those measures. *Id*. They filed amended

---

[6] *See also* IRS, "Guidance on Employee Retention Credit under Section 3134 of the Code and on Miscellaneous Issues Related to the [ERC]" (Dec. 2021), at Part C (pg. 24) ("When a taxpayer claims the [ERC] … the taxpayer should file an amended federal income tax return … to correct any overstated deduction…"), *available at* https://www.irs.gov/pub/irs-drop/n-21-49.pdf.

income tax returns reflecting the decreased wage deduction, and then paid more income tax to the IRS (to reflect the higher tax burden). Under the Tax Code, businesses have until the later of three years from the date the income tax return was due or two years from the date of a tax payment to file a claim for refund. *See, e.g.*, *Benson v. Comm'r*, 91 T.C.M. (CCH) 925 (T.C. 2006), *aff'd,* 560 F.3d 1133 (9th Cir. 2009); 26 U.S.C. § 6511(a). Those two- and three-year windows are closing for businesses while the Moratorium continues. And when the IRS denies an ERC refund claim after that period lapses, that taxpayer cannot recoup the increased tax it paid in good faith based on the ERC claim. Dkt. 14-1 ¶¶58-59. That business has no way to recover those funds. Defendants now ask this Court to allow the IRS an opportunity to whipsaw small businesses with pending ERC claims under a request that the Court trust the agency to protect these taxpayers. Small businesses cannot afford to give that trust to an agency that has already shown a proclivity to ignore its statutory duty to process their claims.

The Moratorium specifically threatens taxpayer's ability to amend their income tax returns for the 2021 tax year because the limitations period to amend would be this coming April 2025. Defendants do not address this concern in their response brief. The IRS testifies that at least 70% of pending ERC claims could face disallowances. Even assuming those numbers are remotely accurate, hundreds of thousands of taxpayers might need to amend income tax returns to accommodate for IRS disallowances. But they will lose the ability to make those filings if the IRS does not process claims before April 2025 which could, in turn, result in irreparable financial losses for businesses that have ERC claims disallowed in whole or in part. Dkt. 14-1 ¶58. To prevent these widespread losses, taxpayers may need to file protective refund claims seeking to reinstate the wage expense deductions as a precaution should the IRS eventually deny the ERC claim. Dkt. 14-1 ¶59.[7] A "protective" refund claim suspends the limitations period pending future contingencies that allow a taxpayer to later complete the refund. This is a complex judicially created process. *See United States v. Com. Nat. Bank of Peoria*, 874 F.2d 1165, 1176 (7th Cir. 1989).

---

[7] *See also* TaxNotes, "Service Provides Guidance on Protective Claims" (Nov. 2008), *at* https://tinyurl.com/TaxNotes-11-2008.

StenTam faces an Article III injury because it must assist clients in seeking those protective refund claims based on its role as the tax preparer associated with client ERC submissions. Supp. Stenson Decl. ¶¶3-8. That threatens a considerable loss of resources that cannot later be recovered. Although lifting the Moratorium may not eliminate the need for action on all StenTam client accounts, it would at least reduce those burdens for claims that could still be processed in 2024. Every day the Moratorium remains in effect, the likelihood of an IRS decision in 2024 for StenTam clients grows smaller.

In addition, Defendants do not credibly refute that the Moratorium costs StenTam new ERC business. The IRS declared that the ERC program is frozen during the Moratorium. Dkt. 1-2 at 1; Dkt. 1 ¶37 n.6. The agency encouraged businesses not to apply. *See* Dkt. 1-2 at 5 (instructing businesses to "consider reviewing the guidelines and waiting to file").[8] Those statements have obvious effects on taxpayers interested in the ERC. Indeed, the IRS reported a precipitous drop in ERC submissions in the immediate aftermath of its September Moratorium. Dkt. 19-1 ¶23. Taxpayers who fail to file by April 15, 2025, will lose their right to collect ERC. Dkt. 14 at 20-21. Some taxpayers may have already lost their ability to claim ERC for 2020. As the Moratorium chills participation, those lost opportunities become permanent. Defendants argue that "StenTam may only rely on the effects of the Moratorium, not on the IRS's statements [about the Moratorium]" in this Motion. Dkt. 19 at 15. But they provide no support for that premise or explain why taxpayers cannot rely on the words of an agency tasked with implementing and enforcing these programs. The net effect of those statements chills ERC claims. Dkt. 19-1 ¶23; Dkt. 14-1 ¶56. Those actions are properly at issue along with the processing suspension. The IRS fails to controvert StenTam's injury flowing from this conduct.

Defendants posit that "There are many potential reasons that ERC claims may have dropped since the Moratorium." Dkt. 19 at 16. But none more obvious than where the government declares the program suspended and asks businesses not to file. The Moratorium is pointless if not to stop inbound ERC claims. Defendants thought they had

---

[8] The IRS also announced "new IRS [Criminal Investigation] education sessions" which was an implied threat of criminal investigation for business with pending ERC claims. *See* IR-2024-21 (Jan. 5, 2024), *at* https://tinyurl.com/IRS-IR-2024-21.

discretion to stop processing [Dkt. 19 at 18-19]. If true, a public declaration was unnecessary unless the underlying goal was to influence participation.

StenTam's injuries are not "self-inflicted" as Defendants argue. *See* Dkt. 19 at 14 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)). This doctrine applies when a plaintiff self-injures to create standing. In *Clapper*, to bring a challenge under the Foreign Intelligence Surveillance Act, the plaintiffs spent money to mitigate perceived risk of government surveillance. *Clapper*, 568 U.S. at 415. The Court rejected that strategy because it would allow plaintiffs to manufacture standing "simply by making an expenditure[.]" *Id.* at 416. This is not that situation. StenTam's injuries predate the Moratorium, which injured StenTam's preexisting relationships with clients.[9] Defendants cite no authority applying the "self-inflicted" harm doctrine retrospectively in this context.

Finally, StenTam's injuries are redressable because an injunction will "slow or reduce" the harm, even if it does not eliminate it completely. *See Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (injury was redressable where the relief sought would "slow or reduce it"). Defendants argue that "Even if the Court issued an injunction ending the Moratorium today, that does not necessarily mean the IRS could act on any of StenTam's clients' ERC claims any sooner." Dkt. 19 at 15. But lifting the Moratorium will spur processing of ERC refund claims, which will hasten the time for action no matter where in the queue StenTam's clients sit. In any event, here the IRS's redressability argument is limited to economic injuries associated with StenTam's *pending* ERC submissions; the IRS's position does not address StenTam's loss of future ERC business, or the burdens associated with lapsing deadlines on amended income tax returns. Moreover, an injunction tailored specifically to StenTam would directly remediate StenTam's injuries.

### 2. StenTam has Statutory Standing

StenTam falls within the zone of protected interests as a tax preparation service logically and foreseeably connected to the ERC statute. StenTam has an interest in prompt

---

[9] IRS concedes that over 880k ERC claims were pending when the agency commenced the Moratorium. *See* Dkt. 19-1 ¶19.

processing of client ERC claims under CARES Act, as amended. The "zone of interests" test is not particularly stringent and excludes only those whose interests are marginally related to or inconsistent with the purposes implicit in the statute. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768-69 (9th Cir. 2018) (the test "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff"). Government action need not directly regulate StenTam. *Id.* Here StenTam has a sufficient interest "more than marginally related to the statute's purpose" of refunding ERC to eligible taxpayers. The IRS concedes in its declaration that tax advisory services like StenTam were essential to the ERC program. Dkt. 19-1 ¶13 ("[I]t is reasonable that a taxpayer would seek professional advice to determine whether they qualify for the ERC, and to determine whether and how to file"). Consistent with that admission, businesses like StenTam foreseeably generated revenue through the ERC program and are foreseeably impacted by a government suspension of that program.

### 3. Sovereign Immunity Does Not Bar Suit

Defendants argue sovereign immunity bars StenTam's claims because (1) refund processing is "committed to agency discretion," and (2) the Moratorium is not final agency action. StenTam nonetheless states a viable claim because the Moratorium is final action that impacts rights and obligations under the ERC, and the IRS lacks discretion to simply stop processing refund claims under the congressionally guaranteed tax program.

#### a) The IRS is Obligated to Process Refund Claims

Defendants argue StenTam's claim is barred because IRS has "discretion" to process refunds and, when it does, it need not respond within a set time. Dkt. 19 at 18-19. That argument conflicts with statutory law. Defendants claim the Commissioner has discretion under 26 U.S.C. § 7803(a)(2)(A) to administer the internal revenue laws. Dkt. 19 at 18. Section 7803 creates the office of the Commissioner and delegates power only to execute the laws as written. But Section 7803(a) is not a general delegation of power authorizing the IRS to revise statutory law or unilaterally suspend Congressionally enacted programs.[10]

---

[10] Section 7803 also codifies taxpayer rights, including "the right to pay no more than the correct amount of tax," the "right to finality," the "right to challenge the position

Even assuming IRS has discretion to process individual claims according to agency priorities or the complexity of each submission, the authority to categorically suspend an entire tax program is a different question. *See, e.g.*, *Louisiana v. Biden*, 622 F.Supp. 3d 267, 293 (W.D. La. 2022) ("Although there is certainly nothing wrong with performing a comprehensive review, there is a problem in ignoring acts of Congress and stopping the process while the review is being completed"). By stalling process on all existing ERC claims and limiting action on new claims, the IRS acts in conflict with Congress's intent to provide relief through a broad tax credit under the CARES Act, as amended (26 U.S.C. § 3134). *See Lousiana*, 622 F.Supp. 3d at 294 ("By stopping the process, the agencies are in effect amending … Congressional statutes" because the law does not give the "agencies authority to implement a stop of lease sales").

The IRS may not stop processing tax refunds. The ERC statute specifies that credits should be treated as an overpayment that "shall" be refunded. *See* 26 U.S.C. § 3134(b)(3); 26 U.S.C. § 6402(a). Section 6402(a) obligates the IRS to process refunds expeditiously:

> In the case of an overpayment, the Secretary, **within the applicable period of limitations**, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment **and shall**, subject to subsections (c), (d), (e), and (f), **refund any balance to such person**.

26 U.S.C. § 6402(a) (emphasis added). The plain text of that statute requires IRS to refund overpayments within the applicable period of limitations. Section 6402(a) includes discretionary and mandatory components. The IRS has discretion to offset overpayments ("may credit the amount… against any liability"), but nonetheless must issue the refund ("shall … refund any balance"). The mandatory component is properly read: "In the case of an overpayment, the Secretary, within the applicable period of limitations, … shall … refund any balance to such person." That obligation is not made contingent on the Secretary's choice to offset overpayments against other liabilities. *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("[w]hen the statute's language is plain, the sole function of the courts

---

of the Internal Revenue Service and be heard," and "the right to a fair and just tax system." *See* 26 U.S.C. § 7803(a)(3). The Commissioner is expressly compelled to give effect to those rights "[i]n discharging his duties[.]" *Id.* The Moratorium imperils those rights by keeping tax credits away from businesses and increasing compliance costs.

… is to enforce it according to its terms"). At a minimum, Section 6402(a) imposes an absolute obligation to *process* a refund. The ERC was designed to support businesses that struggled during COVID but retained employees. That purpose is defeated if the IRS can choose not to timely process refund claims.[11]

If the IRS now claims discretion to suspend refunds wholesale, that presents a question of statutory interpretation under the Major Questions doctrine. *See West Virginia v. EPA*, 597 U.S. 697 (2022). The IRS must point to "clear congressional authorization" for the authority it claims. *Id.* at 724. "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices'" like Section 7803(a)(2)(A). *Id.* "Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.*

The IRS has never before suspended an entire tax program. The lack of historical examples is a "telling indication" that this conduct is "beyond the agency's legitimate reach." *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022) (noting the "lack of historical precedent"); *Texas v. Biden*, No. 6:22-cv-00004, 2023 WL 6281319, at *11 (S.D. Tex. Sept. 26, 2023) ("When the executive branch claims to discover in a long-extant statute an unheralded power to regulate … courts typically greet its announcement with a measure of skepticism.").[12] To rule for Defendants on this point, the Court must conclude that Congress provided IRS unfettered discretion to ignore taxpayer refund claims, subject only to a taxpayer's right to file a refund action in district court under 26 U.S.C. § 7422. That result would render superfluous the many statutory provisions governing the IRS's handling of overpayments.

Even assuming IRS lacks a statutory processing deadline, the absence of that timeline does not preclude judicial review here. *See Louisana*, 622 F.Supp. 3d at 293;

---

[11] The IRS was also under Executive Order to expeditiously prioritize "actions that provide the greatest relief to individuals, families, and small businesses[.]" Dkt. 14-4 at 1.

[12] The IRS estimates that 33% of Earned Income Tax Credit (EITC) claims are erroneous. *See* IRS, EITC, *at* https://tinyurl.com/IRS-EITC-33. The Congressional Research Service estimates the cost of EITC fraud is between $14.9B and $17.6B per year. *See* CRS, "EITC: Administrative and Compliance Challenges" (Apr. 2018), *at* https://tinyurl.com/CRS-EITC-Fraud. Yet despite those similar concerns, the IRS never imposed a moratorium on EITC claims.

*Infracost Inc. v. Blinken*, No. 23-cv-2226-JLS, 2024 WL 1914368, at *6 (S.D. Cal. Apr. 30, 2024) ("a mandatory duty to act may exist without a mandatory deadline. If that were not so, § 706(1)'s unreasonable-delay prong would be superfluous[.]"). At a minimum, the IRS must process refund claims within a "reasonable time" under 5 U.S.C. § 555(b); *Moghaddam v. Pompeo*, 424 F.Supp. 3d 104, 106 (D.D.C. 2020) ("a reasonable time for agency action is typically counted in weeks or months, not years."). Here, the IRS's processing suspension should be evaluated in context with the statutory scheme. The Moratorium threatens compliance costs for income tax returns, prematurely sunsets the ERC program, and delays receipt of pandemic-era relief. *See supra* at Part II.A.1. This is not a circumstance where taxpayers filed for ERC refunds on the eve of the three-year limitations period. These claims have been pending for many months (if not years). Congress set a six-month trigger for refund lawsuits in district court, indicating the desire for IRS to complete work within that frame. The IRS mirrored that period by adopting a "standard processing goal of 90 to 180 days." Dkt. 1-2 at 3. But the IRS is now using its Moratorium to run out the limitations periods for filing new ERC claims and amending income tax returns. The IRS has given no additional guidance on amended returns and instead requires businesses that were hurt during the pandemic to pay income tax liabilities while their ERC refunds are indefinitely delayed. If the "reasonableness" requirement in 5 U.S.C. § 555(b) has any legal effect, it must preclude these administrative delays that grossly burden small businesses nationwide.

        b)    <u>The IRS's Suspension is Final Agency Action and StenTam has no Alternative Remedy</u>

The APA provides a claim for agency action "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "Final agency action" need not be permanent. *See Louisiana*, 622 F.Supp. 3d at 292 (there is a "strong presumption of judicial review" and "[e]stablishing un-reviewability is a heavy burden"). Courts have considered similar pauses, stoppages, or temporary decisions to be "final agency action." *See id.* (collecting cases); *Texas v. United States*, 524 F. Supp. 3d 598, 642 (S.D. Tex. 2021). In *Texas v. U.S.*, a 100-day pause on deportations was final agency action because it became effective

immediately and called for the agency to abandon a statutory duty. *Texas*, 524 F.Supp. 3d at 642-43. Here the IRS Moratorium was also effective immediately in September 2023, and conflicts with the IRS's statutory obligation to process refunds.

Defendants next argue that the Court lacks jurisdiction because "an adequate alternative remedy exists through a refund action" under 26 U.S.C. § 7422. *See* Dkt. 19 at 21. But StenTam lacks standing to bring a refund suit. *See, e.g.*, *Jewell v. United States*, 548 F.3d 1168, 1172 (8th Cir. 2008) ("standing to sue for a tax refund extends only to the taxpayer from whom the tax was allegedly wrongfully collected"). StenTam is the only plaintiff in this lawsuit. Because a refund suit is unavailable to StenTam, there is no bar to Plaintiff's suit under the APA.

StenTam also does not sue for payment of any tax. It sues to compel IRS to perform ministerial duties. *See Govig & Associates, Inc. v. United States*, No. CV-22-00579-PHX-DGC, 2023 WL 2614910, at *6 (D. Ariz. Mar. 23, 2023) (APA claims were proper where no tax penalties or refunds were implicated); *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008 (N.D. Cal. 2020) (granting motion for preliminary injunction); *Cohen v. United States*, 650 F.3d 717, 733 (D.C. Cir. 2011) ("Congress has not required exhaustion in APA suits challenging the adequacy of IRS procedures, only in suits 'for the recovery of any internal revenue tax.'"); *King v. Burwell*, 759 F.3d at 366 ("the plaintiffs are not seeking a tax refund; they ask for no monetary relief, alleging instead claims for declaratory and injunctive relief").

### 4. The ERC Suspension is Without Statutory Right Under 5 U.S.C. § 706(2)(C)

Although Defendants argue the Moratorium is not "arbitrary and capricious" [Dkt. 19 at 22], StenTam sues instead under 5 U.S.C. § 706(1) and (2)(C) because IRS lacks statutory authority to suspend the ERC. Dkt. 1 at ¶¶147-167. Because the agency lacks authority, it cannot justify ultra vires conduct through "pleas of administrative convenience." *See* Dkt. 14 at 17-19 (quoting *Chavez v. Garland*, 593 U.S. 155, 169 (2021)). The Court should disregard Defendants' argument under 5 U.S.C. § 706(2)(A).

But relevant to whether the agency acted appropriately is the fact that the IRS had much less burdensome alternatives available, including amendments to its Form 941-X

return that would allow IRS to easily segregate higher-risk ERC claims or seek more information from taxpayers. The IRS routinely amends these Forms and did so each year in 2021 through 2024.[13] It imposed a Moratorium, in part, because it allegedly had difficulty evaluating ERC claims. *See* Dkt. 19-1 ¶15. Requiring more information at the filing stage could have resolved those concerns. The IRS instead suspended the entire program.

### B. StenTam Suffers Irreparable Harm

Analysis of StenTam's irreparable injury overlaps its position on Article III standing. *See supra* at Part II.A.1. StenTam incorporates those positions here. Defendants fail to controvert evidence of irreparable harm and do not credibly address threatened future losses.

First, StenTam provided evidence that ongoing processing delays caused it to incur high-interest debts to cover notes that are coming due because of the IRS delays. Dkt. 14-1 ¶¶44-45. The IRS argues that its delay is not a causal factor because IRS cannot guarantee that it will process StenTam's claims any faster. Dkt. 19 at 26. StenTam's unrebutted data showed that IRS processed an average of 80 StenTam client claims per week leading into the Moratorium, but those activities then abruptly stopped after the suspension. Dkt. 14-1 ¶¶20-29. The data proves that, but for the Moratorium, StenTam would be receiving payments on at least some of its outstanding debts.

Second, the IRS does not credibly address StenTam's loss of new ERC business with the cutoff for ERC claims looming in April 2025. *See supra* Part II.A.1. Defendants argue that StenTam's drop in business could have resulted from other factors, including "the fact that the ability to claim the ERC is ending." Dkt. 19 at 25. But IRS does not dispute that, if StenTam loses future business, that harm would be irreparable given the expiry of the program in April 2025. StenTam need not show the Moratorium "is the exclusive cause of the injury" or that injury will certainly occur. *Scholl*, 489 F. Supp. 3d at 1037. It must only show "that irreparable injury is *likely* in the absence of an injunction." *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012) (emphasis original). It meets that burden here.

---

[13] *See* IRS Prior Year Forms, *at* https://www.irs.gov/prior-year-forms-and-instructions?find=form%20941-X&items_per_page=200.

Third, business taxpayers were required to amend 2020 and 2021 business income tax returns to include expected ERC as taxable income. While many businesses complied with that obligation, many other businesses are financially unable to pay the associated tax liability because of delays in IRS processing. The lack of funds, and uncertainty from processing delays, will lead to a significant number of businesses refraining from filing the required amended returns, consequently exposing them to potential civil fraud allegations by the IRS for failing to amend their income tax filings. The Moratorium will soon obligate StenTam to prepare protective refund claims to protect clients against these losses should the IRS disallow ERC claims close to the April 2025 deadline to amend income tax returns. *See supra* at Part II.A.1. StenTam must expend those resources without compensation. Supp. Decl. Stenson ¶¶3-9. If the IRS issued a decision within the limitations period, many StenTam clients would not need such services. The Moratorium therefore heightens the likelihood that these compliance burdens will come due. The IRS does not address this threatened injury.

### C. The Balance of Equities and Public Interest Support an Injunction

Defendants overlook the consequences of the ERC suspension. They do not dispute that the Moratorium will cause a run on the courts. They encourage that outcome but accept no blame, arguing: "If taxpayers seek relief in district courts, they would be doing so because Congress, not the IRS, provided for that means of obtaining relief." Dkt. 19 at 26. But the IRS is objectively the party at fault. Hundreds of thousands of taxpayers are held hostage by the Moratorium. The IRS claims to have over 1.4 million backlogged ERC claims and, because of the Moratorium, nearly all are beyond the § 6532(a) six-month window and can therefore proceed to district court. If even a fraction of those taxpayers file suit, the DOJ and federal courts must manage thousands of new cases. This is an unwarranted burden on the judiciary. The IRS—not the federal courts—is tasked with processing tax claims in the first instance.

Defendants' strategy to force taxpayers into litigation ignores another burden in the form of litigation costs. Taxpayers should not bear those expenses to recover tax credits designed to restore losses from government shutdown orders during the pandemic. The

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

public is not disserved by compelling the IRS to resume processing. The public is instead best served if the IRS processes claims as Congress intended. *See, e.g.*, Exh G; Exh. H.

The IRS's rationale for continuing its Moratorium is also difficult to reconcile factually. The IRS concedes that nearly all pending ERC claims in its inventory are subject to mounting interest payouts. Dkt. 19 at 14 (citing 26 U.S.C. § 6611). If the 1.4 million backlogged claims average just $50k per claim (a conservatively low value), with an interest rate at 4% (another conservative assumption), and an average delay of 18 months, the government will carry a mounting interest obligation of over $4.2 billion on claims that IRS has refused to process. The true interest values are likely much higher. By contrast, in March 2024, the IRS claimed to have identified a universe of $3 billion in potentially fraudulent claims with another $1 billion recovered through the Voluntary Disclosure Program.[14] In short, the IRS's Moratorium is costing the American public more than IRS is recovering through its efforts to crack down on ERC submissions.

### D. A Narrow Injunction is Impractical

Defendants argue that "[e]ven if StenTam is entitled to an injunction, it should be limited to StenTam." Dkt. 19 at 27. They do not explain how that injunction could be narrowly tailored to avoid the chill on future ERC business. At a minimum, the IRS must rescind public statements declaring that the ERC program is suspended. That point notwithstanding, if the Court deems a nationwide injunction improper or impractical, StenTam agrees that injunctive relief should then be limited to StenTam. At a minimum, that injunction would require the IRS to process outstanding ERC refund claims submitted through Stenson Tamaddon, LLC, or any of its affiliates and subsidiaries. StenTam can supply a confidential list of accounts as a component of that injunction.

### III. CONCLUSION

For the foregoing reasons, the Court should grant preliminary injunctive relief. StenTam has established that the IRS lacks legislative authority to unilaterally suspend the ERC program, and StenTam suffers irreparable harm from the Moratorium.

---

[14] *See* IR-2024-78 (Mar. 22, 2024), *at* https://tinyurl.com/IR-2024-78-2.

DATED: June 28, 2024.

                                                  Respectfully submitted,

                                 By:    */s/ Peter A. Arhangelsky*
                                                    Peter A. Arhangelsky, Esq. (SBN 025346)
                                                    GREENBERG TRAURIG, LLP
                                                    Em: peter.arhangelsky@gtlaw.com *Attorney for Plaintiff Stenson Tamaddon, LLC*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

16
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION