**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Stenson Tamaddon, LLC, | ) | |
| | ) | No.  2:24-cv-01123-SPL |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | July 16, 2024 |
| United States Internal | ) | 9:01 a.m. |
| Revenue Service, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**PRELIMINARY INJUNCTION HEARING**</u>

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                     **A P P E A R A N C E S**

2

   For the Plaintiff:
3
        GREENBERG TRAURIG, LLP
4       By:  Peter A. Arhangelsky, Esq.
        2375 E. Camelback Road, Suite 800
5       Phoenix, AZ 85016

6  For the Defendants:

7       U.S. DEPARTMENT OF JUSTICE
        By:  Amy T. Matchison, Esq.
8       P.O. Box 683
        Washington, DC 20044
9
   Also Present:
10
        Mr. Mike Mitchell
11       (Stenson Tamaddon client representative)

12       Mr. Eric Stenson
        (Stenson Tamaddon client representative)
13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (Proceedings commenced at 9:01 a.m.)

3          THE COURTROOM DEPUTY:  We're on the record in

4   CV-24-1123, Stenson Tamadddon LLC versus United States Internal

5   Revenue Service, before the Court for a preliminary injunction

6   hearing.

7          Counsel, please state your appearances for the record.

8          MR. ARHANGELSKY:  Good morning, Your Honor.  Peter

9   Arhangelsky --

10         THE COURT:  I'm going to ask all the lawyers to make

11  sure you speak directly into a microphone so it will record

12  you, please.

13         MR. ARHANGELSKY:  Good morning, Your Honor.  Peter

14  Arhangelsky on behalf of Stenson Tamaddon, plaintiff in this

15  matter.  With me at counsel table is Mike Mitchell, client

16  representative, chief legal officer; and Eric Stenson with

17  Stenson Tamaddon.  He's the CEO, Your Honor.

18         THE COURT:  Good morning to all of you.

19         MS. MATCHISON:  Good morning, Your Honor.  Amy

20  Matchison.  I represent the United States.

21         THE COURT:  Good morning to you as well.  Everyone

22  just remain in your seats.  I have a lot of questions for all

23  of you.  It's very important if -- I mean, obviously I know who

24  the defense is, but if you have multiple lawyers at plaintiff's

25  table, please make sure you tell me who you are so we'll have a

1   clear record.

2           By way of background in this case, the Stenson

3   Tamaddon LLC, which is the plaintiff, is a tax advisory firm

4   based in Phoenix, Arizona, that assists businesses with filing

5   for tax credits and other financial advising.  Plaintiff's

6   business model involves helping clients identify and apply for

7   tax credits and other government incentives.  Plaintiff

8   partially derives their profits from the tax refund issued to

9   their clients from the Internal Revenue Service.

10          In this case, the plaintiffs claim that Defendant IRS

11  improperly instituted a moratorium on processing refunds for

12  the Employee Retention Tax Credit, also known as the ERC

13  program.  This tax credit was established by the CARES Act of

14  2020 in response to the COVID-19 pandemic.

15          The ERC is only available for claims during 2020 and

16  2021, but taxpayers can retroactively claim ERC credit by

17  filing a Form 941-X within three years from the date of the

18  original return.

19          On September the 12th of 2023, the defendant IRS

20  announced a moratorium on processing new claims under the ERC,

21  initially until December the 31st of 2023, but now that end

22  date has been extended indefinitely.

23          Defendant IRS claims to have instituted this

24  moratorium due to a surge in ineligible and fraudulent claims.

25  The defendant IRS states that they initiated the moratorium

1    because of concerns inside the agency as well as from tax

2    professionals and media reports that a substantial share of new

3    ERC claims from the program were ineligible and that businesses

4    were increasingly being put at financial risk by being scammed

5    by third-party promoters.

6            Defendant IRS claims to have processed about

7    3.6 million valid claims, with 1.4 million remaining.

8    Defendant IRS further claims that as a policy matter, the

9    moratorium allows them to sort through these millions of claims

10   to determine whether they are fraudulent.

11           On May the 14th of 2024, plaintiff filed suit seeking

12   injunctive and declaratory relief against defendant IRS along

13   with a number of other government agencies.  On May the 30th of

14   2024, plaintiff filed a motion for preliminary injunction,

15   requesting a nationwide injunction against the defendant IRS.

16   Plaintiff's proposed injunction includes a lifting of the

17   moratorium, processing of tax returns within a reasonable

18   amount of time, retracting of public statements about the ERC

19   program by the IRS, and repeated status updates from the

20   agency.

21           Plaintiff alleges that there are about 1.4 million

22   backlogged claims, with an estimated government interest

23   obligation of over $4.2 billion on those claims.  Plaintiff

24   justifies this injunction under the Administrative Procedure

25   Act, also known as the APA, which is 5 United States Code

1    Sections 701 through 706.

2            The defendants oppose the requested preliminary

3    injunction on several grounds.

4            Plaintiff, I have several questions for you.  Again,

5    if you're speaking, let me know who you are and speak directly

6    into the microphone.

7            As it relates to standing, does the moratorium allow

8    you to file new claims which are simply not processed, or not

9    allow you to file new claims at all?

10            MR. ARHANGELSKY:  Thank you, Your Honor.

11            THE COURT:  Sir, you can just remain in your seat.

12    Just make sure you move the microphone towards you.

13            MR. ARHANGELSKY:  Certainly.  This is Peter

14    Arhangelsky with Greenberg Traurig.

15            I think that the course of conduct indicates that

16    parties are filing, and they continue to file, claims with the

17    IRS; and the IRS is simply not processing or taking any action

18    on claims that are coming through the door following the

19    moratorium.  I think the larger concern, however, is the IRS is

20    chilling the market by telling businesses that the program is

21    effectively shuttered and cautioning businesses to wait until

22    the moratorium is lifted before actually filing those claims.

23            So in practice, even if the IRS is actually receiving

24    those claims, there are a host of businesses that are not

25    actually filing them, in reliance on the agency's public

1    commentary about the program.

2              THE COURT:  Okay.  To clarify, do you currently have

3    clients who wish to file an ERC claim but cannot because of the

4    moratorium?

5              MR. ARHANGELSKY:  I don't think we have any -- I can't

6    identify any specific client at this point that would file but

7    for the moratorium.  I think the wise thing to do, because we

8    feel like this is an unlawful action from the agency, would be

9    to file the claim and pursue it in some way.

10             THE COURT:  Okay.  You stated on Page No. 14 of your

11   motion, which is Document No. 14, I quote:  Without preliminary

12   relief, businesses with legitimate ERC claims may lose their

13   ability to pursue those funds.  And that's at page 14.

14             How is that true if your clients are able to file a

15   Form 941-X before the April 15, 2025, deadline and preserve

16   their claim?

17             MR. ARHANGELSKY:  Because there are businesses that

18   are watching what's happening and they're waiting to file, and

19   the IRS is not informing those businesses that if they don't

20   file for the ERC by April 2025, they will in fact lose their

21   ability to pursue that relief.

22             So a business that's waiting on the sidelines right

23   now to see whether the IRS is going to resume processing claims

24   within a reasonable period of time, they may not understand

25   that they're going to lose their rights in April, and they're

1    not coming to a client like Stenson Tamaddon saying they're

2    interested in pursuing these claims because, I think

3    rightfully, they understand the IRS is going to do nothing with

4    them.

5              And I think the concern is that -- this is embodied

6    within the files that they -- their declaration.  I think they

7    concede that in the weeks following the moratorium, there was a

8    very precipitous drop-off in new filings under the ERC program.

9    That's because the moratorium is working as the IRS desires it

10   to, which is to chill participation in the program.  There

11   really --

12             THE COURT:  Is it truly -- let me stop you for a

13   moment.

14             Is it chilling their participation or they simply

15   don't have the personnel to process?  Do you advocate that they

16   hire hundreds of thousands of new people to make sure that they

17   can process the millions of claims?

18             MR. ARHANGELSKY:  Well, chilling participation in the

19   programs is a separate question as to whether the IRS can

20   handle the body of claims that are coming through the door.

21             I think the point of the moratorium is -- and I think

22   they concede this even in their recent press release, that the

23   moratorium is designed to limit participation so the IRS can

24   perhaps recover from the backlog or otherwise.

25             But that -- but companies that are still waiting to

1  file, companies that still have legitimate ERC claims, are

2  likely waiving their ability to pursue this because they think

3  the program is subject to a suspension.  And --

4         THE COURT:  Okay.  Well, let me stop you there, and I

5  appreciate that.

6         If your clients are able to file their ERC claims now,

7  then why do you repeatedly reference the April the 15th of 2025

8  deadline in all of your filings?

9         MR. ARHANGELSKY:  Several reasons.  The

10 April deadline, it's relevant to -- it cuts the program off, so

11 for new business -- and that's one of our allegations, is that

12 Stenson Tamaddon suffers from the loss of new ERC business, and

13 that door closes in April.  And April is also the end of the

14 statutory window for existing clients to amend their personal

15 income tax returns.

16        So if, for example, if the IRS doesn't reach a

17 decision on their pending ERC claims before that time frame,

18 they may be out of luck in being able to amend their personal

19 income tax returns to reflect the changes that happen if IRS

20 should disallow part or all of their ERC claim.

21        THE COURT:  So how do you know you will have clients

22 who want to file ERC claims in the future but currently have

23 not?  If that's the case, what evidence do you have to support

24 this?

25        MR. ARHANGELSKY:  I mean, I think our -- it's

1    difficult, obviously, when you're looking at a market

2    prospectively.  But I think the best evidence is the indication

3    of the drop-off in participation within the program.

4        THE COURT:  So you're telling me it's sheer

5    speculation on your part?

6        MR. ARHANGELSKY:  I don't think it's speculation.  I

7    think you can look at historical data, and you have Stenson

8    Tamaddon, which is filing -- it was able to file 4,000 claims

9    in 2022, 4,000 claims in 2023; and following the moratorium --

10       THE COURT:  So you're telling me you don't have any

11   evidence then?

12       MR. ARHANGELSKY:  Well, I don't -- I think that's a

13   hard conclusion to reach here.  Because do I have a situation

14   where a client has come to Stenson Tamaddon and expressly said

15   that but for the moratorium they would have filed?  No, I can't

16   give you that.

17       But I can say that it's -- the effect of the

18   moratorium in the market is apparent.  And it's apparent

19   through the filings that are coming through the door that are

20   historically abnormal when you compare those to what had

21   happened immediately before the moratorium.

22       THE COURT:  Have you entered into any contracts or

23   formal business relationships which relied on the processing of

24   ERC claims and subsequent issuance of refunds by the IRS?

25       MR. ARHANGELSKY:  I'm sorry, can you clarify that,

1    Your Honor?

2         THE COURT:  Yes.  Have you entered into any contracts

3    or formal business relationships which relied on the processing

4    of the ERC claims and subsequent issuance of the refunds by the

5    IRS?  In other words, have you stood up businesses based on

6    what you perceive you would receive from the IRS by way of a

7    percentage of a refund?

8         MR. ARHANGELSKY:  Yes.  They -- I'm being told that

9    they have entered into those agreements, Your Honor.

10        THE COURT:  Can you give me a figure in terms of how

11   much business in a dollar amount?  Is it millions?  Is it

12   billions?  Is it anything?

13        MR. ARHANGELSKY:  I've been told it's approximately

14   25 million.

15        THE COURT:  I'm sorry?

16        MR. ARHANGELSKY:  It's approximately 25 million.

17        THE COURT:  Okay.  As it relates to traceability, what

18   evidence do you have to support the assertion that your clients

19   withdrew their ERC claims because of the moratorium?

20        The gentleman in the middle there, Counsel, is he a

21   lawyer?  Or you're the only lawyer at the table?

22        MR. ARHANGELSKY:  I'm counsel for Stenson Tamaddon,

23   and I'll clarify.  This is Mike Mitchell, sitting beside me.

24   He's the chief legal officer for Stenson Tamaddon.  He is an

25   attorney.  He's the client representative.  And on my other

1    side here is Eric Stenson.  He's the CEO of Stenson Tamaddon.

2            THE COURT:  Very good.  Go ahead.

3            MR. ARHANGELSKY:  So the answer to your question was,

4    yes, they have.  They have received notices of withdrawal from

5    clients that have indicated those clients are withdrawing from

6    the program during the moratorium period.

7            THE COURT:  Counsel, let me ask you, what will your

8    clients do if the moratorium is hypothetically lifted tomorrow?

9    What would happen?

10           MR. ARHANGELSKY:  The clients themselves would

11   probably be overjoyed in the sense that they -- that they would

12   likely begin to see some action and activity from the IRS on

13   these claims processing, which they've been waiting in some

14   instances two years or more for their -- for ERC that's

15   congressionally guaranteed.

16           THE COURT:  How do you know that the imposition of the

17   moratorium is what caused your alleged economic harm and not

18   some other motivation by these third parties not before the

19   Court?

20           MR. ARHANGELSKY:  Which third parties are you

21   referencing, Your Honor?

22           THE COURT:  In the pleadings, you have other

23   interested parties that are making arguments about the lack of

24   funds as well as it relates to the refunds by the IRS.

25           MR. ARHANGELSKY:  Well, I think -- I think the primary

1    injury that we've alleged is the lack of receipts in money and

2    the deprivation of money by Stenson Tamaddon.  I think that's

3    clearly traceable to the moratorium and not influenced by the

4    third parties that you reference because it's a simple fact

5    that if the IRS was processing claims as they were before the

6    moratorium, Stenson Tamaddon may not have been paid in full,

7    but certainly a significant number of their accounts.

8        And we know this because the IRS, in the months

9    leading right into the moratorium, the IRS cleared 600,000 ERC

10   claims in those several months.  It's certainly within the

11   IRS's capability to be able to process these claims.

12       They've done 3.6 million claims over the course of two

13   years in 2022 and '23, essentially.  These numbers are not --

14   it's not unreasonable to think that if the IRS was actually

15   doing the job that they're statutorily required to do, that we

16   would have a significantly different footing right now for

17   Stenson Tamaddon.

18       THE COURT:  Counsel, just to make sure I'm clear when

19   I go back through the record, how would lifting the moratorium

20   provide you relief?

21       MR. ARHANGELSKY:  Well, lifting the moratorium

22   provides relief -- first of all, it allows for participation

23   again in the program by those companies that are waiting in the

24   wings to rejoin.  Secondarily, it allows Stenson Tamaddon to

25   start seeing some response from IRS on its pending claims.

1          And whether -- wherever they sit in the queue, lifting

2     the moratorium leads to more rapid response from the agency.

3     It may not be that there -- that this is a complete relief, and

4     we've cited cases in our reply brief indicating that that's not

5     even necessary.  But it will definitely help.  Any progress is

6     better than no progress.

7          THE COURT:  If the moratorium were to be lifted, the

8     IRS would go from having 800,000 ERC claims to about

9     1.4 million.  Since you have no idea where you are in that

10    stack of ERC claims, how does the moratorium change anything

11    for you?

12         MR. ARHANGELSKY:  I think it's -- I think they said

13    they have 1.4 million.  And as we mentioned before, immediately

14    prior to the moratorium, Stenson Tamaddon was seeing clearance

15    notices, payment notices from IRS at a rate of about 80 clients

16    per week.  IRS cleared about 4,000, 4,100 Stenson Tamaddon

17    clients per year in 2022 and '23.

18         So even if we see a reduction in the pace at which the

19    IRS processes these claims, you're going to see something, and

20    it's going to advance the ball.  We've pointed out in our

21    briefs and Mr. Stenson's declaration, that number after the

22    moratorium went from 80 per week to zero.  And it has remained

23    that way because the IRS is simply not processing claims right

24    now, despite their statutory obligation to do so.

25         THE COURT:  Counsel, if the moratorium were to be

1    lifted and the IRS then became flooded with new ERC claims,

2    wouldn't this just delay your clients from being paid and in

3    effect prevent you from obtaining the relief that you're

4    seeking at this point?

5          MR. ARHANGELSKY:  No, I don't think so.  I mean, I

6    think the IRS is largely operating on a first-in, first-out

7    basis.  Even if they're prioritizing certain claims, again, the

8    point is that progress is being made.

9          And we shouldn't be in a position where we are sort of

10   disenfranchising businesses with legitimate ERC claims just

11   because we're worried about the burden on the IRS.  Given

12   historically what they've been able to manage in the past, they

13   could easily process all of the pending backlog probably in six

14   months when you think about how they processed 600,000 claims

15   in just several months leading into the moratorium.

16         I think that, yes, there could be some administrative

17   burden as a result of an influx in new claims.  But as I think

18   the law is very clear, administrative burden, arguments of

19   burden and arguments of convenience are not a justification for

20   the agency to step all over its statutory obligations.

21         THE COURT:  Just one moment.

22         Counsel for the government, what are your thoughts

23   about the plaintiff just indicated on the record that with due

24   diligence, basically, you could clear this waiting -- you could

25   clear all of these applications within a half year amount of

1  time?

2           MS. MATCHISON:  Your Honor, I believe that's a false

3  assumption.  I think that StenTam is relying upon the

4  processing time pre-moratorium to resume as soon as the

5  moratorium is lifted, and all the IRS's statements since before

6  the moratorium -- just about before the moratorium and since

7  then have been that this process is going to take a lot longer

8  than it took beforehand because of all these ineligible claims

9  that are being filed and because the IRS is now taking a closer

10  look at every single claim.

11           And so even if the moratorium lifted, the IRS has been

12  very clear, this is still going to take a long time and they're

13  going to process the claims, they're going to continue to

14  process the claims -- they have not stopped -- on a first-in,

15  first-out basis.

16           So I think that to say that the IRS could do this in

17  six months, maybe if the IRS just went ahead and approved

18  everything that was before them in six months they could get it

19  done, but that's simply not going to happen, nor would we want

20  that to happen.  The IRS -- it's much harder for the IRS to get

21  money back once it's been sent out than it is to prevent it

22  from going out to folks that are ineligible.

23           THE COURT:  Do you know if there's a potential

24  criminal component to this alleged fraud that's being committed

25  large-scale?

1          MS. MATCHISON:  I do know that the IRS, and they have

2     made this public in their press releases, that the IRS has been

3     looking at folks for criminal charges and they have conducted

4     investigations.  I believe they're also -- and I believe that's

5     for individuals.

6          Separately, they're also looking at the promoters, and

7     there can be promoter examinations where they go after the

8     folks that are specifically promoting the miseducation, the

9     misrepresentation as to what the ERC program is about.

10          THE COURT:  Thank you very much.

11          Plaintiff, does the moratorium prevent the six-month

12     waiting period pursuant to 26 United States Code

13     Section 6532(a) from starting?

14          MR. ARHANGELSKY:  Well, in reference to the ability

15     for parties to go to the district court within six months, it

16     doesn't start that period from tolling.  I think there's an

17     inherent problem, though, when you're telling taxpayers

18     nationwide that their only recourse from an agency that's no

19     longer doing its essential job function is to file district

20     court actions across the country to recover tax overpayments.

21          The district courts should not be the forum of first

22     impression for resolution of tax liabilities.  I think that's

23     one of -- that's actually one of the injuries that we cite in

24     our brief on the equitable side, because these cases have costs

25     to them.  Businesses -- a business that's trying to recover a

1  $60,000 ERC credit is going to go and pay a hundred thousand

2  dollars or somewhere -- an exorbitant amount of legal fees to

3  be able to pursue that in district court, to recover that?

4          I don't think it's appropriate to funnel these

5  taxpayers into district court just to be able to recover what

6  Congress has said that they're entitled to recover.

7          THE COURT:  As it relates to prudential standing, how

8  are your interests implicated by the CARES Act instructions for

9  the ERC or the Internal Revenue Code's instructions for issuing

10 refunds when it's your clients filing tax returns and not you?

11         MR. ARHANGELSKY:  Sure.  First, at the outset, I think

12 the prudential standing doctrine is obviously a very low burden

13 in these APA cases, and I think also the Supreme Court in

14 *Lexmark* has expressed significant caution with the viability of

15 that doctrine moving forward because the district courts have

16 an unflagging obligation to exercise jurisdiction.

17         But I think -- and again, we cited this in our reply

18 brief.  The IRS's own declaration, the O'Donnell declaration,

19 paragraph 13, outright concedes that because of the complexity

20 of the ERC credit, it was entirely foreseeable that taxpayers

21 were going to use the services of tax preparation companies and

22 tax advisers; and it was therefore imminently foreseeable that

23 these companies were going to receive revenues and generate

24 business as a result of it.

25         And if you -- if the injury here -- and the focus is

1    on the injury for prudential standing.  If the injury is the

2    discontinuation of payment on these claims, that's obviously

3    affecting everyone that's in the chain of commerce when it

4    comes to these types of refund actions.

5            THE COURT:  Just one moment.

6            MR. ARHANGELSKY:  And, Your Honor, if -- I don't want

7    to take us out of the order but --

8            THE COURT:  I'm sorry, Counsel, I was just writing

9    down something that you had just placed on the record.  I'll

10    let you place your thoughts on the record in just a moment.

11           Go ahead, please.

12           MR. ARHANGELSKY:  Well, I wanted -- if -- may it

13    please the Court, I did want to respond to opposing counsel's

14    argument on the concept of fraud within the program.  I think

15    it's an important point to make.

16           That fraud is not ineligibility.  Fraud is something

17    that's very different here.  Fraud is where a company, let's

18    say these taxpayers, they file and they lie outright in their

19    papers.  They file for ERC because -- on behalf of a fictitious

20    company, or they lie about their payroll data, or they lie

21    about the number of employees they have.  Those are, from all

22    indications, very rare instances, especially even when you

23    consider the IRS's data on criminal enforcement.

24           What we're really talking about here is ineligibility

25    issues, and that is very dangerous and we are highly skeptical

1    of the government's position on this idea that all of these

2    claims are somehow ineligible.  And we very strongly think that

3    what is happening here is the IRS is taking action to

4    unlawfully narrow the statute in its interpretation.

5        THE COURT:  Is the IRS' position that all of the

6    claims are ineligible, or they need to strictly scrutinize the

7    ones more because they've had so many occasions of fraud as it

8    relates to processing the claims?  Can we use a broad brush on

9    the issue?

10       MR. ARHANGELSKY:  So that's the point.  I don't think

11   they have any indication that there's widespread fraud.

12   They're claiming now that there's widespread ineligibility, but

13   it's a very different concept.  And what they're doing -- and

14   they wrote in a recent press release that they think that

15   there's up to 90 percent of the current claims that are pending

16   before the agency are potentially ineligible or show a high

17   risk.

18       What they're effectively doing to get there is they're

19   narrowly interpreting the statute in an improper way to be able

20   to say, post hoc, we don't agree that all these claims fall

21   within the statute.  That's very different than saying somebody

22   lied to us or submitted false date.

23       That's the IRS taking an unsupported legal position

24   that in our -- it's part of our case, and we'll argue this

25   later on the issue of the Notice 2021-20.  But we have to

1  understand that their position that there's ineligibility in

2  these numbers is absolutely absurd based on the data.

3           THE COURT:  Counsel, as it relates to statutory

4  standing and agency discretion, assuming that the IRS

5  eventually processes all ERC claims, wouldn't the timing of

6  when they process these claims be within their discretion?

7           MR. ARHANGELSKY:  Well, I don't think so.  I don't

8  think the agency has blanket discretion to act whenever they

9  please.  I mean, there's --

10          THE COURT:  Well, in the statute, does it define how

11 long they have to process?

12          MR. ARHANGELSKY:  Well, I think we've argued that the

13 plain meaning of Section 6402(a) requires the IRS to take

14 prompt action within the statutory window.  I don't --

15          THE COURT:  How do you define "prompt"?

16          MR. ARHANGELSKY:  Well, there's -- the statutory

17 window as it's defined for purposes of 6402(a) is three years

18 from the date the original tax return is filed or two years

19 after the tax is paid, whichever is later.

20          But even if we're not going to say there's a hard

21 deadline in the statute itself, I think the APA and Section 5

22 USC 555(b) applies to the IRS in the circumstances and imposes

23 an obligation on the IRS to act within a reasonable time frame.

24 Reasonable time frame is evaluated based on the statutory

25 scheme as a whole.  And when we look at the statutory scheme,

1    we see indicia all over the place that Congress intended the

2    IRS to act very quickly on these cases.

3            The six-month window for a taxpayer to go to district

4    court and sue the IRS is a very clear indication that Congress

5    wanted prompt action on these.  That waiver of sovereign

6    immunity is an extraordinary measure in the statute, and it

7    can't be that Congress expected taxpayers to be routinely

8    filing civil actions against the IRS for recoupment of

9    overpayments.

10           So what Congress likely planned for was that these

11   cases would, on balance, always be resolved at the

12   administrative level.  Congress also said interest payments

13   that begin to accrue at 45 days after refund is tardy.  That's

14   another example of how Congress would have expected prompt

15   action on these refunds to avoid cascading penalties to the

16   public fisc in the form of mounting interest.

17           And we talked earlier also about the statutory windows

18   closing and taxpayers losing their rights to take important

19   actions to protect themselves after that three-year point,

20   another -- yet another example of how Congress would have

21   expected IRS to have these issues wrapped in a very prompt

22   manner.

23           So even if we're falling into this category where

24   we're looking at reasonableness under the APA and Section 555,

25   I think we still have all indications that the IRS cannot just

1   sit on their hands.  They cannot just wake up one morning and

2   decide they're not going to do that which is essentially their

3   core job for American taxpayers.

4          THE COURT:  Counsel, what I'm going to ask you to do

5   is, for both of you, when we finish the question portion, I'll

6   give you an opportunity to make any arguments you need to on

7   the record.  When I ask you a question, just answer the

8   question.  This additional commentary, I don't need.

9          As it relates to final agency action, why should the

10  moratorium be considered a final decision by the agency when it

11  can be reversed at any moment?

12         MR. ARHANGELSKY:  Well, the -- just because the agency

13  can reverse its position doesn't make it nonfinal.  I think

14  we've seen that plenty of times in the case law, and we gave

15  Your Honor cases in our reply brief:  *Louisiana v. Biden*, which

16  was one of them; *Texas v. Biden*, involving just a hundred-day

17  pause on deportations.

18         Just because an agency action is fleeting or transient

19  doesn't mean it doesn't qualify as a final agency action that

20  represents the agency's -- you know, the end of the agency's

21  decision on the matter and imparts significant changes to

22  rights and obligations.  I think this has all the hallmarks of

23  that here.

24         THE COURT:  Counsel, how has the moratorium affected

25  your legal rights or obligations when your clients are the only

```
1    regulated parties affected by the ERC program?

2            MR. ARHANGELSKY:  Can you clarify that we're the only

3    legally regulated entities, Your Honor?

4            THE COURT:  The only regulated parties in terms of the

5    ones capable of filing the actual claim.

6            MR. ARHANGELSKY:  Well, so the clients, they have a

7    right to file a tax refund claim.  They have the right to

8    pursue the -- right?  I think the question is, does Stenson

9    Tamaddon have Article III standing with respect to an injury.

10   Can they articulate an injury under Article III.  They have.  I

11   think they --

12           THE COURT:  Because the injured party is actually the

13   person who's filing with the IRS, using their tax

14   identification number or SSN.  So I'm just curious what your

15   position is because you have a company representing an interest

16   for a potential program and payout that they take a portion of,

17   so I'm just curious what your position would be.

18           MR. ARHANGELSKY:  Right.  So for purposes of a civil

19   claim for refund, that's correct, they would not have standing

20   to pursue that because only the clients would.  But for

21   purposes of filing an APA claim, challenging final agency

22   action that's not in the corporate law, there's no restriction

23   on Stenson Tamaddon's ability to appear before this Court

24   provided they have an Article III injury, and they do.

25           THE COURT:  Well, I've read through all the papers in
```

1    this case, and I know you all spent a lot of time on it, and I
2    really appreciate the high levels of lawyering in this case.
3    It's very refreshing.
4          But do you have any case law to support the idea that
5    public statements of a federal agency can be considered a final
6    agency action?
7          MR. ARHANGELSKY:  Well, I think the final agency
8    action that we challenge is the moratorium.  And the moratorium
9    is put into place through an -- and announced to the public
10   through public statements that they've put through their press
11   release.  And I think those are inextricably intertwined.
12   We're not necessarily challenging just a press release; we're
13   challenging the effect of the press release and what the agency
14   is actually doing.
15         So I guess, to put it differently, even if the agency
16   had never released a press release, we would still have a claim
17   against the moratorium.  We cite the press releases because it
18   reflects on the injury that we've alleged in our briefing.
19         THE COURT:  Let's shift focus to the likelihood of
20   success on the merits as it relates to Section 706(c)(2),
21   ultra vires.
22         Are you arguing that the IRS exceeded its statutory
23   authority under IRC Section 7803, 26 USC Section 6402, and
24   26 USC Section 3134, or are there additional statutes which
25   this Court should compare the agency's actions to in this case?

1          MR. ARHANGELSKY:  3134, yes.  6402, certainly, yes.

2    7803, there are components of 7803, including the Taxpayer Bill

3    of Rights, that we believe the agency is acting in conflict

4    with.

5          But 7803 is just a general statute that provides for

6    the Office of the Commissioner -- and I think my opponent has

7    cited that as giving discretion to the Commissioner, but we

8    disagree that that statute acts in that way.  It's not a

9    general -- it's not a statute that provides general discretion

10   on the part of the agency to rewrite congressional law.

11         THE COURT:  Counsel, how, then, does the moratorium

12   exceed the statutory authority of the Commissioner as granted

13   by the statutes that we just discussed?

14         MR. ARHANGELSKY:  Well, it's an action that's without

15   statutory right under the APA, under 706(2)(c), because the

16   agency simply lacks the power to act in conflict with

17   congressional intent and to take action -- agencies can only

18   act by operation of law given to them -- by authority given to

19   them by Congress.  The agency cannot just act in a vacuum, and

20   here it's essentially doing that.

21         And I think it's exercising legislative activities.

22   That's, I think, confirmed by when you think about the fact

23   that they just asked Congress for the exact same law.  They

24   asked Congress to pass legislation that would give to them the

25   right to do this, to sunset the program.  They were denied that

1   because it didn't pass in the Senate, and now you have the

2   agency assuming the same legislative authority that they just

3   asked Congress for.

4         I think it's -- obviously it's ultra vires agency

5   action.

6         THE COURT:  If, hypothetically, the IRS' computer

7   network crashed and the IRS ordered a moratorium on new claims

8   for only 24 hours, would this be within the Commissioner's

9   authority to administer, manage, conduct, direct, and supervise

10  the execution and application of the internal revenue laws or

11  related statutes pursuant to Section 7803(a)(2)(A)?

12        MR. ARHANGELSKY:  I think, so in our --

13        THE COURT:  That's a hypothetical.  I just want your

14  best estimate.

15        MR. ARHANGELSKY:  Right.  I mean, I think that's a

16  different -- it's hard for me to answer that because it's a

17  completely separate issue, obviously, when we're dealing in

18  this case.  It's an argument of impractically.  Essentially,

19  the agency is saying they just cannot process this.  Right?

20        And I think under those circumstances, the

21  hypothetical that you articulated would not offend any of the

22  issues because, again, 24-hour period wouldn't offend any of

23  the timelines we've been talking about at this point.

24        THE COURT:  Counsel, is it the length of the pause

25  that matters or just the act of the pause itself?

1          MR. ARHANGELSKY:  Well, I think it's -- I think

2     it's -- I, again, hate this answer.  I think it's a little bit

3     of both.

4          I'm not disputing that the agency may have -- may have

5     discretion to process individual claims within the system

6     according to certain agency priorities.  There will be claims

7     that are more complex than others, and nobody's saying that

8     they have to take everyone's claim first or otherwise.

9          We're dealing here with something that's of a

10    completely different nature, a completely different character.

11    We're dealing with a government that has shut down the entire

12    program categorically.

13         And I think if you look at cases like *Louisiana v.*

14    *Biden*, the courts have been quick to recognize that this is

15    something that is just different in character and scope.  It's

16    not agency exercising discretion to manage its affairs; it's

17    the agency fundamentally rewriting a congressional statute.

18         THE COURT:  Just one moment.

19         Counsel, under Section 706(1), unreasonable delay,

20    what factors from *Telecommunications Research and Action Center*

21    *versus the FCC*, which you know to be 750 F.2d 70 and 80 out of

22    the D.C. Circuit, 1984, ("TRAC factors"), support your argument

23    of unreasonable delay by the IRS?

24         MR. ARHANGELSKY:  So forgive me.  I don't think that

25    we have -- that we fully briefed the TRAC factors in our

1    briefing, and so I'll do this by memory if I can.  But I think

2    one of the core analyses that you'd go through if you look at

3    the TRAC factors is looking at delay in context with the

4    statutory scheme.

5         And I think I articulated a point before about this.

6    When you look at what is Congress's intent when it comes to

7    what the processing delays should be, and I gave you a number

8    of different instances -- the six-month period, the 45 days for

9    interest accruing, the three-year sort of limitation on agency

10   action on these claims -- all of these factors suggest that

11   Congress was anticipating the agency move quickly on this.

12        THE COURT:  How is the IRS's delay unreasonable when

13   they can only operate within the budgets -- the budget that

14   Congress gave them and they're being told to process millions

15   of claims, most of which are likely fraudulent?

16        MR. ARHANGELSKY:  Okay.  Well --

17        THE COURT:  Is it your position that it's not your

18   issue because it's the federal government's issue, because

19   they're responsible for processing these claims in a timely

20   way?

21        MR. ARHANGELSKY:  Well, I think that's a component of

22   it, because by not processing, what they're doing is they're

23   certainly shifting the burden onto the small businesses in this

24   country to do the job that the IRS is tasked and funded to do.

25        But I also disagree that there's rampant fraud in the

1    program.  We've talked about that.  I don't think the agency

2    has come anywhere close to substantiating that position, and I

3    don't think it's a basis for decision in this situation.

4         And so, yeah, I don't -- I just don't -- I'm sorry,

5    what was the second component to your question, Your Honor?

6         THE COURT:  The second component was the budget part

7    of it as it relates to Congress.

8         MR. ARHANGELSKY:  So, and again, we mentioned before,

9    the IRS hasn't had any difficulty conducting this program.

10   They've cleared 3.6 million claims in two years.  They cleared

11   600,000 claims in the months leading into the moratorium.

12        THE COURT:  So you're saying this is now a convenient

13   excuse?

14        MR. ARHANGELSKY:  I think it's a convenient excuse

15   from an agency that has been bent on trying to sunset this

16   provision for some time now.  And I don't think that that's a

17   mystery.  I think they said it publicly.  And I think the goal

18   of the moratorium is to do that which they're not able to do

19   legislatively because Congress hasn't given them that

20   authority.

21        THE COURT:  Sir, as it relates to balance of equities,

22   how are you directly harmed by the moratorium remaining in

23   place?

24        MR. ARHANGELSKY:  So with respect to the balance of

25   equities, well, I think we've argued that there's -- there are

1    obviously a lot of third parties, businesses, small businesses

2    nationwide that are hurting right now.  We've provided evidence

3    in our briefs of, and in declarations, of several businesses

4    that have been forced into bankruptcy, that have become

5    insolvent while waiting for ERC relief.

6           The point here is that the agency, by not acting, is

7    forcing these companies into this choice where they either

8    aren't going to receive their ERC before it's too late or

9    they're going to have to file and go through the expense of

10   filing tax refund cases in droves.  That's a burden not only on

11   those businesses, it's a burden on the court system.

12          And this credit was passed with incredibly broad

13   language because it was an economic stimulus during COVID.  The

14   idea was that it was trying to reward businesses for surviving

15   governmental orders during an unprecedented period.  Now that

16   we're looking at COVID in hindsight, I think it's easier to sit

17   back and say, well, we should cut this off, but these

18   businesses have come to rely on this money, and they've been

19   waiting.  And now it's looking bleaker and bleaker by the day

20   that they'll be able to actually get this.

21          And we talked in our brief also about the compliance

22   costs on these businesses.  Because if they don't get a

23   decision by April 2025, they're going to have to evaluate

24   whether they need to take additional steps and incur additional

25   funds in amending their tax returns again, filing protective

1    tax returns, on the contingency that the IRS denies part of

2    their claim or all of it.

3          And since the IRS is telling you in its briefing that

4    they're going to disallow a significant portion of these

5    claims, rightly or wrongly -- and we contend it's wrongly --

6    you're going to have a lot of businesses that are in a very

7    difficult position very soon.  It takes months to prepare those

8    protective tax returns.

9          THE COURT:  So your argument just now is part of the

10   reason why you believe the balance of hardships tips in your

11   favor?

12         MR. ARHANGELSKY:  Yes, Your Honor.  And it's also -- I

13   think it overlaps with some of the irreparable harm suffered to

14   Stenson Tamaddon because Stenson Tamaddon has to help its

15   clients prepare those filings.

16         THE COURT:  How can you say that you're harmed by the

17   moratorium when any delay could be the result of the IRS having

18   to process 1.4 million claims?

19         MR. ARHANGELSKY:  Well, again, I don't -- I think

20   the -- you know, the evidence is in the historical data.  We've

21   shown with declaration support that Stenson Tamaddon, right up

22   until the moratorium, right up until the buzzer, they were

23   getting 80 clients cleared per week, 4,000 per year.

24         When that number goes to zero after the moratorium, I

25   think that's a pretty clear indication of what's happening

1    here.

2    THE COURT:  Well, Counsel, as it relates to -- and

3    this is my last question for you.  As it relates to nationwide

4    injunction, why should this Court not lift the moratorium

5    only -- as only applied to your clients?

6    MR. ARHANGELSKY:  Well, I think there are components

7    to the relief we've requested that, you know, I don't think it

8    practically can be limited just to Stenson Tamaddon.  For

9    example, having the IRS provide clear guidance to the public

10   indicating that the moratorium -- that the ERC program is still

11   a viable option under the statute, rescinding some of these

12   statements about the moratorium and the suspension.  I think

13   that is necessary, and I think that that is necessary to

14   prevent the chill on future claims.

15   I don't know how we limit that to Stenson Tamaddon.

16   But to the extent the Court feels comfortable issuing a

17   narrower injunction -- and I understand that there's definitely

18   case law in recent times, including from the Supreme Court,

19   indicating that we should be looking narrower if possible --

20   Stenson Tamaddon is obviously comfortable with an injunction

21   that is limited to Stenson Tamaddon, provided it allows the IRS

22   or compels the IRS to process the claims that Stenson Tamaddon

23   ushered through to the agency.

24   THE COURT:  Counsel for the defense.  Ma'am, I'm going

25   to ask you to pull your microphone a little closer to make sure

```
1    we can properly record every word.

2         As it relates to standing and traceability, does the

3    moratorium toll the statute of limitations for filing a

4    Form 941-X or an ERC claim generally?

5         MS. MATCHISON:  No, Your Honor.

6         THE COURT:  Plaintiff alleges that businesses must

7    submit Forms 941-X for eligible 2021 quarters by April 15 of

8    2025.  What happens to those claimants if the moratorium is not

9    lifted by April 15 of 2025?

10        MS. MATCHISON:  The taxpayers are free to continue

11   filing claims for the ERC now.  They have since September 14th,

12   2023, and they will continue to be able to do so until that

13   date.  There is nothing preventing taxpayers from filing claims

14   right now.  The moratorium is just on the processing of new

15   claims.  It's not on the accepting of the -- of filings.

16        THE COURT:  Ma'am, hypothetically, if the moratorium

17   delayed a taxpayer's ability to file for ERC past the statute

18   of limitations, would this not thus be a de facto denial of

19   their ability to file a claim?

20        MS. MATCHISON:  Could you repeat that, please?

21        THE COURT:  Yes.  Hypothetically, if the moratorium

22   delayed a taxpayer's ability to file for ERC past the statute

23   of limitations, would this not thus be what's a de facto denial

24   of their ability to file the claim?

25        MS. MATCHISON:  I suppose, but again, the moratorium
```

1   is not preventing any taxpayer from filing a claim for the ERC.

2         THE COURT:  So is it your position that all claims

3   filed will be processed at some point?

4         MS. MATCHISON:  Yes, Your Honor.

5         THE COURT:  Ma'am, you claim that plaintiff's clients

6   are only temporarily delayed from receiving a refund, and

7   that's in Document No. 19.  But if the moratorium is indefinite

8   in duration, then would this not mean that these clients'

9   refunds are indefinitely delayed?

10        MS. MATCHISON:  Your Honor, I think it depends.  I

11  believe Stenson Tamaddon's declaration says they have like

12  1,900-some clients with claims before the IRS, but it's not

13  clear from their declaration how many of those are

14  pre-moratorium claims and how many of those are post-moratorium

15  claims.

16        So the IRS continues to process claims that were

17  received prior to the moratorium.  Those have been processed

18  this entire -- they're working on processing those this entire

19  time.  And at some point they will turn back to processing of

20  the new claims that have been received.

21        THE COURT:  Okay.  Ma'am, given that the moratorium is

22  currently indefinitely delayed, what is to prevent the IRS from

23  keeping it in place indefinitely?

24        MS. MATCHISON:  I mean, certainly Congress, Your

25  Honor.  Congress could certainly instruct the IRS at any point

1    to lift the moratorium by passing legislation to change -- to

2    make that view clear if that was in fact Congress's view.

3              THE COURT:  Just one moment.

4              MS. MATCHISON:  Sure.

5              I think, however, as a practical point --

6              THE COURT:  I'm sorry, ma'am, I was writing something

7    down.  I'll let you finish in just a moment.

8              MS. MATCHISON:  I apologize.

9              THE COURT:  Go ahead, please.

10             MS. MATCHISON:  I was just going to say, Your Honor,

11   as a practical matter, you know, the IRS is not looking to

12   chill anyone's rights or have anyone's meritorious claim not be

13   brought or submitted to the IRS, right?

14             I think what the IRS is trying to do is to grapple

15   with its responsibilities here in trying to both protect small

16   business owners that do have meritorious claims and making sure

17   they get paid at the same time as protecting the public fisc.

18   And so as the IRS is balancing those things, it's trying to

19   figure out the best way to move forward to make sure the folks

20   that are entitled to the money get the money and that U.S.

21   taxpayers aren't sending out money to folks that aren't

22   entitled to it.

23             THE COURT:  Well, I think plaintiff's counsel

24   indicated earlier that the IRS has submitted or put out press

25   releases, and in one of the releases there was -- and don't

1  quote me on it, obviously, but the IRS indicated that

2  approximately 90 percent were fraudulent.  Don't you think that

3  would cause a de facto chill?

4          MS. MATCHISON:  Your Honor, so in the very most recent

5  press release, the IRS -- since the moratorium, one of the

6  things the IRS has done, and they've done many things since the

7  moratorium, but one of them was to go ahead and review the data

8  from about a million claims.  They digitized and took a look

9  at --

10          THE COURT:  Ma'am, I'm going to ask you to just slow

11  down a little bit because I take a lot of notes; and I wish I

12  could write 180 words per minute, but I can't.  But I need you

13  to slow down.

14          MS. MATCHISON:  Yes, Your Honor.  I apologize.  I

15  actually apologized in advance to your court reporter because I

16  do tend to speak fast, so I will try --

17          THE COURT:  No, she's really good.  I'm the one that's

18  not that good.  But go ahead.

19          MS. MATCHISON:  So in the most recent press release,

20  the IRS made clear that they analyzed data from more than a

21  million ERC claims, which represented about $86 billion in

22  claims.  And what they found is that 10 to 20 percent of those

23  claims were high risk, meaning they showed clear signs of being

24  erroneous claims; 60 to 70 percent of those claims kind of fell

25  in this unacceptable risk category; while only 10 to 20 percent

1    of claims were low risk.

2          And so I think that what you see is that the IRS is

3    taking a look at this, and they're trying to figure out the

4    best way forward given the fact that a large number of these

5    claims may not be eligible.

6          THE COURT:  Counsel, turning to refund suits under IRC

7    Section 6532(a), does the moratorium prevent the six-month

8    waiting period from starting?

9          MS. MATCHISON:  No, Your Honor.

10         THE COURT:  As it relates to redressability, what

11   would happen if the moratorium were lifted?

12         MS. MATCHISON:  Then the claims that have been

13   submitted to the IRS post-September 14, 2023, would basically

14   get in line.  They would join the queue.

15         So the IRS is continuing to process claims that were

16   received pre-September 14.  The new claims would just get in

17   line.

18         THE COURT:  And when you say "get in line," obviously

19   it's by way of when they were filed?

20         MS. MATCHISON:  That's correct, Your Honor.

21         THE COURT:  If a lifting of the moratorium would

22   require you to eventually process ERC claims that you are

23   currently not processing, how would this not provide relief to

24   the plaintiff?

25         MS. MATCHISON:  For the reason I -- Your Honor, we're

1    not clear how many of the claims plaintiff has are

2    pre-moratorium and how many are post-moratorium.  So for some

3    of their clients, they may already be in the line.

4    Additionally, some of those clients have a right to bring a

5    refund suit in district court and could do that to seek their

6    refunds.

7           For any pre -- sorry, any post-moratorium clients,

8    that's not going to hasten the speed at which those claims are

9    processed.  As I mentioned earlier, StenTam's assumption that

10   we're going to go back to the quicker days of approving claims

11   and processing and paying out refunds is not going to happen.

12   The IRS has been clear this is going to take a long time.

13          THE COURT:  Well, what happens if the moratorium is

14   not lifted by April of 2025?

15          MS. MATCHISON:  The IRS -- I mean, the IRS has been

16   accepting claims, so the IRS would accept those claims up until

17   then and they would start processing them at some point.  It's

18   not the IRS's view that they're never going to process the new

19   claims that are received.

20          THE COURT:  As it relates to statutory standing,

21   agency discretion, given that 26 United States Code

22   Section 3134(b)(3) of the CARES Act is unambiguous in its

23   command that the IRS shall eventually process all ERC refunds,

24   what statutory language do you believe gives you the discretion

25   to entirely stop processing certain ERC refunds?

1          MS. MATCHISON:  Your Honor, so I think there's two

2     things here, and that statutory section somewhat piggybacks on

3     the 6402(a) statutory section, which absolutely imposes a duty

4     upon the IRS to pay out a refund once it's been determined a

5     taxpayer is entitled to a refund.

6          That is wholly separate from whether or not the IRS

7     shall or must process claims for refund for the ERC.  There's

8     two totally different things there.

9          The United States does not disagree that once a refund

10    has been determined to be appropriate, the IRS must pay it out.

11    But that is not a statutory command that the IRS process ERC

12    claims for refund on a certain timeline.

13         THE COURT:  Counsel, you lean heavily on *Heckler*

14    *versus Chaney*, but how is that case not distinguishable given

15    that the IRS does not have a discretional choice as to whether

16    or not it can process ERC refunds?

17         MS. MATCHISON:  I think this goes back to the

18    fundamental disagreement.  We're not saying we don't have to

19    process claims for refund.  We're not saying we're not going to

20    process claims.  The IRS has continued to process claims for

21    refund.

22         I think that what we're saying is that there's no

23    statutory duty to do so and that there certainly is no timeline

24    upon which that must be done.

25         THE COURT:  If this Court were to consider the length

1    of time to process these refunds to be a discretionary choice,

2    how is the unreasonably delayed standard from 5 USC

3    Section 706(1) not a meaningful standard from which to judge

4    this decision?

5    　　　　MS. MATCHISON:  So first of all, you don't even get to

6    5 USC 555 and unreasonable delay unless there is an unequivocal

7    statutory or regulatory duty for an agency to take an action.

8    So 706(1), the first requirement is that there's an unequivocal

9    statutory duty to take an action; and then the second step is

10   that there's been unreasonable delay.

11   　　　　So what the government says is that under

12   Section 706(1), StenTam has not identified an unequivocal

13   statutory duty or obligation for the IRS to process ERC claims

14   for refund.  Therefore, you don't even get to unreasonable

15   delay.

16   　　　　THE COURT:  Well, Counsel, doesn't *Telecommunications*

17   *Research and Action Center versus FCC* also provide a meaningful

18   standard to judge your discretion?  Would you agree with that?

19   　　　　MS. MATCHISON:  I think you can look at those TRAC

20   factors, and I think what you can see there is it's not -- the

21   evidence the United States has put in the record as far as what

22   it's doing, what it's been doing, and how long this is going to

23   take given the concerns, I think there would be a positive

24   showing on the TRAC factors.

25   　　　　But I think that the first thing you have to look at

1    is that under the APA, there must be a clear, unequivocal

2    statutory duty.  And StenTam has failed to identify one.

3            THE COURT:  Well, let's shift over to the likelihood

4    of success on the merits.  Under 706(c)(2), how is the

5    imposition of the moratorium within your statutory authority?

6            MS. MATCHISON:  I think that this comes under the

7    authority of the 7803 --

8            THE COURT:  You think or you know?

9            MS. MATCHISON:  Your Honor, it does.  It comes under

10   the statutory authority of 7803(a)(2)(A), where the secretary

11   has the discretion to manage, operate, and make happen the tax

12   programs that are within the IRS's agency authority.

13           THE COURT:  Ma'am, the phrases "cancel" or

14   "indefinitely pause" are not found within the powers listed in

15   IRC Section 7803.  Where does the power to not participate in a

16   congressionally mandated program come from, if you know?

17           MS. MATCHISON:  Your Honor, I don't believe there is

18   that authority, but I don't believe that's what's happening

19   here.  I think, again, the IRS has continued to process ERC

20   claims that were received before the moratorium, and it intends

21   to process the new claims that were received after the

22   moratorium.

23           There is -- I think this is one of the fundamental

24   misunderstandings from plaintiff's side, is that there is --

25   there has been no cancellation.  There has been no suspension

1    of a tax program here.  It's just what the IRS has done is

2    taken a look at the claims that are before it, it has concerns,

3    and it's attempting to address those; and the process is taking

4    longer, certainly, than plaintiffs would like.

5            THE COURT:  Well, Counsel, if the moratorium remains

6    in place past April 15 of 2025, how would this not be a

7    de facto cancellation of the ERC refund process?

8            MS. MATCHISON:  Because, again, the IRS is still

9    accepting claims for refund for the ERC, and so taxpayers are

10   still able to file those claims.  And, again, the IRS does not

11   intend to not process those claims.

12           THE COURT:  I want to shift to 706(1), unreasonable

13   delay.  Why is the current length of the moratorium not

14   unreasonable?

15           MS. MATCHISON:  I think it's not unreasonable because,

16   first, the IRS is attempting to perform its function

17   diligently.  It's trying to balance its protection of the

18   public fisc with the protection of small business owners.

19           But I think also, too, the IRS continues to process

20   claims.  It's taking them a long time.  It's going to continue

21   to take them a long time.  It's not that it's not doing it;

22   it's just that processing and examining these claims is taking

23   a long time.

24           THE COURT:  So why is the six-month timeline from

25   26 USC 6532(a) not a reasonable measure?

1          MS. MATCHISON:  6532(a) is not actually a timeline,

2    it's a waiting period.  It's a waiting period upon which

3    Congress contemplated there may be instances in which the IRS

4    is unable to act on a refund claim and therefore gives

5    taxpayers an avenue to challenge that delay in federal court.

6    But it's a waiting period, Your Honor.

7          THE COURT:  How many ERC claims would you process per

8    day if this moratorium were lifted?

9          MS. MATCHISON:  Your Honor, I don't have that number

10   before me, but I could certainly inquire of the IRS and get

11   that to you.

12         THE COURT:  Can you estimate?

13         MS. MATCHISON:  No, Your Honor, I cannot.

14         THE COURT:  Do you know how many are pending right

15   now?

16         MS. MATCHISON:  How many claims are pending?  I know

17   there's 1.4 million claims in inventory, Your Honor.  880,000

18   of those are pre-moratorium.

19         THE COURT:  Before the moratorium was put in effect,

20   how many claims were being processed per day, if you recall?

21         MS. MATCHISON:  Your Honor, I don't recall.  I believe

22   that's in Douglas O'Donnell's declaration.  I know it was a lot

23   more than certainly the 28,000-plus that have been processed

24   since the moratorium was put in place.

25         THE COURT:  Well, let me ask you:  How many new ERC

1  claims do you anticipate if the moratorium were lifted?

2          MS. MATCHISON:  Your Honor, I don't rightly know

3  because, again, taxpayers can be filing ERC claims right now.

4  There's nothing stopping them from filing claims.

5          THE COURT:  Well, just to make sure I'm clear, because

6  I'm just trying to envision how all of this would be processed.

7  Help me understand how the IRS would handle the processing of

8  1.4 million ERC claims.  How many different regional centers?

9  What does it look like?

10          MS. MATCHISON:  Right, Your Honor.  And I know that

11  the IRS has already reallocated resources to help address the

12  ERC influx of claims, but that is part of the problem, Your

13  Honor.  This is not the only program the IRS administers.

14  There are many, many -- and it's not even -- you know, claims

15  for refund come in for all sorts of reasons, not just for the

16  ERC.

17          And so I'm sure the IRS would have to take a look at

18  what resources it has available to it and what resources

19  possibly could be rededicated, if any.

20          THE COURT:  Can you tell me how many claims are being

21  processed on a daily, weekly, and monthly basis?

22          MS. MATCHISON:  I cannot, Your Honor, but I can get

23  that information from the IRS for you.

24          THE COURT:  That would be very helpful.

25          As it relates to balance of equities, public interest,

1    how would the IRS be harmed by lifting the moratorium?

2         MS. MATCHISON:  The IRS would be harmed either to the

3    extent -- and this is in the Douglas O'Donnell declaration.

4    The moratorium did cause a drop in the number of claims, and so

5    in theory, if the moratorium was lifted, there could be

6    additional claims that were filed.

7         I think also, too, it would just add to the queue --

8         THE COURT:  You can have additional claims anyways

9    because it's open until April of 2025.

10        MS. MATCHISON:  That is correct, Your Honor.  I'm just

11   saying that, you know, one of the effects of the moratorium was

12   that the number of claim filings did drop, so in theory that

13   number could increase.  However, the only practical reality

14   would be that there's just more claims now that the IRS must

15   actively take a look at processing, and to the extent they have

16   already allocated resources to processing the 880,000 that were

17   pre-moratorium, there might need to be an adjustment in how

18   they allocate and what they can do.

19        THE COURT:  So help me out here.  I just want to make

20   sure I understand your position.

21        So how is the IRS harmed by lifting the moratorium if

22   it is required to process the remaining 1 .4 million claims

23   eventually anyways?  Because you said the claims are going to

24   be processed.

25        MS. MATCHISON:  That's right, Your Honor, but it also

1    could -- like I said, in theory it could increase the number of

2    claims as well as if suddenly their inventory --

3            THE COURT:  I don't understand that argument, because

4    until the 25th of April of 2025, you can still submit.  So how

5    would that cause an influx of those filings?

6            MS. MATCHISON:  Your Honor, because --

7            THE COURT:  You're saying -- and my apologies.  I

8    don't mean to shut you off.

9            But you're saying based on the moratorium, it's halted

10   those individuals large-scale to file.  You've seen a

11   significant drop-off.

12           MS. MATCHISON:  That's correct, Your Honor.  That's in

13   Douglas O'Donnell's declaration.  He said that there was a

14   drop-off in claims that were filed after the moratorium had

15   been announced, and I believe that's attributed to a lot of the

16   public information campaign the IRS has out there warning

17   taxpayers about unscrupulous actors in this case.

18           THE COURT:  So, again, how is the IRS harmed by

19   lifting the moratorium if it's required to process the

20   remaining 1.4 million claims eventually anyways?  Is it a harm

21   in personnel?  You know --

22           MS. MATCHISON:  It's a resource allocation harm, Your

23   Honor.

24           THE COURT:  Well, help me out here.  What kind of

25   allocation?  What kind of money?  Is it billions of dollars

1    being pumped into the IRS to assist the process?  Are there a

2    number -- 5,000 employees?  I just don't -- I don't know.

3              MS. MATCHISON:  And you're right, Your Honor, we don't

4    have that quantified in the declaration from the IRS, and

5    that's certainly information that I could get to you, is what

6    they would need to do additionally to resource, that sort of --

7    that situation.

8              THE COURT:  Ma'am, you stated in your response that if

9    the moratorium were to be lifted, the number of actionable ERC

10   claims would increase from 880,000 to 1.4 million.  This is a

11   large number to a large number, so why does this difference in

12   the number of claims matter here?

13             I know 1.4 million is a lot more than 880,000, but

14   880,000 claims, that's a staggering amount of claims.  So

15   what's the difference?

16             MS. MATCHISON:  The difference, I mean, I don't know

17   the mathematical difference, Your Honor.  It would be the IRS

18   would probably have to take a look at its resource allocation.

19   It might need to move things around.

20             And when you move things around in the IRS, it's not

21   an unlimited pool of money, right?  And so if you take from

22   some other area, you're then taking resources from some other

23   taxpayer program and then funneling it to there.  So it's not

24   like a no-cost thing, because Congress doesn't just give the

25   IRS unlimited funds.

1          THE COURT:  So in theory, it's do more with less?

2          MS. MATCHISON:  Yes, Your Honor.  Or it's taking away

3    from other taxpayer programs so that you could address the ERC

4    situation.  But it would be a resource allocation issue.

5          THE COURT:  Do you -- I'm pretty sure I already know

6    the answer to this question, but do you know what the financial

7    impact to the IRS would be by lifting the moratorium?

8          MS. MATCHISON:  No, Your Honor, I do not, but I can

9    ask them.

10         THE COURT:  How does the moratorium help the IRS

11   accomplish its mission?

12         MS. MATCHISON:  Your Honor, I think it's given them

13   some breathing space so they can take a look at what's going

14   on.  It allowed them the time to digitize those 1 million

15   claims and take a look at what they were doing so they can come

16   up with an approach --

17         THE COURT:  It seems like before the moratorium, they

18   were streamlining and processing at light speed.  So what's

19   different with this moratorium?

20         MS. MATCHISON:  It came to their attention that there

21   were a large number of ineligible and possibly fraudulent

22   claims that were being paid out, and therefore, they wanted to

23   have more time to take a look at more of the claims.  And

24   that's why there's such delays, is they're taking a look, a

25   harder look, at all those claims.

1      THE COURT:  But this is what I don't understand.  And

2  I've had dozens of criminal matters in this room with the PPP

3  COVID loans and people going to prison for 20 years based on

4  millions that they stole from the program.

5      In theory, when you have an employee, a government

6  employee or any employee, and their full-time employment

7  position calls for them to do certain things, isn't it already

8  built in to make sure the people who submit the claim can

9  properly submit the claim?  So there's already a fraud

10  component in there because there's criteria that the IRS

11  employees would look at to make sure the claims are processed

12  or submitted properly.  Correct?

13      MS. MATCHISON:  That's correct, Your Honor.

14      THE COURT:  So what's new?

15      MS. MATCHISON:  The influx of claims.  The influx of

16  claims as well as I do believe they are taking -- I know they

17  are; they have said this publicly -- a harder look at every

18  single claim to make sure --

19      THE COURT:  But I don't understand the concept of

20  "harder look."  If it's your job to look at a claim and you

21  have this checkoff sheet that says make sure the name's

22  correct, make sure the TIN's correct, make sure the Social

23  Security number is correct, make sure all of this information

24  is corroborated, what is the harder look at the claim?  I don't

25  understand that.

1          MS. MATCHISON:  I think they're -- they're doing more

2    follow-up, Your Honor, with the taxpayers about the amount of

3    gross receipts; what sort of state, local, or government orders

4    they're relying upon in claiming the ERC.  They're requiring

5    more information about the number of employees they had on

6    their payroll to make sure that they qualified.  Things like

7    that, Your Honor.

8          THE COURT:  So they're doing what they should have

9    been doing all along?

10          MS. MATCHISON:  Yes, Your Honor.

11          THE COURT:  Why does the IRS need the moratorium when

12    it could just process ERC claims in the order that they were

13    received with the resources it already has available to them?

14          MS. MATCHISON:  You know, I think most people would

15    chuckle about this, Your Honor, but the IRS is actually a

16    customer service organization.

17          THE COURT:  Who is?

18          MS. MATCHISON:  The IRS is a customer service

19    organization.  That's how they view themselves.  And so I think

20    they wanted to communicate to the taxpaying public what was

21    going on and why there was going to be a delay and what they

22    were doing about it.

23          THE COURT:  Well, tell me about why the balance of

24    hardships tips in your favor.

25          MS. MATCHISON:  Your Honor, so I think that there is

1    the practical reality that we've hit upon before, which is the

2    fact that if -- with a greater influx of claims, there might

3    need to be resource allocation issues and things like that in

4    the way that the IRS operates, and certainly that would be a

5    hardship.

6            But I think also, too, that there's the larger point

7    of, you know, the IRS, this is a matter committed to their

8    discretion, and they are the ones best placed to determine how

9    it is that the IRS can most effectively handle this while

10   balancing the need to protect taxpayers and the public fisc at

11   the same time.

12           THE COURT:  Well, again, I want to thank both sides

13   for your command of all of the information.  It's been very,

14   very impressive.  You two certainly are at the top of your

15   profession as it relates to these very, very complicated

16   issues.

17           What I'm going to do now is the court will be in

18   recess until 10:30.  You guys have every single question that

19   I've asked you.  When you come back into this courtroom or I

20   come back into the courtroom at 10:30, each side will be

21   allowed ten minutes to argue your respective positions.

22           So go through everything that you want to tell me and

23   boil it down to ten minutes.  If you want to do eight minutes

24   and save two to rebut, whatever you need to do, you have ten

25   minutes.

1          And I'll allow you to stay in the courtroom to work on

2     whatever you need to, but I have the U.S. Marshal Service

3     watching this room, which they do in all courtrooms, so please

4     don't move past the lectern that's there in the middle of the

5     courtroom.

6          Court's in recess until 10:30.

7          (Recess taken, 10:10 a.m. to 10:35 a.m.)

8          THE COURT:  Good morning again, everyone.  Please

9     takes your seats.  This court will come to order.  All parties

10    present when the court last closed are present again.

11         Counsel, please approach the lectern for your

12    ten-minute argument.

13         Counsel, if that's too low for you, under the right

14    side of the lip there, there's a button.  The right side of the

15    lip.  You can push the button and it will go up for you if you

16    need to.

17         MR. ARHANGELSKY:  Appreciate that.  I'm okay, Your

18    Honor.  I think this is just fine.

19         THE COURT:  Okay.  I can hear you fine.

20         MR. ARHANGELSKY:  I'll do my best here to try to

21    interpret my own handwriting.  And I'll speak for a few

22    minutes, and then if it may please the Court, I'll reserve a

23    few minutes.

24         THE COURT:  Okay.  It's about 10:38 right now.

25         MR. ARHANGELSKY:  You have 38?  All right.  I have 36.

1              THE COURT:  You have 36?

2              MR. ARHANGELSKY:  My clock says 36.

3              THE COURT:  Oh, that's the official clock to my right

4    over there.  No, go ahead.

5              MR. ARHANGELSKY:  We'll go with that.  It's fine.

6              THE COURT:  I'll go with 36.

7              MR. ARHANGELSKY:  I don't think I'll take too much of

8    your time.  I just -- there's a few points that I think came up

9    in your conversation with opposing counsel in our last session,

10   and I wanted to follow up on that.

11             I think one of the highlights would be that IRS is

12   conceding in that discussion that for the post-moratorium

13   claims that have come in after the moratorium, those filings

14   are not even in the queue for processing.  They've taken them

15   out of the queue.  That's not something they're even arguing

16   that they're in the queue.

17             And I think that's one of the primary points here,

18   that those claims -- every claim should be in the queue.  What

19   is the fate of those claims if they're not?

20             And progress has to be made to clearing these

21   backlogs.  It cannot be a situation where you have filings that

22   are going into the agency that are just earmarked for some

23   indefinite action in the future.  That is entirely in conflict

24   with what we've argued is the agency's obligation.

25             The IRS was also unable to provide any statutory basis

1    to justify its suspension of the program.  They cited only

2    Section 7803.  For reasons we've explained in our reply brief

3    as well, Section 7803 is not a license to avoid their statutory

4    obligations in this case.

5         It's -- the IRS also concedes that the statute

6    requires them to pay refunds.  I think that's a really

7    significant point.  But somehow they then go on to argue that

8    even though there's a requirement to pay out these refunds,

9    they have no obligation to actually do what's necessary to get

10   to that point.  They're arguing they have no obligation to

11   process claims.  They have to pay these claims, but they don't

12   have an obligation to process them in the first instance?

13        And one of the things to highlight here is that these

14   refund claims that come in through the Section 941s, they are

15   legally really indistinguishable from tax returns in general.

16   Businesses can amend their tax returns for a host of different

17   reasons.  Taxpayers can file refund claims as part of their

18   annual submissions to the IRS.  Just any average Joe who's off

19   the street filing a tax refund, this is the obligation the

20   agency has, to process these refunds.

21        And I think -- so let's imagine the situation where

22   one day the IRS decides, after everyone files their taxes on

23   April 15th, that they're no longer going to be processing tax

24   refunds for hundreds of millions of Americans that have filed

25   under the law.  Right?  I think that would obviously shock the

1    conscience.  What the IRS is asking this Court to do is write

2    an order that would authorize the IRS to simply ignore their

3    obligation to process any of these tax refunds for Americans,

4    for American businesses.

5          And I think when pressed on that point, opposing

6    counsel -- you asked what it would take.  They said it would

7    take an act of Congress to order them to resume processing.  It

8    shouldn't take an act of Congress for the IRS to do the job

9    that it's -- that it is essentially built to do.  Right?  It

10   exists to do this job.  It should be doing that.  Congress

11   shouldn't have to tell them to do it again.

12         There was some talk about progress, whether they're

13   processing or not.  I think it's relevant to mention the Tax

14   Advocate Service -- we put some of this into our original brief

15   in the declaration of Eric Stenson and as attachments thereto.

16   We also, I think, mentioned it in our reply brief.

17         The Tax Advocate Service has warned Congress very

18   recently in its annual report to the legislature that they're

19   not seeing IRS process any claims whatsoever at this point.  So

20   the claims that IRS is making progress, to the extent that

21   they're doing so on escalations within the agency or

22   administrative appeals pending, they're not making meaningful

23   progress really on anything at this point.  That's also

24   reflected in Stenson Tamaddon's data, which we've also

25   mentioned in the declaration, where they've shown zero claims

1    have been processed since the moratorium, a fairly significant

2    departure from prior to the moratorium.

3           The IRS -- you asked this question, I think, of

4    opposing counsel, what the progress was beforehand.  The IRS

5    has publicly stated that it was processing roughly 20,000 ERC

6    claims during tax filing season, when obviously the agency is a

7    little more busy.  After tax season dies down, they were

8    processing 40,000 ERC claims per week before the moratorium.

9           THE COURT:  Is that your recollection as well,

10   Counsel?  The 40,000 per week?

11          MS. MATCHISON:  Let me double-check the declaration

12   from the IRS, Your Honor.

13          THE COURT:  Okay.  Thank you very much.

14          You'll get your time back.

15          MS. MATCHISON:  Do you want me just to confirm it when

16   I have my ten minutes so he can continue?

17          THE COURT:  If you could, please.

18          MS. MATCHISON:  Absolutely, Your Honor.

19          MR. ARHANGELSKY:  Another concern that's been raised,

20   I think, we need to be careful about what's happening here,

21   because what's to stop the IRS from sitting on all these claims

22   until, let's say, the eve of April 15, 2025, when the statutory

23   window lapses and then suddenly sending out a mass disallowance

24   to all these claims they say are ineligible, right?  They have

25   their calculations, which they refuse to disclose.  We don't

1    have any factual bases.

2            The IRS, I should mention, has just been sued by the

3    State of Missouri in an action that was filed on Friday under

4    the FOIA act, because the IRS has been refusing to provide

5    information to the State of Missouri regarding the moratorium

6    and the purposes for the moratorium and some of these

7    calculations.  I could give you a citation to that docket if

8    it's of interest.

9            THE COURT:  It is.  Go ahead.

10            MR. ARHANGELSKY:  That case is *Missouri versus IRS*,

11    Internal Revenue Service.  It's number 4:24-cv-00955, and it's

12    in the Eastern District of Missouri.

13            And as I also mentioned, the Tax Advocate Service has

14    cautioned Congress that the IRS is not being genuine to the

15    public in their commentary about their moratorium.  Members of

16    Congress have begun to write the IRS asking for information

17    about why this moratorium is still in existence and the bases

18    for it.  We've attached two of those letters to our reply as

19    exhibits.

20            But my point that I was making just a second ago was

21    what's to stop the IRS from going ahead and suddenly

22    disallowing all those claims and then forcing all those

23    taxpayers, on the eve of their deadlines, to struggle with

24    trying to go through an administrative process that is going to

25    time out on them very, very shortly?  And without mass

1    extensions from the IRS and a whole lot of heartache from these

2    businesses, they're going to lose their ability to prosecute

3    these issues administratively, and they'll be forced into the

4    federal court on this.  I mean, it could be sort of a mass

5    prejudice to taxpayers everywhere.

6            There was discussion about hardship on the agency.  I

7    point out that the Consolidated Appropriations Act of 2021 and

8    the Inflation Reduction Act, through those measures, Congress

9    gave the IRS $81 billion to handle these issues.  It was a

10   massive increase in what their appropriations would normally

11   be, and that was for the purpose of being able to manage these

12   types of programs, Your Honor.

13           Another point, I think, to emphasize is the IRS is

14   essentially -- they're agreeing now.  They're conceding that

15   the point of the moratorium is to have a chilling effect on the

16   market.  In your discussions with counsel, I think that came

17   out.

18           What they're saying is that by lifting the moratorium,

19   one of the harms to the agency is that they might see an influx

20   of new claims.  Well, what that is is a concession that the

21   moratorium is preventing those new claims.

22           And I think we argued in our reply brief, what would

23   be the point of the moratorium, a public declaration, if it

24   wasn't to chill participation in the program?  Because if they

25   claim they have the ability to just delay, delay, delay, and

1    they have discretion to process these things whenever they

2    want, just receive the claims and process them whenever they

3    get to it.

4          The point of the moratorium is to send a message.

5    It's part of what we contend is a fear-mongering campaign that

6    they've put forth in the marketplace that is designed to

7    influence businesses to shy away from using this program, which

8    is a congressionally guaranteed tax credit to struggling

9    businesses.

10         So I think -- being conscious of some time here, I

11   think we can certainly provide data from Stenson Tamaddon

12   showing splits, if it's of interest to the Court, and sort of a

13   letter brief or otherwise.  We can provide some information on

14   pre- and post-moratorium claims that are pending.

15         THE COURT:  Just to make sure the record is clear,

16   earlier the defense counsel indicated that she could provide

17   some additional information.  I'm not seeking anything else to

18   be filed in this case from either side.

19         MR. ARHANGELSKY:  Okay, great.  Of course, Your Honor.

20         I guess a final point I'll make is just in

21   conversations about the so-called fraud, we talked about the

22   difference between fraud and ineligibility.  We've talked about

23   how we have serious reservations with how the IRS is managing

24   eligibility issues here and how that's not fraud.

25         3.6 million claims have been filed and only several

1     hundred investigations pending on fraud.  That's not nothing,

2     and I'm not discounting, but there has been -- and we put this

3     in our reply brief -- there's been estimates that 33 percent of

4     claims under the Earned Income Tax Credit are fraudulent, and

5     we've never seen something like this from the IRS where they've

6     shuttered an entire tax program without statutory authority,

7     Your Honor.

8            So with that, I think I'll reserve whatever is left of

9     my time.  Thank you very much.

10           THE COURT:  Counsel, thank you very much.

11           Ma'am, come on up when you're ready.

12           MS. MATCHISON:  Thank you, Your Honor.

13           And while we're on this, I'll just go ahead and

14    address this one point first to pick up on the last thread.

15    The point of the moratorium -- not the point, but a point,

16    certainly, of the moratorium is to send a message to taxpayers

17    that there are unscrupulous actors operating in this space and

18    to warn them to make sure that when they're filing ERC claims

19    that they are in fact eligible.

20           Because once a taxpayer submits a claim, if it's found

21    to be ineligible, penalties and interest can accrue to them.

22    And so there's a very real cost to them of filing this.  It's

23    not just about a burden upon the IRS, but these folks, if

24    they're taken advantage of, it suddenly becomes worse for them.

25    They already needed this money, and now there's penalties and

1  interest that attach because they filed a possibly ineligible

2  claim.

3        As for the numbers that counsel was just speaking of,

4  I think he might have said they came from the Taxpayer Advocate

5  study or report to Congress.  I wouldn't disagree with those

6  numbers if those are the ones he's quoting from the TAS, Your

7  Honor, certainly --

8        THE COURT:  Are you talking about the 40,000 per day

9  or --

10        MS. MATCHISON:  Those processing numbers.  If those

11  are from the TAS, Your Honor, I wouldn't dispute that.

12        The one thing I would say is that in the declaration

13  of Douglas O'Donnell, at paragraphs 18 and 19, he talks about

14  how -- the rapid influx of claims the IRS saw.  So not

15  processing, Your Honor, but he discusses just the increase --

16  the substantial increase in amount of claims that were being

17  made over the period of the ERC program.

18        There's a couple points I just wanted to hit, Your

19  Honor.  StenTam is not likely to succeed on the merits here

20  because it lacks standing.  The moratorium does not deprive

21  StenTam of its right to be paid by its clients.  Because of

22  that, there is no injury in fact for purposes of establishing

23  standing.  The Ninth Circuit has already determined that a

24  delayed payment does not amount to an injury in fact for

25  purposes of Article III standing.

1            In the matter of *East Coast Foods*, the Ninth Circuit

2      rejected an argument that timing of payment amounted to an

3      injury in fact where there was no guarantee of the timing of

4      the payment.

5            So, too, here, StenTam does not argue that it won't be

6      paid, but rather, that its payment is delayed.  But the binding

7      precedent in this circuit is that the timing of a payment does

8      not amount to an injury in fact for purposes of standing.  Even

9      before the moratorium, there was no guarantee on the timing of

10     payment to StenTam.

11           The ERC statute and the tax code in general does not

12     dictate that the IRS must act upon an ERC claim within a set

13     time frame or even promptly.  And when Congress intends for the

14     IRS to act promptly, it includes such language in the statute.

15     For example, also in the CARES Act, IRC 6428(f)(3), mandating

16     that the IRS shall act rapidly as possible.

17           Another place in the code, 6411, a provision that was

18     put in post-World War II to make sure folks could get refunds

19     quickly.  Shorthand, it's called "quickie refunds."  IRS at the

20     time had to process claims for refund within 45 days.  Now, for

21     certain aspects, it's to 90.  Congress knows how to legislate

22     to make the IRS work faster if it needs to.

23           Now, I would just like to point out that if the Court

24     concludes there is no injury in fact for standing purposes, it

25     need not go further.  It does not need to address traceability.

1    It does not need to address redressability or any of the other

2    arguments the parties have made today.

3          The United States has argued that self-inflicted harm

4    cannot establish standing, and we cited to the Supreme Court's

5    opinion in *Clapper* for that.  Contrary to what StenTam argued

6    in its reply, *Clapper* does not enunciate a rule that

7    self-inflicted harm can only be considered for purposes of

8    traceability if the harm was created to establish standing.

9          And I wanted to provide the Court a few more citations

10   for the general proposition, the first being the Supreme

11   Court's decision in *Pennsylvania v. New Jersey*, which is at 426

12   U.S. 660; *Southwest Fair Housing Council v. WG Scottsdale*,

13   which is a Ninth Circuit case that can be found at 2023 Westlaw

14   6820681; and *National Family Planning and Reproductive Health*

15   *Association vs. Gonzales*, a D.C. Circuit case, which can be

16   found at 468 F.3d 826.

17         We touched upon this a bit earlier, but I wanted to

18   revisit the APA and Section 706(1), 706(2)(c).  StenTam is

19   suing under both sections because they claim the moratorium is

20   agency action short of a statutory right.

21         But in 706, the APA limits the government's waiver of

22   sovereign immunity where a party seeks to compel agency action.

23   The APA distinguishes between negative injunctive relief and

24   affirmative injunctive relief.  And as the Supreme Court

25   explained in *Norton v. Southern Utah Wilderness Alliance*,

1    Section 706 limits affirmative injunctive relief to a discrete

2    action an agency is required to take.

3         And I quote:  The only agency action that can be

4    compelled under the APA is action legally required.  The

5    limitation is required -- the limitation to required agency

6    action rules out judicial discretion of even discrete agency

7    action that is not demanded by the law.  This limitation holds

8    true whether the underlying claim is framed as an attempt to

9    remedy unlawful agency action under 706(2) or to compel

10   withheld agency action under Section 706(1).

11        The injunction StenTam seeks here is for resumption of

12   processing amended tax returns implicating the Employee

13   Retention Credit and for the IRS to process claims for refund

14   under the ERC program within a reasonable time and with all

15   deliberate speed, which means this action falls squarely under

16   706(1), because it is seeking to compel agency action that it

17   claims was unlawfully withheld or unreasonably delayed.

18        But StenTam cannot prevail under Section 706(1)

19   because it has failed to identify an unequivocal statutory or

20   regulatory duty for the IRS to process ERC claims.  And absent

21   an unequivocal statutory or regulatory duty, the APA prevents a

22   federal court from issuing affirmative injunctive relief

23   compelling an agency to take action.

24        Two points that were raised in the reply that also

25   have been repeated here today that I want to address.  The IRS

1   has not stopped issuing refunds under Section 6402(a), and it

2   has not suspended an entire tax program under 7803(a)(2)(A).

3        StenTam argued in its reply that under 6402, the IRS

4   has a statutory duty to issue refunds, and the United States

5   does not disagree with that statement of the statute.  But what

6   needs to be made clear is that the statutory duty comes into

7   play only after the IRS has determined a taxpayer is entitled

8   to a refund.  6402 does not impose a duty on the IRS to process

9   claims for refund.  Instead, the Internal Revenue Code

10  contemplates that the IRS may fail to act on a claim for refund

11  and has provided taxpayers with the remedy in a refund suit.

12       The second point, the IRS has not suspended the ERC

13  program or any other tax program under its Section 7803

14  authority.  As the declaration of Douglas O'Donnell and the

15  recent IRS press release makes clear, the ERC program

16  continues.

17       And it bears repeating, the IRS moratorium has only

18  paused the processing of new claims filed after September 14th,

19  2023.  The IRS has not stopped taking ERC claims, and it

20  continues to process claims that were submitted before that

21  date.  As the IRS recently made clear in its June 24th press

22  release, during the moratorium it's processed 28,000 claims

23  received prior to September 14th that were worth 2.2 billion.

24  It disallowed 14,000 claims worth more than 1 billion.

25       The IRS has not stopped processing ERC claims, but it

1    is admittedly taking longer.

2            THE COURT:  Counsel, you have about a minute left.

3            MS. MATCHISON:  Okay.  Real quick then, there is no

4    whipsaw, Your Honor.  There's been talk today about incurring

5    additional costs to prepare amended tax returns or claims for

6    refund.

7            It's the IRS's position that special statutory rules

8    for the ERC work in a way similar to having a right or

9    reasonable expectation of reimbursement for qualified wage

10   expenses.  Therefore, an employer should take into account the

11   previously disallowed wage expense in the tax year during which

12   it is finally determined that it is not entitled to the ERC.

13           An employer should not file an amended income tax

14   return to claim a refund for the tax year in which the

15   qualified wages were paid or incurred; and an employer should

16   not file a protective claim for refund for the tax year in

17   which the qualified wages were paid or incurred, because under

18   the substantive law, no refund is allowable for that year.

19   StenTam does not need to incur additional costs.

20           The motion for preliminary injunction, Your Honor,

21   should be denied.

22           THE COURT:  Counsel, thank you very much.

23           Plaintiff's counsel, you have two minutes.

24           MR. ARHANGELSKY:  Thank you, Your Honor.  Just a few

25   points then.

1          I want to clarify for the record that the statement

2     about the processing of claims, the 20K during tax season and

3     40K outside of tax season, was from testimony of Defendant

4     Werfel, and it was before a Senate Committee in April 2023.  It

5     was in response to a question by Senator Gillibrand.

6          Counsel mentioned *East Coast Foods,* the discussion

7     about how a delay of money is not an actionable injury.  We've

8     addressed this issue in our reply at 7, which is -- I'm using

9     the ECF pagination when I refer to this.  It's -- which is --

10    our reply is Docket 24.

11         *East Coast Foods* just isn't applicable here at all.

12    It's a bankruptcy case where the issue is limited to a creditor

13    challenging the trustee's fee scale under the idea that it

14    might reduce the money available to the creditor in that case.

15         That case, if it's precedential at all, it really is

16    because it refers to and discusses the person aggrieved

17    standard, which is a unique issue in context with bankruptcy

18    matters.  We've given plenty of case law in our reply brief

19    explaining that the rule in the Ninth Circuit has and will

20    continue to be that even a temporary deprivation of money is in

21    fact an actionable Article III injury.

22         There was discussion about whether this is an

23    affirmative or a negative injunction.  It's a negative

24    injunction.  It's a prohibitory injunction.  And we addressed

25    that briefly in our original brief, Docket 14, at page 14,

1    under the Standards section.

2          One of the cases we cite was the *Arizona Dream Act*

3    *Coalition*, which is 757 F.3d 1053 at 1061, Ninth Circuit case

4    in 2014, which explains that the status quo for purposes of an

5    injunction refers to the legally relevant relationship between

6    the parties before the controversy arose.

7          Here, before the controversy arose was prior to the

8    moratorium.  And what the moratorium did was change the status

9    quo.  An injunction in this instance would just restore that.

10   It's a negative injunction.  It's prohibitory.

11         Thank you, Your Honor.

12         THE COURT:  This Court will take the issue under

13   advisement.

14         Court's adjourned.

15         (Proceedings concluded at 10:58 a.m.)

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3           I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 19th day of July,

13   2024.

14

15

16                          s/Jennifer A. Pancratz_____

17                          Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25