IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Stenson Tamaddon, LLC, | ) | No. CV-24-01123-PHX-SPL |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| United States Internal Revenue | ) | |
| Service, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court are Stenson Tamaddon, LLC's ("Plaintiff") Motion for Preliminary Injunction (Doc. 14), United States Internal Revenue Service, et al.'s ("Defendants") Response (Doc. 19), and Plaintiff's Reply (Doc. 24). The Court now rules as follows.

## I.     **BACKGROUND**

Plaintiff is a tax advisory firm based in Phoenix, Arizona that assists businesses with filing for tax credits. (Doc. 1 at 4). Plaintiff's business model involves helping clients identify and apply for tax credits and other government incentives. (*Id*.). Plaintiff partially derives their profits from the tax refunds issued to their clients from the United States Internal Revenue Service ("Defendant IRS"). (*Id*.). In this case, Plaintiff claims that Defendant IRS improperly instituted a moratorium on processing refunds for the Employee Retention Tax Credit ("ERC") program. (*Id*. at 2). This tax credit was established by the CARES Act of 2020 in response to the COVID-19 Pandemic. *See* 26 U.S.C. § 3134. The ERC is only available for claims during 2020 and 2021, but taxpayers can retroactively

claim the ERC by filing a Form 941-X within three years from the date of the original return. (Doc. 14 at 8). On September 12, 2023, Defendant IRS announced a moratorium on processing new claims under the ERC, initially until December 31, 2023, but now the end date has been extended indefinitely. (Doc. 14 at 11–12).

Defendant IRS claims to have instituted this moratorium due to a surge in ineligible and fraudulent claims. (Doc. 19 at 8). Specifically, Defendant IRS states that they "initiated the moratorium because of concerns inside the agency, as well as from tax professionals and media reports, that a substantial share of new ERC claims from the program were ineligible, and that businesses were increasingly being put at financial risk by being scammed by third party promoters." (*Id*. at 9). As of May 2024, Defendant IRS claims to have processed about 3.6 million valid claims, with 1.4 million remaining. (*Id*. at 8). Defendant IRS further claims that as a policy matter, the moratorium allows them to sort through these millions of claims to determine whether they are fraudulent. (*Id*.).

On May 14, 2024, Plaintiff filed suit, seeking injunctive and declaratory relief against Defendant IRS, along with several other government agencies. (Doc. 1). On May 30, 2024, Plaintiff filed the instant Motion for Preliminary Injunction, requesting a nationwide injunction against Defendant IRS. (Doc. 14 at 7). Plaintiff's proposed injunction includes a lifting of the moratorium, processing of tax returns within a reasonable amount of time, retracting of public statements about the ERC program by the IRS, and repeated status updates from the agency. (Doc. 14-10 at 3–4). Plaintiff alleges that there are about 1.4 million backlogged claims with an estimated government interest obligation of over $4.2 billion on those claims. (Doc. 24 at 19). Plaintiff justifies this injunction under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. (Doc. 14 at 7). Defendants oppose the requested preliminary injunction on several grounds, including constitutional and statutory standing, as well as attacking the merits of the claim under the APA. (Doc. 19 at 7). On July 16, 2024, the Court held oral argument on the Motion, and took the matter under advisement. (Docs. 27 and 32).

///

## II.   LEGAL STANDARD

### A. Preliminary Injunction

A party seeking injunctive relief must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is a party, the last two factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). "The Ninth Circuit weighs these factors on a sliding scale, such that where there are only 'serious questions going to the merits'—that is, less than a 'likelihood of success' on the merits—a preliminary injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). "The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)). "'Status quo ante litem' refers to 'the last uncontested status which preceded the pending controversy.'" *Id.* (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)).

"A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (internal quotation and modification omitted). In contrast, "[a] mandatory injunction orders a responsible party to take action." *Id.* at 879 (internal quotation omitted). Thus, "[a] mandatory injunction goes well beyond simply maintaining the status quo pendente lite and is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* (internal quotations omitted).

### B.  Relevant Statutes at Issue

This case implicates several statutes necessary to determine the scope of Defendant IRS's authority as compared to the challenged action. Defendant IRS argues that its statutory authority to implement the moratorium derives from I.R.C. § 7803, as promulgated by its Commissioner ("the Commissioner"). (Doc. 19 at 18). I.R.C. § 7803 sets out the duties, powers, and responsibilities of the Commissioner, as delegated by the Secretary of the Treasury. This statute does not stand alone though, as the Court must also consider the instructions given to Defendant IRS from both 26 U.S.C. § 3134, the portion of the CARES Act which establishes the ERC program, and 26 U.S.C. § 6402(a) which authorizes Defendant IRS to make credits or refunds. The relevant excerpts from each statute are below:

I.R.C. § 7803 charges the Commissioner to "administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes . . . ." § 7803(a)(2)(A). Additionally, § 7803 includes what is colloquially known as the taxpayer's bill of rights, which states in part, "[i]n discharging his duties, the Commissioner shall ensure that employees of the Internal Revenue Service are familiar with and act in accord with taxpayer rights as afforded by other provisions of this title, including . . . (C) the right to pay no more than the correct amount of tax . . . ." § 7803(a)(3)(C).

26 U.S.C. § 6402 instructs the Commissioner that "[i]n the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsections (c), (d), (e), and (f), refund any balance to such person." § 6402(a).

26 U.S.C. § 3134, a portion of the CARES Act, instructs the Commissioner that "[i]n the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 70 percent of the qualified wages with respect to each employee of such employer for such calendar quarter." § 3134(a). Furthermore, "[i]f the amount of the credit under subsection (a) exceeds the

limitation of paragraph (2) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." § 3134(b)(3).

Of note, as a federal administrative agency, Defendant IRS is no longer entitled to deference in interpreting these statutes. On June 28, 2024, the U.S. Supreme Court issued their opinion in *Loper Bright Enterprises v. Raimondo*, No. 22-1219, 2024 WL 3208360 (U.S. June 28, 2024) ("*Loper*"), which largely changed the established judicial procedures for interpreting the enabling statutes for federal administrative agencies. In doing so, the Supreme Court overruled *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984) ("*Chevron*") which required federal courts to give deference to agency interpretations of these statutes, even when a reviewing court read the statute differently. Now under *Loper*, federal courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . ." and "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id*. at *22. Thus, courts now act alone in determining whether an administrative agency exercised its authority "in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125, (2000).

## III.   **DISCUSSION**

Defendants challenge Plaintiff's Motion for Preliminary Injunction on several grounds, including constitutional and statutory standing, as well as attacking the merits of the claim under the APA. (Doc. 19 at 7). The Court will address these arguments in turn, as well analyzing Plaintiff's Motion under the applicable *Winter* factors.

### A. Constitutional Standing

First, Defendant IRS first argues that Plaintiff lacks Article III standing. (Doc. 19 at 13).

To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992).

1      1. <u>Injury</u>

2          To satisfy the first element of standing, "the plaintiff must have suffered an injury

3   in fact—an invasion of a legally protected interest" that is concrete, particularized, and

4   actual or imminent, rather than conjectural or hypothetical. *Id.* at 560. Broadly speaking,

5   an "economic injury is generally a legally protected interest." *Cent. Arizona Water*

6   *Conservation Dist. v. U.S. E.P.A.*, 990 F.2d 1531, 1537 (9th Cir. 1993). An injury may also

7   exist when an economic interest in an agency's action is created by contract, rather than by

8   statute. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 951

9   (9th Cir. 2013). "[T]he temporary loss of use of one's money constitutes an injury in fact

10  for purposes of Article III." *Van v. LLR, Inc.*, 962 F.3d 1160, 1164 (9th Cir. 2020).

11         In the present case, Defendant IRS argues that Plaintiff will eventually be paid from

12  their clients and that the moratorium only delays this payment. (Doc. 19 at 13). Thus,

13  according to Defendant IRS, no injury has occurred. (*Id.*). However, this argument fails

14  because it goes to the merits of Plaintiff's claim, not whether Plaintiff has suffered an injury

15  for the purposes of Article III standing. In making this argument, Defendant IRS is

16  asserting that any delay is not unreasonably long under the APA, not whether Plaintiff has

17  demonstrated an injury from such a delay. Whether Defendant IRS acted lawfully does not

18  change the whether Plaintiff has alleged harm resulting from this action. *See Van*, 962 F.3d

19  at 1164 ("temporary loss of use of one's money constitutes an injury in fact for purposes

20  of Article III."). By way of analogy, if Defendant IRS stated that it would prioritize its

21  processing of ERC claims based on the race of the applicant, but that it would process all

22  ERC claims eventually, a hypothetical plaintiff would possess standing to challenge this

23  agency action. It would be immaterial as to whether that plaintiff had sufficiently stated an

24  Equal Protection Clause or APA challenge for the purposes of Article III standing. That

25  hypothetical plaintiff would have been economically harmed by the agency's action. The

26  existence of that harm is what constitutes an injury under Article III. *See Cent. Arizona*

27  *Water Conservation Dist.*, 990 F.2d at 1537 ("economic injury is generally a legally

28  protected interest."). Simply because that hypothetical plaintiff would eventually be paid

1   does not negate this.

2      Turning to what the injury may be here, Plaintiff established business relationships
3   and contracts with others based on the ERC program. (Doc. 32 at 11). Plaintiff thus relied
4   upon Defendant IRS to process all claims for eligibility, as dictated by the CARES Act.
5   According to Plaintiff, these business deals have not and cannot be realized because of the
6   moratorium. (Doc. 14 at 19). This loss of business is "concrete, particularized, and actual .
7   . ." given its dollar value. *Lujan*, 504 U.S. 560. For example, if the moratorium prevents
8   the fulfilment of any preexisting contracts, then it violates Plaintiff's concrete interest of
9   receiving the benefit of their bargain under contract. Similarly, by offering tax advisory
10  services predicated on existing laws, and then losing the ability to be compensated for those
11  services, Plaintiff was "adversely affected" by Defendant IRS. § 702. The Court again
12  stresses that any question as to whether Defendant IRS acted lawfully goes to the merits of
13  Plaintiff's APA claim, and not whether some form of adverse downstream effects occurred.
14  Likewise, any question over whether the moratorium was the cause of these adverse effects
15  goes to traceability, not whether they occurred in the first place. Therefore, Plaintiff's
16  allegation of "economic injury" is sufficient for the purposes of Article III standing. *Cent.*
17  *Arizona Water Conservation Dist.*, 990 F.2d at 1537.

18      2.  <u>Traceability</u>

19      To demonstrate traceability, a plaintiff must show the injury is causally linked to a
20  defendant's alleged misconduct. *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1142 (9th
21  Cir. 2013). Traceability does not require that a defendant be the "sole source of injury[,]"
22  and "a causal chain does not fail simply because it has several links, provided those links
23  are not hypothetical or tenuous[.]" *Id*. at 1141–42. But, when the plaintiff is not himself
24  the object of the government action he challenges, standing is "substantially more difficult
25  to establish." *Lujan*, 504 U.S. at 562 (cleaned up). Thus, where causation and redressability
26  hinge on the response of a regulated third party to the government action, it becomes
27  Plaintiffs' burden to "adduce facts showing that those choices have been or will be made
28  in such manner as to produce causation and permit redressability of injury." *Id*. In other

words, in third-party causation cases, a plaintiff must identify facts showing "that [the] third parties will likely react in predictable ways." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F. 4th 997, 1018 (9th Cir. 2021) (quoting *California v. Texas*, 593 U.S. 659, (2021)). So long as the plaintiff can make that showing without relying on "speculation" or "guesswork" about the third parties' motivations, they have adequately alleged Article III traceability. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013); s*ee also Mendia v. Garcia*, 768 F.3d 1009 (9th Cir. 2014).

Of note, the Supreme Court has held that there is no "exception to traceability for injuries that a party purposely incurs." *FEC v. Cruz*, 596 U.S. 289, 296–97 (2022); *see also Legacy Health Sys. v. Hathi*, No. 23-35511, 2024 WL 2843034 (9th Cir. June 5, 2024). An injury that results from a defendant's actions satisfies traceability "even if the injury could be described in some sense as willingly incurred." *Id.* at 297; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982) (holding that a tester who "approached the real estate agent fully expecting that he would receive false information" had standing to sue for violation of "right to truthful housing information").

In analyzing traceability here, the Court first would like to point to a recent example. On July 1, 2024, the Supreme Court released their opinion in *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, No. 22-1008, 2024 WL 3237691, at *14–15 (U.S. July 1, 2024). While not binding, this Court finds Justice Kavanaugh's concurrence persuasive as it describes the exact scenario faced by the Plaintiff in this case. Specifically, the concurrence states that unregulated third parties may bring suit against agency action under the APA, so long as they are "adversely affected by an agency's regulation of others." *Id.* at *15. The phrase "adversely affected" mirrors the language of 5 U.S.C. 702. Below is an excerpt from the concurrence which summarizes the procedural similarities:

> Corner Post [plaintiff] can obtain relief in this case only because the APA authorizes vacatur of agency rules.
> Corner Post challenged an agency rule that regulates the fees that banks may charge. But Corner Post is not a bank regulated by the rule. Rather, it is a business that must pay the

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> fees charged by the banks who are regulated by the rule. Corner Post complains that the agency rule allows banks to charge fees that are unreasonably high.
>
> Corner Post's suit is a typical APA suit. An unregulated plaintiff such as Corner Post often will sue under the APA to challenge an allegedly unlawful agency rule that regulates others but also has adverse downstream effects on the plaintiff. In those cases, an injunction barring the agency from enforcing the rule against the plaintiff would not help the plaintiff, because the plaintiff is not regulated by the rule in the first place. Instead, the unregulated plaintiff can obtain meaningful relief only if the APA authorizes vacatur of the agency rule, thereby remedying the adverse downstream effects of the rule on the unregulated plaintiff.
>
> The APA empowers federal courts to "hold unlawful and set aside agency action" that, as relevant here, is arbitrary and capricious or is contrary to law. 5 U.S.C. § 706(2). The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others.

15   *Corner Post, Inc.*, 2024 WL 3237691, at *14–15 (Kavanaugh, J., concurring).

16   In the present case, Defendant IRS has argued that causation cannot be established

17   because Plaintiff voluntarily entered into business relationships with their clients and

18   outside lenders. (Doc. 19 at 14). Thus, according to the IRS, Plaintiff brought any economic

19   injury upon themselves by voluntarily assuming the risk of ERC claims not being timely

20   processed. This argument falls short though as there is no "exception to traceability for

21   injuries that a party purposely incurs." *FEC*, 596 U.S. at 296–97. Defendant IRS's

22   argument again goes to the merits of Plaintiff's overall claim, and not whether Plaintiff's

23   alleged injury is causally related to Defendant IRS's actions. To hold otherwise would fly

24   in the face of every "tester" cause of action which Congress has established, such as Fair

25   Housing Act claims. *See Havens Realty Corp.*, 455 U.S. at 373–74 (finding standing under

26   the FHA for a "tester" who received false information from an apartment complex).

27   Furthermore, as described by Justice Kavanaugh's concurrence in *Corner Post*, the APA

28   allows for suits brought by unregulated third parties. 2024 WL 3237691, at *14–15

(Kavanaugh, J., concurring). It was similarly immaterial to the plaintiff in *Corner Post* that it voluntarily did business with the affected regulated parties, so long as its injury was causally related to the agency rule that it challenged. *Id.*

Traceability is easily established here. Plaintiffs will not be paid as long as their clients, *i.e.* the third-party taxpayers, do not receive their refunds from Defendant IRS. Additionally, at oral argument Plaintiff demonstrated that their clients will likely react in "predictable ways" if the moratorium is lifted. *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F. 4th at 1018. Specifically, Plaintiff "has received notices of withdrawal from clients that have indicated those clients are withdrawing from the program during the moratorium period." (Doc. 32 at 12). Plaintiff has thus sufficiently "adduced facts" showing that their clients' responses to the imposition of the mortarium are what caused Plaintiff's economic harm, and not some other motivation. *Lujan*, 504 U.S. at 562. This causal chain is the exact "downstream effects of the rule on the unregulated plaintiff" described by Justice Kavanaugh. *Corner Post, Inc.*, 2024 WL 3237691, at *14–15 (Kavanaugh, J., concurring). Additionally, Plaintiff is a tax preparation service which relied upon the language of the CARES Act in offering various services to their clients. There is no "speculation" as to whether their clients sought to take advantage of this tax break given that they did in fact file ERC claims. *Clapper*, 568 U.S. at 413. Plaintiff has satisfied their burden as to traceability under Article III.

3. <u>Redressability</u>

To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and is likely to be redressed by an injunction against them. To carry that burden, a plaintiff must proffer evidence that the defendants' "allegedly wrongful behavior w[ould] likely occur or continue." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190, (2000). At the preliminary injunction stage, a plaintiff must show that they are likely to succeed in carrying that burden. *See Winter*, 555 U.S. at 22.

Here, Defendant IRS argues that a lifting of the moratorium would not actually

provide relief to Plaintiffs. (Doc. 19 at 15). The Court acknowledges that it is unknown where in the stack of outstanding claims Plaintiff's clients currently sit. The Court also notes that neither party could estimate at oral argument how going from 880,000 to 1.4 million outstanding claims would affect the timing of processing for Plaintiff's clients. If there would be no change, then a lifting of the moratorium would not redress Plaintiff's injury. At the same time, none of Plaintiff's clients who filed after September 14, 2023 will have their claims processed so long as the mortarium remains in place. Thus, the only way to guarantee that no relief occurs would be to leave the moratorium in effect. For the purposes of preliminary injunction, Plaintiff needs only demonstrate that Defendants' "allegedly wrongful behavior w[ould] likely occur or continue." *Friends of the Earth, Inc.*, 528 U.S. at 190. Defendants have indicated that the moratorium will remain in place for the foreseeable future. As a result, this Court cannot ignore that some progress on these claims is different than no progress at all for the purposes of analyzing redressability. The timing of when Plaintiff's clients would be paid is thus not dispositive, so long as relief goes from impossible to possible.

Furthermore, Plaintiff also stated at oral argument that the moratorium also has other harmful effects such as chilling the filing of new ERC claims. (Doc. 32 at 6) ("the larger concern, however, is the IRS is chilling the market by telling businesses that the program is effectively shuttered and cautioning businesses to wait until the moratorium is lifted before actually filing those claims."). If another purpose of the moratorium is to discourage claims, and Plaintiff alleges they are harmed by this discouragement, then ending the moratorium would thus provide relief. Whether Defendant IRS is allowed to discourage the public from filing ERC claims is again a question for the merits, not standing. In sum, by demonstrating that lifting the moratorium would eventually provide relief that would not otherwise be available, Plaintiff has satisfied their burden of redressability under Article III.

### 4.  Prudential Standing

In addition to Article III standing, a plaintiff must demonstrate prudential standing.

*Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 937 (9th Cir. 2005) ("Grafted on top of this constitutional backbone [of Article III standing] are prudential standing requirements consisting of 'several judicially self-imposed limits on the exercise of federal jurisdiction'") (citation omitted). To demonstrate prudential standing in an APA case, the alleged injury must be "within the zone of interests to be protected or regulated" by the statute in question. *Port of Astoria v. Hodel*, 595 F.2d 467, 474 (9th Cir. 1979) (holding that the port district's "pecuniary losses and frustrated financial expectations" outside NEPA's zone of interest). While "the benefit of any doubt goes to the plaintiff" on issues of prudential standing, the "zone of interests" standard forecloses suit when a plaintiff's interests are so "inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 796 (9th Cir. 2013) (internal quotation and citations omitted); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–31 (2014).

Here, the Court finds that Plaintiff's suit falls within the CARES Act's zone of interest. That statute intentionally created the ERC program for the benefit of Plaintiff's clients. As admitted by Defendants (Doc. 19-1 at 4–5), professional tax preparation services are essential in carrying out Congress' intent with respect to these clients. Given that the "benefit of any doubt goes to the plaintiff" this causal connection is not too attenuated to deny prudential standing here. *Wild Fish Conservancy*, 730 F.3d at 796. Therefore, the Court cannot say that Plaintiff's suit to enforce the ERC via the APA is "inconsistent with the purposes implicit in the statute." *Id.*

**B. Statutory Standing**

Defendants next make several arguments claiming that Plaintiff lacks statutory standing under the APA. First, Defendants argue that Plaintiff is not entitled to APA review because the decision to implement the moratorium is entirely invested in the discretion of the IRS. (Doc. 19 at 20). Second, the Defendants argue that the moratorium is not final agency action, and thus not subject to APA review. (*Id.* at 21). Third, Defendants argue that because Plaintiff's clients can file a refund suit, they have an adequate alternative

1    remedy, and thus are precluded from APA review. (*Id.* at 21).

2        1.  Agency Discretion

3        There exists a "strong presumption that Congress intends judicial review of

4    administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670

5    (1986). "That presumption can be rebutted by a showing that the relevant statute

6    'preclude[s]' review, § 701(a)(1), or that the 'agency action is committed to agency

7    discretion by law,' § 701(a)(2)." *Dep't of Homeland Sec. v. Regents of the Univ. of*

8    *California*, 591 U.S. 1, 17 (2020). The exception in Section 701(a)(2) is read "quite

9    narrowly, restricting to 'those rare circumstances where the relevant statute is drawn so

10   that a court would have no meaningful standard against which to judge the agency's

11   exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23

12   (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

13       Only where there is truly "no law to apply" has the Ninth Circuit found an absence

14   of meaningful standards of review. *Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019)

15   (quoting *Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)).

16   Even inherently discretionary standards have been found sufficiently meaningful to support

17   judicial review for abuse of discretion. *See ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059,1071

18   (9th Cir. 2015) ("Section 701(a)(2) . . . has never been thought to put all exercises of

19   discretion beyond judicial review. Indeed, the APA itself commits final agency action[s]

20   to our review for 'abuse of discretion.") (internal quotation and citations omitted). Courts

21   routinely treat discretion-laden standards as providing "law to apply." *See Citizens to*

22   *Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411 (1971), abrogated on other

23   grounds by *Califano v. Sanders*, 430 U.S. 99 (1977) (holding that § 701(a)(2) does not

24   preclude judicial review of agency determination that a "feasible and prudent alternative"

25   was lacking); *Pac. Nw. Generating Co-op. v. Bonneville Power Admin.*, 596 F.3d 1065,

26   1077 (9th Cir. 2010) (holding that the statutory requirement to operate in a manner

27   "consistent with sound business principles" provided a meaningful standard of review).

28       In the present case, Congress has not expressly barred review of Defendant IRS's

13

decision making by statute, therefore Defendant IRS's first avenue to rebut the presumption of judicial review under § 701(a)(1) does not apply. Considering the second avenue under § 701(a)(2), Defendant IRS attempts to characterize the moratorium as an optional non-enforcement decision under *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (holding that the "agency's decision not to prosecute or enforce" is "committed to an agency's absolute discretion"). However, neither § 7803(a)(2)(A) nor § 6402(a) grant the Commissioner the discretion to not process applications for tax refunds. Instead, they state that Defendant IRS "shall" process eligible refunds in the case of an overpayment. § 6402(a). The CARES Act is similarly unambiguous in its command that Defendant IRS "shall" eventually process all ERC refunds. § 3134(b)(3) ("such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)."). Defendants' appeal *Heckler* thus fails as that case pertains only to discretionary agency decisions. The Court sees no language within § 6402(a) or § 3134 which would allow Defendant IRS to decline to process the ERC claims. The only conditional language in the CARES act concerns the eligibility of an applicant, not the discretion of Defendant IRS. § 3134(b)(3) ("If the amount of the credit under subsection (a) exceeds the limitation of paragraph (2) for any calendar quarter . . . ."). This is not a question of prosecutorial discretion but instead a dispute over whether the challenged moratorium was an abdication of duty. Furthermore, even if the Court were to consider the length of time to process these refunds to be a discretionary choice, a meaningful standard to judge this decision exists. Specifically, § 706(1) compels "unreasonably delayed" required agency actions, and *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) provides a six-factor test to measure what is reasonable. Therefore, the presence of agency discretion in how long it takes to process an ERC claim also does not bar review in this case.

### 2.  Final Agency Action

The APA limits judicial review to final agency action in the form of "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). An agency action must be "reviewable by statute" or

be a "final agency action for which there is no other adequate remedy[.]" 5 U.S.C. § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017). Two conditions must be satisfied for an agency action to be final: (1) "the action must mark the consummation of the agency's decision [ ] making process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "In determining whether an agency's action is final, we look to whether [a] the action amounts to a definitive statement of the agency's position or [b] has a direct and immediate effect on the day-to-day operations of the subject party, or [c] if immediate compliance with the terms is expected." *Or. Nat. Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotations and citations omitted). The focus is "on the practical and legal effects of the agency action." *Id.*

As an initial matter, the Court finds that Defendant IRS's public statements[1] regarding the ERC program are not final agency action. None of the complained of statements by Plaintiff have a required or mandatory "effect on the day-to-day operations" of Plaintiff. *Or. Nat. Desert Ass'n*, 465 F.3d at 987. These statements in no way impact the legal rights or obligations of Plaintiff and their clients, as they merely reflect the opinion of the agency which is purely advisory. *See General Motors Corp. v. EPA*, 363 F.3d 442, 447 (D.C. Cir. 2004) (holding that EPA letters to automobile manufacturers did not represent the culmination of the EPA's position on an issue because the letters merely restated a previously settled position, and no legal consequences flowed from them). Plaintiff's clients are free to listen to Defendant IRS's advice about fraud within the ERC or disregard it entirely. In either scenario, their pre-existing duty to follow the law remains unchanged. Defendant IRS is allowed to publicly state such opinions about the ERC

---

[1] The Court does not analyze Notice 2021-20 as part of these statements as Plaintiff has communicated that Notice 2021-20 is not before the Court on this Motion. (Doc. 14 at 9 at n.3).

program, and retract them at will, for two reasons. First, the APA directly excludes general policy statements from notice and comment rulemaking. 5 U.S.C. § 553(b)(3)(A). While completing the notice and comment process is not required for agency statements to be considered final agency action, the lack of notice and comment strongly indicates that these statements are "tentative or interlocutory." *United States Army Corps of Engineers*, 578 U.S. at 597. If circumstances surrounding the ERC program change, the IRS could easily issue new statements to the contrary, and nothing regarding Plaintiff's legal rights or obligations would be different. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) (explaining that policy statements are not subject to judicial review). Second, and more importantly, what opinions each federal agency chooses to communicate to the public is a policy decision that is determined at the ballot box, not in this Court. *See generally Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities.").

The implementation of the moratorium is a closer call and requires additional consideration. While the moratorium is not the result of the notice and comment process, it nevertheless does mark "the consummation of the agency's decisionmaking process" and is one "from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78. Here, the moratorium was issued under the authority of the Commissioner as definitive statement of the agency's potion. (Doc. 19 at 10). Defendants do not deny that the moratorium is the culmination of Defendant IRS's consideration on how to resolve the increasing number of fraudulent ERC claims. The moratorium is thus far removed from the types of action which merely declare the agency's intent, such as informal letters issued by subordinate officials or press releases, which do not amount to final agency action. Instead, the moratorium is an agency wide policy which affects the legal rights of all taxpayers who wish to file an ERC claim. So long as the moratorium remains in place, Plaintiff's clients will not receive their ERC refunds, and Plaintiff will not be paid. Additionally, the fact that Defendant IRS could unilaterally lift the moratorium is also not dispositive here. *See Sackett v. E.P.A.*, 566

U.S. 120, 127, (2012) ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."). Previous courts have held that pauses on existing regulations or agency practices can constitute a final agency action. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (per curiam) (holding that a stay of an existing order was "tantamount to amending or revoking a rule" and thus final agency action.). Given that the moratorium has been in place for almost a year now, the Court can hardly call it "tentative or interlocutory" in nature. *United States Army Corps of Engineers*, 578 U.S. at 597.

As to the second prong of final agency action, direct alteration of previous regulatory requirements necessarily "affects regulated parties' rights or obligations." *Clean Air Council*, 862 F.3d at 7. Here, to the extent the moratorium suspends the applicability of the ERC program, it determines the legal rights both the taxpayers and the tax preparation services who benefit from it. This includes protective refund filings and amended tax returns by Plaintiff's clients. (Doc. 24 at 9). Tax preparation services are as equally duty bound to follow the IRS's rules for filing ERC claims as are the taxpayers given their shared vested interest. The fact that these filing rules are often so complicated is why many taxpayers hire professional tax consultants like Plaintiff. Defendants admit as much in their submitted declaration. (Doc. 19-1 at 4–5) ("[I]t is reasonable that a taxpayer would seek professional advice to determine whether they quality for the ERC, and to determine whether and how to file"). Thus, the agency's decision to impose the moratorium impacts not only the taxpayers, but also the services which the taxpayers enlist to comply with the law. If the moratorium were to be found unlawful, then Plaintiff could only obtain legal relief from it via the APA. *See Corner Post, Inc.*, 2024 WL 3237691, at *14–15 (Kavanaugh, J., concurring). The Court can hardly think of a starker example of having one's legal rights or obligations altered than requiring a lawsuit to proceed in the same manner as one did prior to an agency's unilateral action. Therefore, the moratorium does affect Plaintiff's legal rights and obligations for the purposes of considering it a final

1   agency decision.

2         3.  <u>Alternative Adequate Remedy</u>

3        The APA provides for judicial review of "final agency action for which there is no

4   other adequate remedy in a court." 5 U.S.C. § 704. Thus, review under the APA can be

5   invoked only where there is lack of an alternative adequate remedy elsewhere. As the

6   Supreme Court explained in its seminal decision interpreting § 704: "the provision as

7   enacted . . . makes it clear that Congress did not intend the general grant of review in the

8   APA to duplicate existing procedures for review of agency action." *Bowen v.*

9   *Massachusetts*, 487 U.S. 879, 903 (1988). In other words, "where Congress has provided

10  special and adequate review procedures," § 704 "does not provide additional judicial

11  remedies." *Id.* (quotation marks omitted); *see also Brem–Air Disposal v. Cohen*, 156 F.3d

12  1002, 1004 (9th Cir. 1998) ("[F]ederal courts lack jurisdiction over APA challenges

13  whenever Congress has provided another 'adequate remedy.'") (quoting 5 U.S.C. § 704).

14      In the present case, Defendant IRS argues that the ERC program is subject to the

15  requirements of 26 U.S.C. § 7422 which requires all tax litigation to occur via refund suits.

16  (Doc. 19 at 21). While this is correct for taxpayers who have filed an ERC claim, this is

17  incorrect for third parties who may be affected by Defendant IRS's handling of the ERC

18  program. Nothing in § 7422 indicates that third parties have standing to bring refund suits

19  on behalf of others, and courts outside the Ninth Circuit have explicitly stated as such. *See,*

20  *e.g.*, *Jewell v. United States*, 548 F.3d 1168, 1172 (8th Cir. 2008) ("standing to sue for a

21  tax refund extends only to the taxpayer from whom the tax was allegedly wrongfully

22  collected"). As a result, it is immaterial whether Plaintiff's clients possess an alternative

23  remedy, as Plaintiff does not. Instead, as an unregulated party, the APA is the only avenue

24  for relief which Plaintiff can pursue. *See Corner Post, Inc.*, 2024 WL 3237691, at *14–15

25  (Kavanaugh, J., concurring). Therefore, Defendant IRS's argument on this point fails.

26    **C. Likelihood of Success on the Merits**

27      Plaintiff makes two arguments for why they will succeed on the merits. First,

28  Plaintiff argues that Defendant IRS has no legal basis to cease activity under the CARES

Act, and thus the moratorium is ultra vires in violation of the APA, 5 U.S.C. § 706(2)(C). (Doc. 14 at 14). Second, Plaintiff argues that Defendants have unreasonably delayed required action under § 706(1) by failing to process certain ERC claims for over ten months. (*Id*.).

As an initial matter, the parties have disputed whether the moratorium is an affirmative action which requires a negative injunction to "set aside" under § 706(2)(C), or whether it is a lack of action which would require a mandatory injunction to "compel" the agency under § 706(1). (Doc. 32 at 64 and 68). While this difference in characterization is immaterial to Plaintiff's desired result of renewing the processing of claims, it does affect the legal analysis under each theory. At oral argument Plaintiff characterized the moratorium as an affirmative action by the agency which should be set aside via negative injunction. (*Id*. at 68). This is unsurprising given that mandatory injunctions require a much higher standard. *See Marlyn Nutraceuticals, Inc.*, 571 F.3d at 878–79 ("In general, mandatory injunctions are not granted unless extreme or very serious damage will result . . . ."). The Court will first point out that Defendants are incorrect in arguing that the requested injunction cannot be considered a prohibitory injunction. (Doc. 32 at 64). That Defendant IRS may have to perform other, affirmative acts based on an old policy does not transform this "classic form of prohibitory injunction" into a mandatory one. *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017). Nevertheless, the Court finds that it does not need to resolve this question at the outset, as Plaintiff has argued under both theories in the alternative in their Motion. (Doc. 14). Thus, the Court will first determine whether Plaintiff has raised "serious questions" as to whether instituting the moratorium was an ultra vires action under § 706(2)(C) and thus deserving of a negative injunction. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) (holding that "serious questions" going to merits combined with a hardship balance that tips sharply toward plaintiff can support issuance of preliminary injunction). Second, the Court will analyze whether Defendant IRS must be compelled to act under § 706(1), requiring a mandatory injunction. ///

1       1.   <u>§ 706(2)(C) Ultra Vires</u>

2        The APA provides that a court may "set aside" or invalidate agency action if it

3   exceeds the statutory authority under which it was promulgated. 5 U.S.C. § 706(2)(C). The

4   APA prescribes the same "set aside" remedy for all categories of "agency action,"

5   including agency adjudicative orders and agency rules. §§ 551(13), 706(2). To determine

6   whether the challenged agency action is consistent with Congress's directive, courts no

7   longer employ the familiar *Chevron* framework. Instead, Courts "must exercise their

8   independent judgment in deciding whether an agency has acted within its statutory

9   authority, as the APA requires . . ." *Loper Bright Enterprises*, 2024 WL 3208360 at *22.

10       "Statutory interpretation begins with the plain meaning of the statute's language,

11  [and] [w]here the statutory language is clear and consistent with the statutory scheme at

12  issue, the plain language of the statute is conclusive and the judicial inquiry is at an end."

13  *Botosan v. Paul McNally Realty*, 216 F.3d 827, 831 (9th Cir. 2000) (citations omitted); *see*

14  *also BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) ("Unless otherwise defined,

15  statutory terms are generally interpreted in accordance with their ordinary meaning.").

16  "The first and most important canon of statutory construction is the presumption 'that a

17  legislature says in a statute what it means and means in a statute what it says there.'" *In re*

18  *Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Conn. Nat. Bank*

19  *v. Germain*, 503 U.S. 249, 253 (1992)). Nevertheless, a court also "must read the words in

20  their context and with a view to their place in the overall statutory scheme." *King v.*

21  *Burwell*, 576 U.S. 473, 486 (2015) (citation omitted). "In general, a statute should 'be

22  construed so that effect is given to all its provisions, so that no part will be inoperative or

23  superfluous, void or insignificant.'" *Stand Up for California! v. U.S. Dep't of the Interior*,

24  959 F.3d 1154, 1159 (9th Cir. 2020) (quoting *Corley v. United States*, 556 U.S. 303, 314,

25  (2009)). Finally, the Supreme Court has made clear that when a statute uses the word

26  "shall," Congress has imposed a mandatory duty upon the subject of the command. *See*

27  *United States v. Monsanto*, 491 U.S. 600, 607, (1989) (by using "shall" in civil forfeiture

28  statute, "Congress could not have chosen stronger words to express its intent that forfeiture

be mandatory in cases where the statute applied").

Here, in addition to finding that Defendants' press releases do not constitute final agency action, the Court also finds that they were well within the Commissioner's statutory authority. The Court finds that issuing public statements about the dangers of fraudulent ERC claims is a form of "administering" the ERC program. § 7803(a)(2)(A). Using the power of persuasion is a far cry from the coercive effects of shutting down a program entirely. Conveying the agency's opinion of the dangers associated with the program can only be considered as part of the Commissioner's duty to manage the program, even if this has a side effect chilling effect on future filings. *Id.*

Given that the Court does not find the IRS's public statements to have been ultra vires, the remaining question is whether instituting the moratorium was within the Commissioner's statutory authority. Plaintiff argues that any cessation in processing ERC claims is outside the Commissioner's authority as the CARES Act repeatedly uses the word "shall." (Doc. 14 at 15). Defendants counter that they are not abdicating their duty under the CARES Act, but instead have simply not acted as quickly as Plaintiff desires. (Doc. 19 at 19). Defendants further argue that no statutory authority requires them "to act on ERC claims within a specified period." (*Id.*).

On the one hand, the Court finds Defendants' argument regarding timing to be persuasive when considering the Commissioner's duties under § 7803(a). At oral argument, the Court posed the following hypothetical to Plaintiff: "If, hypothetically, the IRS's computer network crashed and the IRS ordered a moratorium on new claims for only 24 hours, would this be within the Commissioner's authority to 'administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes' pursuant to Section 7803(a)(2)(A)?" (Doc. 32 at 27). Plaintiff admitted that it would, and the Court agrees. This could indicate that the question is not whether the moratorium itself is unlawful under § 706(2), but whether the length of delay in processing under § 706(1) is. If it is impossible to handle new claims due to an overload, then this temporary pause would only further facilitate the processing of legitimate claims. This is

the scenario which Defendant IRS complains of here, as it alleges to being overwhelmed with millions of fraudulent claims. (Doc. 19 at 9).

The problem with this argument, though, is that the length of the moratorium could affect whether the Commissioner has the power to keep it in place. In analyzing the plain language of § 7803, the Commissioner does not have the authority to choose not to participate in a Congressionally mandated program. That statute instead does the opposite and directs the Commissioner "supervise the execution and application of the internal revenue laws or related statutes . . . ." § 7803(a)(2)(A). Similarly, § 6402(a) also requires the Commissioner to process all eligible refunds. ("In the case of any overpayment, the Secretary . . . shall . . . refund any balance to such person."). Thus, the moratorium cannot last forever, or else it would be a de-facto cancellation of the program. *See Public Citizen Health Research Group v. Comm'r, FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984) (holding that administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform). The moratorium was originally supposed to end in December of 2023, but has since been extended indefinitely. Continued indefinite extension would be a wholesale abandonment of the ERC program. This would be improper without authorization from Congress. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" (quoting *FDA*, 529 U.S. at 160)). This would also directly contravene § 3134(b)(3), which instructs that the "excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." The word "shall" leaves no discretion to the Commissioner as to whether or not to eventually process all ERC claims. *See Monsanto*, 491 U.S. at 607 (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied").

Defendants have countered that they do intend to eventually process all ERC claims, and thus the moratorium will not last forever. (Doc 32 at 39). This, though, does not resolve whether 10 months is already too long to be within the Commissioner's authority. At some

point, excluding certain claims from processing goes from "managing" the ERC program to stifling it. § 7803(a). Defendants tacitly admitted at oral argument that this was one purpose of the moratorium. (Doc. 32 at 46–47) ("The IRS would be harmed either to the extent -- and this is in the Douglas O'Donnell declaration. The moratorium did cause a drop in the number of claims, and so in theory, if the moratorium was lifted, there could be additional claims that were filed."). Reducing the number of incoming ERC claims has nothing to do with managing the program aside from creating less work for Defendant IRS to perform. It is also difficult for the Court to consider a 10-month moratorium to be mere management when it also resulted in Defendant IRS not "process[ing] any [pre-moratorium] claims whatsoever at this point." (Doc. 32 at 56). Furthermore, even if the moratorium is not truly indefinite, it still transforms into a quasi-cancelation of the ERC program if it is allowed to continue until April 15, 2025. That is the statutory deadline for taxpayers to file amended returns, but taxpayers must first receive a decision from Defendant IRS on their ERC claims before filing an amended return. Plaintiff claims this can only be avoided by taxpayers filing additional protective refund claims, which incurs additional costs. (Doc. 24 at 9). The Commissioner likely does not have the power under § 7803 to utilize procedural deadlines to increase compliance costs to disincentivize participation. This would seemingly conflict with the Commissioner's duty to ensure that taxpayers "pay no more than the correct amount of tax . . . ." § 7803(a)(3)(C).

On balance, the Court finds Plaintiff's position compelling, but the Court will not go so far as to say that Plaintiff is likely to succeed on the merits. There is still some ambiguity over how far the word "manage" from can be stretched in § 7803(a). The text of §§ 6402(a) and 3134 are clear regarding the Commissioner's eventual duty, but not regarding his authority as it relates the nature and length of the moratorium. In turning to the legislative history of these statutes, and looking towards their "overall statutory scheme," the Court similarly sees no definitive answers for Plaintiff. *King*, 576 U.S. at 486. Plaintiff has characterized the statutory scheme as seeking to provide COVID-19 related tax credits to the public as soon as possible (Doc. 14 at 8), but the Court will not assume

that Congress intended Defendant IRS to sacrifice accuracy in doing so.

Nevertheless, the Court finds that Plaintiff has raised "serious questions" about the lawfulness of the Commissioner's actions here. *All. for the Wild Rockies*, 632 F.3d at 1134. The record indicates that the moratorium has very possibly evolved from beyond a resource allocation tool and into a procedural smoke screen. Regardless of whether Defendant IRS acted with good intentions at the outset, it cannot later attempt to shape public policy where the CARES Act has already spoken. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021) ("our system does not permit agencies to act unlawfully even in pursuit of desirable ends." (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952))). Thus, Plaintiff's lack of a conclusive showing on the first *Winter* factor is not fatal to its request. *See Short*, 893 F.3d at 675. At the preliminary injunction stage, Plaintiff only needs to present "serious questions" if it can also demonstrate that "the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies*, 632 F.3d at 1134. Plaintiff has presented such questions here.

2. § 706(1) Unreasonably Delayed

Section 706(1) of the APA states that reviewing courts "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). As a threshold matter, the Supreme Court has restricted courts to compel agency action under § 706(1) only when "an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*").

Once the two threshold requirements of *SUWA* have been met, Courts utilize a six-factor test to determine whether an agency's actions have been unreasonably delayed. This test derives from *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC* factors"). Those factors are:

> (1) The time agencies take to make decisions must be governed by a "rule of reason;" (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays

24

that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need note find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d 70, 80 (D.C. Cir. 1984) (internal citations omitted); *see also Indep. Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (applying *TRAC* factors in assessing whether relief under the APA was appropriate).

Although not dispositive, the first factor in the *TRAC* analysis is the most important. *In re A Community Voice*, 878 F.3d 779, 786 (9th Cir. 2017). The first factor hinges on "whether the time for agency action has been reasonable.*" In re Nat. Res. Def. Council v. EPA*, 956 F.3d 1134, 1139 (9th Cir. 2020). "[T]here is no per se rule as to how long is too long" to wait for agency action. *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992). In general, "[t]he reasonableness determination is a fact-specific inquiry," and "length of delay alone is not dispositive." *Mugomoke v. Curda,* Civ. No. 2:10-cv-2166-KJM-DAD, 2012 WL 113800, at *8 (E.D. Cal. Jan. 13, 2012) (citing *Gelfter v. Chertoff*, Case No. 06-cv-6724-WHA, 2007 WL 90238, at *2 (N.D. Cal. Mar. 22, 2007)). Rather, courts must "look to the source of the delay-e.g., the complexity of the investigation as well as the extent to which the defendant participated in delaying the proceeding." *Qureshi v. Napolitano*, Case No. 11-cv-5814-YGR, 2012 WL 2503828, at *4 (N.D. Cal. June 28, 2012). But "courts in this and other circuits have concluded that a reasonable time for agency action is typically counted in weeks or months, not years." *Nat. Res. Def. Council*, 956 F.3d at 1139 (quotation marks omitted).

In the present case, the Court finds that the moratorium satisfies the two threshold criteria from *SUWA*, 542 U.S. at 64. First, as stated above, Defendant IRS is required at some point to take the "discrete action" of processing the eligible ERC refunds. *Id.* at 62; *see also Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 684 (N.D. Cal. 2020) ("There is no doubt

that the CARES Act compels the Treasury and the IRS to take a discrete agency action.").
Defendant IRS has attempted to separate the action of processing ERC claims from the
issuance of refunds (Doc. 32 at 40), but this distinction is immaterial given that the
moratorium prevents both. Regardless of whether Defendant IRS is required to provide
refunds for eligible claims, it is required to determine the eligibility of all outstanding ERC
claims. *See Hu v. Reno*, No. 3-99-CV-1136-BD, 2000 WL 425174, at *3 (N.D. Tex. Apr.
18, 2000) ("Although the INS is vested with broad discretion in making the ultimate
decision whether to grant an application . . . , it has a non-discretionary duty to process the
application" and "courts have not hesitated to exercise jurisdiction to compel the
performance of this duty."). If the Court were to adopt Defendant IRS's interpretation of §
6402 (Doc. 32 at 40), then the agency would never have a statutory duty to process a claim
for a refund as the agency could just sit on that application indefinitely. While § 7422
enables a taxpayer to remedy this hypothetical harm, it does not provide a remedy to
Plaintiff's alleged harm here. Plaintiff's only hope is under the APA. Defendant IRS's
interpretation of § 6402 also flies in the face of the statutory text. *See* § 6402(a) ("In the
case of any overpayment, the Secretary . . . shall . . . refund any balance to such person.").
Accordingly, whether this Court should compel the "discrete action" of treating pre- and
post-moratorium claims similarly in processing is what is at issue here. *SUWA*, 542 U.S. at
64. Moving to the second threshold requirement from *SUWA*, the instructions from the
CARES Act are a "specific, unequivocal command" placed on the agency. *Id.* at 63. Neither
party disputes this second point. (Doc. 32 at 40) ("that statutory section [§ 3134] somewhat
piggybacks on the 6402(a) statutory section, which absolutely imposes a duty upon the IRS
to pay out a refund once it's been determined a taxpayer is entitled to a refund.").

Turning to the *TRAC* factors, the Court notes that under the first factor neither party
made a compelling argument regarding "whether the time for agency action has been
reasonable*." In re Nat. Res. Def. Council*, 956 F.3d at 1139. The moratorium went into
effect on September 14, 2023. (Doc. 14 at 7). Initially, Defendant IRS indicated that the
moratorium would be lifted by December 31, 2023, but it continues to remain in effect.

(Doc. 14 at 12). The Commissioner stated on May 7, 2024 that the moratorium currently has no end date. (*Id.*). This makes the moratorium over 10 months long at the time of this writing. First, the Court will note that it cannot consider a truly indefinite end date to be reasonable given that Defendants have a statutory duty to act. *See Mugomoke v. Curda*, No. 2:10-CV-02166-KJM, 2012 WL 113800 at *7 (E.D. Cal. Jan. 13, 2012) ("for defendants to hold the application indefinitely in case they might, at some unspecified point in the future, consider an exemption does not constitute a 'rule of reason' that allows this court to find the delay reasonable."). As elaborated above in the § 706(2)(C) analysis, whether 10 months is too long is a much closer question. While 10 months might seem unreasonably long to process a small number of claims, Defendant IRS claims to be currently processing approximately 880,000 pre-moratorium claims. This is not a small number. The parties agreed at oral argument that prior to the moratorium, Defendant IRS processed about 20,000 ERC claims per week during the height of tax season, and about 40,000 ERC claims in the off-season. (Doc. 32 at 57 and 62). If the Court were to assume a faster processing rate of 40,000 per week, Defendant IRS theoretically could have processed 1.73 million ERC claims over the course of 10 months.[2]

In analyzing these facts though, the Court notes that § 706(1) is not for second guessing the speed at which Defendant IRS is actively working. Instead, the APA only allows this Court to "compel agency action unlawfully withheld or unreasonably delayed." § 706(1). Thus, the question is not whether the rate of processing 880,000 claims is reasonable under the first *TRAC* factor, but whether 10 months is a reasonable length of time to treat some ERC claims differently than others. Prior to the moratorium, Defendant IRS operated on a "first in first out" basis. Following the moratorium, Defendant IRS now only treats pre-moratorium claims in this way. Part of Plaintiff's argument is that this failure to treat all claims equally is partially what creates their harm. (Doc. 14 at 21)

---

[2] The Court notes that these numbers are not necessarily applicable in the current context, as Defendant IRS has admitted that it has slowed down since to enhance their compliance reviews. (Doc. 19 at 11).

("Because the IRS based its Moratorium on alleged 'fraud' in the program, clients are led to believe all ERC claims are suspicious—an obviously incorrect assumption given the broad scope of ERC statute."). Defendant IRS has provided almost no evidence as to why it needs more than 10 months to ban progress on some ERC claims entirely. The only explanation given at oral argument for this length was due to internal resource management concerns in evaluating potential fraud. However, the Court is unclear how a complete pause on post-moratorium claims would affect this given that Defendant IRS retains the discretion to allocate resources towards the ERC program in whatever way it sees fit. Given that Defendant IRS is the sole "source of the delay," which is seemingly justified by attempting to reduce its workload, the Court is left without a reasonable explanation for the current length of the moratorium. *Qureshi*, 2012 WL 2503828, at *4. In aggregate, these points also raise "serious questions" as to whether 10 months is an unreasonable delay in treating all ERC claims on a first in first out basis. *All. for the Wild Rockies*, 632 F.3d at 1134.

As to the second *TRAC* factor, Congress did not provide an explicit timetable in the CARES Act for the speed which it expects Defendant IRS to proceed. *See* 26 U.S.C. 3134. Plaintiff has analogized the current timeline to that in 26 U.S.C. §§ 7422 and 6532(a)(1) which allow taxpayers to file suit for a refund after six months. Defendants fail to provide a reason as to why this time period is not analogous, instead merely stating that "6532(a) is not actually a timeline, it's a waiting period. It's a waiting period upon which Congress contemplated there may be instances in which the IRS is unable to act on a refund claim and therefore gives taxpayers an avenue to challenge that delay in federal court." (Doc. 32 at 44). This also conflicts with what Defendant IRS stated in its Response, namely that "Congress intended for the ERC to be subject to the requirements in § 7422." (Doc. 19 at 21). If Congress considers six months to be unreasonably long for small businesses individually claiming the ERC, then it is hard to imagine why it would not consider six months similarly unreasonable for those assisting those small businesses.

Under the third factor, the delay in this case only affects economic harm, and not

28

human health or safety. While Plaintiff has alleged irreparable harm in seeking injunctive relief, and cannot seek damages, the possible downstream effects of Plaintiff's economic loss are too attenuated to be considered an afront to its "welfare" for the purposes of the *TRAC* factors. 750 F.2d at 80.

Turning to the fourth factor, Defendant IRS has stated that it manages dozens of other tax credit programs, and that the ERC is only one of many competing interests. (Doc. 32 at 45). The Court has no reason to doubt that these other programs would be adversely affected if Defendant IRS was directed to expedite its processing of ERC claims. This could result in a substantial burden for all taxpayers, not just ERC claimants. Determining Defendant IRS's priorities of work is not what is in question here though. The question is what the effect of ending the moratorium would be. At oral argument, Defendant IRS stated the only effect would be that the roughly 520,000 post-moratorium claims would "get in line." (Doc. 32 at 38). The Court thus sees no practical difference in increasing the number of ripe claims from 880,000 to 1.4 million when Defendant IRS is required to process all these claims anyways. In doing so, Defendant IRS is still free to process ERC claims in any manner it deems necessary to ensure compliance.

Considering the nature and extent of the interests prejudiced by delay under the fifth *TRAC* factor, Plaintiff claims that without an injunction it faces mounting compliance costs which threaten its business model. (Docs. 14 at 19; 24 at 8 and 18). Plaintiff also argues that as the moratorium approaches the April 15, 2025 deadline for amended filings "businesses with legitimate ERC claims may lose their ability to pursue those refunds." (Doc. 14 at 20). Defendant IRS counters that the moratorium buys the agency time to address widespread fraud in the ERC program. (Doc. 32 at 49). While increasing the chances of fraud would be prejudicial to Defendant IRS, and the public at large, it's not entirely clear how a lifting of the moratorium would cause this given that the new claims would merely "get in line" and "join the queue." (Doc. 32 at 38). The Court does acknowledge that Defendant IRS has taken steps to combat fraud during the moratorium such as digitizing ERC filings and conducting enhanced compliance reviews. It is unclear

if further efforts are needed though, and if the moratorium is what enables these measures.

Finally, with regard to the sixth *TRAC* factor, there is no evidence that the delay is due to nefarious motives by the IRS. Plaintiff has alleged that the moratorium is an attempt by Defendant IRS to run out the clock on the ERC program (Doc. 32 at 57), but the Court is unwilling to speculate on this without anything more than circumstantial evidence. Even if this were true, this is not the sort of bad faith contemplated under the sixth *TRAC* factor. *Vaz v. Neal*, 33 F.4th 1131, 1138 at n.6 (9th Cir. 2022) (noting that the sixth TRAC factor is "irrelevant" where there is no evidence of improper conduct).

On balance, the Court finds that it is a close call as to whether Plaintiff has shown it is likely to succeed on the merits under the *TRAC* factors. Some of the TRAC factors break in favor of Plaintiff, while others cut in favor of Defendants. Even some of the individual factors are seemingly split. In the end though, the fact that § 706(1) requires a mandatory injunction creates a heavier burden for Plaintiff. While Plaintiff may have demonstrated that serious questions persist as to nature and length of the moratorium under § 706(1), Plaintiff has not shown that "the facts and law clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)); *see also Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (holding that mandatory injunctions should not issue in "doubtful cases."). The Court is not satisfied with Defendant's explanation for why 10 months is reasonable, but this alone does not make the length of the moratorium "clearly" unreasonable. *Anderson*, 612 F.2d at 1114. Plaintiff's allegations under § 706(1) thus fall short of what is required to affirmatively compel agency action at the preliminary injunction stage.

### D. Irreparable Harm

Given that Plaintiff has raised "serious questions" as to Defendant IRS's actions under § 706(2)(C), the Court will continue its analysis of the *Winter* factors with reference to that theory. The Court next turns to whether irreparable harm will occur absent a preliminary injunction.

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is

likely in the absence of an injunction.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Winter*, 555 U.S. at 22); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" (quoting *Winter*, 555 U.S. at 22)). Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The irreparable harm "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *Azar*, 911 F.3d at 581 (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). "[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). But the general rule that "[e]conomic harm is not normally considered irreparable" does not apply where there is no adequate remedy to recover those damages, such as in APA cases. *Azar*, 911 F.3d at 581 (citing 5 U.S.C. § 702). Finally, there must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (citing *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981–82 (9th Cir. 2011)). "However, a plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.'" *Id.* (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012)).

Here, even if the moratorium is ultimately found to be unlawful, there is no mechanism for Plaintiff to seek damages from Defendants' actions as the APA only allows for injunctive relief. *See* 5 U.S.C. § 706. As a result, any loss in business resulting from the moratorium between now and the resolution of this case cannot be recovered otherwise. Defendants argue that while this is true, there is no irreparable deprivation as their earnings have only been delayed. (Doc. 19 at 24). The Court finds this argument to be incomplete though as it does not consider the compliance costs of the delay. As alleged by Plaintiff,

"[t]he [m]oratorium will soon obligate StenTam to prepare protective refund claims to protect clients against these losses should the IRS disallow ERC claims close to the April 2025 deadline to amend income tax returns. [ ] StenTam must expend those resources without compensation." (Doc. 24 at 18). Plaintiff has no avenue for recouping these compliance costs, and thus has established future irreparable harm for the purposes of the APA. *See Azar*, 911 F.3d at 581.

Moreover, Plaintiff has also alleged reputational harm resulting from the moratorium. Plaintiff established business relationships in reliance on Defendant IRS's compliance with the CARES Act. (Doc. 14 at 21). Plaintiff's inability to deliver on these business expectations directly affects their reputation. As a result, Plaintiff has suffered inflated financing charges to cover the loans supporting their business model which similarly relied upon the existing statutory framework. (*Id*. at 20) ("Under the extended Moratorium, that borrowing base is aging out and forcing StenTam into breach of various financing agreements. StenTam must now enter more complex and costly lending arrangements to cover liabilities. [ ] Unless the IRS resumes processing ERC soon, StenTam will suffer inflated finance charges that can never be reimbursed."). Finally, the APA does not presuppose that Plaintiff must wait for an irreparable harm to occur before filing suit. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ("the technical differences between applying for and eligibility for asylum are of no consequence to a refugee when the bottom line—no possibility of asylum—is the same."). Plaintiff has sufficiently alleged irreparable harm here.

### E.  Balance of Hardships and Public Policy

Where, the government is a party to a suit, the last two *Winter* factors merge. *See Drakes Bay Oyster Co.*, 747 F.3d at 1092. In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). When determining the public interest, a court "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs. Blue Mountains Biodiversity Project v.*

32

*Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When the alleged action by the government violates federal law, the public interest factor usually weighs in favor of the plaintiff. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018) ("In addition, the Court again notes the public interest that exists in ensuring that the government complies with its obligations under the law and follows its own procedures." (quotation marks omitted)).

In the present case, the Court acknowledges that the harms alleged by each party are difficult to quantify. Weighing these harms also drifts dangerously close to a policy decision which this Court should not undertake unless Plaintiff demonstrates that the harms tip "sharply" in its favor. *All. for the Wild Rockies*, 632 F.3d at 1134. In attempting to establish this, Plaintiff has alleged that the moratorium "poses an immediate threat to StenTam's viability." (Doc. 14 at 19). This is Plaintiff's strongest point. For many requested preliminary injunctions, this type of harm is dispositive for a plaintiff. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) (finding that the balance of equities tipped in the plaintiff's favor because "without an injunction, it will go out of business."). In requesting a nationwide injunction though, the balance of equities becomes much broader in scope. *See Azar*, 911 F.3d at 582 ("Although 'there is no bar against . . . nationwide relief in federal district court or circuit court,' such broad relief must be 'necessary to give prevailing parties the relief to which they are entitled.'" (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987))); *League of Wilderness Defs. Blue Mountains Biodiversity Project*, 752 F.3d at 766 (requiring courts to address the impact on non-parties when determining the public interest). When viewed through this lens, Plaintiff's remaining arguments are not as strong. The Court will address these arguments in turn.

First, Plaintiff argues that many small businesses nationwide have been harmed in waiting for the ERC and in bearing the compliance costs of filing amended returns. (Doc. 32 at 30–31). However, these small businesses have an alternative remedy in filing a refund

suit under § 7422. Plaintiff's retort to this is "that option is inappropriate and a waste of resources for small businesses, the court system, and the Department of Justice." (Doc. 24 at 5). Whether this option is a waste of resources does not change whether a preliminary injunction is "necessary" to afford relief here though. *Azar*, 911 F.3d at 582. The fact that taxpayers have an alternative remedy indicates that preliminary injunctive relief is not necessary here.

Next, Plaintiff is correct in that the public does have an interest in Defendant IRS following the law by not exceeding its statutory authority. *See Valle del Sol Inc.*, 732 F.3d at 1029. At this point though, the Court is not prepared to say that it is likely that the Commissioner violated the law but only that Plaintiff has raised "serious questions" as to whether this is the case. *All. for the Wild Rockies*, 632 F.3d at 1134. Neither side has shown definitively that their respective interpretations of the relevant statutes at play are correct. Thus, the Court cannot say that this consideration tips "sharply" in Plaintiff's favor. *Id.*

Plaintiff has also argued that Defendant IRS would suffer no harm by a lifting of the moratorium, given that processing ERC claims is its statutory duty. As stated in Section (III)(C)(2) of this Order, the Court is largely sympathetic to this argument. Specifically, the Court sees little practical difference in increasing the number of ripe claims from 880,000 to 1.4 million given that Defendant IRS is required to process all of these claims at some point. If the only practical effect of lifting the moratorium would be that the post-moratorium claims would "get in line," then this indicates that Defendant IRS does not face future harm from a preliminary injunction. (Doc. 32 at 70). The public is not harmed by requiring Defendant IRS to do its job. Despite this though, Plaintiff has not shown how this consideration overcomes Defendants' concern of fraud. Plaintiff has attempted to negate this by arguing that Defendant IRS lacks evidence of widespread fraud, as it has only provided evidence of ineligibility. (*Id.* at 19). In making this argument though, Plaintiff discounts the fact that retrospectively investigating potential fraud is much more costly than preventing it on the front end. If Plaintiff is incorrect in their distinction between ineligibility and fraud, it could cost Defendant IRS, and thus the public, millions of dollars.

The Court is not keen on preventing Defendant IRS from being able to take preventative measures against fraud, such as digitizing ERC claims or enhanced compliance review. Whether the Commissioner can take 10 months on these actions is a question regarding the merits, not whether the balance of equities or public interest favors Plaintiff. This is further demonstrated by Plaintiff's failure to consider how forcing Defendant IRS to act on the ERC program might negatively affect the agency's ability to process other types of tax credit programs. As neither party could conclusively say how lifting the moratorium would disrupt operations at Defendant IRS, this consideration also does not decisively break in Plaintiff's favor.

Plaintiff further argues that all ERC claims, not just Plaintiffs, are subject to mounting interest payouts which would harm the public. (Doc. 24 at 19). Plaintiff estimates that Defendant IRS has incurred mounting interest obligations of over $4.2 billion on outstanding ERC claims. (*Id*.). In the very next sentence though, Plaintiff acknowledges that Defendant IRS has identified "$3 billion in potentially fraudulent claims with another $1 billion recovered through the Voluntary Disclosure Program." (*Id*.). This leaves a difference of less than 5% between the two estimates. The Court has trouble saying that this size of difference heavily favors Plaintiff. This also doesn't consider the costs of enforcement mechanisms needed to recover fraudulent ERC claims, or whether Plaintiff's $4.2 billion figure assumes a 100% validity rate among existing claims. Of course, the statistics from both sides are largely speculative at best. Accordingly, this argument is also not conclusive for Plaintiff.

Finally, the Court will note that since Plaintiff bears the burden in requesting a preliminary injunction, the Court may consider other equitable factors which may have affected Plaintiff. *See Drakes Bay Oyster Co*, 747 F.3d at 1092. Defendant IRS is notorious for processing delays, and Plaintiff had no reason to think the ERC would be different. Although the prospect of going out of business is a serious hardship, Plaintiff took on loans and built its business model knowing that these types of delays were possible, if not likely. Thus, Plaintiff bears at least some responsibility for the harm now facing them. *Id*. ("When

parties 'anticipate[ ] a pro forma result' in permitting applications, they become largely responsible for their own harm.'" (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011))). This does not excuse potentially unlawful conduct by Defendant IRS, but it does indicate that the balance of equities does not tip "sharply" in Plaintiff's favor for the purposes of a preliminary injunction. *All. for the Wild Rockies*, 632 F.3d at 1134.

In sum, the public would benefit from Defendant IRS following the directives of the CARES Act in both a timely and an accurate manner. The Court has no basis upon which to weigh these competing values except for the alleged harm on both sides. This is certainly "not an exact science." *Azar*, 911 F.3d at 582. Justice Frankfurter once remarked that the balancing of the equities was merely "lawyers' jargon for choosing between conflicting public interests." *Youngstown Sheet & Tube Co.*, 343 U.S. at 609 (Frankfurter, J., concurring). In doing so here under the sliding scale approach, Plaintiff has a heavy burden given that it has only raised "serious questions" as opposed to a strong likelihood of success on the merits. *All. for the Wild Rockies*, 632 F.3d at 1134. Without demonstrating that the balance of equities tips "sharply" in Plaintiff's favor, preliminary injunctive relief should not be granted. *Id*. In making this evaluation, the Court cannot ignore the potential ripple effect on the entire country which could ensue if Defendant IRS is denied a tool to combat fraud in the ERC program. Unfortunately for Plaintiff, the harm they allege is only equal at best to this potential consequence. Therefore, preliminary injunctive relief is inappropriate here.

### F.  Nationwide injunction

Although the Court does not find that the balance of equities or public interest factors tip sharply in Plaintiff's favor, it will briefly address why it could not theoretically limit any potential injunction to only the parties before it. The Court makes note of this to clarify why it considered the national implications of the requested injunction when attempting to balance the equities.

To start, the Ninth Circuit has cautioned prudence in issuing nationwide injunctions

and recently has narrowed the scope of several district court orders after finding that nationwide relief was not appropriate. *See, e.g.*, *Azar*, 911 F.3d at 584 (upholding injunction regarding contraceptive mandate but limiting its scope to the plaintiff states because "[o]n the present record, an injunction that applies only to the plaintiff states would provide complete relief to them" and the record was insufficiently developed on the harm to other states); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244–45 (9th Cir. 2018) (agreeing with the district court that injunction was appropriate to enjoin executive order that would withhold federal grants from "sanctuary jurisdictions" but finding record insufficiently developed on the harm outside California and remanding question to district court). Some of the many problems with nationwide injunctions include foreclosing adjudication of the issue by other courts, depriving non-parties of the right to litigate their individual cases, and forum shopping. *Azar*, 911 F.3d at 583. The Court also evaluates today's question mindful that "the proper scope of injunctions against agency action is a matter of intense and active controversy." *Innovation Law Lab v. Wolf*, 951 F.3d 986, 990 (9th Cir. 2020) (citations omitted). Despite this though, if a plaintiff ultimately prevails on the merits, then nationwide relief may be appropriate. *See, e.g.*, *Department of Homeland Security v. Regents of Univ. of Cal.*, 591 U.S. 1, (2020) (holding that the rescission of a major federal program "must be vacated"); *see also Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting) ("[I]f the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual."); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

In the present case, there is not a feasible way to lift the moratorium for only Plaintiff and no one else. The moratorium applies to all of Plaintiff's current and future clients, the latter of which is impossible to determine at this juncture. Furthermore, the Court would only lift the moratorium if it were found to be unlawful, and if it is unlawful as applied to Plaintiff then it is unlawful to all taxpayers and preparation services. *See Califano v.*

*Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff."); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) (holding that an injunction may extend a "benefit or protection" to nonparties "if such breadth is necessary to give prevailing parties the relief to which they are entitled."). Under the APA, this Court is required to "hold unlawful and set aside" agency action found to be invalid, such that the rule can no longer apply to anyone, not just Plaintiff. § 706(2). Plaintiff's alleged reputational harm in reference to the moratorium is also not solved if it remains in place for everyone else. The stigma of the program remains. Finally, neither party has any idea where Plaintiff's client's presently sit in the stack of 1.4 million outstanding ERC claims. All amended claims are filed on paper, not digitally. (Doc. 19-1 at 5). In processing each of these claims, Defendant IRS would be searching for a needle in a stack of needles. Even then, the post-moratorium claims would still be later in line than the 880,000 pre-moratorium claims. Put simply, it is not practical to order a lifting of the moratorium as applied only to Plaintiff's clients.

## IV.    <u>CONCLUSION</u>

As the Supreme Court has emphasized, injunctive relief is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. In this case, the Court finds that Plaintiff possess Article III standing to request a preliminary injunction as it has suffered economic harm from the moratorium, traceable to Defendants' actions, and redressable via the requested relief. Plaintiff also possesses statutory standing under the APA as Defendant IRS does not have the discretion to permanently ignore some ERC claims. The moratorium also constitutes final agency action, and Plaintiff has no alternative remedy to challenge it. Defendants' statements in the form of press releases are not final agency action, however. On the likelihood of success on the merits, Plaintiff raised some very serious separation of powers concerns regarding the Commissioner's implementation of the moratorium as it relates to the CARES Act. This action will likely result in irreparable harm to Plaintiff in the form of lost business and compliance costs. The Court does not diminish this but finds

that the serious questions raised are not enough to warrant preliminary injunctive relief outside a stronger showing on the balance of equities and public interest. As a result, Plaintiffs request for a preliminary injunction will be denied.

Accordingly,

**IT IS ORDERED** that Stenson Tamaddon LLC's Motion for Preliminary Injunction (Doc. 14) is **denied**.

Dated this 30th day of July, 2024.

Honorable Steven P. Logan
United States District Judge