DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
KENTON MCINTOSH
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
Telephone:     (202) 307-6422
               (202) 514-3768
Fax:           (202) 307-0054
Email:   Amy.T.Matchison@usdoj.gov
         Kenton.McIntosh@usdoj.gov
         Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stenson Tamaddon, LLC, | Case No. 2:24-cv-01123-SPL |
| Plaintiff, | **UNITED STATES' ANSWER** |
| v. | |
| United States Internal Revenue Service; the United States of America; United States Department of Treasury; Daniel Werfel, in his official capacity as Commissioner of the U.S. Internal Revenue Service; and Janet Yellen, in her official capacity as Secretary of the Treasury, | |
| Defendants. | |

The United States, on its behalf and on behalf of named defendants United States Internal Revenue Service; United States Department of Treasury; Daniel Werfel, in his official capacity as Commissioner of the U.S. Internal Revenue Service; and Janet Yellen, in her official capacity as Secretary of the Treasury,[1] hereby answer the allegations in the Plaintiff's Complaint (ECF No. 1) as follows. For convenience of the reader, the allegations in the Complaint are reproduced in **bold type**.

**1. This is an action for injunctive relief and mandamus under the administrative procedure act (5 U.S.C. § 701, et seq.) and the mandamus act (28 U.S.C. § 1361).**

ANSWER: Admitted.

**2. Congress charged the U.S. Department of Treasury and the Internal Revenue Service with implementing portions of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") of 2020. *See* 15 U.S.C. § 9006; 26 U.S.C. § 3134(m). Among the programs created by Congress, the IRS was tasked with reimbursing businesses through the Employee Retention Credit ("ERC") program.**

ANSWER: Admitted that Section 2301 of the CARES Act, which is not codified, established the ERC for certain wages paid to certain employees after March 12, 2020, and before January 1, 2021. Section 206 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 ("Relief Act") (also not codified) adopted amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit. Section 207 of the Relief Act (also not codified), effective for calendar quarters beginning after December 31, 2021, amended section 2301 of the CARES Act to extend the application of the ERC to qualified wages paid after December 31, 2020, and

---

[1] The real party in interest is the United States. The Department of Treasury and the Internal Revenue Service are not separately suable entities. Likewise, the suit against the Commissioner of Internal Revenue Daniel Werfel and the Secretary of the Treasury Janet Yellen is based solely on both acting in their official capacities and, as such, is a suit against the United States. *See generally Balser v. DOJ*, 327 F.3d 903, 907 (9th Cir. 2003).

before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time. Section 3134 of the Internal Revenue Code ("I.R.C.") was enacted by section 9651 of the American Rescue Plan Act of 2021 ("Rescue Plan"). Section 3134 of the I.R.C. provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022. The Infrastructure Investment and Jobs Act (2021) terminated the ERC for most employers in the fourth calendar quarter of 2021. The United States admits that Congress passed 15 U.S.C. § 9006. The United States further admits that the Department of Treasury and the IRS were tasked with implementing portions of the CARES Act with the IRS being tasked with administering the ERC program. As to the remaining allegations in the paragraph, denied.

**3.     The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on small business from the unprecedented challenges the pandemic posed. Congress intended for the credit to be broadly applicable to help businesses through a historic pandemic that disrupted the global economy. The IRS has failed Congress and American businesses in its role as steward of the ERC program.**

ANSWER: Admitted that the ERC is a refundable tax credit for certain eligible employers that paid qualified wages to employees during the COVID-19 pandemic. Denied that the IRS has failed Congress and American businesses in its role as steward of the ERC program. As to the remaining allegations in the paragraph, the United States lacks knowledge or information sufficient to form a belief about their truth and therefore denies them.

**4.     The IRS has improperly restricted the availability of ERC payments based on unlawful legislative rules that were issued in violation of the APA, 5 U.S.C. § 553(b). Congress afforded the IRS rulemaking authority under the CARES Act. *See* 26 U.S.C. § 3134(m). But instead of issuing regulations, the IRS legislated**

**improperly through guidance documents, thereby bypassing the mandatory notice-and-comment rulemaking process and eliminating the transparency and deliberation it offers. By doing so, the IRS stripped taxpayers of their right to participate.**

ANSWER: Admitted that Congress conferred upon the IRS the authority to issue such forms, instructions, regulations, and other guidance as were necessary under the CARES Act. The United States avers that the authority provided in the CARES Act is broader than what is codified in I.R.C. § 3134. As to the remaining allegations in the paragraph, denied.

**5.      Among other unlawful legislative rules, the IRS issued "Notice 2021-20," a purported guidance document that improperly narrowed the ERC statutory scheme thereby depriving otherwise eligible small businesses of the ERC payments they are entitled to under Section 3134.**

ANSWER: Admitted that the IRS issued Notice 2021-20. As to the remaining allegations in the paragraph, denied.

**6.      The IRS now treats its improperly issued guidance as binding legislative authority, elevating it to be treated by its employees as infallible law. The Service routinely cites Notice 2021-20 when denying ERC claims. The IRS's reliance on that Notice has prevented thousands of taxpayers from collecting financial relief Congress guaranteed to them under the statute.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegation in this paragraph that the IRS routinely cites Notice 2021-20 when denying ERC claims and therefore denies it. As to the remaining allegations in the paragraph, denied.

**7.      Congress did not grant the IRS authority to alter the statutory scheme in this way. The Service's restriction of ERC eligibility by way of Notice 2021-20 and other "guidance" was "in excess of [its] statutory jurisdiction, authority, or limitations." *See* U.S.C. §§ 706(2)(C).**

ANSWER: Denied.

**8.      What's more, the IRS adopted substantive positions in Notice 2021-20 without providing a reasoned explanation. The Service's adoption of substantive positions that materially changed the statutorily created ERC program through guidance was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).**

ANSWER: Denied.

**9.      Plaintiff asks that the Court vacate the unlawful Notice 2021-20 and enjoin the IRS from enforcing it absent compliance with the APA.**

ANSWER: Admitted that the Plaintiff asks the Court to vacate Notice 2021-20 and seeks injunctive relief against the IRS. Otherwise, denied.

**10.     Finally, the IRS improperly suspended the ERC program in violation of its statutory mandate to refund American businesses under the Congressionally enacted program. *See, e.g.*, 26 U.S.C. § 3134. In September 2023, the IRS announced it was suspending its review and processing of new ERC claims indefinitely. The IRS originally suggested this unlawful moratorium would end, and processing would resume, at the beginning of 2024. Yet even as of this filing, over seven months later, the IRS still has not ended its unilateral, ultra vires moratorium on ERC claims.**

ANSWER: Admitted that in September 2023, the IRS announced a moratorium on processing new ERC claims. As to the other allegations in the paragraph, denied.

**11.     Although the IRS says that it continues to process claims filed before the moratorium began on September 14, 2023, it has done so "at a greatly reduced speed." In practice, the Service has processed very few ERC claims since the moratorium began. The ERC program is effectively suspended in its entirety.**

ANSWER: Admitted that the IRS has continued to process claims filed before the moratorium began on September 14, 2023, and that it has done so at a greatly reduced speed. As to the remaining allegations in the paragraph, denied.

**12.    While Congress bestowed the IRS with regulatory tools to manage, process, and operate programs under the CARES Act, Congress did not delegate to the IRS the legislative authority to alter or disregard its statutory obligations. The moratorium places on indefinite hold thousands of legitimate claims by businesses that qualify for ERC under 26 U.S.C. § 3134. The moratorium has dissuaded businesses from filing legitimate ERC refund claims. The IRS has deprived and continues to deprive taxpayers of due process of law by staying the ERC program indefinitely without affording tax filers a pathway to resolve or collect payments that are due under the ERC program at the administrative level.**

ANSWER: Admitted that Congress has bestowed on the IRS regulatory tools to manage, process, and operate programs under the CARES Act consistent with the following delegations of authority:

- Section 2301 of the CARES Act, which is not codified, established the ERC for certain wages paid to certain employees after March 12, 2020, and before January 1, 2021.

- Section 206 of the Relief Act (also not codified) adopted amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit.

- Section 207 of the Relief Act (also not codified), effective for calendar quarters beginning after December 31, 2021, amended section 2301 of the CARES Act to extend the application of the ERC to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.

- Section 3134 of the I.R.C. was enacted by section 9651 of the Rescue Plan.

- Section 3134 of the I.R.C. provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022.

5

- The Infrastructure Investment and Jobs Act (2021) terminated the ERC for most employers in the fourth calendar quarter of 2021.

The United States lacks knowledge or information sufficient to admit or deny that the moratorium has dissuaded businesses from filing legitimate ERC refund claims and therefore denies it. As to the remaining allegations in the paragraph, denied.

**13.    Plaintiff asks that the Court declare the IRS moratorium unlawful; compel the Service to process ERC claims filed during the moratorium consistent with the CARES Act; and compel the Service to timely process ERC claims filed before the moratorium began, as required by the CARES Act and the Internal Revenue Code.**

ANSWER: Admitted that Plaintiff seeks the relief described in this paragraph. As to the remaining allegations in the paragraph, denied.

**I. PARTIES**

**A. The Plaintiff**

**14.    Stenson Tamaddon, LLC ("StenTam") is a multifaceted tax advisory and technology firm that assists businesses with tax credits and financial solutions. Based in Phoenix, Arizona, StenTam provides its national client base with solutions for identifying and seeking tax credits and government incentives.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies it.

**15.    StenTam operates as a consultant under the ERC program by helping businesses file ERC claims. StenTam is compensated from the proceeds of credits refunded to its clients. StenTam's services extend to defending claims that are challenged by the IRS. If a filed claim is disallowed, StenTam does not receive compensation for services on that submission.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies it.

**16.     As part of its business model, StenTam works with businesses to evaluate eligibility under the ERC program. StenTam has dedicated significant resources to ensuring compliance with all policy positions the IRS releases with respect to the ERC. For example, when the IRS publishes guidance documents concerning ERC eligibility or claim procedures, StenTam must adjust its business practices to account for the new developments. Those adjustments require investment of professional resources at considerable cost, including legal fees, research-related efforts, implementation costs, and human resource expenses.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies it.

**17.     As a business that depends on ERC refunds for a source of revenue, StenTam is directly injured by IRS positions that unlawfully narrow or limit the availability of ERC for businesses. When the IRS improperly narrows the eligibility criteria for ERC through legislative rules, StenTam suffers a commensurate loss of income and business opportunity. Likewise, when the IRS unlawfully suspended the ERC program in September 2023, StenTam lost the ability to receive compensation for work performed on behalf of clients that have ERC claims under 26 U.S.C. § 3134, by suspending refund payments to those clients, from which StenTam would in turn be paid.**

ANSWER: Denied.

**18.     The IRS has denied ERC refunds to StenTam clients based on unlawfully issued rules, like Notice 2021-20, that improperly narrowed eligibility criteria under the ERC program outside of the APA. StenTam is obligated to assist its clients in the pursuit of those credits at the administrative level. The IRS's unlawful guidance reduces StenTam's compensation for services rendered, prevents StenTam's clients from recovering refunds owed under the plain text of 26 U.S.C. § 3134, and imposes administrative costs on StenTam as it supports client claims before the agency.**

ANSWER: Denied.

**19.     Taken together, the IRS's unlawful approach to ERC eligibility and claims processing has cost StenTam millions in revenue.**

ANSWER: Denied.

**20.     A decision invalidating or vacating the IRS's unlawfully issued ERC rules will redress StenTam's injury by lifting barriers to refundable credits to which StenTam's clients are entitled under the statute. Mandamus relief should compel IRS officials to process the legitimate claims of American businesses entitled to refunds under the statute and will absolve StenTam of certain potential liabilities.**

ANSWER: Denied.

**B. The Defendants**

**21.     Defendant the IRS is an agency within the Executive Branch of the United States Government organized within the Department of Treasury. The IRS is an agency within the meaning of 5 U.S.C. § 701(b)(1).**

ANSWER: Admitted that the IRS is an agency within the meaning of 5 U.S.C. § 701(b)(1), but the United States avers that the IRS is a bureau of the Department of Treasury, within the Executive Branch of the United States Government.

**22.     Defendant Danny Werfel is the Commissioner of the IRS. In his capacity as Commissioner, Mr. Werfel establishes, enforces, and interprets tax administration policies, including through IRS guidance known as "Notices."**

ANSWER: Admitted that Danny Werfel is the Commissioner of the IRS. As to the remaining allegations in the paragraph, denied.

**23.     The United States Department of the Treasury is an arm of the Executive Branch of the United States Government that oversees the IRS.**

ANSWER: Admitted.

**24.     Defendant Janet Yellen is the Secretary of the Treasury.**

ANSWER: Admitted.

## II. **JURISDICTION AND VENUE**

**25.** **This Court has original subject matter jurisdiction over this cause of action under 28 U.S.C. § 1331 and 5 U.S.C[.] §§ 702, 704, and 706 as to all claims arising from federal law, interpretation of federal statutes, rules, regulations, orders, and the Constitution.**

ANSWER: Denied.

**26.** **Venue is proper under 28 U.S.C. § 1391(e)(1), as Defendants are employees of the United States, Plaintiff maintains its principal place of business in this district in Phoenix, AZ, and a substantial part of the events giving rise to this action occurred in this district as explained below.**

ANSWER: Admitted.

**27.** **Plaintiff files this action timely under 28 U.S.C. § 2401(a) and 5 U.S.C. § 704 because the claims are brought within six years after the right of action first accrued.**

ANSWER: Admitted as to 28 U.S.C. § 2401(a) but denied as to 5 U.S.C. § 704.

## III. **BACKGROUND**

**A. Congress Enacts the Employee Retention Credit Program and Directs the IRS to Facilitate It.**

**28.** **Beginning in 2020, COVID-19 swept through all fifty states and resulted in governmental orders that disrupted the United States' local and national economies. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID-19. The governmental response to that public health emergency involved historically unprecedented measures, including lockdown orders, social distancing mandates, and forced business closures. The profound economic effects of those policies were apparent. Deemed the "greatest threat to prosperity and well-being the US has**

encountered since the Great Depression[,]" the estimated cumulative financial costs of COV[I]D-19 were forecast at $16 trillion.[1]

[Footnote 1: *See* David M. Cutler & Lawrence H. Summers, *The COVID-19 Pandemic and the $16 Trillion Virus*, 324 JAMA 1495–1496 (2020). *See also* Council of Economic Advisers, *Evaluating the Effects of the Economic Response to COVID-19* (Aug. 2020), https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/08/Evaluating-the-Effects-of-the-Economic-Response-to-COVID-19.pdf.]

ANSWER: Admitted that the quotation is accurate. As to the remaining allegations in the paragraph, the United States lacks knowledge or information sufficient to form a belief about their truth and therefore denies them.

**29.    Those realities led the federal government to enact sweeping economic measures to assist American businesses and citizens. Through emergency measures like the Paycheck Protection Program ("PPP") and Economic Impact Payments, the government authorized direct payments to households and businesses on expedited timelines. Congress intended the remedial measures to have a broad effect.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies it.

**30.    The broad remedial purpose of the CARES Act, and specifically the ERC, was discussed by voting members of Congress who outlined the need for sweeping relief.[2]**

**[Footnote 2: *See, e.g.*, 166 Cong. Rec. S1897 (2020) (Sen. Collins explaining her support for the CARES Act and describing sponsoring Senators' "joint vision … to help small businesses and their employees make it through to the other side of this crisis by providing cashflow assistance quickly to employers who agree to keep their workers on the payroll");166 Cong. Rec. S1899 (2020) (Sen. Loeffler, recognizing the "acceleration of infection," that "small businesses are closing," and stating that Congress must "act immediately to pass the CARES Act"); 166 Cong. Rec. S2059**

**(2020) (Sen. Schumer, remarking that Congress' speedy work on the CARES Act "will be worth it to save industries from the brink of collapse in order to save the jobs of hundreds of thousands of Americans in those industries"); 166 Cong. Rec. E347 (2020) (Rep. Adams, voicing his support of the CARES Act "because it provides billions in assistance to our number one job creators, our small businesses, as they look to make payroll and keep their workers employed").]**

ANSWER: Admitted that Plaintiff has accurately quoted Senator Collins', Senator Loeffler's, and Representative Adams' statements in the Congressional Record. As to the remaining allegations in the paragraph, the United States lacks knowledge or information sufficient to form a belief about their truth and therefore denies them.

**31.     The statutory goal was to put money in the hands of citizens and businesses at an unprecedented speed, in a critical time of need. For instance, the CARES Act provided Economic Impact Payments of up to $1,200 per eligible adult and $500 each qualifying child under age 17. H.R. 748, 116th Cong. § 6428(a) (2020). The Tax Relief Act of 2020 authorized payments of up to $600 per eligible adult and up to $600 for each qualifying child under age 17. Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1965 § 6428A(a)(1) (2021). The American Rescue Plan of 2021 provided more Economic Impact Payments for eligible individuals and married couples. H.R. 1319, 117th Cong. § 6428B (2021). The purpose of these measures was to alleviate financial burdens created by the pandemic through broadly applied stimulus payments, tax credits, and exemptions. To that end, the federal government began issuing checks to citizens across the nation soon after the relief programs were approved by Congress.**

ANSWER: Admitted that the CARES Act provided Economic Impact Payments of up to $1,200 per eligible adult and $500 for each qualifying child under age 17. Further admitted that the Relief Act authorized payments of up to $600 per eligible adult and up to $600 for each qualifying adult under age 17 and that the Rescue Plan provided more Economic Impact Payments for eligible individuals and married couples. As to the

remaining allegations in the paragraph, the United States lacks knowledge or information sufficient to form a belief about their truth and therefore denies them.

**32.**   **Section 2301 of the CARES Act enacted the Employee Retention Credit ("ERC") program, which provided a tax credit to employers whose business operations were adversely affected by COVID-19, but who nonetheless continued to pay qualified wages, including some health plan expenses, to their employees.** *See* **26 U.S.C. § 3134. The statute created "a [refundable and non-refundable] credit against applicable employment taxes for each calendar quarter" in which a business was eligible.** *See* **26 U.S.C. § 3134(a).**

ANSWER: Admitted that the ERC tax credit and program was a result of the following legislative actions:

- Section 2301 of the CARES Act, which is not codified, established the ERC for certain wages paid to certain employees after March 12, 2020, and before January 1, 2021.

- Section 206 of the Relief Act (also not codified) adopted amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit.

- Section 207 of the Relief Act (also not codified), effective for calendar quarters beginning after December 31, 2021, amended section 2301 of the CARES Act to extend the application of the ERC to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.

- Section 3134 of the I.R.C. was enacted by section 9651 of the Rescue Plan.

- Section 3134 of the I.R.C. provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022.

- The Infrastructure Investment and Jobs Act (2021) terminated the ERC for most employers in the fourth calendar quarter of 2021.

**33.     Because Congress's goal was to give businesses a financial incentive to retain employees, it drafted the statute using broad language intended to extend credit to all employe[r]s who retained their employees, notwithstanding government measures that adversely impacted commerce during the pandemic.**

ANSWER: Denied.

**34.     Congress's goal in providing the Employee Retention Credit, as implied by the ERC's name, was to prevent a sudden mass enrollment in public assistance programs like Unemployment Insurance and Medicare or Medicaid during the pandemic, by incentivizing employers to keep employees on payroll despite a full or partial suspension of operations or a significant decline in revenue.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies it.

**35.     Congress mandated the IRS to conduct a public information campaign to inform businesses about the ERC program and to encourage participation. Amendments to the CARES Act required the IRS to work with the Small Business Administration (SBA) to disseminate information about the tax credit.[3]**
**[Footnote 3: *See* Consolidated Appropriates Act, 2021, Pub. L. No. 116-260, Div. EE, § 2[07](i) (requiring government "outreach" to business by giving "notice about the credit allowed under this section and the requirements for eligibility to claim the claim").]**

ANSWER: Admitted.

**36.     The IRS did not fulfill its Congressionally imposed obligation to publicize the availability of ERC payments by way of outreach to businesses. Despite qualifying under the statute, many eligible businesses remained unaware of the available tax relief well after the CARES Act was passed. Third-party tax advisory services therefore served an important role in alerting businesses to the**

**financial incentives associated with employee retention during the COVID-19 pandemic, by performing the outreach Congress had not.**

ANSWER: Denied.

**37.     Instead of publicizing the ERC program to encourage businesses' claims, the IRS has undermined its success through a fear mongering campaign. In March 2023, the IRS added claims about the ERC program to its "Dirty Dozen" list of "tax scams."[4] The Service later announced a "Voluntary Disclosure Program" meant to encourage taxpayers to pay back ERC they had already received but that they now believed might not have been owed to them. The IRS incentivized that program by requiring disclosing taxpayers to pay back only 80% of the total ERC received.[5] Over the past few months, the IRS has also scheduled public meetings to discuss the "freeze on ERC claims," hosted by members of the IRS Office of Criminal Investigation.[6]**

**[Footnote 4: *See* IR-News Rel. 2023-49, *IRS opens 2023 Dirty Dozen with warning about [ERC] claims; increased scrutiny follows aggressive promoters making offers too good to be true*, IRS.Gov (Mar. 20, 2023), https://tinyurl.com/IR-2023-49 ("In a further warning to people and businesses, the Internal Revenue Service added widely circulating promoter claims involving the Employee Retention Credits as a new entry in the annual Dirty Dozen list of tax scams.").]**

**[Footnote 5: *See Employee Retention Credit – Voluntary Disclosure Program*, IRS.gov (last updated Mar. 23, 2024), https://www.irs.gov/coronavirus/employee-retention-creditvoluntary-disclosure-program.]**

**[Footnote 6: *See* IR-News Rel. 2023-201, *Free IRS webinar shares latest details on the [ERC] including options for withdrawing or correcting previously filed claims amid aggressive marketing*, IRS.gov (Oct. 31, 2023), https://tinyurl.com/IR-2023-201.]**

ANSWER: Admitted that in 2023 the IRS included in its "Dirty Dozen" list of tax scams that taxpayers should be aware of aggressive pitches from scammers who promote large refunds related to the ERC. The warning followed blatant attempts by promoters to

con ineligible employers into claiming the credit. The IRS highlighted these schemes from promoters who were blasting ads on radio and the internet touting refunds involving the ERC. These promotions could have been based on inaccurate information related to eligibility for and computation of the credit. Additionally, the IRS warned that some of the advertisements existed solely to collect the taxpayers' personally identifiable information in exchange for false promises. The scammers then used the information to conduct identity theft.

Also admitted that the IRS announced a "Voluntary Disclosure Program" and held public meetings regarding the ERC, including the one cited.

As to the remaining allegations in the paragraph, denied.

**38.     The IRS's characterization of ERC as attracting fraud, scams, and ineligible claims is informed by its unlawful requirements for eligibility imposed by Notice 2021-20. Those positions have caused qualified, eligible StenTam clients to needlessly repay, withdraw, or reverse their ERC claims.**

ANSWER: Denied.

**39.     Although the moratorium on processing remains in place indefinitely, a business can still retroactively seek relief under the ERC for prior quarters in which that business was eligible for the credit by filing an IRS Form 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund).**

ANSWER: Admitted that employers can claim the ERC by filing an IRS Form 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund) during the moratorium. As to the remaining allegations in the paragraph, denied.

**B. The Text of Section 3134 Provides for Widespread ERC Eligibility.**

**40.     The text of Section 3134 provides for a credit against applicable employment taxes paid by an "eligible employer" in each relevant quarter of 2020 and 2021.**

ANSWER: Admitted that Section 2301 of the CARES Act, which is not codified, established the ERC for certain wages paid to certain employees after March 12, 2020,

and before January 1, 2021. Section 206 of the Relief Act (also not codified) adopted amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit. Section 207 of the Relief Act (also not codified), effective for calendar quarters beginning after December 31, 2021, amended section 2301 of the CARES Act to extend the application of the ERC to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time. Section 3134 of the I.R.C. was enacted by section 9651 of the Rescue Plan. Section 3134 of the I.R.C. provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022. The Infrastructure Investment and Jobs Act (2021) terminated the ERC for most employers in the fourth calendar quarter of 2021.

**41.     The credit payable to each "eligible employer" is equal to a set percentage of qualified wages the employer paid in the relevant quarter. *See* 26 U.S.C. § 3134(a). As originally enacted, the statute limited the credit to 50 percent of qualified wages per quarter, but Congress later amended the law to increase the credit to 70 percent of qualified wages per quarter. *See* 26 U.S.C. § 3134(a).**

ANSWER: Denied.

**42.     Congress defined "eligible employer" in Section 3134(c)(2). For any quarter subject to ERC in which a business was operational, the business may qualify as an "eligible employer" under the ERC program in any one of three possible ways:**

> **a.     First, a business qualifies if it "is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the**

coronavirus disease 2019 (COVID- 19).” 26 U.S.C. §
3134(c)(2)(A)(ii)(I).

      **i.**      **For this first prong, Congress chose not to include a requirement that the relevant government order directly regulate the fully or partially suspended business. *See generally* 26 U.S.C. § 3134. That is, Congress did not restrict the “orders from an appropriate governmental authority” referred to in the statute to those that directly ordered businesses to close. Instead, Congress purposefully used broad language to encompass all government orders that in any way limited “commerce, travel, or group meetings” due to COVID- 19. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(I). Thus, the language in Section 3134(c)(2)(A)(ii)(I) extends to businesses that were constructively suspended through a comprehensive regulatory scheme comprised of federal, state, and local orders that limited commerce, travel, and group meetings with the intent to stop the spread of COVID-19 at the cost of commercial interests. The language chosen by Congress reflects its intent to address the effects of a variety of governmental orders on a broad scale.[7]**

**[Footnote 7: *See* 166 Cong. Rec. S1897 (2020) (Senator Collins recognizing, as relevant to the CARES Act, that “96 percent of small business owners say they have already been affected by the coronavirus—not in the sense that they have become ill with it, but their customer base has simply dried up”).**

      **b.**      **Second, a business qualifies as an “eligible employer” if it suffered a certain diminution of business during the pandemic—for any reason. See 26 U.S.C. § 3134(c)(2)(A)(ii)(II). In contrast with the first avenue for ERC eligibility, Congress chose to impose specific numerical thresholds businesses must meet to qualify under this second**

17

**prong, limiting eligibility to circumstances in which "the gross receipts … of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019."**

    **c.     Under the third and final prong, a business qualifies as an "eligible employer" if it meets the statute's definition of a "recovery startup business."** *See* **26 U.S.C. § 3134(c)(2)(A)(ii)(III).**

ANSWER: Admitted that Section 2301 of the CARES Act, which is not codified, established the ERC for certain wages paid to certain employees after March 12, 2020, and before January 1, 2021. Section 206 of the Relief Act (also not codified) adopted amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit. Section 207 of the Relief Act (also not codified), effective for calendar quarters beginning after December 31, 2021, amended section 2301 of the CARES Act to extend the application of the ERC to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time. Section 3134 of the I.R.C. was enacted by section 9651 of the Rescue Plan. Section 3134 of the I.R.C. provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022. The Infrastructure Investment and Jobs Act (2021) terminated the ERC for most employers in the fourth calendar quarter of 2021. The United States further admits that Plaintiff accurately quoted Senator Collins' statement in the Congressional Record. As to the remaining allegations in the paragraph, denied.

    **C. The IRS Unlawfully Issues Legislative Rules Through "Notice 2021-20."**

    **43.    The CARES Act authorized the Secretary of the Treasury to "issue forms, instructions, regulations, and guidance as are necessary" for the IRS to facilitate the ERC program.** *See, e.g.***, 26 U.S.C. § 3134(m).**

ANSWER: Admitted that Congress conferred upon the IRS the authority to issue such forms, instructions, regulations, and other guidance as were necessary under the CARES Act. The United States avers that the authority provided in the CARES Act is broader than what is codified in I.R.C. § 3134.

**44.     The statutory text makes clear that Congress delegated this authority to the IRS for the purpose of facilitating the expeditious payout of employee retention credits—not to reformulate or reimagine the statute. For instance, Congress granted the IRS the limited authority to issue forms, instructions, regulations, and guidance necessary "to allow the advance payment of the credit … based on such information as the Secretary shall require[.]" *See* 26 U.S.C. § 3134(m).**

ANSWER: Admitted that Congress conferred upon the IRS the authority to issue such forms, instructions, regulations, and other guidance as were necessary under the CARES Act. The United States avers that the authority provided in the CARES Act is broader than what is codified in I.R.C. § 3134. As to the remaining allegations in the paragraph, denied.

**45.     Even as to those regulations Congress authorized the IRS to impose, Congress did not exempt the IRS from the APA's requirement that agencies follow the notice-and-comment rulemaking process. *See* 5 U.S.C. § 553(b); *see generally* 26 U.S.C. § 3134. *See also Mann Constr. v. United States*, 27 F.4th 1138, 1141–42 (6th Cir. 2022) (holding that Congress does not exempt the IRS from APA requirements when the statute does not explicitly provide such exemption).**

ANSWER: Denied as worded.

**46.     Although Congress granted the Secretary authority to promulgate "regulations" to facilitate the ERC program, the IRS chose instead to legislate through ever-changing "guidance" in the form of internet FAQs and notices, thereby circumventing the notice-and-comment process mandated by the APA. As explained by the IRS in representative refund denials:**

> **Treasury did not issue regulations addressing entitlement to, or calculation of, the ERC. Rather, consistent with statutory authority allowing the Secretary to issue "other guidance as may be necessary to carry out the purpose of the credit" …, the Service issued guidance in coordination with Treasury in the form of Frequently Asked Questions beginning on April 29, 2020.**

**Exh. C at 17 (pg. 5 of Form 886-A).**

ANSWER: Admitted that Plaintiff's quotation is accurate. As to the remaining allegations in the paragraph, denied.

**47.     On March 1, 2021, nearly a full year after Congress passed the CARES Act, the IRS published a 102-page guidance document titled "Notice 2021-20," which presented information in a "Question and Answer" format. *See* Exh. A.**

ANSWER: Admitted.

**48.     The stated purpose of Notice 2021-20 was to publish the IRS's standards for application of Section 2301 of the CARES Act, as amended by section 206 of the Relief Act. *Id.* at 1.[8]**

**[Footnote 8: The Relief Act retroactively expanded the ERC, reflecting Congress' view that not enough businesses were receiving the intended relief. The Relief Act expanded the program so that more, not less, businesses would qualify, and it increased the credit amount. Taken together, the legislative intent was clearly to have more, not less, businesses qualify under the ERC program.]**

ANSWER: Admitted that the ERC tax credit and program was a result of the following legislative actions:

- Section 2301 of the CARES Act, which is not codified, established the ERC for certain wages paid to certain employees after March 12, 2020, and before January 1, 2021.

- Section 206 of the Relief Act (also not codified) adopted amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit.

- Section 207 of the Relief Act (also not codified), effective for calendar quarters beginning after December 31, 2021, amended section 2301 of the CARES Act to extend the application of the ERC to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.
- Section 3134 of the I.R.C. was enacted by section 9651 of the Rescue Plan.
- Section 3134 of the I.R.C. provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022.
- The Infrastructure Investment and Jobs Act (2021) terminated the ERC for most employers in the fourth calendar quarter of 2021.

The United States further admits that Congress conferred upon the IRS the authority to issue such forms, instructions, regulations, and other guidance as were necessary under the CARES Act. The United States avers that the authority provided in the CARES Act is broader than what is codified in I.R.C. § 313. Admitted that Notice 2021-20 provides guidance on the ERC created under section 2301 of the CARES Act, as amended by section 206 of the Relief Act, which was enacted as Division EE of the Consolidated Appropriations Act, 2021, and addresses how the ERC applies to qualified wages paid after March 12, 2020, and before January 1, 2021. As to the remaining allegations in the paragraph, denied.

**49.      The "guidance" in Notice 2021-20 materially changed the ERC program by, among other things, significantly and improperly narrowing the scope of "eligible employer[s]" under the program and imposing substantial obligations on businesses seeking to benefit from the program. See id. at 29–30, 33–34, 39–40, 100–01. Notice 2021-20 also defined various terms in Section 3134, identified factors or elements necessary to claim the credit, set minimum thresholds for recovery of ERC, and imposed new, related record-keeping requirements—all of which resulted in the ERC being restricted to a lesser number of businesses than originally**

**contemplated by Congress. This "guidance" was not sourced from the Internal Revenue Code or the plain text of the CARES Act; it was created arbitrarily and capriciously ex nihilo by the IRS to govern and constrain payouts under the credit.**

ANSWER: Denied.

**50.     The IRS also improperly narrowed the universe of "government orders" that could qualify as causing full or partial business suspensions under Section 3134(c)(2). *Id.* 27–50 (defining what constitutes a full or partial shutdown under the ERC).**

ANSWER: Denied.

**51.     Notice 2021-20 announced that only those governmental orders that directly compelled a business closure or restriction could be considered to determine eligibility for ERC. *Id.* at 29–30. In doing so, the IRS excluded governmental orders that fully or partially suspended a business's operations based on indirect or collateral restrictions on commerce. *Id.* (stating that an order compelling customers shelter in place, but not directly requiring a business closure, is not an applicable governmental order). In other words, according to Notice 2021-20, an order that does not directly "relate to the suspension of an employer's operation of its trade or business does not rise to the level of a governmental order for the purposes of the employer's determination of its eligibility for the [ERC]." This limitation does not appear in the statutory language, and the IRS did not provide support in the Congressional record or otherwise that would indicate an intent to apply the statutory language so narrowly. The IRS's position in Notice 2021-20 is inconsistent with the purpose of the ERC program.**

ANSWER: Admitted that as stated in Notice 2021-20, an order that does not directly "relate to the suspension of an employer's operation of its trade or business does not rise to the level of a governmental order for the purposes of the employer's determination of its eligibility for the [ERC]." As to the remaining allegations in the paragraph, denied.

52.     **The IRS also concluded that a "voluntary" suspension of business could not support a claim for eligibility under the ERC.** *Id.* **at 29–30. Under this new standard, if a business closed due to a lack of demand or in response to governmental guidance and recommendations—rather than because of a direct closure order—the business is not deemed suspended by operation of a governmental order under 26 U.S.C. § 3134(c)(2)(A)(ii)(I). But of course, many businesses were subject to government-mandated lockdowns that made continued operations economically infeasible. Businesses struggled when these governmental orders compelled their customer base to remain home, and many were forced to close due to severe decreases in demand. Many businesses faced a dilemma between remaining open in violation of governmental guidance, which would expose the business to liability if customers contracted COVID-19, or closing and losing both revenue and the ability to pay their employees.**

ANSWER: Admitted that as stated in Notice 2021-20, a "voluntary" suspension of business could not support a claim for eligibility under the ERC. As to the remaining allegations in the paragraph, denied.

53.     **Businesses' concerns about the effect of the governmental guidance and recommendations could not be voiced in relation to the ERC program, given the lack of opportunity for public input prior to Notice 2021-20 being issued. Thus, despite the clear causal connection between lockdown orders and business closures, an affected business would not qualify as an eligible employer under Notice 2021-20, because the orders did not regulate the business directly. Exh. A at 29–30. The constructive closure from reduced business is, according to IRS, an inadequate basis to claim the credit under Section 3134(c)(2)(A)(ii)(I). Had this rule gone through the notice-and-comment process, the issue of constructive closures could have been addressed, and the IRS would have been required to, at minimum, explain its basis for discounting such closures for purposes of the program.**

ANSWER: Denied.

**54.     Even for businesses directly regulated by a qualifying order, Notice 2021-20 installs minimum thresholds for ERC eligibility by requiring that a business show more than a "nominal" disruption of business caused by the order to establish "partial suspension."** *Id.* **at 27 (noting that an employer may "have a partial suspension if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order").**

ANSWER: Admitted that the quotation in the parenthetical is accurate. As to the remaining allegations in the paragraph, denied.

**55.     Specifically, in Notice 2021-20 the IRS arbitrarily defined "nominal portion" of business operations to mean either "(i) the gross receipts from that [suspended] portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts from the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business[.]"** *Id.* **at 28. This was not a policy choice that Congress made. Absent Congress' directive to impose a minimum threshold, the IRS lacks authority to do so.**

ANSWER: Admitted that as stated in Notice 2021-20, a portion of an employer's business operations will be deemed to constitute more than a "nominal portion" of its business operations if either "(i) the gross receipts from that [suspended] portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts from the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business[.]" As to the remaining allegations in the paragraph, denied.

**56.     What's more, the IRS did not explain in Notice 2021-20 why the "ten percent" threshold set was appropriate or necessary. The IRS did not provide any bases for its decision that a business suffering from a 9.5% reduction in receipts has**

**not suffered an adequate "partial suspension" of business, but a business suffering from a 10% reduction in receipts has. For many small businesses operating on narrow margins, a nine percent reduction in business operations is significant. The IRS did not provide any evidence that Congress intended to impose an arbitrary threshold that would operate to exclude business suffering real harm.**

ANSWER: Denied.

**57.     The direct order and "nominal portion" requirements are ubiquitous in Notice 2021-20 and trigger additional requirements that must be satisfied for eligibility under the ERC. *Id.* at 27, 34–40, 100.**

ANSWER: Denied.

**58.     For example, Notice 2021-20 imposes new regulatory duties and obligations on businesses, including StenTam. It requires employers to substantiate their eligibility for ERC by, among other things, maintaining records showing: the governmental order(s) that suspended business operations; the records the employer relied on to determine whether a governmental order had more than a nominal effect on its business operations; records the employer used to determine whether it experienced a significant decline in gross receipts; records of which employees received qualified wages and in what amounts; and, for large employers, work records, and documentation showing whether and what amount of wages the business paid to employees who were not providing services. *Id.* at 100–01.**

ANSWER: Denied.

**59.     Notice 2021-20 also requires each employer to maintain records showing how it calculated allocable qualified health plan expenses; the documents relied on and its analysis whether the employer is a member of an aggregated group treated as a single employer for purposes of ERC; and how aggregation of businesses impacts the claimed credit. Employers must also maintain copies of completed and submitted Form 7200s and the complete and submitted federal employment tax returns. *Id.***

ANSWER: Denied.

**60.       Notice 2021-20 requires employers to independently determine whether the interruption or reduction to their business constituted "more than a nominal" disruption, as defined in the Notice, and to maintain all records used to do so.** *See* **Exh. A at 39 (while leaving it open-ended, the Notice includes examples of record-keeping to include documents showing: limited occupancy to provide for social distancing, required services that were performed only on an appointment basis, changes to the format of services, requirements on employees and customers to wear face coverings, and so on.);** *but see id.* **at 39–40 (requiring, above all else, that the governmental order must result "in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent," and that a mask mandate for employees and customers "will not result in more than nominal effect on the business operations."). An employer's failure to maintain supporting records could subject taxpayers to penalties, including erroneous refund penalties.** *See* **I.R.C. § 6676.**

ANSWER: Denied.

**61.       Under Notice 2021-20, taxpayers must maintain those records for four years after the date each tax becomes due or is paid, whichever comes later.** *Id.* **at 101. In yet another indication of the disconnect between the IRS's unlawful Notice 2021-20 and the statutory text, the four-year retention period differs from the applicable five-year statute of limitation for examining the credit.** *See* **26 U.S.C. § 3134(l).**

ANSWER: Denied.

**62.       The IRS has modified, expounded on, and purported to clarify Notice 2021-20 since issuing the "guidance," including by way of Notice 2021-23, Notice 2021-33, Notice 2021-49, and Notice 2021-65.**

ANSWER: Admitted that the IRS has issued Notice 2021-23, Notice 2021-33, Notice 2021-49, and Notice 2021-65. As to the remaining allegations in the paragraph, denied.

**63.     None of these IRS Notices were subjected to the notice-and-comment rulemaking process. The IRS provided no opportunity for public comment that would have alerted the IRS to the challenges and irrationality in the rules and limitations it ultimately selected. Further, the absence of the rule-making process allowed the IRS to circumvent its obligation to explain the basis for its rules, thereby depriving the Court of the ability to discern whether the rules are rationally related to the facts before the IRS.**

ANSWER: Admitted that Notice 2021-20, Notice 2021-23, Notice 2021-33, Notice 2021-49, and Notice 2021-65 did not go through notice-and-comment procedures. As to the remaining allegations in the paragraph, denied.

**64.     As a result of the IRS bypassing the notice-and-comment process, the Notices lack the transparency those required administrative procedures are meant to provide. Because administrative agencies operate outside the scrutiny of the electorate, and administrative rules are not promulgated by elected officials, the rulemaking procedures guaranteed by Congress in 5 U.S.C. § 553 are essential safeguards that enable direct public participation. Here, adhering to the rulemaking process with respect to the ERC would have benefited both the agency and the public.**

ANSWER: Denied.

**65.     The IRS's choice to forego the important (and mandated) rulemaking process resulted in an unlawful narrowing of the employee retention credit that conflicts with Congressional intent and the plain language of the Act.**

ANSWER: Denied.

**66.     The IRS indicates that Notice 2021-20 will apply to businesses currently awaiting a decision on their ERC claims, and to prospective claims under**

the ERC that have not yet been filed but are still eligible. Therefore, the unlawfully promulgated Notice 2021-20 continues to limit StenTam clients' rights to receive some or all of the tax credits they would otherwise be owed and, in turn, the direct revenue to StenTam for its ERC-related services.

ANSWER: Admitted that the IRS will process ERC claims currently awaiting a decision and prospective claims consistent with the guidance articulated in Notice 2021-20. As to the remaining allegations in the paragraph, denied.

67.     The IRS has successfully used Notice 2021-20 and the Moratorium to deter the filing of new ERC claims as reflected by the substantially reduced number of new claims filed since September 14, 2023.

ANSWER: Denied.

**D. The IRS Treats Notice 2021-20 as Having the Force of Law.**

68.     The IRS has published a series of legal memoranda and information letters to Congress treating Notice 2021-20 as binding legal authority.[9]

[Footnote 9: *See, e.g.*, C.A.M. 2023-005, 2023 WL 4701979 (July 21, 2023) (explaining that Notice 2021-20 governs and provides limited exceptions for certain employers); C.A.M. 2023-007, 2023 WL 7296104 (Nov. 3, 2023) (noting that businesses can claim ERC only if they "fall within the provisions" of the Notice 2021-20); IRS Information Letter, 2023-0005, 2023 WL 5319790 (June 30, 2023) (in an IRS letter to Rep. Cartwright, the agency provided clarification "about income tax filing rules related to the employee retention credit[,]" referencing Notice 2021-20 along with the statutory law as a source of authority) (emphasis added); IRS Information Letter, 2023-0001, 2023 WL 2859099 (Mar. 31, 2023) (in an IRS letter to Senator Cornyn, the agency noted that it "has rules and regulations in place" and those "rules help ensure the proper withholding and payment of employment taxes," and citing only Notice 2021-20 in support of that position).]

ANSWER: Denied.

**69.     Legal memoranda published by the IRS's Office of Chief Counsel concerning the application of ERC have referenced Notice 2021-20 as operative "law" alongside the language of the statute.[10] The IRS relies on Notice 202[1]-2[0] as an operational rule that defines eligibility under the ERC. *See id.* at 12 (citing Notice 2021-20 as legal authority alongside other Treasury regulations, including Treas. Reg. § 31.6001-1 and 1.6001-1); *id.* at 12 (explaining that "To fall within the provisions of … Notice 2021-20, the determination of whether an employer experienced a full or partial suspension of operations depends upon whether more than a nominal portion of an employer's trade or business operations was suspended by a governmental order or a governmental order had more than a nominal effect on an employer's trade or business operations"). IRS counsel has therefore publicly proclaimed that eligibility under the ERC depends on whether a business "fall[s] within the provisions of Notice 2021-20." *Id.* at 12, 13.**

**[Footnote 10: *See* C.A.M. 2023-007 (Nov. 3, 2023).]**

ANSWER: Admitted that Plaintiff's quotations are accurate. Otherwise, denied.

**70.     The agency uses Notice 2021-20 as its primary source for interpretation of the ERC eligibility criteria when evaluating claims.**

ANSWER: Denied.

**71.     The IRS therefore relies on Notice 2021-20 as authoritative law when denying ERC claims. *See, e.g.*, Exh. C at 17–18, 23–29; ERC Disallowance, Exh. D at 4 (The IRS instructing that "To the extent … legislation did not modify the original provisions of the ERC, Notice 2021-20 governs the ERC for all periods.").**

ANSWER: Denied.

**72.     The IRS provides its substantive basis for disallowances in a Form 866-A (Explanation of Items). In those documents, the IRS has stated that Notice 2021-20 governs the outcome.**

ANSWER: Denied.

**73.     For instance, in multiple disallowances issued to StenTam clients, the IRS relied on specific sections in Notice 2021-20 as legal justification for denying Plaintiff's ERC submission. *See, e.g.*, Exh. C at 24 (12 of Form 866-A) (citing Notice 2021-20 for the agency's rule concerning governmental orders); *see also id.* at 24-29 (relying on Notice 2021-20).**

ANSWER: Denied.

**74.     On information and belief, the IRS has consistently relied on Notice 2021-20 and cited noncompliance with the Notice as a legal basis to deny other refund claims under the ERC program, as well. Notice 2021-20 has therefore altered the rights and obligations of regulated employers and, in turn, imposed challenges on tax preparation providers and consultants as they manage uncertainties caused by the IRS's failure to follow the APA in promulgating legislative rules.**

ANSWER: Denied.

**75.     Official publications make clear that IRS agents must follow Notice 2021-20 when evaluating refund claims under the ERC.**

ANSWER: Denied.

**E. The IRS Abruptly and Indefinitely Suspends Processing of ERC Claims.**

**76.     On September 14, 2023, the IRS announced, via press release on its website, "an immediate moratorium through at least the end of the year on processing new claims for the pandemic-era relief program…." *See* Exh. B at 1 (Moratorium News Release).**

ANSWER: Admitted.

**77.     The IRS offered no assurance that its unilateral moratorium would end at the start of 2024. And by early 2024, the Service still had not resumed processing new ERC claims.**

ANSWER: Admitted.

**78.     More recently, the IRS extended its moratorium "into late spring."[11] But as of the date of this filing, the IRS still has not ended or provided an end-date**

1  **for the moratorium. Instead, the Service continues to violate the plain language of**

2  **the CARES Act by refusing to process any claims submitted since the moratorium's**

3  **start date. As to any claims submitted before the moratorium began, the IRS openly**

4  **acknowledged it continues to process them, but at a "greatly reduced speed."**

5  **[Footnote 11:** *See* **IR-News Rel. 2024-78,** *IRS Employee Retention Credit compliance*

6  *effort tops $1 billion threshold since fall; Voluntary Disclosure Program suspended*

7  *after March 22, special withdrawal program remains open as audits, investigations*

8  *intensify* **(Mar. 22,**

9  **2024), https://tinyurl.com/IR-2024-78 ("A specific resumption date hasn't been**

10  **determined but, at this point, the IRS anticipates it will be sometime in late**

11  **spring").]**

12      ANSWER: Admitted that the moratorium on the processing of claims filed after

13  September 14, 2023, did not end by the time Plaintiff filed the Complaint and that the

14  IRS will process claims submitted before the moratorium with more scrutiny and at a

15  much slower rate than before the IRS's approach changed in 2023. The United States

16  avers that on August 8, 2024, the IRS announced it would start judiciously processing

17  claims filed between September 14, 2023, and January 31, 2024. As to the remaining

18  allegations in the paragraph, denied.

19      **79.    As with Notice 2021-20, the IRS moratorium was not subjected to the**

20  **notice-and-comment rulemaking process, and the text of Section 3134 does not**

21  **provide for such a moratorium. The agency provided no opportunity for**

22  **stakeholders to be heard and first announced the moratorium in a press release**

23  **published to its website.**

24      ANSWER: Admitted that the IRS's moratorium decision did not go through

25  notice-and-comment procedures. As to the remaining allegations in the paragraph,

26  denied.

27      **80.    Although Congress afforded the Secretary of the Treasury authority to**

28  **issue "forms, instructions, regulations, and other guidance" that were necessary to**

**carry out the ERC program (see 26 U.S.C. § 3134(m)), Congress never delegated to the Department of the Treasury legislative authority to unilaterally suspend or terminate the ERC program.**

ANSWER: Admitted that Congress conferred upon the IRS the authority to issue such forms, instructions, regulations, and other guidance as were necessary under the CARES Act. The United States avers that the authority provided in the CARES Act is broader than what is codified in I.R.C. § 3134. As to the remaining allegations in the paragraph, denied.

**81.     As its basis for the moratorium, the IRS cited "growing concerns inside the tax agency, from tax professionals as well as media reports that a substantial share of new claims from the aging program are ineligible…" *Id.* The agency then cautioned would-be "ineligible" filers to review the IRS's unlawfully promulgated legislative rules to "help[] determine ERC eligibility, including [the] frequently asked questions" in Notice 2021-20. *Id.* at 2. Thus, once again, the agency held out its Notice 2021-20 as legislative rule, even though the Notice was not subject to the mandatory notice-and-comment procedures of the APA.**

ANSWER: Admitted that in announcing the moratorium the IRS cited "growing concerns inside the tax agency, from tax professionals as well as media reports that a substantial share of new claims from the aging program are ineligible…" and  cautioned would-be "ineligible" filers to review the IRS's guidance on the ERC to help determine their eligibility. As to the remaining allegations in the paragraph, denied.

**82.     The Service's unlawful legislative rules, such as Notice 2021-20, provided the impetus for its unlawful moratorium. This is made evident by the bases the IRS cites for its concern about ineligible claims. For example, the Service recently admonished businesses about "special warning signs that an ERC claim may be questionable to help businesses that may need to resolve incorrect claims."[12] Among those red flags include IRS concerns with tax filers relying on "[g]overnment orders that don't qualify" and "businesses citing supply chain**

issues." *Id.* Both of those conditions reflect the Service's narrowing of 26 U.S.C. § 3134 through Notice 2021-20.

[Footnote 12: IR-News Rel. 2024-85, *Dirty Dozen: Beware of aggressive promoters who dupe taxpayers into making questionable [ERC] claims; risks continue for small businesses, special withdrawal program remains available* (Mar. 29, 2024), at https://tinyurl.com/IR-2024-85.]

ANSWER: Denied.

83.     The IRS's complaint about purportedly "ineligible" ERC claimants is a self-fulfilling prophecy. First the IRS unlawfully narrowed the eligibility criteria for ERC claims through Notice 2021-20 and now alleges that a greater percentage of filings are "incorrect" or "questionable" under that same unlawfully issued, narrowed criterion.

ANSWER: Denied.

84.     On information and belief, IRS agents have stopped processing pending and incoming ERC claims. IRS employees have stated that the moratorium precludes all action on those inbound submissions.

ANSWER: Denied.

85.     Congress has consistently supported the ERC program, and the Biden administration actively encouraged businesses to take full advantage of the credit.[13] But the IRS confronted burdens when administrating the program, and soon began discouraging businesses from claiming the credit.

[Footnote 13: *See, e.g.*, White House, *Fact Sheet: President Biden Announces Additional Steps to Help Americans Return to Work* (May 10, 2021), https://tinyurl.com/FactSheet-WhiteHouse ("[T]he Biden-Harris Administration is working to increase awareness of and participation in this beneficial program"); Carmen Reinicke, *Biden encourages businesses to take advantage of the employee retention credit*, CNBC.com (May 12, 2021), https://tinyurl.com/CNBC-Reinicke.]

ANSWER: Admitted that Congress and the Biden administration have supported and encouraged the filing of eligible ERC claims by eligible employers as indicated by the citations in the paragraph. As to the remaining allegations in the paragraph, denied.

**86.    Congress enacted a broad measure in 26 U.S.C. § 3134. To be sure, the scope of that program may have grown larger than forecasted. But regardless of any pitfalls faced by the ERC program, the IRS has no authority to simply stop processing ERC claims of businesses that may be rightfully entitled to refunds under Section 3134. Only the legislature can speak to those remedial measures.**

ANSWER: Denied.

**87.    The IRS has not established that the incoming rate of new ERC claims in late 2023 was greater than at other times during the life of the ERC program.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies it.

**88.    The IRS has also not shown that the rate of purported abuse within the ERC program is materially different from rates of abuse under other common tax programs.**

ANSWER: The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore denies it.

**89.    As a whole, IRS processed 262,829,039 total tax returns in 2022.[14] According to the IRS, the Service closed 708,309 general tax return audit investigations in 2022, resulting in nearly $30.2 billion in recommended additional tax.[15] In that same time frame, 1,595,277 employers submitted ERC claims in 2022.[16] IRS claimed that it received 3.6 million ERC claims leading into the moratorium. *See* Exh. B at 3. But as of summer 2023, when the IRS decided to proceed with a moratorium, the IRS had announced 252 investigations, resulting in 15 federally charged cases, 6 convictions, and 4 sentencings with an average sentence of 21 months per offender. *Id.* Even if those numbers are underinclusive, several hundred**

investigations out of nearly 3.6 million claims does not facially reflect defects with the ERC program justifying a complete cessation of the program.

[Footnote 14: *See IRS Data Book*, 2023 (Apr. 2024) at 4, table 2, https://www.irs.gov/pub/irs-pdf/p55b.pdf.]

[Footnote 15: *See SOI Tax Stats – Examination Coverage: Recommended Additional Tax, and Returns with Unagreed Additional Tax, After Examination, by Type and Size of Return – IRS Data Book Table 18*, IRS.gov (last updated Apr. 18, 2024), https://tinyurl.com/Table-18.]

[Footnote 16: *See IRS Data Book*, 2022 at 75, https://www.irs.gov/pub/irs-pdf/p55b.pdf.

ANSWER: Denied as to the last sentence in the paragraph. Otherwise, admitted.

**90.     The numbers have remained consistent since the moratorium began. Of the 352 criminal investigations concerning ERC initiated by IRS, only 18 have resulted in charges. Just 11 of those charges resulted in conviction.[17]**

[Footnote 17: *See* IR-News Rel. 2024-21, *IRS continues work on Employee Retention Credit; new IRS CI education sessions come as agency urges businesses to review VDP, withdrawal program for questionable claims* (Jan. 25, 2024), https://tinyurl.com/IR-2024-21.]

ANSWER: Admitted that at the time Plaintiff filed its Complaint these numbers were accurate. The United States avers that as of July 1, 2024, IRS Criminal Investigation has initiated 460 criminal cases, with potentially fraudulent claims worth nearly $7 billion. In all, 37 investigations have resulted in federal charges so far, with 17 investigations resulting in convictions and nine sentencings with an average sentence of 20 months.

**91.     As of March 2024, the IRS has been able to identify 22,000 claims that it viewed as "improper" under the ERC, which represents less than 1% of the total claims filed.[18]**

**[Footnote 18:** *See* **IR-News Rel. 2024-78,** *IRS Employee Retention Credit compliance effort tops $1 billion threshold since fall; Voluntary Disclosure Program suspended after March 22, special withdrawal program remains open as audits, investigations intensify* **(March. 22, 2024), https://tinyurl.com/IR-2024-78.]**

ANSWER: Admitted that at the time Plaintiff filed its Complaint these numbers were accurate. The United States avers that since then, and as the IRS announced on August 8, 2024, the IRS has sent out 28,000 disallowance letters to businesses whose claims showed a high risk of being incorrect. The IRS estimates that these disallowances will prevent up to $5 billion in improper payments.

**92.    As the moratorium drags on into its eighth month, the IRS is sitting on billions in ERC funds that Congress intended to be distributed to American businesses, and interest on the delinquent payment to businesses continues to accumulate. Yet the IRS refuses to process new claims, regardless of whether claimants would be eligible for ERC under the statute.**

ANSWER: Admitted that as of the filing of the Compliant, the moratorium had been in effect for eight months and that the IRS was not processing claims received after September 14, 2023. As to the remaining allegations in the paragraph, denied.

**93.    Taxpayers have a Congressionally established "right" to pay only the correct amount of tax owed.** *See* **26 U.S.C. § 7803(C). That necessarily includes the right to a refund of amounts overpaid, including money retroactively deemed overpaid by way of the ERC program.**

ANSWER: Admitted that 26 U.S.C. § 7803(a)(3)(C) mentions "the right to pay no more than the correct amount of tax." Otherwise, denied.

**94.    The IRS has a Congressionally established obligation to process taxpayers' claims for ERC, and to refund amounts overpaid based on application of the ERC.**

ANSWER: Admitted that 26 U.S.C. § 6402(a) provides that in the case of any overpayment, the Secretary of the Treasury, within the applicable period of

36

limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to certain limitations, refund any balance to such person. Otherwise, denied.

## IV. <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>

**Violation of the APA's Notice-and-Comment Rulemaking Requirement**

**[5 U.S.C. § 553]**

**95.     StenTam re-alleges and incorporates by reference the paragraphs set forth above.**

ANSWER: The United States incorporates by reference its answers to the paragraphs set forth above.

**96.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.**

ANSWER: Admitted that this allegation accurately quotes a portion of 5 U.S.C. § 702.

**97.     The Court may therefore "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. 706(2)(D).**

ANSWER: Admitted that this allegation accurately quotes a portion of 5 U.S.C. § 707(2)(D).

**98.     Agency rules can be "interpretative" or "substantive."**

ANSWER: Because this allegation does not identify the source of the quotes, the United States lacks sufficient information to admit or deny its accuracy. On that basis, denied.

99.     Substantive, also called "legislative" rules, impact rights and obligations and have the force and effect of law. Legislative rules therefore impose new rights or obligations on the regulated class and can change a party's legal status. *See United States v. Mana[ff]ort*, 312 F. Supp. 3d 60, 75 (D.D.C. 2018).

ANSWER: Denied to the extent this paragraph's allegation are incomplete based on, and/or inconsistent with, the source cited.

100.     When evaluating whether a rule is "legislative," Courts broadly consider whether the rule imposes new obligations. The imposition of even minor duties, such as recordkeeping requirements, is grounds to deem a rule legislative. *See Green Valley Invs., LLC v. Comm'r of Internal Revenue*, No. 17379-19, 2022 WL 16834499, \*5 (T.C. Nov. 9, 2022) (finding that the IRS imposed new duties in the form of reporting obligations and recordkeeping requirements, and are "hallmarks of a legislative, not an interpretive rule.").

ANSWER: Denied to the extent this paragraph's allegations are incomplete based on, and/or inconsistent with, the source cited.

101.     The APA requires that certain rules promulgated by an agency must be published following specified notice-and-comment procedures. 5 U.S.C. § 553. "Substantive" or "legislative" rules are subject to the APA's notice-and-comment procedures. *See* 5 U.S.C. § 553.

ANSWER: Admitted that certain rules promulgated by an agency must be subject to notice and comment procedures. Otherwise, denied.

102.     An agency's failure to meet those obligations is grounds to invalidate a substantive rule. *Mann Constr., Inc. v. U.S.*, 27 F.4th 1138, 1148 (6th Cir. 2022); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2021); *Bullock v. Internal Revenue Serv.*, CV-18-103, 2019 WL 3423485, (D. Mont. July 30, 2019).

ANSWER: Denied to the extent this paragraph's allegations are incomplete based on, and/or inconsistent with, the sources cited.

**103.    Under the APA, the court shall set aside agency action that is "without observance of procedure required by law."** *See* **5 U.S.C. § 706(2)(D).**

ANSWER: Admitted that this allegation accurately quotes a portion of 5 U.S.C. § 706(2)(D).

**104.    The IRS has given Notice 2021-20 the force and effect of law.**

ANSWER: Denied.

**105.    The IRS did not issue a notice of proposed rulemaking describing the proposed rules it intended to implement through Notice 2021-20.**

ANSWER: Admitted that Notice 2021-20 did not go through notice-and-comment procedures. As to the remaining allegations in the paragraph, denied.

**106.    The IRS did not give the public the opportunity to submit comments on the rules ultimately adopted in Notice 2021-20.**

ANSWER: Admitted that Notice 2021-20 did not go through notice-and-comment procedures. As to the remaining allegations in the paragraph, denied.

**107.    The IRS did not provide a clear statement of the basis and purpose of the extensive rules found in Notice 2021-20.**

ANSWER: Denied.

**108.    Notice 2021-20 creates new substantive duties and restrictions by, among other things, requiring employers to substantiate and document eligibility under the ERC; promulgating new legislative standards for application of the ERC that materially narrow eligibility for the credit; and by imposing document and data retention requirements on taxpayers and those submitting claims on their behalf.**

ANSWER: Denied.

**109.    Notice 2021-20 is not an interpretative rule under 5 U.S.C. § 553(b)(3)(A).**

ANSWER: Denied.

**110.    Notice 2021-20 is a substantive rule under 5 U.S.C. § 533(b)(3)(A).**

ANSWER: Denied.

**111.    One year before the nationwide shutdowns under COVID-19, the Department of the Treasury and the IRS published a policy statement purporting to "reaffirm their commitment to a tax regulatory process that encourages public participation, fosters transparency, affords fair notice, and ensures adherence to the rule of law." Exh. E at 1 (Dept. of Treasury Policy Stmt.). The IRS acknowledged that "[t]he best practice for agency rulemaking is the notice-and-comment process established by the [APA]." *Id.* The IRS committed to follow notice-and-comment procedures even for interpretive rules. *Id.* (pledging that "IRS will continue to adhere to their longstanding practice of using the notice-and-comment process for interpretive tax rules published in the Code of Federal Regulations.").**

ANSWER: Denied to the extent this paragraph's allegations are incomplete based on, and/or inconsistent with, the sources quoted. Further, the United States avers the policy statement also reflects that the "APA exempts interpretive rules from notice-and-comment requirements."

**112.    Despite recognizing that guidance documents should not have the force of law, the IRS has held out Notice 2021-20 as a purported rule with the force and effect of law. *Compare* Exh. D at 4 *with* Exh. E at 2.**

ANSWER: Denied.

**113.    Notice 2021-20 makes no showing of good cause legally sufficient to avoid notice-and-comment rulemaking. *See* 5 U.S.C. § 553(b)(3)(B). The IRS issued Notice 2021-20 one year after the CARES Act. It's failure to engage the proper rulemaking process did not result from an exceptional circumstance. *See* Exh. E at 2.**

ANSWER: Denied.

**114.    The agency has yet to begin a rulemaking despite the passage of three years.**

ANSWER: This allegation does not state what "a rulemaking" applies to. On that basis, denied.

**115.    The IRS and Treasury failed to comply with 5 U.S.C. § 553 when issuing the rules found in Notice 2021-20. The IRS's Notice 2021-20 is therefore unlawful.**

ANSWER: Denied.

**116.    The notice-and-comment procedures would have fostered a productive exchange of information and public input on material points. That process would have caused changes in the IRS's positions. It would have at least provided the statutorily mandated transparency and explanation for IRS's substantive positions, which is necessary for the courts to evaluate whether a rule is supported by a rational basis or is arbitrary and capricious.**

ANSWER: Denied.

**117.    The IRS's failure to abide by the APA injures StenTam. Notice 2021-20 subjects StenTam clients to unreasonable and unexplained standards for ERC refund applications, which limits StenTam's ability to counsel and assist clients. As a tax preparer focusing on ERC claims, StenTam is directly impacted by Notice 2021-20.**

ANSWER: Denied.

**118.    But for Notice 2021-20, StenTam would have secured additional ERC refunds for its clients under 26 U.S.C. 3134(c)(A)(ii)(I) and (II). Moreover, by narrowing the eligibility criteria for ERC claims, Notice 2021-20 continues to impede StenTam's tax advisory services.**

ANSWER: Denied.

**119.    StenTam invested substantial resources to respond to the new obligations imposed by Notice 2021-20, which included, for example, collection of records, implementing compliance policies, and altering processing policies for prospective and current ERC claims. Those measures would not otherwise be necessary if Notice 2021-20 was invalidated. *See, e.g.*, *City of Clarksville v. Fed. Energy Regul. Comm'n*, 888 F.3d 477, 481-82 (D.C. Cir. 2018) ("imposition of new**

regulatory obligations, in and of itself, is sufficient to establish standing"); *Am. Tunaboat Ass'n v. Ross*, 391 F. Supp. 3d 98, 108 (D.D.C. 2019) ("Regulated entities have concrete interests in both (1) being able to meet their regulatory responsibilities; and (2) in avoiding unwarranted regulatory obligations").

ANSWER: Denied.

**120.    Plaintiff asks that the Court set aside Notice 2021-20 as an invalid exercise of IRS authority.**

ANSWER: Admitted that Plaintiff asks the Court to set aside Notice 2021-20. Otherwise, denied.

**121.    Plaintiff also seeks a mandatory, nationwide injunction barring the IRS from enforcing the unlawfully promulgated Notice in any administrative forum or proceeding.**

ANSWER: Admitted that Plaintiff seeks a mandatory, nationwide injunction. Otherwise, denied.

**122.    Plaintiff does not seek to enjoin, impede, or restrain the collection of any tax. Plaintiff does not seek any refund of taxes or credits for any clients through this Count, and instead limits its challenge to the IRS's failure to meet APA requirements under 5 U.S.C. § 553.** *See CIC Servs., LLC v. Internal Revenue Serv.*, **141 S. Ct. 1582, 1588 (2021).**

ANSWER: Denied.

## COUNT TWO

### Arbitrary & Capricious Agency Action

### [5 U.S.C. § 706(2)(A)]

**123.    StenTam re-alleges and incorporates by reference the paragraphs set forth above.**

ANSWER: The United States incorporates by reference its answers to the paragraphs set forth above.

124.   **"The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained."** *Fed. Commc'ns Comm'n. v. Prometheus Radio Project*, **141 S.Ct. 1150, 1158 (2021). An agency must reasonably consider the relevant issues and reasonably explain their decisions.** *Id.*; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, **463 U.S. 29, 30 (1983) (agency action is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").**

ANSWER: Denied to the extent this paragraph's allegations are incomplete based on, and/or inconsistent with, the sources cited.

125.   **Agency action is arbitrary and capricious "if it exhibits internally inconsistent reasoning."** *Braeburn v. U.S. Food and Drug Admin.*, **389 F. Supp. 3d 1, 28 (D.D.C. 2019) (citing** *ANR Storage Co. v. FERC*, **904 F.3d 1020, 1024 (D.C. Cir. 2018).**

ANSWER: Denied to the extent this paragraph's allegations are incomplete based on, and/or inconsistent with, the sources cited.

126.   **The 102-page Notice 2021-20 is arbitrary and capricious because the IRS relied on factors Congress had not intended it to consider, ignored important aspects of the problem, and fashioned rules that were not supported by transparent and reasoned decision-making.** *Supra* **Section III.B.**

ANSWER: Denied.

127.   **The IRS provided no explanation or reasoning for choosing certain eligibility requirements over others. For example, the agency never explained why a 10% effect on business was beyond a "nominal" disruption, but a 9% reduction was not. The IRS failed to explain why a governmental order that required businesses to adopt social distancing measures could render a business eligible, but an order that prevents customers from even visiting that same business would not similarly**

qualify. **Exh. A at 24–25 (Q/A No. 11), 29 (Q/A No. 13). In fact, the IRS did not explain any of its limitations in Notice 2021-20.**

ANSWER: Denied.

128. **The Notice 2021-20 factors also show inconsistencies in the application of various factors affecting an employer's eligibility. For instance, Notice 2021-20 provides factors for determining whether a business's operations were more than nominally affected through, inter alia, changes to the format of certain services, including "requiring employees and customers to wear face coverings." *See* Exh. A at 39 (stating that "Whether a modification … has more than a nominal effect on the business operations is based on the facts and circumstances."). But after directly stating that such modifications might be qualifying case-by-case, the Notice then takes the contradictory, categorical position that such "[m]odifications altering customer behavior (for example, mask requirements…") … will not result in more than a nominal effect on the business operations." *Id.* at 40. Absent the agency's explanation (which was not provided), the IRS positions are definitionally arbitrary.**

ANSWER: Denied.

129. **Because the IRS has taken substantive positions which are arbitrary and capricious, the Court should enjoin the IRS from either enforcing the terms of Notice 2021-20 or from mandating compliance with that notice.**

ANSWER: Denied.

130. **Plaintiff does not seek to enjoin, impede, or restrain the collection of any tax. Plaintiff does not seek any refund of taxes or credits for any clients through this Count, and instead limits its challenge to the IRS's failure to meet APA requirements under 5 U.S.C. § 553. *See CIC Servs., LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582, 1588 (2021).**

ANSWER: Denied.

## COUNT THREE

**Unlawful Agency Action in Excess of Statutory Jurisdiction, Authority, or**

**Limitations, or Short of Statutory Right**

**[5 U.S.C. § 706(2)(A) & (C)]**

**131.   StenTam re-alleges and incorporates by reference the paragraphs set forth above.**

ANSWER: The United States incorporates by reference its answers to the paragraphs set forth above.

**132.   The publication of Notice 2021-20 is a final agency action.**

ANSWER: Admitted.

**133.   Agency positions must conform to the scope of Congressional mandates. When an agency claims to impose decisions of vast economic and political significance, the courts require that agency to identify a clear Congressional command enabling that interpretation. *Id.* (citing *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)). When evaluating whether the agency's chosen rule or policy fits within the statutory scheme, the court must look at the entire statutory context—not just isolated words in a vacuum. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). "[T]he Court overprotects the nondelegation principle by increasing the cost of delegating authority to agencies— namely, by requiring Congress to speak unequivocally in order to grant them significant rule-making power." *See Biden v. Nebraska*, 143 S. Ct. 2355, 2377 (2023) (Barrett, J., concurring). "The [major questions] doctrine serves as an interpretive tool reflecting 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 133).**

ANSWER: Denied to the extent this paragraph's allegations are incomplete based on, and/or inconsistent with, the sources cited.

**134.   The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right,**

**power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)-(C).**

ANSWER: Admitted that this paragraph accurately quotes portions of 5 U.S.C. § 706(2).

**135.   IRS Notice 2021-20 violates 5 U.S.C. § 706(2)(A) and (C) because it imposes arbitrary thresholds and obligations (e.g., a 10% threshold for "nominal" effects on a business) without explanation, inconsistent with Congressional intent, and without Congressional authority.**

ANSWER: Denied.

**136.   The IRS does not explain why the threshold requirements and factors imposed by Notice 2021-20 are necessary per the CARES Act.**

ANSWER: Denied.

**137.   While Congress authorized the Secretary of Treasury to "issue such forms, instructions, regulations, and other guidance as are necessary to allow the advance payment of the credit," it did not authorize the Secretary to issue legislative rules outside of the APA, or to limit the scope of eligible taxpayers under the statute.**

ANSWER: Admitted that Congress conferred upon the IRS the authority to issue such forms, instructions, regulations, and other guidance as were necessary under the CARES Act. The United States avers that the authority provided in the CARES Act is broader than what is codified in I.R.C. § 3134. As to the remaining allegations in the paragraph, denied.

**138.   IRS Notice 2021-20 has a substantial economic impact. The IRS claims to have received "approximately 3.6 million" ERC claims over the course of the program. Exh. B at 3. The IRS has used Notice 2021-20 as a basis to deny hundreds of millions of dollars in economic relief that Congress directed to businesses harmed during the pandemic. Under the ERC program, the IRS presides over billions of dollars in emergency relief funding. An IRS rule that substantially narrows that statutory scheme implicates the major questions doctrine.**

ANSWER: Admitted that as of the time of filing the Complaint, the IRS claimed to have received "approximately 3.6 million" ERC claims over the course of the program. As to the remaining allegations in the paragraph, denied.

**139.    The text of the CARES Act is clear and unambiguous. Because Notice 2021-20 adopts substantive positions inconsonant with Congressional command, the agency acted beyond its authority. The text of the CARES Act does not authorize the IRS to impose requirements or conditions on taxpaying employers that would substantially narrow the scope of eligible businesses under the ERC program.**

ANSWER: Denied.

**140.    Congress specifically defined "eligible employers" using broad language consistent with the legislative goal of sustaining businesses during and after the historic pandemic. *See* 26 U.S.C. § 3134(C)(2). As alleged, *supra*, Section III.B, the IRS's alterations in Notice 2021-20 are not apparent from the plain text of the CARES Act or its amending legislation. Congress did not give the IRS authority to create threshold requirements for a business to qualify as an "eligible employer."**

ANSWER: Denied.

**141.    Congress broadly defined governmental orders that would qualify under the ERC statute. *Supra* Section III.A. Section 3134 describes orders limiting group meetings for "social, religious, or other purposes[."] 26 U.S.C. § 3134(c)(2)(A)(ii)(I). The plain language of the statute includes orders that impact businesses broadly, rather than just orders specifically directed at businesses. *See id.* Further, Congress's amendments to the law are evidence of legislative intent, extending the ERC by making it easier, not harder, for employers to qualify for the credit. *See* The Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1965; The American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 6428B; The Infrastructure Investment and Jobs Act of 2021, Pub. L., 117- 58, 135 Stat. 429 (Nov. 15, 2021).**

ANSWER: Denied.

142.    The IRS altered the scope of eligible governmental orders, replacing Congress's unambiguous definition with its own that significantly narrowed employer eligibility. *Compare* **26 U.S.C. § 3134(2)(A)(ii)(I)** *with* **Exh. A at 25–26.**

ANSWER: Denied.

143.    The IRS Notice 2021-20 exceeds the boundaries and purpose of the CARES Act by unduly narrowing the universe of "eligible employers" under **26 U.S.C. § 3134(c)(2)** in several material respects. *See supra* **Section III.B;** *see also Biden***, 143 S. Ct. at 2369-70 (holding that Dept. of Education exceeded statutory authority by enacting a plan that "augments and expands" the law).**

ANSWER: Denied.

144.    By exceeding statutory authority, Defendants have also violated the constitutional separation of powers.

ANSWER: Denied.

145.    The Court should invalidate and strike Notice 2021-20 and enjoin the IRS from enforcing the terms of that Notice in any administrative or judicial forum.

ANSWER: Denied.

146.    Plaintiff does not seek to enjoin, impede, or restrain the collection of any tax. Plaintiff does not seek any refund of taxes or credits for any clients through this Count, and instead limits its challenge to the IRS's failure to meet APA requirements under **5 U.S.C. § 553.** *See CIC Servs., LLC v. Internal Revenue Serv.***, 141 S. Ct. 1582, 1588 (2021).**

ANSWER: Denied.

## COUNT FOUR

### Ultra Vires Action in Violation of the APA

### [5 U.S.C. §§ 706(1) and 706(2)(C)]

147.    StenTam re-alleges and incorporates by reference the paragraphs set forth above.

48

ANSWER: The United States incorporates by reference its answers to the paragraphs set forth above.

**148.    Agency action is unlawful under the Administrative Procedure Act (5 U.S.C. § 706(2)(C)) when "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"**

ANSWER: Denied to the extent this paragraph's allegations are incomplete based on, and/or inconsistent with, the statute quoted.

**149.    Under 5 U.S.C. § 706(1), the Court has jurisdiction and authority to "compel agency action unlawfully withheld or unreasonably delayed[.]" The IRS's refusal to process new ERC claims is agency action unlawfully withheld.**

ANSWER: Admitted that under 5 U.S.C. § 706(1), the Court has jurisdiction and authority to "compel agency action unlawfully withheld or unreasonably delayed[.]" Denied that the IRS's refusal to process new ERC claims is agency action unlawfully withheld.

**150.    The IRS's moratorium unilaterally suspended the ERC program for all new filers to the prejudice of those businesses with legitimate ERC claims.**

ANSWER: Admitted that at the time of filing the Complaint, the moratorium suspended the processing of ERC claims submitted after September 14, 2023. As to the remaining allegations in the paragraph, denied.

**151.    The moratorium violates Section 706(2)(C) because IRS lacks statutory authority to unilaterally terminate the ERC program in conflict with Congressional command in 26 U.S.C. § 3134.**

ANSWER: Denied.

**152.    The Moratorium is final agency action because it marks the consummation of the agency's decision-making process on this point. The IRS has not abated or reconsidered the moratorium in the seven months since it became effective.**

ANSWER: Denied.

**153.    The Moratorium has a future and present effect.**

ANSWER: Admitted.

**154.    The Moratorium was a legislative act that violates the non-delegation and separation of powers doctrines.**

ANSWER: Denied.

**155.    It is actionable under 5 U.S.C. § 706(1) because, under the CARES Act, the IRS has a clear, certain, and mandatory duty to process refund claims under the ERC.**

ANSWER: Denied.

**156.    The CARES Act states that "[i]n the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 70 percent of the qualified wages with respect to each employee of such employer for such calendar quarter." 26 U.S.C. § 3134(a) (emphasis added); *Abreu v. United States*, 796 F. Supp. 50, 53 (D.R.I. 1992) (holding that mandatory language in a statute imposes a clear duty: "There can be no doubt as to the mandatory language in the statute").**

ANSWER: Admitted that this paragraph accurately quotes a portion of 26 U.S.C. § 3134(a) and a portion of the decision in *Abreu v. United States*.

**157.    The Act adds that "If the amount of the credit under subsection (a) exceeds the limitation of paragraph (2) for any calendar quarter, such excess shall be treated as an overpayment that <u>shall</u> be refunded under sections 6402(a) and 6413(b)." 26 U.S.C. § 3134(b)(3) (emphasis added).**

ANSWER: Admitted that this paragraph accurately quotes 26 U.S.C. § 3134(b)(3).

**158.    26 U.S.C. § 6402(a) states that, "In the case of an overpayment, the Secretary … <u>shall</u>, subject to subsections (c), (d), (e), and (f), refund any balance to such person." (emphasis added).**

ANSWER: Admitted that this paragraph accurately quotes a portion of 26 U.S.C. § 6402(a).

**159.    Similarly, 26 U.S.C. § 6413(b) states that "…the amount of the overpayment shall be refunded in such manner and at such times (subject to the statute of limitations properly applicable thereto) as the Secretary may by regulations prescribe." (emphasis added).**

ANSWER: Admitted that this paragraph accurately quotes a portion of 26 U.S.C. § 6413(b).

**160.    Congress's use of mandatory language must be given effect. The above statutory provisions, which repeatedly state that IRS "shall" refund taxpayers, eliminate the agency's discretion and require the IRS to process refund claims. Congress did not make ERC refunds optional, but mandatory for eligible employers meeting the standards of the law.**

ANSWER: Denied.

**161.    Congress determined that a reasonable time for processing refund claims is within six months. *See, e.g.*, 26 U.S.C. § 6532(a)(1) (permitting suit for refund action where the IRS fails to act on refund claim "before the expiration of 6 months from the date of filing the claim"); *Gaylor v. Mnuchin*, 919 F.3d 420, 426 (7th Cir. 2019) ("Several courts of appeals have cited the six-month filing requirement approvingly").**

ANSWER: Denied.

**162.    Congress has also codified the Taxpayer Bill of Rights in 26 U.S.C. § 7803(a)(3), which memorializes taxpayer protections. Taxpayers have "the right to pay no more than the correct amount of tax." 26 U.S.C. § 7803(a)(3)(C). The IRS moratorium stands as an impediment to those core protections by keeping ERC refunds from businesses with legitimate claims.**

ANSWER: Denied.

**163.    The IRS understood that only an amendment to the Congressionally enacted scheme could stay or sunset the ERC program. In early 2024, the agency lobbied Congress for legislative amendments that would bar additional claims for**

the ERC. The agency's efforts were memorialized in H.R. 7024, which passed in the House of Representatives on January 31, 2024. *See* H.R. 7024, Rep. No. 118-353 (118th Congress, 2nd Session). Through that Bill, the IRS would have received broader authority to investigate "promoters" under the ERC. The bill would also have imposed a bar on additional claims for the ERC as of January 31, 2024— effectively memorializing the IRS moratorium on new ERC claims.

ANSWER: Admitted that Congress included language in H.R. 7024, Rep. No. 118-353 (118th Congress, 2nd Session), that would have increased the IRS's enforcement authority with respect to ERC promoters and disallowed claims for the ERC filed after January 31, 2024. As to the remaining allegations in the paragraph, denied.

**164.    Those legislative efforts failed in the Senate. Yet the IRS continues to impose its moratorium on new ERC claims, acting unilaterally without congressionally delegated authority.**

ANSWER: Admitted that H.R. 7024 failed to advance in the Senate. Also admitted that at the time the Complaint was filed, the IRS's moratorium on the processing of ERC claims filed after September 14, 2023, was in effect. As to the remaining allegations in the paragraph, denied.

**165.    Plaintiff does not seek to enjoin, impede, or restrain the collection of any tax. Plaintiff does not seek any refund of taxes or credits for any clients through this Count. *See CIC Servs., LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582, 1588 (2021). Plaintiff takes no position on whether IRS must agree with any refund request under the ERC, or issue sums to specific taxpayers. Plaintiff does not ask the Court to require that IRS pay or not pay any tax claim. Plaintiff instead sues for an order requiring the agency to process those claims in the first instance.**

ANSWER: Denied.

**166.    The public needs expeditious relief. For quarters in 2020, the deadline to apply under the ERC program was April 15, 2024. For quarters in 2021, the**

**deadline is April 15, 2025. Without prompt relief, businesses with legitimate ERC claims may lose their procedural outlet to pursue reimbursement.**

ANSWER: Admitted that the expiration of the period of limitation to claim a credit or refund for quarters in 2020 was generally April 15, 2024, and for quarters in 2021, was generally April 15, 2025. As to the remaining allegations in the paragraph, denied.

**167.    Plaintiff requests that the Court vacate, hold unlawful, and set aside the IRS Moratorium pursuant to 5 U.S.C. § 706(2)(C). The Court should issue a mandatory injunction under 5 U.S.C. § 706(1) requiring the IRS to resume processing ERC claims.**

ANSWER: Admitted that Plaintiff requests that the Court vacate, hold unlawful, and set aside the IRS Moratorium. As to all other allegations, denied.

<u>**COUNT FIVE**</u>

**Claim for Writ of Mandamus**

**[28 U.S.C. § 1361]**

**[As to Defendants Yellen and Werfel]**

**168.    StenTam re-alleges and incorporates by reference the paragraphs set forth above.**

ANSWER: The United States incorporates by reference its answers to the paragraphs set forth above.

**169.    Plaintiff seeks a writ of mandamus under the Mandamus Act, 28 U.S.C. § 1361, compelling Defendants Werfel and Yellen to perform their Congressionally mandated duties and resume processing new refund claims under the ERC.**

ANSWER: Admitted that Plaintiff seeks this relief.

**170.    The district court has original jurisdiction in any action seeking a "mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.**

ANSWER: Admitted.

**171.    Defendants Yellen and Werfel are officers of federal agencies. Defendant Yellen is the Secretary of the Department of the Treasury. Defendant Werfel is the Commissioner of the Internal Revenue Service.**

ANSWER: Admitted.

**172.    Defendants Yellen and Werfel have the authority and obligation to oversee their agencies. Defendant Werfel ordered the Moratorium, thereby ceasing the IRS's processing of new refund claims under the ERC.**

ANSWER: Admitted.

**173.    As alleged supra, ¶¶ 147-161, Congress imposed a clear, certain, and mandatory duty on the IRS to process claims for refund under the ERC and, where appropriate, refund money to businesses entitled to receive same under the CARES Act and amendments thereto. *Id.*; 26 U.S.C. §§ 3134(b)(3), (m)(1); 5 U.S.C. § 555(b); *see also Stang v. I.R.S.*, 788 F.2d 564, 565 (9th Cir. 1986) ("The IRS is 'required to make the inquiries, determinations, and assessments of all taxes' imposed by title 26") (quoting 26 U.S.C. § 6201(a)).**

ANSWER: The United States incorporate its responses to paragraphs 147–161 set forth above. As to the remaining allegations in the paragraph, denied.

**174.    IRS's duty to process new refund claims is clear and certain. Congress mandated that action through use of compulsory language in the CARES Act. H.R. 748 § 2301(m).**

ANSWER: Denied.

**175.    At the very least, the IRS must process refund claims "within a reasonable time." *See, e.g.*, *Brian A. C. v. Kijakazi*, No. 3:21-CV-710-BN, 2022 WL 3648571, at \*4 (N.D. Tex. Aug. 24, 2022) ("Although Plaintiff points to no particular time period in which the Commissioner was required to act, under Section 555(b) of the APA …, when Congress fails to specify a time by which an adjudication should**

**be made, … the necessary implication is that adjudication must occur within a**
**reasonable time.") (internal quotations omitted).**

ANSWER: Denied.

**176.    Congress determined that a reasonable time for processing refund**
**claims is within six months.** ***See, e.g.*****, 26 U.S.C. § 6532(a)(1) (permitting suit for**
**refund action where the IRS fails to act on refund claim "before the expiration of 6**
**months from the date of filing the claim");** ***Gaylor v. Mnuchin*****, 919 F.3d 420, 426**
**(7th Cir. 2019) ("Several courts of appeals have cited the six-month filing**
**requirement approvingly").**

ANSWER: Denied.

**177.    The IRS moratorium on processing ERC refund claims has exceeded**
**six months.**

ANSWER: Admitted.

**178.    Defendant Werfel's duty to oversee IRS processing of those refund**
**claims is nondiscretionary, ministerial, and so plainly prescribed as to be free from**
**doubt.** ***See*** **26 U.S.C. § 7803(a)(2).**

ANSWER: Denied.

**179.    The IRS suspension of the ERC program and refusal to process new**
**claims conflicts with that nondiscretionary duty.**

ANSWER: Denied.

**180.    Plaintiff StenTam has no other adequate remedy other than a writ of**
**mandamus requiring Defendant Werfel to perform his job function as required by**
**Congress.**

ANSWER: Denied.

**181.    Neither StenTam nor its clients can pursue relief at the administrative**
**level during the moratorium because the IRS is not providing a pathway to exhaust**
**administrative remedies.**

ANSWER: Denied.

**182.   This Count is limited to seeking an order requiring IRS to perform its nondiscretionary, ministerial duties, which the IRS has suspended under the moratorium. Through this Count V, Plaintiff does not seek a specific determination on any refund claim or require the IRS to collect any tax. Plaintiff seeks to compel the IRS to process claims through the IRS system.** *See, e.g.***, Hu v. Reno, No. 3-99-CV-1136-BD, 2000 WL 425174, at \*3 (N.D. Tex. Apr. 18, 2000) ("Although the INS is vested with broad discretion in making the ultimate decision whether to grant an application …, it has a nondiscretionary duty to process the application. Most courts have not hesitated to exercise jurisdiction to compel the performance of this duty.") (internal citations omitted).**

ANSWER: Admitted that Plaintiff seeks this relief.

**183.   Plaintiff requests that this Court issue a writ of mandamus compelling Defendants Yellen and Werfel to process new refund claims under 26 U.S.C. § 3134.**

ANSWER: Admitted that Plaintiff seeks this relief.

The remainder of the Complaint is a prayer for relief, to which no response is required. To the extent a response is required, the United States denies Plaintiff is entitled to the requested relief.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

The Court lacks subject-matter jurisdiction to consider the Plaintiff's claims because the Plaintiff lacks Article III standing.

### THIRD DEFENSE

The Court lacks subject-matter jurisdiction to consider the Plaintiff's claims because the Plaintiff lacks statutory standing.

FOURTH DEFENSE

The Court lacks subject-matter jurisdiction to consider the Plaintiff's claims because the United States has not waived its sovereign immunity.

FIFTH DEFENSE

The Court should decline to consider the Plaintiff's claims because it lacks statutory standing.

SIXTH DEFENSE

The Court lacks jurisdiction to grant affirmative injunctive relief.

SEVENTH DEFENSE

The Court lacks jurisdiction under the APA to consider the moratorium and Notice 2021-20 because both are matters committed to agency discretion.

EIGHTH DEFENSE

The Court lacks jurisdiction under the APA to consider the moratorium because it is not a final agency action.

PRAYER FOR RELIEF

WHEREFORE, the United States requests the Court to determine that the Plaintiff is not entitled to any of the relief it seeks in the Complaint; and to grant such other and further relief as the Court may deem just and proper.

DATED this 23rd of August, 2024

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice