Peter A. Arhangelsky, Esq. (SBN 025346)
Peter.Arhangelsky@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Rd.
Suite 800
Phoenix, AZ 85016
Ph: (602) 445-8017
*Attorney for Plaintiff Stenson Tamaddon, LLC*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stenson Tamaddon, LLC | Case No. 2:24-cv-01123-SPL |
| Plaintiff, | |
| v. | **PLAINTIFF STENSON TAMADDON'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| United States Internal Revenue Service; et al., | |
| Defendants. | Hon. Steven P. Logan |
| | **[Oral Argument Requested]** |

# <u>TABLE OF CONTENTS</u>

I.    BACKGROUND ..........................................................................................3

  A.  The Employee Retention Credit ......................................................3

  B.  The IRS Publishes Notice 2021-20 .................................................5

II.   PROCEDURAL HISTORY ..................................................................6

III.  LEGAL STANDARDS ...........................................................................7

IV.   ARGUMENT ..............................................................................................8

  A.  IRS Violated the APA's Notice-and-Comment Rulemaking
      Requirements Through Notice 2021-20 ..........................................8

    1.  Notice 2021-20 Imposed Legislative Rules....................................9

    2.  The IRS Gave Notice 2021-20 the Force of Law .........................14

  B.  ERC Eligibility Requirements in Notice 2021-20 Are Arbitrary
      and Capricious ................................................................................16

  C.  ERC Eligibility Requirements in Notice 2021-20 Conflict with
      Enabling Authority and Congressional Intent ................................19

    1.  IRS Lacked Authority to Issue Legislative Rules on
        Eligibility ...................................................................................20

    2.  Notice 2021-20 Is Inconsistent with Congressional Intent..........21

V.    CONCLUSION .......................................................................................24

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## Cases

*Alameda Health Sys. v. Centers for Medicare & Medicaid Servs.*, 287 F. Supp. 3d 896 (N.D. Cal. 2017) .............................................................................................. 14

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................................ 19, 20

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) .................................................... 23

*Bullock v. Internal Revenue Serv.*, CV-18-103, 2019 WL 3423485 (D. Mont. July 30, 2019) ..................................................................................................... 8

*Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615 (4th Cir. 2018) ............................................................................................................. 12

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019) ......................................................................... 7, 16

*City & Cty. of San Francisco v. United States*, 130 F.3d 873 (9th Cir. 1997) ................ 7

*Ctr. for Biological Diversity v. Haaland*, 530 F. Supp. 3d 853 (D. Ariz. 2021) ............. 8

*E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2021) ......................... 8

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................ 19

*Fed. Commc'ns Comm'n. v. Prometheus Radio Project*, 141 S.Ct. 1150 (2021) ........... 16

*Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124 (2d Cir. 2022) ........................................ 9

*Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234 (5th Cir. 2023) ...................................................................................................................... 9

*Gen. Elec. Co. v. E. P.A.*, 290 F.3d 377 (D.C. Cir. 2002) ......................................... 14

*Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996) .......................................................... 9, 12

*Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19 (D.D.C. 2018) ........................................ 12

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ............................. 8, 19, 24

*Mann Constr., Inc. v. U.S.*, 27 F.4th 1138 (6th Cir. 2022) ................................... 2, 8, 13

*Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452 (D. Md. 2019) ...................................................................................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

29 (1983) .................................................................................................... 16

*Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126 (D.C. Cir. 2022)...................................................................................................... 21

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) ........................... 13, 24

*Olsen v. United States*, 665 F. Supp. 2d 1225 (E.D. Wash. 2009).................................. 8

*Pac. Gas & Elec. Co. v. United States*, 664 F.2d 1133 (9th Cir. 1981)........................ 19

*POET Biorefining, LLC v. EPA*, 970 F.3d 392 (D.C. Cir. 2020)................................ 13

*Sacks v. Office of Foreign Assets Control*, 466 F.3d 764 (9th Cir. 2006) ....................... 8

*Scholl v. Mnuchin*, 494 F. Supp. 3d 661 (N.D. Cal. 2020) ...................................... 7

*Stenson Tamaddon, LLC v. United States Internal Revenue Serv.*, No. CV-24-01123-PHX-SPL, 2024 WL 3595643 (D. Ariz. July 30, 2024)................................... 2

*Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000) ...................................................... 13

*Texas v. Cardona*, No. 4:23-CV-00604-0, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024)........................................................................................................ 13

*Texas v. Equal Emp. Opportunity Comm'n*, 633 F. Supp. 3d 824 (N.D. Tex. 2022)........................................................................................................ 14

*Thompson v. U.S. Dep't of Labor*, 885 F.2d 551 (9th Cir. 1989) ............................... 8

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014)....................................... 19

*Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016) ................................................ 9

## Statutes

26 U.S.C. § 3134(c)(2)(A)(ii)(I) ...............................................................passim

26 U.S.C. § 3134(c)(2)(A)(ii)(II) ............................................................ 4, 23

26 U.S.C. § 3134(m) ........................................................................... 20

26 U.S.C. § 469(c)(1)(B) ..................................................................... 13

26 U.S.C. § 6601 .............................................................................. 12

26 U.S.C. § 6662 .............................................................................. 12

26 U.S.C. § 6676 ............................................................................... 6

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

44 U.S.C. § 3507(d) ................................................................................................ 15

5 U.S.C. § 553(b) ............................................................................................... 2, 15

5 U.S.C. § 706(2)(A) .......................................................................................... 2, 19

5 U.S.C. § 706(2)(C) .............................................................................................. 24

5 U.S.C. § 804(3)(C) .............................................................................................. 15

Cal. Code Regs. tit. 8, § 3205(f) ............................................................................ 10

Consolidated Appropriations Act of 2021, Pub. L. 116-260, 134 Stat. 1965
    (2020) ................................................................................................................ 22

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, §2301,
    134 Stat. (2020) ................................................................................................. 5

The American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 6428B
    (2021) ................................................................................................................ 22

The Infrastructure Investment and Jobs Act of 2021, Pub. L. 117-58, 135 Stat.
    429 (Nov. 15, 2021) ........................................................................................... 22

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

## MOTION FOR SUMMARY JUDGMENT

Plaintiff Stenson Tamaddon, LLC ("StenTam"), pursuant to Fed. R. Civ. P. 56, moves for summary judgment on Counts I, II, and III of the Complaint, Dkt. 1. This motion is supported by the following Memorandum of Law, Statement of Facts, and exhibits, all filed herewith.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

Congress enacted the Employee Retention Tax Credit ("ERC") through the CARES Act of 2020. The ERC was a stimulus that encouraged employers to retain and rehire employees when federal, state, and local governments restricted commerce during the COVID-19 pandemic. The ERC statutory language broadly extended financial relief to businesses nationwide. IRS representatives reportedly estimated that 80% of small businesses were "good candidates for the ERC."[2]

Nearly one year after Congress enacted the CARES Act, the Internal Revenue Service ("IRS") published "Notice 2021-20," a purported "guidance" document that set rules for eligibility and procedures for claiming the credit. *See* Exh. A, Dkt. 1-1. Notice 2021-20 is a 102-page tome that materially narrowed the tax credit. IRS did more than merely interpret law through that Notice. It changed the statutory eligibility criteria, and altered the rights and obligations of employers nationwide. Notice 2021-20 defined which taxpayers are eligible for ERC, defined which wages qualify under the program, invoked the Secretary's authority to promulgate regulations, and imposed new record-keeping requirements flowing from IRS's new standards.

Defendants have given Notice 2021-20 the "force of law." IRS enforces those rules by disallowing ERC claims based on Notice 2021-20. It routinely cited Notice 2021-20 in official publications and held out those "rules" as a source of IRS authority. Those actions violate the APA in three primary ways.

---

[1] For the reasons set forth below, Plaintiff does not move for relief on Counts IV and V concerning the IRS moratorium.

[2] *See* Dean Zerbe, "Employee Retention Credit—Still The One" (Feb. 15, 2022), *at* https://www.forbes.com/sites/deanzerbe/2022/02/15/employee-retention-credit---stilltheone-the-latest-update/.

First, Notice 2021-20 is a substantive or "legislative" rule that required notice-and-comment rulemaking under the APA, 5 U.S.C. § 553(b). An agency's failure to meet those obligations is grounds to invalidate the substantive rule. *See, e.g., Mann Constr., Inc. v. U.S.*, 27 F.4th 1138, 1148 (6th Cir. 2022). Notice 2021-20 supplements the statutory law through new standards that alter eligibility criteria under 26 U.S.C. § 3134(c)(2)(A)(ii)(I). IRS had years to submit these regulations through appropriate process under Section 553(b). Because it made no attempt to comply with those obligations, the Notice is invalid.

Second, Notice 2021-20 imposes limitations on the ERC program that are arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). IRS set arbitrary thresholds for claiming the credit, including a new requirement that government orders must effect "more than [a] nominal portion" of an employer's business, which IRS defines as greater than 10-percent of gross receipts or service hours. *See* Statement of Facts ("SOF") ¶¶66-68. Those thresholds, like other rules in Notice 2021-20, are arbitrary, unexplained, and at times inconsistent. Because the Notice violates Section 706(2)(A), the Court should vacate.

Finally, IRS violates the APA, 5 U.S.C. § 706(2)(A) & (C), because the Notice sets eligibility requirements that are inconsistent with enabling authority. IRS improperly limits the types of government orders and commercial burdens that qualify an employer for the ERC. The statutory text sets no quantitative thresholds for claiming the ERC under the "partial suspension" prong. Congress intended to instead provide a broad economic stimulus. Because IRS narrows the universe of "eligible employers" without authority, Defendants violated the APA and the separation of powers doctrine.

The Court should invalidate Notice 2021-20 and enjoin IRS from enforcing those rules in any administrative or judicial forum. Plaintiff StenTam suffers continuing and imminent injuries resulting from IRS APA violations, including the deprivation of payment for services, delayed receipt of those payouts, and increased compliance costs. *See* Exh. F (Dkt. 14-1). A nationwide permanent injunction is warranted. *See Stenson Tamaddon, LLC v. United States Internal Revenue Serv.*, No. CV-24-01123-PHX-SPL, 2024 WL 3595643, at *19 (D. Ariz. July 30, 2024) ("*StenTam*") (holding that there is "no feasible

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

way" to invalidate IRS actions for Stenson Tamaddon and no one else).

## I.     **BACKGROUND**

### A.     **The Employee Retention Credit**

The COVID-19 pandemic swept through the country in early 2020.  SOF ¶11. Dubbed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVID-19 were projected at $16 trillion.  SOF ¶10.  The pandemic was characterized by historically broad government-imposed restrictions under the "stop the spread" regulatory scheme.  Nearly every business was impacted, directly or indirectly, by government orders and regulations designed to limit commerce and social interaction.  Those restrictions increased operating costs, reduced or eliminated customers, closed facilities, burdened supply chains, and so on.  SOF ¶¶12-18.

Recognizing that those restrictions would decimate the economy, eliminate millions of jobs, and bankrupt small businesses nationwide, Congress passed a series of economic stimulus and preservation packages.  SOF ¶¶2-6, 19.  Those remedial measures were intentionally broad and designed to pump money into the economy.  SOF ¶¶21-23. Congress's intent was to distribute financial support well beyond specific financial losses experienced by employers and citizens. SOF ¶¶2-6, 19-23.  The ERC was passed alongside programs that facilitated direct cash payments to citizens with no strings attached.  SOF ¶4.

The remedial purpose of the CARES Act, and specifically the ERC, was discussed by voting members of Congress.  SOF ¶¶21-23. Congress also amended the ERC several times, with each successive amendment expanding the credit. SOF ¶¶7-8, 27-28.  In 2020, Congress referred to the ERC program as the "Employe Retention and *Rehiring* Credit," which signaled legislative intent to use ERC as a stimulus for employers to restore operations prospectively.  SOF ¶7.  Section 207 of the Relief Act (passed in March 2021) substantially expanded payouts under the ERC for prospective quarters in 2021, and broadened eligibility criteria.  SOF ¶¶27.  In 2021, the Consolidated Appropriations Act opened the ERC program to employers that had also taken PPP loans. *Id.* ¶8. IRS internally

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

recognized that, following those amendments, "roughly 5 million previously ineligible employers might make massive claims." *Id.* ¶9.

Given the broad scope of ERC legislation, Congress also directed IRS to conduct a public relations campaign informing every U.S. employer with fewer than 500 employees about the ERC. SOF ¶24. The Biden Administration encouraged businesses to capitalize on the broad credit. *Id.* ¶25. Nearly every legislative measure enacted during the pandemic signaled Congress's intent to broadly distribute ERC funds.

The ERC gave eligible employers a refundable tax credit on a percentage of qualified wages paid during certain tax periods. The text of the CARES Act, later codified as I.R.C. § 3134 (as amended), includes broad eligibility language.[3] SOF ¶¶29-36. Congress defined "eligible employer" in I.R.C. 3134(c)(2).[4] An employer can qualify in one of three ways.

First, the employer qualifies if it was "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I). Under this prong, Congress excluded any requirement that a government order directly regulate the fully or partially suspended business. *Id.* Congress included no minimum loss necessary under this first prong. *Id.* Instead, Congress selected broad language to encompass government orders that in any way limited "commerce, travel, or group meetings" because of COVID-19.

Second, an employer qualifies as an "eligible employer" if it suffered a certain diminution of business during the pandemic. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II).

Third, a business qualifies as an "eligible employer" if it meets the statute's definition of a "recovery startup business." 26 U.S.C. § 3134(c)(2)(A)(ii)(III).

---

[3] Congress used employee retention credits to address prior disasters, like hurricane relief. SOF ¶20. But the CARES Act was substantially broader, in part, because it had widespread application for businesses that were only "partially suspended" by government restrictions.

[4] Although Section 2301 of the CARES Act has been amended and modified, the legislative definitions of a "qualified employer" under paragraph (c)(2)(A)(ii)(I) have remained consistent.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

**B.    The IRS Publishes Notice 2021-20**

In Section 2301(l) of the CARES Act, Congress instructed IRS to issue "forms, instructions, regulations, and other guidance as are necessary" to implement aspects of the ERC tax program.    SOF ¶¶37-39.    But Congress limited that authority to certain components of the ERC, including guidance necessary "to allow the advance payment of the credit[.]"  *See* CARES Act, Pub. L. 116-136, §2301(l), 134 Stat. (2020); SOF ¶¶37-39. Congress delegated that authority to facilitate expeditious payouts of ERC—not to reformulate or reimagine the statute.  SOF ¶40.  As pressure mounted on IRS to implement the ERC program, the agency expressly refused to initiated rulemaking, and chose instead to legislate through guidance:

> Treasury did not issue regulations addressing entitlement to, or calculation of, the ERC. Rather, consistent with statutory authority allowing the Secretary to issue other guidance as may be necessary to carry out the purpose of the credit …, the Service issued guidance in coordination with Treasury in the form of Frequently Asked Questions beginning on April 29, 2020.

Exh. C, Dkt. 1-3 at 17 (pg. 5 of Form 886-A).[5]

On March 1, 2021, one year after Congress passed the CARES Act, IRS published a 102-page document titled "Notice 2021-20," which set rules of eligibility for the ERC program in "Question and Answer" format."  *See* Exh. A, Dkt. 1-1.  The stated purpose of Notice 2021-20 was to publish IRS's standards for application of Section 2301 of the CARES Act, as amended by section 206 of the Relief Act.  *Id.* at 2.

Notice 2021-20 materially changed the ERC program by, among other things, narrowing the scope of "eligible employers" and imposing substantial obligations on businesses seeking to benefit from the program. *See id.* at 29–30, 33–34, 39–40, 100–02. Notice 2021-20 defined key terms in Section 3134, identified factors or elements necessary to claim the credit, set minimum thresholds for ERC eligibility, and imposed new record-keeping requirements—all of which restricted ERC to a lesser number of employers than originally contemplated by Congress.  SOF ¶¶3, 21, 34, 63-82.

---

[5] Pagination refers to the ECF-stamped numbering unless unavailable.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

To illustrate the restrictive nature of those conditions, in Q/A No. 13, the IRS ruled that a governmental order does not qualify even if it eliminates a business's customer base: "An employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its products or services is not considered to have a full or partial suspension of its operations due to a governmental order."  SOF ¶¶70-71.

Even for businesses directly regulated by a qualifying order, Notice 2021-20 added a requirement to show more than a "nominal" disruption of business. *Id.* at 28 (stating that an employer may "have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order").  The "nominal portion" standard is ubiquitous in Notice 2021-20 and triggers additional conditions of eligibility. *Id.* at 28, 35-51, 101.  Notice 2021-20 requires employers to substantiate eligibility through, *inter alia*, records the employer relied on to determine whether a governmental order had more than a nominal effect on its operations. *Id.* at 101-102.

Notice 2021-20 therefore requires employers to independently determine whether an interruption to business fits within IRS's new rules.  *See, e.g.,* Exh. A at 40 (providing examples of adequate records); *but see id.* at 39–40 (requiring, above all else, that the governmental order must result "in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent").  An employer's failure to maintain supporting records could subject the taxpayer to penalties, including erroneous refund penalties. *See* I.R.C. § 6676.

Notice 2021-20 was not subject to notice-and-comment rulemaking.  SOF ¶52.  An opportunity for public comment would have alerted IRS to the challenges and irrationality in the rules ultimately selected.

## II.    **PROCEDURAL HISTORY**

StenTam filed suit on May 14, 2024, alleging five counts.  *See* Dkt. 1.  Counts I, II, and III challenged Notice 2021-20.  *Id.* at 24-32.  Counts IV and V sought relief from

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

Defendant's ERC processing moratorium. *Id.* at 32-37. StenTam filed a motion for preliminary injunction on Counts IV and V, asking the Court to lift that moratorium. *See* Motion, Dkt. 14. That motion did not seek review of IRS Notice 2021-20. *Id.*

The Court denied StenTam's motion, but ruled that IRS had a statutory obligation to process ERC claims within a reasonable time. *See* Dkt. 34 at 22 ("The word 'shall' leaves no discretion to the Commissioner as to whether or not to eventually process all ERC claims"). The Court also found that IRS pushed the boundaries of its authority: "The record indicates that the moratorium has very possibly evolved from beyond a resource allocation tool and into a procedural smoke screen. Regardless of whether Defendant IRS acted with good intentions at the outset, it cannot later attempt to shape public policy where the CARES Act has already spoken." *Id.* at 24.

Following this Court's Dkt. 34 Order, IRS began processing ERC claims in bulk using a screening system intended to clear the agency's backlog.[6] IRS has not formally lifted its unlawful moratorium. But because the agency is now processing ERC claims, at least in part, StenTam no longer seeks relief to compel that outcome. StenTam moves for summary judgment only on Counts I, II, and III, which concern the agency's unlawful promulgation of legislative rules.

## III. **LEGAL STANDARDS**

In a suit challenging administrative action under the APA, "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 673 (N.D. Cal. 2020) (quoting *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997)). "[T]he usual standard set forth in Rule 56(c) does not apply." *Id.* The record "is not necessarily those documents that the *agency* has compiled and submitted as the administrative record. The whole administrative record,

---

[6] IRS is now denying tens of thousands of ERC claims using those flawed filters, which violates the APA and the Due Process Clause. On November 13, 2024, StenTam joined with another tax preparation service to file a related action challenging those unlawful processing rules. *See* Complaint, *ERC Today, LLC, et al. v. McInelly, et al.*, No. 2:24-cv-03178 (D. Ariz. Nov. 13, 2024), Dkt. 1.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

therefore, consists of all documents and material directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Scholl*, 494 F.Supp. 3d at 683 (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)) (emphasis original).

The APA mandates that a reviewing court may uphold agency action only on the grounds the agency invoked when it took the action. *See Ctr. for Biological Diversity v. Haaland*, 530 F. Supp. 3d 853, 857 (D. Ariz. 2021) (an agency "may not offer a new explanation for the action during the course of litigation"). "[P]ost hoc explanations of agency action cannot substitute for the agency's own articulation of the basis for its decision." *Id.*

"Challenges that an agency exceeds its statutory authority are questions of law and thereby subject to *de novo* review." *Olsen v. United States*, 665 F. Supp. 2d 1225, 1228 (E.D. Wash. 2009) (citing *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 770 (9th Cir. 2006)). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

## IV.    ARGUMENT

### A.    IRS Violated the APA's Notice-and-Comment Rulemaking Requirements Through Notice 2021-20

Agency rules can be "interpretive" or "legislative." Legislative rules[7] impact rights and obligations and have the force of law. The APA requires that legislative rules be published following notice-and-comment procedures. *See* 5 U.S.C. § 553. An agency's failure to meet those obligations is grounds to invalidate a legislative rule. *Mann Constr.*, 27 F.4th at 1148 (invalidating IRS Notice 2007-83); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2021); *Bullock v. Internal Revenue Serv.*, CV-18-103, 2019 WL 3423485 (D. Mont. July 30, 2019). Because Notice 2021-20 is a legislative rule, IRS violated the APA by failing to proceed through notice-and-comment rulemaking.

---

[7] Also called "substantive" rules in the precedent.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

A rule is deemed legislative if it supplements a statute or effects a substantial change in existing law or policy. *See Wilson v. Lynch*, 835 F.3d 1083, 1099 (9th Cir. 2016). A rule is also legislative if it creates new law, rights, or duties that are distinct from existing frameworks. "The hallmark of a legislative rule is that it modifies or adds to a legal norm." *Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234, 241 (5th Cir. 2023); *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 141–42 (2d Cir. 2022) (deeming a rule "legislative" because it "changed the law" by adding requirements where the statute was silent). When an agency fills in the gaps of an ambiguous statute by using the legislative authority delegated by Congress, that is a legislative act. *See Hoctor v. USDA*, 82 F.3d 165, 168 (7th Cir. 1996).

### 1.    Notice 2021-20 Imposed Legislative Rules

Notice 2021-20 sets out a series of "legislative" rules that required notice-and-comment rulemaking. It set eligibility requirements under the "government orders" test in I.R.C. § 3134(c)(2)(A)(ii)(I); SOF ¶¶63-85. Those rules narrowed the ERC program for taxpayers. Among those rules, IRS determined that a government order does not qualify unless the issuing authority had "jurisdiction over the employer's operations." Exh. A, Dkt. 1-1 at 26. That determination excluded orders that impacted an employer's customer base or supply chains, which for many businesses were out of state.

Notice 2021-20 determined that an employer cannot claim a "partial suspension" if the government order did not physically close a portion of the business. *Id.* at 28. That decision prevents employers from claiming ERC where government orders left facilities open but saddled them with extreme compliance costs or conditions.[8]

The Notice added a novel standard for determining eligibility under the "partial suspension" prong. *Id.* at 28. IRS explained that an employer is subject to a partial suspension only if "more than a nominal portion of its business operations are suspended

---

[8] The ERC statute has no indication that Congress intended to exclude businesses that were substantially burdened by increased operating costs flowing from government mandates. IRS's position would incentive employers to reduce productivity (and, thus, suffer gross receipt declines), rather than reward businesses that pushed through despite the added difficulties.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

by a governmental order." *Id.* at 27; SOF ¶¶55, 66-68, 77-80. The "nominal portion" test is replete throughout Notice 2021-20 and represents IRS's primary rule of eligibility:

> [A] portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).

Exh. A at 28; SOF ¶¶55, 66-68, 77-80. Through that standard, IRS introduced concepts foreign to the ERC statute. *See* I.R.C. § 3134(c)(2)(A)(ii)(I). The "nominal portion" standard adds a gross receipts threshold onto the partial suspension test that resembled the gross receipts test in Section 3134(c)(2)(A)(ii)(II), but instead at a lesser 10-percent limit. SOF ¶67. IRS also imposed an obligation on employers to track and determine hours of service performed by employees in comparison to 2019 performance. *See* Exh. A at 28, 100-102. Because those requirements were imposed retroactively, tracking those hours is difficult or impossible for businesses that did not have these systems in place.

Notice 2021-20 also excluded orders that *indirectly* impacted the employer through supply chain concerns. *Id.* at 29-31. The Notice allowed employers to claim ERC if suppliers were "unable to make deliveries of critical goods or materials" but only if the shortage resulted from a government order that "cause[d] the supplier to suspend its operations." *Id.* at 28; Exh. C at 28. That rule ignored impacts of supply shortages and similar difficulties. For example, many healthcare businesses were unable to lawfully operate without PPE (personal protective equipment).[9] Because similar standards were imposed nationwide, the country suffered PPE shortfalls when manufacturers fell behind. Other employers struggled to find equipment needed for remote work environments. Under the IRS Notice, if an employer was forced to stop operating when PPE supplies ran dry, or because telecommuting devices were in short supply, the business was not ERC eligible

---

[9] *See, e.g.*, Cal. Code Regs. tit. 8, § 3205(f).

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

because its supplier was not itself "suspended" but rather incapable of meeting demand.

Notice 2021-20 imposed a rule that employers were not sufficiently "suspended" if government orders eliminated their customers: "An employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its products or services is not considered to have a full or partial suspension[.]" Exh. A at 30.  IRS also ruled that an employer is not ERC eligible if it "voluntarily suspends operations" in response to those conditions.  *Id.* at 30.  Notice 2021-20 therefore determined that the foreseeable *impacts* from government orders are inadequate.  Instead, only orders that directly compel the closure of a business would qualify.

IRS determined that an employer forced to "close" is nonetheless still ERC ineligible if "able to continue operations *comparable* to its operations prior to the closure."  *Id.* at 30 (emphasis added).  If a business could "requir[e] its employees to telework, the employer's operations are not considered to have been fully or partially suspended[.]"  *Id.* at 30-31.  That "comparable operations" rule was not drawn from statutory language.  IRS did not factor the costs of implementing a teleworking system, or the availability of hardware and equipment.  The Notice also promulgated a series of "factors" that must be evaluated to "determin[e] if an employer is able to continue comparable operations[.]"  *Id.* at 33; *id.* at 34 (a business is suspended "if, under the facts and circumstances, the operations that are closed are more than a nominal portion of its business operations and cannot be performed remotely in a comparable manner").  The "comparable operations" rule is an administrative contrivance not sourced from statutory authority.

Expounding on the "nominal portion" test, the Notice also specified which "factors should be taken into account in determining whether a modification required by a governmental order has more than a nominal effect on business operations[.]"  *Id.* at 39.  In conjunction with the "comparable operations" standard, IRS's new "nominal portion" test became a feature of the IRS regulatory model and is referenced thirty-two times within Notice 2021-20.  *See generally* Dkt. 1-1; SOF ¶66.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

IRS also obligated taxpayers to store business data under these new rules.  In Subpart N, IRS instructed employers to "substantiate eligibility" for the ERC by, inter alia, documenting "whether more than a nominal portion of its operations were suspended due to a governmental order or whether a governmental order had more than a nominal effect on its business operations."  Exh. A at 101.  The failure to keep records under the "nominal portion" test is an actionable violation of law.  *See* I.R.C. § 6001.  If taxpayer ERC claims are deemed inaccurate for failure to follow Notice 2021-20's "nominal portion" standard, those employers can face punitive interest assessments or accuracy-related penalties.  *See, e.g.,* I.R.C. §§ 6601, 6662.

These rules are well beyond interpretive.  They "supplement the statute."  *See, e.g., Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) ("[A] rule is legislative if it supplements a statute").[10]  They add limitations and qualifications that reduce the pool of employers eligible under the statute.  Those restrictions are not clearly outlined in the statute, they materially change the eligibility criteria, and carry binding legal consequences because IRS has given Notice 2021-20 the force of law.  Courts have found "legislative" rules under similar circumstances.

In *Hoctor v. USDA*, Judge Posner held that the USDA's rule requiring animal enclosures to be at least eight feet high was legislative because it imposed a specific requirement (an 8-foot fence) that narrowed the statutory criteria.  *See Hoctor*, 82 F.3d at 168.  The regulatory text called for enclosures that were "appropriate for the animals involved."  *Id.* at 167-68.  Although USDA had authority to enforce the statute, setting a specific fence height was a legislative function.  *Id.* at 170-71 ("When agencies base rules on arbitrary choices they are legislating, and so these rules are legislative or substantive and require notice and comment rulemaking").  Requiring an 8-foot fence is substantively

---

[10] *See Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 45-47 (D.D.C. 2018) (denying motion to dismiss plaintiff's APA claims after finding plaintiff had sufficiently alleged that USCIS memorandum was a legislative rule because it "broadens statutory criteria" for deportability); *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014) (DOL guidance letters were legislative rules because the letters "do more than clarify or remind parties of preexisting duties"; "they supplement the statute by imposing specific duties on employers").

similar to IRS's arbitrary and unexplained "10-percent" threshold under the "nominal portion" test created in Notice 2021-20.[11]

Similarly, in *Mann Constr.*, the Sixth Circuit held that IRS's Notice 2007-83 was a legislative rule because, like Notice 2021-20, it had "create[d] new substantive duties" which were "hallmarks of a legislative, not interpretive rule." *See Mann Constr.*, 27 F.4th at 1144. The Sixth Circuit emphasized that "the relevant statutory terms [were] not self-defining," and so Congress gave IRS authority to determine which transactions were reportable. *Id.* "That feature of the Notice, once again, represents a quality of a quintessential legislative rule." *Id.*

Courts have identified legislative rules in guidance documents that "impose new duties by changing the text of the statute they profess to interpret." *See Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 3658767, at *10 (N.D. Tex. Aug. 5, 2024) (quoting *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020)). Notice 2021-20 similarly "speaks with the force of law and independently create[s] legal effects for the regulated entities, which qualifies them as a legislative or substantive rule." *Id.* (quoting *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020)); *see also Sweet v. Sheahan*, 235 F.3d 80, 92 (2d Cir. 2000) (finding that a significant change in the number of persons subject to a legal requirement was "a strong indication that the agencies engaged in legislative rulemaking"); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 508 (D. Md. 2019) (Foreign Affairs Manual (FAM) was a legislative rule, in part, because "the FAM revisions are not merely codifying longstanding practices to improve inter-agency coordination; rather, they alter the standards that govern whether a visa applicant is inadmissible as a public charge").

---

[11] The IRS has proceeded through rulemaking under similar circumstances. For instance, as with Notice 2021-20's nominal portion test, IRS's business participation rules under Section 469 govern whether a taxpayer materially participates in a trade or business for certain tax programs. The statute defines "passive activity" as any activity "in which the taxpayer does not materially participate." 26 U.S.C. §469(c)(1)(B). IRS interpreted that statutory text to include a 500-hour minimum participation requirement. But the agency did so through rulemaking in 26 C.F.R. § 1.469-5T(a)(1). The material participation tests in Section 1.469-5T are examples of IRS using explicit thresholds to define eligibility for tax programs, but recognizing that it must do so through regulation.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I, II, AND III

Notice 2021-20 imparts a "substantive regulatory change" to the ERC statute through the above-described tests and factors that narrow eligibility.  *See Mendoza*, 754 F.3d at 1021 ("The court's inquiry in distinguishing legislative rules from interpretive rules is whether the new rule effects a substantive change to the statutory or regulatory regime"); SOF ¶¶53-85.  By substantially altering the scope of the ERC's "full or partial suspension" prong, narrowing eligibility for employers under that statutory section, imposing new tests and elements for claiming the ERC, and imposing record-keeping burdens on employers based on those new standards, IRS passed legislative rules in Notice 2021-20 that were required to proceed through notice-and-comment rulemaking.

### 2.    The IRS Gave Notice 2021-20 the Force of Law

Through a series of legal memoranda and information letters, IRS held out Notice 2021-20 as binding legal authority.  SOF ¶¶53-59.  When evaluating whether an agency rule as the force of law, the "[p]rimary focus is on whether the rule has binding effect on agency discretion or severely restricts it."  *Texas v. Equal Emp. Opportunity Comm'n*, 633 F. Supp. 3d 824, 839 (N.D. Tex. 2022).  "An agency pronouncement will be considered binding as a practical matter if it … is applied by the agency in a way that indicates it is binding."  *Id.* (quoting *Gen. Elec. Co. v. E. P.A.*, 290 F.3d 377, 383 (D.C. Cir. 2002)).  A rule also has the "force of law" when, in the absence of the rule, there would not be an adequate basis for enforcement action.  *See Alameda Health Sys. v. Centers for Medicare & Medicaid Servs.*, 287 F. Supp. 3d 896, 915 (N.D. Cal. 2017) (finding that rule had force of law because nothing in the Medicaid statute or implementing regulations made it unlawful for hospitals to include certain costs in payment calculations other than the new legislative rule).

Defendants gave Notice 2021-20 the force of law by deeming that rule binding in adjudicative proceedings, other guidance documents, legal memoranda, and official agency proceedings.  SOF ¶¶53-62.  IRS has based ERC denials on the text of Notice 2021-20, finding an employer's failure to meet those rules sufficient to disallow ERC.  SOF ¶¶57-59. In the absence of Notice 2021-20, IRS would lack a basis to reject an ERC claim under

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

new rules like the "nominal effects" test or "comparable operations" standard.

IRS has modified and purported to clarify Notice 2021-20 through Notice 2021-23 and Notice 2021-49. SOF ¶¶87-90. In those subsequent publications, IRS repeatedly refers to Notice 2021-20 as a binding "rule." *See, e.g.,* Notice 2021-23, at 4 ("Notice 2021-20 provides rules for determining whether an employer is an eligible employee for purposes of the employee retention credit for 2020."); SOF ¶¶87-90.

IRS also invoked statutory authority applicable to proposed rulemaking. SOF ¶¶85, 97-100. In Notice 2021-20, IRS cited the Paperwork Reduction Act of 1995, specifically 44 U.S.C. § 3507(d). Exh. A at 103. That statutory section "shall apply only when an agency publishes a notice of *proposed rulemaking* and requests public comments." *See* 44 U.S.C. § 3507(d)(5) (emphasis added). IRS's internal citations therefore support the characterization of Notice 2021-20 as a legislative rule that should have been subjected to rulemaking. IRS also supplied Notice 2021-20 to Congress under the Congressional Review Act (CRA), which is a required step only when the agency promulgates a "rule" that "substantially affects" the rights or obligations of non-agency parties. *See* SOF ¶¶97-100; 5 U.S.C. §804(3)(C).

Legal memorandum published by IRS's Office of Chief Counsel referenced Notice 2021-20 as operative "law" alongside the statutory language and Treasury Regulations. SOF ¶54; Exh. K at 2-4, 12. IRS counsel has publicly proclaimed that eligibility under the ERC depends on whether a business "fall[s] within the provisions of Notice 2021-20." Exh. K at 12, 13; Exh. D at 10; SOF ¶¶55-56.

IRS also uses Notice 2021-20 as its primary source for interpretation of the ERC eligibility criteria when evaluating claims. SOF ¶57. In multiple disallowances issued to StenTam clients, IRS relied on specific sections in Notice 2021-20 as legal justification for denying Plaintiff's ERC submission. SOF ¶¶57-58.

IRS lacked good cause to avoid the notice-and-comment provisions. Notice 2020-21 included no explanation of the agency's "good cause" as required by 5 U.S.C. §553(b)(B). SOF ¶¶60-61. The burdens of COVID were also not "good cause" to avoid

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

these obligations. The SBA was able to issue similar rules governing the PPP loan program within the first six months of 2020. *See* SOF ¶¶103-106. IRS was also able to issue Treasury Regulations concerning the recapture of ERC funds in that same period. SOF ¶102.

The notice-and-comment procedures would have fostered a productive exchange of information and public input on material points. SOF ¶¶93-96. That process would likely have caused changes in IRS positions. It would have at least provided the statutorily mandated transparency for IRS's substantive positions, which is necessary for the courts to evaluate whether a rule is arbitrary and capricious. Avoiding the rule-making process allowed IRS to circumvent its obligation to explain its rules, thereby preventing the Court from discerning whether the rules are related to the facts before IRS.

**B.    ERC Eligibility Requirements in Notice 2021-20 Are Arbitrary and Capricious**

Even assuming Notice 2021-20 was procedurally proper, IRS's positions are nonetheless arbitrary and capricious. "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n. v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021). An agency must reasonably consider the relevant issues and reasonably explain their decisions. *Id.; Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 30 (1983) (agency action is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").

Rendering a decision without explanation is the definition of arbitrary and capricious. *See City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1104 (N.D. Cal. 2019), *aff'd sub nom. City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 981 F.3d 742 (9th Cir. 2020) ("Agency action is invalid if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no 'rational connection between the facts found and the choice made.'").

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

The 102-page Notice 2021-20 is arbitrary and capricious because IRS relied on factors Congress had not intended it to consider, ignored important aspects of the problem, and fashioned rules that were not supported by transparent and reasoned decision-making.

IRS's selection of a 10-percent threshold under the "nominal portion" test has no grounding in facts or reasoning.  The IRS chose that number arbitrarily.  It provided no explanation or reasoning for choosing certain eligibility requirements over others.  SOF ¶¶65-68, 77-78, 92.  It never explained why a 10% effect on business was beyond a "nominal" disruption, but a 9% reduction was not.  *See generally* Exh. A, Dkt. 1-1.  The IRS also failed to explain why referencing the diminution of gross receipts is appropriate under I.R.C. § 3134(c)(2)(A)(ii)(I), when Congress had already chosen a separate threshold under Section 3134(c)(2)(A)(ii)(II), and Congress gave no indication that the "partial suspension" prong should be connected with a diminution in gross receipts.

The agency's 10-percent threshold, the "nominal portion" test, and the "comparable operations" test, all fail to account for the cumulative impact of multiple, smaller disruptions on an employer.  For example, a business may face several restrictions (e.g., reduced capacity, limited hours, compliance costs) that individually fall outside Notice 2021-20, but collectively result in a significant operational burden.  IRS never considered the costs and burdens of installing a so-called "comparable" operation.  Notice 2021-20 does not facilitate that type of analysis.  It also fails to acknowledge that smaller businesses or those with narrower margins may experience substantial disruptions from government restrictions without meeting the 10-percent threshold, and the Notice does not allow flexibility to make these determinations on a case-by-case basis.  That disproportionately excludes certain employers from relief Congress intended to provide.

Notice 2021-20 also shows inconsistencies in the application of various factors affecting an employer's eligibility.  For example, Notice 2021-20 provides factors for determining whether a business's operations were more than nominally affected through changes to the format of services, including "requiring employees and customers to wear face coverings."  *See* Exh. A at 40 (stating that "Whether a modification … has more than

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

a nominal effect on the business operations is based on the facts and circumstances."). But after stating that such modifications could potentially be sufficient, the Notice then takes a contradictory, categorical position that such "[m]odifications altering customer behavior (for example, mask requirements…) … will not result in more than a nominal effect on the business operations." *Id.* at 41. Under Q/A No. 19, a business could be subject to a partial suspension if required to "reduce … operational hours," but elsewhere IRS determined that reductions to customer base or burdens on supply chains would not qualify (Q/A No. 13).[12] IRS does not explain why a reduction in business hours is a partial suspension but a reduction in resources or customers is not. It failed to explain why a governmental order that required businesses to adopt social distancing measures could render a business eligible, but an order that prevents customers from even visiting that same business would not similarly qualify. Exh. A at 24–25 (Q/A No. 11), 29 (Q/A No. 13). Absent the agency's explanation (which was not provided), its positions are definitionally arbitrary.

In Q/A Nos. 17 and 18, IRS specifies that compulsory "modifications" could qualify as a partial suspension, but only if "required by a governmental order as a condition of *reopening a physical space* for business or service to the public." Exh. A at 40 (emphasis added). IRS never explained why "partial suspensions" were limited to the physical business space but not indirect burdens imposed on businesses by government orders. The ERC statute includes no requirement that a partial suspension be limited to the closure of a physical space.

The concept of a business "suspension" is broad enough to reach an interruption or cessation of normal business operations, even if the physical space is not shuttered. In addition to reduced operational capacity, compliance with government-imposed restrictions often imposed significant costs and inefficiencies, including, e.g., increased staffing needs to enforce social distancing or manage customer flow; reconfiguration of spaces to meet safety guidelines; and delays caused restricted services. Those burdens disrupted normal

---

[12] The IRS was apprised of these concerns by industry. *See, e.g.,* AR0320 (Request for Guidance from AICPA, citing concerns with supplier shutdowns); AR0340 (Request for guidance from Ivan Phillips Barker, explaining that loss of customers resulting from shutdown orders was directly tied to business suspensions).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

business operations and should qualify as partial suspensions under the statute.  Notice 2021-20 provides no insight into why IRS favored certain business impacts over others.

Notice 2021-20 lacks agency explanation for the many rules issued.  The document merely states the agency's position without underlying rationale.  Particularly in the absence of explanation, those positions are "arbitrary and capricious" and therefore violate the APA, 5 U.S.C. § 706(2)(A).

## C.     ERC Eligibility Requirements in Notice 2021-20 Conflict with Enabling Authority and Congressional Intent

IRS modifies the ERC statute through Notice 2021-20 without Congressional authorization.  Agency positions must conform to the scope of Congressional mandates.  *See Pac. Gas & Elec. Co. v. United States*, 664 F.2d 1133, 1136 (9th Cir. 1981) (holding an agency's regulations "must be consistent with the statute under which they are promulgated").     Following *Loper-Bright*, courts must scrutinize administrative interpretations more rigorously.  *Loper*, 144 S. Ct. at 2266 ("In the business of statutory interpretation, if [the agency's] is not the best, it is not permissible").  "[E]ven when an ambiguity happens to implicate a technical matter, it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts and given it to the agency.  Congress expects courts to handle technical statutory questions." *Id.* at 2267.

Moreover, decisions of vast economic significance require the agency to identify a clear Congressional command enabling that interpretation. *Id.* (citing *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)).  When evaluating whether the agency's chosen rule or policy fits within the statutory scheme, the court must look at the entire statutory context—not just isolated words in a vacuum.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).  "[T]he Court overprotects the nondelegation principle by increasing the cost of delegating authority to agencies—namely, by requiring Congress to speak unequivocally in order to grant them significant rule-making power." *See Biden v. Nebraska*, 143 S. Ct. 2355, 2377 (2023) (Barrett, J., concurring).  This "doctrine serves as an interpretive tool reflecting 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

to an administrative agency.'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 133)).

Notice 2021-20 has a substantial economic impact.  IRS claims to have received "approximately 3.6 million" ERC claims over the course of the program.  Exh. B at 3.  IRS has used Notice 2021-20 as a basis to deny hundreds of millions of dollars in economic relief that Congress directed to businesses harmed during the pandemic.  Under the ERC program, IRS presides over billions of dollars in emergency relief funding.  *See* Exh. R, Dkt. 19-1 ¶19.  An IRS rule that substantially narrows that statutory scheme implicates the major questions doctrine.  IRS is therefore required to show clear Congressional authorization for the regulatory authority it wields.

### 1.    IRS Lacked Authority to Issue Legislative Rules on Eligibility

Congress afforded the Secretary with authority to issue "regulations and guidance" to "allow the advance payment of the credit" under the Act.  *See* 26 U.S.C. § 3134(m).  But that regulatory authority was circumscribed.  Congress did not delegate power to modify the statute.  *See Biden*, 143 S. Ct. at 2369 (invalidating Secretary of Education's adjustments to federal programs under the HEROES Act where those changes created a "fundamentally different loan forgiveness program").

Relevant here, Congress provided IRS authority to "issue such forms, instructions, regulations, and guidance, as are necessary … *to allow the advance payment* of the credit[.]"  *See* I.R.C. § 3134(m)(1) (emphasis added).[13]  The "advance payment" of the credit is a distinct issue from ERC eligibility.  IRS addressed advanced payouts separately in Notice 2021-20.  *See* Exh. A, Dkt. 1-1, Q/A No. 51 ("Can an eligible employer receive an advance payment of the employee retention credit…"); *see also id.* at 85-86 (addressing the advance payment).  IRS specified a separate form (Form 7200) for taxpayers seeking "advance payment of employer credits due to COVID-19."[14]  But Congress never delegated separate authority for IRS to issue substantive rules or even guidance that altered eligibility criteria.

Where Congress has carved out a list of specified authority, it can be presumed to

---

[13] No other delegated authority in Section 3134(m) would be applicable.
[14] *See* https://www.irs.gov/pub/irs-prior/f7200--2021.pdf.

have denied the IRS additional authority by failing to include it within that list.  *See Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) (the canon *expressio unius exclusio alterius* "is a useful aide" where "context shows that the draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives").  Congress evidently withheld authority to change eligibility criteria because it wanted IRS to pay ERC claims promptly during a historically harmful world event.  The Notice therefore fails for the independent reason that Congress denied IRS authority to modify ERC eligibility criteria.

### 2.    Notice 2021-20 Is Inconsistent with Congressional Intent

Notice 2021-20 exceeds the boundaries and purpose of the CARES Act by unduly narrowing the universe of "eligible employers" under 26 U.S.C. § 3134(c)(2) in several material respects.  *See Biden*, 143 S.Ct. at 2369-70 (holding that Dept. of Education exceeded statutory authority by enacting a plan that "augments and expands" the law). Because the Notice adopts substantive positions inconsonant with Congressional intent, the agency acted beyond its authority.

The network of governmental orders impacting commerce was extensive during COVID.  Those orders included restrictions at the federal, state, and local level.  SOF ¶12. The U.S. Department of Health & Human Services (HHS) maintains a database of COVID-19 State and County Policy Orders through HealthData.gov.[15]  HHS lists 4,218 "orders" that applied variously during the COVID-19 pandemic.  These orders collectively imposed substantial economic drains on small businesses in particular.  SOF ¶¶12-18.

Government orders displaced customers, pushed employees into remote working environments, limited supply chains, and imposed substantial changes on business operations.  Those conditions had lasting impacts that were not eliminated or normalized for some time after those government orders were rescinded.  *See* Exh. T, CRS Report R45864, *Tax Policy and Disaster Recovery* (Sep. 3, 2021), at 22 ("Employee displacement can create labor market challenges that persist over time.  Further, longer-term supply chain

---

[15] *Available at*, https://healthdata.gov/dataset/COVID-19-State-and-County-Policy-Orders/gyqz-9u7n/data (Exh. Q).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

disruptions can make it difficult for businesses to resume operations after initial clean-up efforts are complete.").

The ERC was intended to address those difficulties by injecting money into the economy with few restrictions. Congress paid straight cash to citizens with no strings attached. Under the same legislation (CARES Act), Congress passed relief providing for Economic Impact Payments (EIPs) that included up to $2,400 per married couple with an additional $500 for each qualifying child. SOF ¶¶4-5. Congress eventually issued three rounds of EIPs costing the federal government $814 billion. SOF ¶5. Meanwhile, the anticipated cost estimate of the ERC was $85 billion, a fraction of the stimulus package Congress planned nationwide. SOF ¶6. At a time when Congress was handing out money unconditionally to citizens nearly nine-fold the value of ERC program, there remains no indication that Congress intended the ERC program to be narrowly construed.

A broad interpretation of the Partial Suspension Test fulfills Congressional intent.[16] But the IRS's narrow rules exclude business that Congress intended to cover. For example, a manufacturer might have taken costly measures to continue business during COVID, and even noted a slight increase in "gross" receipts as a result.[17] But if government orders also saddled that business with increased compliance costs that destroyed margins and raised operating expenditures, that business may have lost money even if its revenues remained consistent. The employer would not be eligible for ERC under a "gross receipts" test because *gross* receipts, which do not account for costs and expenses, can be a poor indicator of COVID-19 impacts on a business's bottom line. Congress therefore addressed these situations under the "partial suspension" prong. A narrow construction of the ERC eligibility criteria in I.R.C. § 3134(c)(2)(A)(ii)(I) that excludes employers in that category

---

[16] Congress's amendments are evidence of legislative intent, extending the ERC by making it consistently easier, not harder, for employers to qualify. *See* Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1965 (2020); The American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 6428B (2021); The Infrastructure Investment and Jobs Act of 2021, Pub. L., 117-58, 135 Stat. 429 (Nov. 15, 2021).

[17] Inflation and rising prices were rampant during COVID because of government stimuli, which contributed to increases in gross receipts, even if commensurate benefits were not realized by the business which had to similarly bear increased costs of goods and materials. *See, e.g.*, U.S. BLS, "What caused the high inflation during the COVID-10 period?" (Dec. 2023), *at* https://tinyurl.com/US-BLS-Inflation-COVID.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

is inconsistent with Congress's goal to incentive businesses to keep doors open and pay employees despite government-imposed obstacles.

Congress described "eligible employers" using broad language consistent with its legislative goal of sustaining businesses during and after the pandemic. *See* 26 U.S.C. § 3134(c)(2). Section 3134 describes orders limiting interaction for "social, religious, or other purposes." 26 U.S.C. § 3134(c)(2)(A)(ii)(I). When statutory terms are undefined, the courts use the "plain meaning" to interpret Congressional intent, often derived from dictionary sources. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020) (determining "the ordinary public meaning" of the statutory section). The dictionary defines "partially" as "to some extent" or "in some degree."[18] The plain meaning therefore correlates "partial suspensions" with an employer that had its operation suspended "to some extent." *See* I.R.C. § 3134(c)(2)(A)(ii)(I) (a business is eligible if its "operation of the trade or business … is fully or partially suspended"). "Operation" of a business means the "method or manner of functioning."[19] Based on the plain meaning, the statute therefore extended ERC to employers that had their "method or manner of functioning" suspended "to some extent."

The IRS's "more than nominal portion" and "comparable operations" tests are more restrictive than "to some extent," particularly when evaluated under IRS's 10-percent threshold. Here the statute does not limit a "partial suspension" to employers rendered inoperable. Instead, it broadly encompasses disruptions to business operations from any limit on "commerce, travel, or group meetings (for commercial, social, religious, or other purposes)[.]" I.R.C. § 3134(c)(2)(A)(ii)(I). Had Congress intended to apply a separate quantitative threshold, it would have included that language in the statute as it did in I.R.C. § 3134(c)(2)(A)(ii)(II). The 10-percent threshold, "nominal portion" test, and "comparable operations" test are examples of administrative constructs that impose materiality thresholds not derived from the statutory text.

---

[18] *See* https://www.merriam-webster.com/dictionary/partially.
[19] "Operation" of a business simply means the "method or manner of functioning." *See* https://www.merriam-webster.com/dictionary/operation.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Following *Loper Bright*, courts must have no tolerance for administrative deference when an agency's interpretation departs from or changes the statutory text. *Loper*, 144 S. Ct. at 2257 ("[I]t is emphatically the province and duty of the judicial department to say what the law is"); *Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005) (noting, even under *Chevron*, that "We should not defer to an agency's interpretation of a statute if Congress' intent can be clearly ascertained through analysis of the language, purpose and structure of the statute."). Because IRS rules in Notice 2021-20 conflict with Congressional authority, IRS violated the APA, 5 U.S.C. § 706(2)(C).

Despite Congressional intent to enact broad economic stimulus, and the extent of government-imposed burdens, IRS altered the scope of eligible government orders and partial suspensions by replacing Congress's terms with IRS's own regulatory model that significantly narrowed employer eligibility. *Compare* 26 U.S.C. § 3134(c)(2)(A)(ii)(I) *with* Exh. A at 26-27; *see also* SOF ¶¶63-84. Because that violated the APA and separation of powers, the Court should invalidate Notice 2021-20.

## V.    **CONCLUSION**

For the reasons set forth above, Plaintiff StenTam requests that this Court grant summary judgment on Counts I, II, and III of the Complaint. Defendants violated the APA and exceeded their statutory authority by implementing rules in conflict with the language of the CARES Act, § 2301, as amended. The Court should declare that IRS issued Notice 2021-20 in violation of APA, and that Notice 2021-20 is unlawful, void, and without force or effect. The Court should enjoin Defendants from enforcing Notice 2021-20 and the unlawful rules contained therein. Defendants' failure to follow applicable law injures hundreds of thousands of small businesses, and must be remedied through a clear and unequivocal nationwide injunction. A proposed order is attached under LRCiv 7.1(b)(2).

DATED: December 6, 2024.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Respectfully submitted,


By:    */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 025346)
GREENBERG TRAURIG, LLP
Em: peter.arhangelsky@gtlaw.com
*Attorney for Plaintiff Stenson Tamaddon, LLC*