Peter A. Arhangelsky, Esq. (SBN 025346)
Peter.Arhangelsky@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Rd.
Suite 800
Phoenix, AZ 85016
Ph: (602) 445-8017
*Attorney for Plaintiff Stenson Tamaddon, LLC*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stenson Tamaddon, LLC<br><br>Plaintiff,<br><br>v.<br><br>United States Internal Revenue Service, et al.,<br><br>Defendants. | Case No. 2:24-cv-01123-SPL<br><br>**PLAINTIFF STENSON TAMADDON'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Steven P. Logan |

Plaintiff Stenson Tamaddon, LLC ("StenTam") submits this Statement of Facts ("SOF") in support of its Motion for Summary Judgment under LRCiv 56.1(a).

**A.    The Employee Retention Credit**

1.    Congress charged the U.S. Department of Treasury and the Internal Revenue Service with implementing portions of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") of 2020.  *See* Pub. L. 116-136, §2301, 134 Stat. 281, 347 (2020); as amended 26 U.S.C. § 3134.

2.    Among the CARES Act programs imposed by Congress, the IRS was tasked with reimbursing businesses through the Employee Retention Credit ("ERC") program.  *Id.*

3.    Congress enacted the ERC as a broad-based, refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability,

and mitigate impacts on small business from the unprecedented challenges the pandemic posed. *See* IRS, "Covid-19-Related Employee Retention Credits: Overview," *at* https://www.irs.gov/newsroom/covid-19-related-employee-retention-credits-overview (the ERC "is designed to encourage Eligible Employers to keep employers on their payroll despite experiencing an economic hardship related to COVID-19"); *see also* Exh. F, Dkt. 14-1 ¶6.

4.  Congress enacted the ERC alongside other programs that paid cash outright to citizens with no strings attached. That included broad payouts like Economic Impact Payments (EIPs) made directly to citizens of up to $1,200 per adult for eligible individuals and $500 for qualifying children under age 17. *See* H.R. 748, 116th Cong. § 6428(a) (2020). The Tax Relief Act of 2020 again authorized payments of up to $600 per adult for eligible individuals and up to $600 for each qualifying child. *See* Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1965 § 6428A(a)(1) (2021). The American Rescue Plan of 2021 also provided Economic Impact Payments for eligible individuals and married couples. H.R. 1319, 117th Cong. § 6428B (2021).

5.  Congress eventually issued three rounds of EIPs costing the federal government a total of $814 billion. *See* Pandemic Oversight, Data Stories (Feb. 17, 2022), *at* https://www.pandemicoversight.gov/data-interactive-tools/data-stories/update-three-rounds-stimulus-checks-see-how-many-went-out-and (accessed Dec. 3, 2024) (Exh. S (printout)); *see also* IRS, "SOI Tax Stats – Coronavirus Aid, Relief and Economic Security Act (CARES Act) statistics," *at* https://www.irs.gov/statistics/soi-tax-stats-coronavirus-aid-relief-and-economic-security-act-cares-act-statistics (accessed Dec. 3, 2024).

6.  The initial anticipated cost estimate of the ERC was around $85 billion. *See* Exh. P (CBO Estimate of ERC Program to Hon. Sinema).

7.  In 2020, Congress referred to the ERC as the "Employee Retention and **Rehiring** Credit" in the Relief Act of 2020 (enacted as Subtitle B to Title II of Division N of the Consolidated Appropriations Act. *See* Consolidated Appropriations Act, 2021, PL 116-260 (Dec. 27, 2020), 134 Stat 1182 § 207 (emphasis added); *see also* CRS, "The

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Employee Retention and Employee Retention and **Rehiring** Tax Credits," CRS IF11721, 2021 WL 371450 (Jan. 7, 2021) ("The credit was modified and expanded in December 2020, becoming the employee retention and rehiring tax credit").

8. In 2021, the Consolidated Appropriations Act opened the ERC program to employers that had also taken PPP loans. *See* Taxpayer Certainty and Disaster Relief Act of 2020 (part of Consolidated Appropriations Act of 2021) (allowed businesses that received PPP loans to still claim the ERC, and applied those changes retroactively).

9. Following those amendments, the IRS internally recognized that "roughly 5 million previously ineligible employers might make massive claims." *See* AR0649-AR0650, Dkt. 38-11 at 5-6.

10. Deemed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVID-19 were forecast by some experts at $16 trillion. *See* Cutler DM, Summers LH. The COVID-19 Pandemic and the $16 Trillion Virus. *JAMA.* 2020;324(15):1495–1496. doi:10.1001/jama.2020.19759; *see also* Economic Advisors Council, "Evaluating the Effects of the Economic Response to COVID-19" (Aug. 2020), *available at*, https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/08/Evaluating-the-Effects-of-the-Economic-Response-to-COVID-19.pdf.

11. COVID-19 swept through all fifty states and resulted in government orders that disrupted the United States' local and national economies. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 FR 15337 (March 13, 2020).

12. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID-10. *See* HealthData.gov, "COVID-19 State and County Policy Orders," *at* https://healthdata.gov/dataset/COVID-19-State-and-County-Policy-Orders/gyqz-9u7n/data (listing 4,218 orders at the state and local level related to COVID-19); *see also* Exh. Q (Data export from HealthData.gov).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

13. Many businesses were subject to government-mandated lockdowns that made continued operations economically infeasible. Exh. F, Dkt. 14-1 ¶¶13-15.

14. In a January 26, 2024 news release, the United States Courts released bankruptcy data showing that business bankruptcy filings rose 40.4% year-over-year in 2023 vs. 2022.[1]

15. EPIQ, a tracker of bankruptcy data, reflected first quarter bankruptcy filings by businesses up 22% in the first quarter of 2024 over 2023, with Chapter 11 filings for businesses specifically up 43%. Exh. F ¶14.

16. Other sources have connected that increase in bankruptcy filings with pandemic-related concerns.[2]

17. StenTam's interactions with its clients reflects that many are struggling financially because of pandemic-related fallout. Exh. F, Dkt. 14-1 ¶14.

18. The United States Small Business Administration (SBA) estimates 99.9% of businesses in the United States are small businesses, representing 62 million jobs and 40% of payroll.[3] And even though the SBA estimates 33.2 million small businesses were in the United States, fewer than 10% of businesses claimed ERC credits based on publicly available IRS data. Exh. F, Dkt. 14-1 ¶9.

19. Congress passed the ERC as a stimulus to put money in the hands of businesses in their critical time of need. *See In re Roman Cath. Church of Archdiocese of Santa Fe*, 615 B.R. 644, 649 (Bankr. D.N.M. 2020) ("the CARES Act is intended, among other things, to provide stimulus to the economy by distributing approximately $2.3 trillion to various industries, programs, and individuals.").

---

[1] *At* https://www.uscourts.gov/news/2024/01/26/bankruptcy-filings-rise-168-percent (Jan. 26, 2024), Exh. G (printout).

[2] *See* PYMNTS, "Business Bankruptcies Jump as COVID Relief Ends" (Dec. 18, 2023), *at* https://www.pymnts.com/economy/2023/business-bankruptcies-jump-as-covid-relief-ends/ (accessed Dec. 3, 2024).

[3] *See* SBA Office of Advocacy, "Frequently Asked Questions" (March 2023), *at* https://advocacy.sba.gov/wp-content/uploads/2023/03/Frequently-Asked-Questions-About-Small-Business-March-2023-508c.pdf (attached as Exh. H).

20.    Congress has used Employee Retention Credits in other emergencies.  The Disaster Tax Relief Act of 2019 (Div. Q of the Cons. Appropriations Act, 2020, Pub. L. 116-94), the Bipartisan Budget Act of 2018 (Pub. L. 115-23), and the Disaster Tax Relief Act of 2017 (Pub. L. 115-63) all included temporary employee retention credits for businesses that continued to pay wages after disasters.  The Hurricane Katrina Employee Retention Credit was a federal credit available to businesses affected by Hurricane Katrina and unable to operate between August 29, 2005, and December 31, 2005.  *See* Pub. L. 115-63 § 503(a)(2)(ii).

21.    The broad remedial purpose of the CARES Act, and specifically the ERC, was discussed by voting members of Congress who outlined the need for sweeping relief. *See, e.g.*, 166 Cong. Rec. S1897-02, 166 Cong. Rec. S1897-02, S1897 (Sen. Collins explaining her support for the CARES Act); 166 Cong. Rec. S1897-02, 166 Cong. Rec. S1897-02, S1899 (Sen. Loeffler, same); 166 Cong. Rec. S2059-01, 166 Cong. Rec. S2059-01, S2059 (Sen. Schumer, same); 166 Cong. Rec. E347-01, 166 Cong. Rec. E347-01, E347 (Rep. Adams, same).

22.    Legislators connected the ERC with business losses stemming from reductions in customers.  *See* 166 Cong. Rec. S1897-02, 166 Cong. Rec. S1897-02, S1897 ("They simply do not have the cash flow, the revenue coming in the door, to allow them to remain open").

23.    They also emphasized that the ERC's primary purpose was to keep employment numbers stable no matter the short-term cost.  *See* 166 Cong. Rec. S1897-02, 166 Cong. Rec. S1897-02, S1898 ("We know that keeping people employed and ready to get back to work, not severing that connection between employers and employees, will cost far less than it would to try to rescue the economy after we have massive layoffs and business closures.").

24.    Congress legislatively directed the IRS to conduct a public relations campaign to inform every U.S. employer with fewer than 500 employees about the ERC. *See* Consolidated Appropriates Act, 2021, Pub. L. No. 116-260, Div. EE, § 270(i)

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

(requiring government "outreach" to business by giving "notice about the credit allowed under this section and the requirements for eligibility to claim the claim").

25.    The Biden Administration also encouraged businesses to capitalize on the broad credit.  *See, e.g.*, White House, "FACT SHEET:  President Biden Announces Additional Steps to Help Americans Return to Work" (May 10, 2021), *at* https://tinyurl.com/FactSheet-WhiteHouse ("[T]he Biden-Harris Administration is working to increase awareness of and participation in this beneficial program"); Carmen Reinicke, "Biden encourages businesses to take advantage of the employee retention credit" CNBC (May 12, 2021), *at* https://tinyurl.com/CNBC-Reinicke.

26.    The ERC provides a tax credit to employers whose business operations were adversely affected by COVID-19, but who still paid qualified wages, including some health plan expenses, to their employees.  *See* CARES Act, Pub. L. 116-136, 134 Stat 281 (March 27, 2020) §2301.

27.    Section 2301 of the CARES Act, which is not codified, established the ERC for wages paid after March 12, 2020, and before January 1, 2021. Section 206 of the Relief Act (also not codified) adopted amendments and technical changes to section 2301 of the CARES Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit.  Section 207 of the Relief Act (also not codified), effective for calendar quarters beginning after December 31, 2021, amended section 2301 of the CARES Act to extend the ERC to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.  Section 3134 of the I.R.C. was enacted by section 9651 of the Rescue Plan. Section 3134 of the I.R.C. provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022. The Infrastructure Investment and Jobs Act (2021) terminated the ERC for most employers in the fourth calendar quarter of 2021. *See* Answer, Dkt. 35, at 16-17.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

PLAINTIFF'S STATEMENT OF MATERIAL FACTS

28.     As originally enacted, the ERC statute limited the credit to 50 percent of the qualified wages in a given quarter, but Congress later amended the law to increase the credit to 70 percent of qualified wages for 2021 quarters.  *Compare* Pub. L. 116-136, 134 Stat 281, at §2301 *with* 26 U.S.C. § 3134(a).

29.     Congress defined "eligible employer" for purposes of the ERC in Section 3134(c)(2).  Although Congress has changed the law through amendment, the eligibility criteria in I.R.C. § 3134(c)(2)(A)(ii)(I) has not substantively changed since the enactment of the CARES Act in March 2020.  *See Compare* Pub. L. 116-136, 134 Stat 281, at §2301(c)(2)(A) *with* 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

30.     For any quarter subject to ERC in which a business was operational, the business may qualify as an eligible employer in any one of three possible ways.  *See* PL 116-136, 134 Stat 281, at §2301(c)(2), as amended.

31.     First, a business qualifies if it "is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)."  26 U.S.C. § 3134(c)(2)(A)(ii)(I).

32.     Congress did not include a requirement that the relevant government order directly regulate the fully or partially suspended business.  *See generally* 26 U.S.C. § 3134.

33.     Congress also did not set a minimum threshold or magnitude of loss necessary for a suspension to qualify as "partial" under this first prong.  *Id.*

34.     Congress did not restrict "orders from an appropriate governmental authority" to those that directly closed a business.  *See* I.R.C. § 3134(c)(2)(A)(ii)(I); Pub. L. 116-136, 134 Stat. 281, at §2301(c)(2).  Instead, Congress used broad language to encompass government orders that in any way limited "commerce, travel, or group meetings" because of COVID-19.  *See id*.

35.     Second, a business qualifies as an "eligible employer" if it suffered a certain diminution of business during the pandemic.  *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II) (where

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

"the gross receipts … of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019").

36.    Third, a business qualifies as an eligible employer if it meets the statute's definition of a "recovery startup business."  *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(III).

## B.    IRS Publishes Notice 2021-20

37.    The CARES Act authorized the Secretary of the Treasury to "issue forms, instructions, regulations, and guidance as are necessary" for the IRS to facilitate the ERC program.  *See* Pub. L. 116-136, 134 Stat. 281, at §2301(l), and as amended, I.R.C. §3134(m).

38.    The CARES Act, Section 2301(l), provided the following authority:  "The Secretary shall issue such forms, instructions, regulations, and guidance as are necessary— (1) to allow the advance payment of the credit under subsection (a), subject to the limitations provided in this section, based on such information as the Secretary shall require, (2) to provide for the reconciliation of such advance payment with the amount advanced at the time of filing the return of tax for the applicable calendar quarter or taxable year, (3) to provide for the recapture of the credit under this section if such credit is allowed to a taxpayer which receives a loan described in subsection (j) during a subsequent quarter, (4) with respect to the application of the credit under subsection (a) to third party payors (including professional employer organizations, certified professional employer organizations, or agents under section 3504 of the Internal Revenue Code of 1986), including regulations or guidance allowing such payors to submit documentation necessary to substantiate the eligible employer status of employers that use such payors, and (5) for application of subparagraphs (A)(ii)(II) and (B) of subsection (c)(2) in the case of any employer which was not carrying on a trade or business for all or part of the same calendar quarter in the prior year."  *See* Pub. L. 116-136, Section 2301(l).

39.    IRS acknowledged in Notice 2021-20 that "Section 2301(l) of the CARES Act requires the Secretary to issue forms, instructions, regulations, and guidance, as necessary, to allow for the advance payment of the credit, provide for reconciliation of the

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

advance payment at the time of filing the employment tax return, and to apply the credit to third-party payers." Exh. A, Dkt. 1-1 at 16.[4]

40.     That Congressional authority did not extend to guidance or rulemaking regarding the underlying eligibility criteria for the ERC. *See* Pub. L. 116-136, 134 Stat. 281, at §2301(l), and as amended, I.R.C. §3134(m).

41.     As to those regulations that Congress authorized IRS to issue, Congress did not exempt the agency from the APA's notice-and-comment rulemaking process. *See* 5 U.S.C. § 553(b); *see generally* 26 U.S.C. § 3134; Pub. L. 116-136, 134 Stat. 281, at §2301.

42.     Although Congress granted the Secretary authority to issue "regulations" to facilitate parts of the ERC program, the IRS never did so. Exh. C, Dkt. 1-3 at 18.

43.     Instead, it administered the ERC through "guidance" documents that circumvented the APA's notice-and-comment rulemaking requirement. As explained by the IRS in representative refund denials:

> Treasury did not issue regulations addressing entitlement to, or calculation of, the ERC. Rather, consistent with statutory authority allowing the Secretary to issue other guidance as may be necessary to carry out the purpose of the credit …, the Service issued guidance in coordination with Treasury in the form of Frequently Asked Questions beginning on April 29, 2020.

Exh. C, Dkt. 1-3, at 18 (Form 886-A).

44.     On March 1, 2021, nearly a full year after Congress passed the CARES Act, the IRS published a 102-page guidance document titled "Notice 2021-20," which presented information in a "Question and Answer" format. *See* Exh. A, Dkt. 1-1.

45.     The purpose of Notice 2021-20 was to publish the IRS's standards for application of Section 2301 of the CARES Act, as amended by section 206 of the Relief Act. *Id.* at 2.[5]

---

[4] Notice 2021-20 was filed as an exhibit to the Complaint (Exh. A, Dkt. 1-1). It was also included within the administrative record at AR0945-AR1046. Plaintiff reattaches the initial exhibit in support of its motion for summary judgment.
[5] The Relief Act retroactively expanded the ERC, reflecting Congress's view that not enough businesses were receiving the intended relief. The Relief Act expanded the program so that more, not less, businesses would qualify, and it increased the credit amount.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

46.    The "guidance" in Notice 2021-20 materially changed the ERC program by, among other things, significantly narrowing the scope of "eligible employer[s]" under the program and imposing many new obligations on businesses seeking to benefit from the program. *See* Exh. A, Dkt. 1-1 at 30-31, 34-35, 40-41, 101-02.

47.    The "guidance" was created by the IRS to govern payouts under the credit through collaboration of the highest administrative levels in the IRS and Treasury. *See* Exh. C, Dkt. 1-3 at 20 ("[T]he Service worked closely with Congress and the highest levels of the Department of Treasury to develop, and issue published guidance.").

48.    The IRS also narrowed the universe of "government orders" that qualify under Section 2301 of the CARES Act, as amended, I.R.C. § 3134(c)(2). *Id.* 28–51 (defining what constitutes a full or partial shutdown under the ERC).

49.    Notice 2021-20 installs minimum thresholds for ERC eligibility.  Exh. A, Dkt. 1-1 at 28 (noting that an employer may "have a partial suspension if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order").

50.    The IRS did not provide explanation or underlying rationale for any of its decisions in Notice 2021-20, and the document instead simply announced the agency's position. *See generally id.*

51.    The IRS has modified and purported to clarify Notice 2021-20 since issuing the "guidance," including through Notice 2021-23, Notice 2021-33, Notice 2021-49, and Notice 2021-65.  *See* Exh. I (Notice 2021-23); Exh. J (Notice 2021-49).

52.    None of these IRS Notices underwent the notice-and-comment rulemaking process, and the IRS provided no opportunity for public comment that otherwise would have been afforded by that process.  *See generally* Exh. A (N-2021-20); Exh. I (N-2021-23); Exh. J (N-2021-49).

---

*See* Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act), enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020). Taken together, the legislative intent was to have more, not less, businesses qualify under the ERC program.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

### C.    Notice 2021-20 Has the Force of Law

53.    The IRS has published a series of legal memoranda and information letters to Congress holding Notice 2021-20 out as binding legal authority.  *See, e.g.*, Exh. K, Chief Counsel Attorney Memorandum, IRS AM 2023-005, 2023 WL 4701979 (July 21, 2023) (explaining that Notice 2021-20 governs and provides limited exceptions for certain employers); Exh. L, Chief Counsel Attorney Memorandum, IRS AM 2023-007, 2023 WL 7296104 (Nov. 3, 2023) (noting that businesses can claim ERC only if they "fall within the provisions" of the Notice 2021-20); Exh. M, *Info. Letters*, IRS INFO 2023-0005, 2023 WL 5319790 (June 30, 2023) (in an IRS letter to Rep. Cartwright, the agency provided clarification "about income tax filing *rules* related to the employee retention credit[,]" referencing Notice 2021-20 along with the statutory law as a source of authority) (emphasis added); Exh. N, *Info. Letters*, IRS INFO 2023-0001, 2023 WL 2859099 (Mar. 31, 2023) (in an IRS letter to Senator Cornyn, the agency noted that it "has rules and regulations in place" and those "rules help ensure the proper withholding and payment of employment taxes," citing only Notice 2021-20 in support of that position).

54.    In legal memoranda published by the IRS's Office of Chief Counsel concerning the application of ERC, IRS counsel referenced Notice 2021-20 as operative "law" alongside other examples of statutory language.  Exh. K at 4 (AM 2023-005).

55.    The IRS relies on Notice 2020-21 as an operational rule that defines eligibility under the ERC.  *See id.* at 12 (citing Notice 2021-20 as legal authority alongside other Treasury regulations, including Treas. Reg. § 31.6001-1 and 1.6001-1); *id.* at 12 (explaining that "To fall within the provisions of … Notice 2021-20, the determination of whether an employer experienced a full or partial suspension of operations depends upon whether more than a nominal portion of an employer's trade or business operations was suspended by a governmental order or a governmental order had more than a nominal effect on an employer's trade or business operations").

56.     IRS counsel has publicly proclaimed that eligibility under the ERC depends on whether a business "fall[s] within the provisions of Notice 2021-20."  Exh. D, Dkt. 1-4 at 9-10.

57.     The agency uses Notice 2021-20 as its primary legal source for interpretation of the ERC eligibility criteria when evaluating claims.  *See* Exh. C, Dkt. 1-3 at 19-30; Exh. D, Dkt. 1-4 at 5-10.

58.     The IRS therefore relies on Notice 2021-20 as authoritative law when denying ERC claims.  *See, e.g.*, Exh. C, Dkt. 1-3 at 18-19, 24-30; *id.* at 19 (The IRS instructing that "To the extent … legislation did not modify the original provisions of the ERC, Notice 2021-20 governs the ERC for all periods."); Exh. D, Dkt. 1-4 at 5 (same).

59.     The IRS provides its substantive basis for disallowances in a Form 866-A (Explanation of Items).  In those documents, the IRS has stated that Notice 2021-20 governs the outcome.  *See, e.g.*, Exh. C, Dkt. 1-3 at 25 (Form 866-A) (citing Notice 2021-20 for the agency's rule on governmental orders); *see also id.* at 25-30 (relying on Notice 2021-20).

60.     Notice 2021-20 includes no showing of good cause to avoid notice-and-comment rulemaking.  *See generally* Exh. A, Dkt. 1-1; 5 U.S.C. § 553(b)(3)(B).

61.     The IRS issued Notice 2021-20 one year after the CARES Act.  *Compare* Dkt. 1-1 (March 1, 2021) *with* Pub. L. 116-136, 134 Stat. 281 (March 27, 2024).  Its failure to engage the proper rulemaking process did not result from an exceptional circumstance. *See* Exh. E, Dkt. 1-5 at 3.

62.     The agency has yet to begin a rulemaking despite the passage of three years. *See* Answer, Dkt. 35 at 28.

**D.     The IRS Promulgated Unlawful Legislative Rules Through "Notice 2021-20"**

63.     Notice 2021-20 includes a series of rules that alter the ERC statute, taxpayer obligations, change the ERC eligibility criteria, and narrow the universe of eligible employers under the law, as reflected in the examples below.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

64.     Q/A No. 6[6] eliminated household employers from the definition of those "operating a trade or business," thus rendering them ineligible for the ERC.  Exh. A, Dkt. 1-1 at 22 ("Household employers are not considered to operate a trade or business and, therefore, are not eligible for the employee retention credit with respect to household employees").

65.     Q/A No. 10 limited the type of government orders in several ways, including narrowing the list of potential orders to those issued by governments having "jurisdiction over the employer's operations."  Exh. A, Dkt. 1-1 at 25.  That rule excluded government orders that may have imposed substantial effects on an employer's stream of commerce, including customers in other jurisdictions.  *Id.*

66.     Q/A No. 11 specified that an employer may claim ERC only if "more than a nominal portion of its business operations are suspended by a governmental order."  Exh. A, Dkt. 1-1 at 28.  The IRS's "nominal portion" rule is referenced 32 times in Notice 2021-20 and throughout the document.  *See generally* Exh. A, Dkt. 1-1.

67.     Under the "nominal portion" rule, "a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019)."  Exh. A, Dkt. 1-1 at 29.

68.     Notice 2021-20 requires taxpayers to maintain "records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order or whether a governmental order had more than a nominal effect on its business operations."  Exh. A, Dkt. 1-1 at 101.  Notice 2021-20 therefore

---

[6] "Q/A" refers to the Question and Answer format used in Notice 2021-20.

requires taxpayers claiming the ERC under the Partial Suspension prong to ensure that their internal systems compile and store data required to make this calculation; perform the calculation as specified by IRS in Notice 2021-20; and maintain records reflecting those calculations for a period of at least four years. *Id.* at 101-102.

69.    Q/A No. 12 sets a rule governing supplier disruption in context with the Partial Suspension analysis. Exh. A, Dkt. 1-1 at 29. This rule limits eligible supplier disruptions to instances when a supplier is directly suspended by the government order. *Id.* ("An employer may be considered to have a full or partial suspension of operations due to a governmental order if, under the facts and circumstances, the business's suppliers are unable to make deliveries of critical goods or materials due to a governmental order that causes the supplier to suspend its operations"). The text of that rule does not accommodate a circumstance where, because of government orders, a supplier may be fully operational but still unable to meet demand (i.e., a supplier of PPE to health care facilities).

70.    Q/A No. 13 imposes a rule excluding employers that suspend all or some of their operations after a government order eliminates their customer base: "An employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its product or services is not considered to have a full or partial suspension of its operations due to a governmental order." Exh. A, Dkt. 1-1 at 30.

71.    The example IRS provided under Q/A No. 13 involves an automobile repair service that, although not required to close its business, lost its customers to government lockdown orders that prevented access to the employer's business. *Id.* at 31. According to IRS, the employer "is not considered to have a full or partial suspension of operations due to a governmental order." *Id.*

72.    In Q/A No. 14, the IRS determined that an employer which voluntarily suspends operations because of COVID-19 is not eligible for ERC. *See* Exh. A, Dkt. 1-1 at 31. Read in conjunction with Q/A No. 13, these rules eliminate ERC for employers suffering indirect but foreseeable effects on business operations.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

73.     Q/A No. 15 imposes a rule requiring employers to show they cannot continue "comparable" operations even if closed by a government order.  *See* Exh. A, Dkt. 1-1 at 31. That rule explains, "If an employer's workplace is closed by a governmental order, but the employer is able to continue operations comparable to its operations prior to the closure, including by requiring its employees to telework, the employer's operations are not considered to have been fully or partially suspended as a consequence of a governmental order."  Exh. A, Dkt. 1-1 at 31-32.

74.     The "comparable" operations rule in Q/A No. 15 is not set forth in the ERC statute or any of its amendments.  *See* I.R.C. § 3134(c)(2)(A)(ii)(I).

75.     The "comparable" operations rule in Q/A No. 15 does not account for costs or expenses that an employer incurs when launching so-called "comparable" operations following a government-imposed suspension.  *See* Exh. A, Dkt. 1-1 at 31-32.

76.     Q/A No. 16 sets factors that employers must apply when determining whether they were "able to continue comparable operations."  Exh. A, Dkt. 1-1 at 34-35.  None of those factors are described in the CARES Act Section 2301 or subsequent amendments. *See* Pub. L. 116-136, 134 Stat. 281 (March 27, 2024), as amended I.R.C. § 3134(c)(2)(A)(ii)(I).

77.     Q/A No. 17 addresses the IRS rule that an employer must show how a government order impacted (1) "more than a nominal portion of its business operations" and that such work (2) "cannot be performed remotely in a comparable manner."  Dkt. 1-1 at 35.  An employer that does not meet both standards is ineligible for ERC.  Those rules are not in the ERC statutory language.  *See* Pub. L. 116-136, 134 Stat. 281 (March 27, 2024), as amended I.R.C. § 3134(c)(2)(A)(ii)(I).

78.     Q/A No. 18 sets the "factors" that must "be taken into account in determining whether a modification required by a governmental order has more than a nominal effect on business operations for purposes of Q/A-17[.]" Dkt. 1-1 at 40-41.  Failure to meet those standards renders an employee ineligible for ERC.  *Id.* at 40 ("A governmental order that results in a reduction in an employer's ability to provide goods or services in the normal

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

course of the employer's business of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations.").

79. Q/A No. 70 imposes recordkeeping obligations consistent with IRS rules articulated throughout Notice 2021-20. Exh. A, Dkt. 1-1 at 101-102. Employers are required to maintain documentation including "any records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order or whether a governmental order had more than a nominal effect on its business operations[.]" Exh. A, Dkt. 1-1 at 101.

80. Notice 2021-20 requires employers to substantiate their eligibility for ERC by, among other things, maintaining records showing: the governmental order(s) that suspended business operations; the records the employer relied on to determine whether a governmental order had more than a nominal effect on its business operations; records the employer used to determine whether it experienced a significant decline in gross receipts; records of which employees received qualified wages and in what amounts; and, for large employers, work records, and documentation showing whether and what amount of wages the business paid to employees who were not providing services. *Id.* at 101-02; *see also* Dkt. 1-1 at 40 (while leaving it open-ended, the Notice includes examples of record-keeping to include documents showing: limited occupancy to provide for social distancing, required services that were performed only on an appointment basis, changes to the format of services, requirements on employees and customers to wear face coverings, and so on.); *but see id.* at 40-41 (requiring, above all else, that the governmental order must result "in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent").

81. Notice 2021-20 also requires each employer to maintain records showing how it calculated allocable qualified health plan expenses; the documents relied on to establish whether the employer is a member of an aggregated group treated as a single employer for purposes of ERC; and how aggregation of those businesses impacts the claimed credit.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

82.    Notice 2021-20 requires employers to independently determine whether the interruption or reduction to their business constituted "more than a nominal" disruption, as defined in the Notice, and to maintain all records used to do so.

83.    An employer's failure to maintain supporting records could subject taxpayers to penalties, including refund penalties.  *See* I.R.C. § 6676.

84.    Under Q/A No. 71, taxpayers must maintain those records for four years after the date each tax becomes due or is paid, whichever comes later.  Exh. A, Dkt. 1-1 at 102.

85.    That four-year retention period differs from the applicable five-year statute of limitation for examining the credit.  *See* 26 U.S.C. § 3134(l).

86.    The IRS published Notice 2021-20 under an OMB control number designated under the Paperwork Reduction Act of 1995 (44 U.S.C. § 3507(d)).  *See* Dkt. 1-1 at 103 (citing  44 U.S.C. § 3507(d)).   Section 3507(d)—the statutory section cited by IRS— pertains to the "proposed collection of information contained in a *proposed rule*" and the statute "shall apply only when an agency publishes a notice of proposed rulemaking and requests public comments."  *See* 44 U.S.C. § 3507(d) (emphasis added).

87.    The IRS added to Notice 2021-21 through later Notices, including Notice 2021-23 and Notice 2021-49.  *See* Exh. I (Notice 2021-23); Exh. J (Notice 2021-49).  Those documents address updates to the ERC program through the Taxpayer Certainty and Disaster Tax Relief Act of 2020 and the American Rescue Plan of 2021.  *Id.*

88.    Notice 2021-23 and Notice 2021-49 both state that Notice 2021-20 imposed "rules" to govern ERC refunds.  The IRS refers to Notice 2021-20 as the source of eligibility "rules" at least twenty-nine times.  *See* Exh. I (Notice 2021-23 references the "rules" created by Notice 2021-20 at least fifteen times); Exh. J (Notice 2021-49 references the "rules" created by Notice 2021-20 at least fourteen times).

89.    According to IRS, "Notice 2021-20 provides various rules related to claiming the employee retention credit, including the circumstances under which an eligible employer may request and advance payment of the employee retention credit."  Exh. I (Notice 2021-23) at 12; *see also id.* at 4 ("Notice 2021-20 provides rules for determining

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

whether an employer is an eligible employee for purposes of the employee retention credit for 2020."); *see also id.* at 5 ("Section III.E. of Notice 2021-20 provides rules for determining when an employer experiences a significant decline in gross receipts."); *id.* at 10 ("Accordingly, the rules provided in section III.G of Notice 2021-20 are applied using the revised definitions…").

90. Notice 2021-49 affirmed that Notice 2021-20 set the "rules" for the ERC. *See* Exh. J (Notice 2021-49) at 6 ("[S]ections III.A., III.D, and III.E. of Notice 2021-20 provide the rules for determining whether an employer is an eligible employer for purposes of the employee retention credit for 2020"); *id.* ("[S]ections III.B. and III.C. of Notice 2021-23 provide those rules for the first and second calendar quarters of 2021."); *id.* at 7 n.1 ("The rules for determining a significant decline or decline in gross receipts are set forth in section III.E. of Notice 2021-20 and section III.C. of Notice 2021-23, respectively"); *id.* at 11 ("The aggregation rules described in section III.B. of Notice 2021-20 apply when determining whether an employer's trade or business is fully or partially suspended or the employer experiences a decline in gross receipts. Similarly, the aggregation rules described in section III.B. of Notice 2021-20 apply when determining if an employer is a recovery startup business"); *id.* at 11-12 ("Section III.G. of Notice 2021-20 and section III.E. of Notice 2021-23 set forth the rules for determining qualified wages paid after March 12, 2020, and before January 1, 2021, and qualified wages paid after December 31, 2021, and before July 1, 2021, respectively."); *id.* at 12 ("Section III.G. of Notice 2021-20 provides rules for determining the average number of full-time employees, including for employers that came into existence in 2020. Accordingly, the rules set forth in section III.G. of Notice 2021-20 for determining the average number of full-time employees continue to apply in the third and fourth calendar quarters of 2021."); *id.* at 17 ("Section III.I. of Notice 2021-20 provides rules related to the interaction between PPP loans and the employee retention credit; under those rules, the employee retention credit does not apply to the qualified wages for which an election or deemed election to not take the wages into account for purposes of the credit is made."); *id.* at 33 *"The Treasury Department and the IRS have been asked

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

whether this rule continues to apply to employers that acquire businesses in 2021. This rule continues to apply to employers that acquire businesses in 2021 for purposes of measuring whether a decline in gross receipts occurred."); *id.* ("Section III.E. of Notice 2021-20 provides rules for determining gross receipts for an employer that came into existence in 2019. The same rule set forth in section III.E. of Notice 2021-20 continues to apply for 2021").

91.    At no point in Notice 2021-20 or in the administrative record does the IRS provide its reasoning for selecting certain positions over others, or for setting specific standards in Notice 2021-20.  *See generally* AR0001-AR1091.

92.    The administrative record does not include an explanation for why IRS chose 10-percent as the value that represents a "nominal portion" of a business under the ERC. *See generally* AR0001-AR1091.

93.    In March 2019, the Department of the Treasury and IRS issued a policy statement "reaffirm[ing] their commitment to a tax regulatory process that encourages public participation, fosters transparency, affords fair notice, and ensures adherence to the rule of law." Exh. E, Dkt. 1-5 at 2.

94.    Defendants explained, "The best practice for agency rulemaking is the notice-and-comment process established by the Administrative Procedure Act (APA).  This process allows the public to participate before any final rule becomes effective and ensures that all views are adequately considered.  It also enables the public to apprise the government of relevant information that the government may not possess or to alert the government to consequences that it may not foresee." *Id.*

95.     "The APA generally requires notice and comment for legislative rules. The APA exempts interpretive rules from notice-and-comment requirements. Nonetheless, as a matter of sound regulatory policy, the Treasury Department and the IRS will continue to adhere to their longstanding practice of using the notice-and-comment process for interpretive tax rules published in the Code of Federal Regulations." *Id.*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA  85016
(602) 445-8000

96.    IRS promised to proceed through notice-and-comment rulemaking where the agency's intended interpretation or position would create new legislative rules on matters not addressed in existing law:  "Factors to be considered include the intended effect on taxpayers' rights or duties, the need for public comments, the form and content of prior positions, the significance of the issues, the statutory framework, and whether the interpretation or position is of short-term or long-term value. After weighing relevant factors, if the intended interpretation or position would have the effect of modifying existing legislative rules or creating new legislative rules on matters not addressed in existing regulations, the interpretation or position will generally be issued through notice-and-comment rulemaking, absent exceptional circumstances." *Id.* at 3.

97.    The Congressional Review Act (CRA), codified at 5 U.S.C. §§801-808, is a tool Congress can use to overturn federal agency actions.  *See* Exh. O (CRS, "The Congressional Review Act: A Brief Overview").

98.    The CRA requires agencies to submit certain "rules" to both houses of Congress before they take effect.  *Id.*

99.    Under the CRA, the term "rule" generally tracks the definition under the APA under 5 U.S.C. § 551, but the CRA expressly excludes "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties."  *See* 5 U.S.C. § 804(3)(C).  In other words, a rule that does "substantially affect the rights or obligations of non-agency parties" remains subject to the CRA.

100.    The IRS submitted Notice 2021-20 to the GAO, Senate, and House of Representatives under the CRA.  *See* AR0924-AR0941.

101.    The IRS did not prepare an analysis of costs and benefits associated with Notice 2021-20.  *See* AR0925.

102.    The IRS had opportunity to issue regulations during the COVID pandemic. In July 2020, the agency issued temporary regulations amending the employment tax regulations under Sections 3111 and 3221 of the Code to provide for recapture of erroneous refunds of ERC under Section 2301 of the CARES Act.  *See* Recapture of Excess

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Employment Tax Credits Under the Families First Act and the CARES Act, 85 Fed. Reg. 45551-01 (July 29, 2020). IRS's notice of proposed rulemaking was published the same day as its temporary regulations. *See id.; see also* Temporary Regs: Recapture of Excess Employment Tax Credits Under the Families First Act and the CARES Act, 85 Fed. Reg. 45514-01 (July 29, 2020).

103. In April 2020, the Small Business Administration announced an interim final rule designed to implement sections 1102 and 1006 of the CARES Act. *See* SBA, *Business Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20811 (Apr. 15, 2020).

104. That SBA rule was subject to notice and comment rulemaking. *Id.* (providing 30 days for comments until May 15, 2020); *see also* Draft SBA Interim Final Rule (AR0719-AR0842).

105. Like the IRS's Notice 2021-20, the SBA's interim final rule provided information to regulated entities through a question-and-answer format, which included information on "eligibility" under the PPP loan program. *See* AR0779 ("Who is eligible to make PPP loans?").

106. The SBA identified "good cause to dispense with the 30-day delayed effective date provided in the [APA]" and thereby made its rule effective immediately despite seeking public comment. *See* 85 Fed. Reg. at 20811.

DATED: December 6, 2024.

Respectfully submitted,

By:   */s/ Peter A. Arhangelsky*
      Peter A. Arhangelsky, Esq. (SBN 025346)
      GREENBERG TRAURIG, LLP
      Em: peter.arhangelsky@gtlaw.com
      *Attorney for Plaintiff Stenson Tamaddon, LLC*

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000