DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON
KENTON MCINTOSH
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044
Telephone:    (202) 307-6422
              (202) 514-3768
Fax:          (202) 307-0054
Email:    Amy.T.Matchison@usdoj.gov
          Kenton.McIntosh@usdoj.gov
          Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stenson Tamaddon, LLC,<br><br>Plaintiff,<br><br>v.<br><br>United States Internal Revenue Service; the United States of America; United States Department of Treasury; Daniel Werfel, in his official capacity as Commissioner of the U.S. Internal Revenue Service; and Janet Yellen, in her official capacity as Secretary of the Treasury,<br><br>Defendants. | Case No. 2:24-cv-01123-SPL<br><br>**UNITED STATES' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND...................................................................................................2

    A.   CONGRESS CREATES THE EMPLOYEE RETENTION CREDIT ............................2

    B.   THE IRS ISSUES NOTICE 2021-20 TO PROVIDE GUIDANCE TO THE PUBLIC ON HOW IT INTERPRETS THE ERC STATUTE...................................................................4

        *1.   Orders from an appropriate governmental authority*................................5

        *2.   Partial suspension.*....................................................................................6

        *3.   Substantiation*..........................................................................................8

    C.   CONGRESS FURTHER MODIFIES ERC REQUIREMENTS. ...................................9

    D.   STENTAM AND THIS LAWSUIT...................................................................10

III.  STANDARD OF REVIEW .................................................................................11

IV.   ARGUMENT .....................................................................................................11

    A.   STENTAM LACKS STANDING TO ASSERT, AND THE COURT LACKS JURISDICTION OVER, THE CHALLENGE TO NOTICE 2021-20. .........................................................11

        *1.   StenTam lacks Article III standing.* ........................................................11

        *2.   StenTam lacks prudential standing.* ........................................................12

        *3.   The Court lacks jurisdiction because there is no waiver of the United States' sovereign immunity.* ................................................................................14

    B.   THE IRS'S ISSUANCE OF NOTICE 2021-20 DID NOT VIOLATE THE APA.......................16

        *1.   The IRS properly issued Notice 2021-20 because it is an interpretive rule that need not undergo notice-and-comment rulemaking.* ................................................16

            a)   Adequate Legislative Basis........................................................17

            b)   Explicit Invocation of Authority.................................................17

            c)   Effectively Amends Prior Rule...................................................19

        *2.   Notice 2021-20 is not arbitrary and capricious*........................................21

        *3.   The IRS had authority to issue Notice 2021-20.* ......................................24

    C.   THE APA ALONE DOES NOT AUTHORIZE UNIVERSAL VACATUR OF AGENCY RULES. ...26

V.    CONCLUSION .................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10 East 40th St. Bldg., Inc. v. Callus,*
    325 U.S. 578 (1945)........................................................................................22

*Adams v. Johnson,*
    355 F.3d 1179 (9th Cir. 2004) ....................................................................15

*Arizona Yage Assembly v. Garland,*
    595 F. Supp. 3d 869 (D. Ariz. 2022) ..........................................................12

*Balser v. DOJ,*
    327 F.3d 903 (9th Cir. 2003) .........................................................................1

*Bank of Am. Corp. v. City of Miami, Fla.,*
    581 U.S. 189 (2017)......................................................................................13

*Bob Jones Univ. v. Simon,*
    416 U.S. 725 (1974)......................................................................................15

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988)......................................................................................14

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ......................................................................27

*Children's Hosp. of the King's Daughters, Inc. v. Azar,*
    896 F.3d 615 (4th Cir. 2018) ......................................................................20

*City & Cnty. of San Francisco v. United States,*
    130 F.3d 873 (9th Cir. 1997) ......................................................................11

*Cnty. of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999)..................................................................11

*Cohen v. Beneficial Indus. Loan Corp.,*
    337 U.S. 541 (1949)......................................................................................22

*Dep't of Homeland Sec. v. New York,*
    140 S. Ct. 599 (2020)....................................................................................27

*Dunn & Black, P.S. v. United States,*
    492 F.3d 1084 (9th Cir. 2007) ....................................................................14

iii

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ............................................................. 13

*Erringer v. Thompson,*
    371 F.3d 625 (9th Cir. 2004) ............................................................. 19

*Garcia v. McCarthy,*
    No. 13-cv-03939-WHO, 2014 WL 187386 (N.D. Cal. Jan. 16, 2014) ....................... 15

*Gill v. United States Dep't of Justice,*
    913 F.3d 1179 (9th Cir. 2019) ........................................................... 19

*Hand v. Bibeault,*
    400 F. App'x 526 (11th Cir. 2010) ...................................................... 13

*Hemp Indus. Ass'n v. Drug Enf't Admin.,*
    333 F.3d 1082 (9th Cir. 2003) ................................................... 16, 17, 18

*Hoctor v. USDA,*
    82 F.3d 165 (7th Cir. 1996) ......................................................... 20, 21

*J&G Sales Ltd. v. Truscott,*
    473 F.3d 1043 (9th Cir. 2007) ........................................................... 22

*Jafarzadeh v. Nielsen,*
    321 F. Supp. 3d 19 (D.D.C. 2018) ........................................................ 20

*L.A. Closeout, Inc. v. Dep't of Homeland Sec.,*
    513 F.3d 940 (9th Cir. 2008) ............................................................ 19

*L.A. Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ............................................................ 27

*Lane v. Salazar,*
    911 F.3d 942 (9th Cir. 2018) ............................................................ 19

*Larson v. United States,*
    2016 WL 7471338 (S.D.N.Y. Dec. 28, 2016) ............................................... 15

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) .................................................................. 24

*Louisville Gas & Elec. Co. v. Coleman,*
    277 U.S. 32 (1928) ...................................................................... 22

*Lujan v. Def. of Wildlife,*
    504 U.S. 555 (1992) ..................................................................... 12

iv

*Mann Constr., Inc. v. U.S.*,
  27 F.4th 1138 (6th Cir. 2022) ............................................................... 20

*Massachusetts, Dep't of Pub. Welfare v. Sec'y of Agric.*,
  984 F.2d 514 (1st Cir. 1993) ................................................................. 22

*Mayor & City Council of Baltimore v. Trump*,
  416 F. Supp. 3d 452 (D. Md. 2019) ........................................................ 20

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ............................................................. 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) ................................................................................ 21

*Occidental Eng'g Co. v. I.N.S.*,
  753 F.2d 766 (9th Cir. 1985) ................................................................. 11

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ................................................................................ 16

*QinetiQ U.S. Holdings, Inc. & Subs. v. Comm'r*,
  845 F.3d 555 (4th Cir. 2017) ................................................................. 15

*Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*,
  499 F.3d 1108 (9th Cir. 2007) ............................................................... 22

*Reno Sparks Indian Colony v. U.S. E.P.A*,
  336 F.3d 899 (9th Cir. 2003) ................................................................. 19

*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*,
  819 F. Supp. 2d 1077 (E.D. Cal. 2011) .................................................. 11

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ................................................................. 22

*Smith v. S. Side Loan Co.*,
  567 F.2d 306 (5th Cir. 1978) ................................................................. 13

*Stahl v. United States*,
  626 F.3d 520 (9th Cir. 2010) ................................................................... 9

*State v. Su*,
  121 F.4th 1 (9th Cir. 2024) .................................................................... 25

*Sweet v. Sheahan*,
  235 F.3d 80 (2d Cir. 2000) .................................................................... 20

*Texas v. Cardona,*
    No. 4:23-CV-00604-0, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) ...................... 20

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................................................ 11

*U.S. Army Corps of Engineers v. Hawkes Co.,*
    578 U.S. 590 (2016) ............................................................................................ 14

*United States v. Bailey,*
    34 U.S. (9 Pet.) 238 (1835) ................................................................................. 25

*United States v. Clintwood Elkhorn Min. Co.,*
    553 U.S. 1 (2003) ................................................................................................ 15

*United States v. Mitchell,*
    445 U.S. 535 (1980) ............................................................................................ 14

*Voisine v. United States,*
    579 U.S. 686 (2016) ............................................................................................ 25

*Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.,*
    379 U.S. 411 (1965) ............................................................................................ 14

**Statutes**

5 U.S.C. § 553 ............................................................................................................ 16

5 U.S.C. § 702 .................................................................................................... 14, 15

5 U.S.C. § 704 .................................................................................................... 14, 15

5 U.S.C. § 706 ............................................................................................................ 11

5 U.S.C. § 804 ............................................................................................................ 18

28 U.S.C. § 1331 ....................................................................................................... 14

44 U.S.C. § 3507 ....................................................................................................... 18

26 U.S.C. § 448 ........................................................................................................... 3

26 U.S.C. § 3134 ................................................................................................ *passim*

26 U.S.C. § 6001 ......................................................................................................... 8

26 U.S.C. § 6033 ......................................................................................................... 4

26 U.S.C. §§ 6107, 6109(a)(4), 6511, 6532, 6694, 6695, 6713, 7422 ...................... 13

26 U.S.C. § 7422 ................................................................................ 14

26 U.S.C. § 7803 ................................................................................ 24

26 U.S.C. § 7805 ................................................................................ 24

Administrative Procedure Act (APA) ............................................. *passim*

CARES Act ...................................................................................... *passim*

Congressional Review Act ............................................................... 18

Paperwork Reduction Act of 1995 .................................................. 18

# I.    INTRODUCTION

The United States, on behalf of named defendants, moves under Fed. R. Civ. P. 56 for summary judgment and opposes Plaintiff Stenson Tamaddon LLC's ("StenTam") motion for summary judgment.[1] StenTam challenges the issuance of IRS Notice 2021-20 and asks the Court to vacate the only publicly available guidance on how the IRS interprets the many congressional actions that have resulted in the Employee Retention Credit ("ERC"). The publication of that Notice was in response to public and congressional requests for guidance on the IRS's interpretation of portions of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). As explained below, the United States is entitled to summary judgment in its favor on all StenTam's claims.

This case is not about all the congressional pandemic stimulus programs that paid cash outright to American citizens with no strings attached. This case is about the ERC, which is a limited refundable employment tax credit that Congress created to incentivize employers to retain employees during the pandemic. Unlike the broad reach of other pandemic government assistance programs, Congress never intended for every American employer that was impacted by COVID-19 to qualify for the ERC. Had that been the case, Congress would have written, and amended, the statute differently than it did the three times it addressed it over the short span of less than two years. Instead, it kept very specific limits on who qualified for the credit and how they qualified. Over time Congress amended certain eligibility requirements and limitations, but it never modified its original requirements that employers could be eligible for the credit only if their businesses were either fully or partially suspended because of governmental orders or they experienced the requisite decline in gross receipts. Another constant despite the legislative amendments is the role the IRS was to play in implementing the ERC. That is, Congress mandated that the IRS provide guidance as

---

[1] The real party in interest is the United States. The Department of Treasury and the IRS are not separately suable entities. Likewise, the suit against the IRS Commissioner Daniel Werfel and Secretary of the Treasury Janet Yellen is based solely on both acting in their official capacities and, as such, is a suit against the United States. *See generally Balser v. DOJ*, 327 F.3d 903, 907 (9th Cir. 2003).

necessary to prevent the avoidance of the purposes of the *limitations* of the ERC. Said another way, Congress tasked the IRS with making sure that taxpayers understood how to properly claim the limited credit.

StenTam's complaint posits a radical theory—that Notice 2021-20, which is an IRS publication intended to assist and educate the public through a collection of frequently asked questions, should be vacated nationwide. This would leave the public with no guidance about how the IRS interprets the many congressional actions that have resulted in the ERC and how it will apply those interpretations to its evaluation of ERC claims. StenTam's requested relief would leave the taxpaying public on its own to interpret the complex mix of uncodified public laws and statutory provisions that establish and govern eligibility for the ERC. This result would not only be contrary to congressional command that the IRS provide such guidance, it also would not change how the IRS interprets and applies the ERC statute. It would just leave the public in the dark.

StenTam seeks this extraordinary relief because it contends that Notice 201-20 is invalid. It is wrong. To start, StenTam lacks standing to challenge Notice 2021-20 and the United States has not waived its sovereign immunity to such suit. But even if this Court has jurisdiction to consider StenTam's challenge, the IRS's issuance of Notice 2021-20 did not violate the Administrative Procedure Act ("APA") because the Notice is an interpretive rule excepted from notice-and-comment requirements. And the IRS's issuance of Notice 2021-20 is not an arbitrary and capricious agency action and did not exceed the IRS's statutory authorization. StenTam's motion for summary judgment must be denied and the United States is entitled to summary judgment in its favor.

## II.     BACKGROUND

### A.     Congress creates the Employee Retention Credit

The ERC is a tax credit that was created to encourage employers to keep employees on their payroll during the COVID-19 pandemic. (United States' Separate Statement of Material Facts ("SOF") ¶¶ 1-2.) Enacted on March 27, 2020, it first provided relief only during the 2020 calendar year and in an amount equal to 50% of qualified wages (not to

exceed $10,000). (SOF ¶¶ 2-3.) Congress further limited the ERC by making it available only to eligible employers, which it defined as those carrying on a trade or business and, with respect to the calendar quarter in which the employer was claiming the credit, either:

1) the trade or business was fully or partially closed because of a governmental order limiting commerce, travel or group meetings due to the COVID-19 pandemic, or

2) the trade or business had a significant decline in gross receipts.

(SOF ¶ 4.) This second way an employer could be considered eligible for the ERC came to be known as the "gross receipts test."[2] (*Id.*)

Also as originally enacted, the ERC applied only to eligible wages paid after March 12, 2020, and before January 1, 2021. Some additional restrictions included: (1) the ERC was not available to governmental employers; (2) it was not available for employers who received a Paycheck Protection Program ("PPP") loan under a different COVID-era program; (3) certain employees could not be taken into account for purposes of the ERC; and (4) an employer could not use the wages considered for the ERC to determine certain other credits. (SOF ¶¶ 5-6.)

Just days after the legislation creating the ERC was enacted, the IRS began providing taxpayers guidance on the ERC, as Congress directed it to, by posting information to its website, including frequently asked questions and responses. (SOF ¶ 7.) Throughout 2020, the IRS continued to post information on its website as the need for answers to more questions about the ERC arose. (*Id.*)

Nine months after the ERC was enacted, on December 27, 2020, Congress adopted

---

[2] As initially enacted, the gross receipts test was calculated using the period in which an employer experienced a significant decline in gross receipts beginning with the first quarter after December 31, 2019, for which gross receipts (within the meaning of I.R.C. § 448(c)) are less than 50% of gross receipts for the same quarter in the prior year. The period of a significant decline in gross receipts ends with the quarter for which gross receipts were greater than 80% percent of gross receipts for the same quarter in the prior year. *See* Section 2301(c)(2)(B) of the CARES Act.
An eligible employer in 2021 satisfies the gross receipts test if "the gross receipts (within the meaning of section 448(c)) of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019." I.R.C. § 3134(c)(2)(A)(ii)(II)(amending section 2301(c)(2)(B) of the CARES Act.

retroactive amendments and technical changes for qualified wages paid after March 12, 2020, and before January 1, 2021. Some of those changes were to: (1) remove the categorical restriction on employers who received a PPP loan from claiming the credit; (2) add a restriction related to the ERC for employers affected by qualified disasters; and (3) provide that gross receipts for a tax-exempt employer are determined using the definition under I.R.C. § 6033. Congress made additional changes to the ERC that applied prospectively. Those changes included: (1) making the ERC available for eligible employers paying qualified wages that were paid after December 31, 2020, and before July 1, 2021; (2) increasing the maximum credit amount that could be claimed per employee to 70% (up from 50%) of $10,000 of qualified wages paid to an employee per calendar quarter; (3) allowing certain governmental employers to claim the credit; (4) modifying the gross receipts test; (5) modifying the definition of qualified wages; (6) broadening the denial of the double benefit rule and applying it to certain sections of the I.R.C.; and (7) changing the eligibility to receive advance payments and limited the amount of the advances. (SOF ¶¶ 10-11.)

**B.    The IRS issues Notice 2021-20 to provide guidance to the public on how it interprets the ERC statute.**

On March 1, 2021, the IRS issued Notice 2021-20, incorporating FAQs that it had posted on its website along with additional information. (SOF ¶ 15.) Notice 2021-20 is organized into three sections. Section I introduces the purpose of the Notice. As stated, the purpose of the Notice is to provide "*guidance* on the employee retention credit provided under section 2301 of the Coronavirus Aid, Relief, and Economic Security Act." (SOF ¶ 16 ) (emphasis added). Section II of the Notice tracks the language of the CARES Act and contains background information about claiming the ERC, the definition of an "eligible employer," the definition of "qualified wages," an election not to take certain wages into account, and coordination with a PPP loan, aggregation rules, and other rules related to the ERC. (SOF ¶ 17.) Section III of the Notice provides the IRS's guidance in question-and-answer format, including examples. (SOF ¶ 18.) The 71 total FAQs cover 14 subject matters.

The relevant statutory provision defines "eligible employer" in part to mean any

employer that was carrying on a trade or business and the operation of the trade or business was "fully or partially suspended due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." I.R.C. § 3134(c)(2)(A). In Notice 2021-20 the IRS explains how it interprets the terms "orders from an appropriate governmental authority" and "partial suspension" and how eligible employers should substantiate ERC claims.

> 1.    *Orders from an appropriate governmental authority.*

Congress made clear that one way an employer can be eligible for the ERC is if a governmental order *required suspension of its business operations*. Consistent with the language in the statute, the IRS explained in FAQ 10 what type of governmental orders may be considered in determining eligibility for the ERC. On that list were "orders, proclamations, or decrees from the Federal government or any State or local government" if they limited "commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease." (SOF ¶ 15: Administrative Record ("AR") 0968-71.) The IRS also explained that statements made by government officials during press conferences or media interviews would not qualify, nor would a declaration of a state of emergency that did not limit commerce, travel, or group meetings. *Id.* Finally, the IRS explained that a declaration of emergency that generally limited commerce, travel, or group meetings, but did not relate to the suspension of an employer's business, would not be considered a governmental order for purposes of determining employer eligibility. *Id.* The IRS also described examples of four types of governmental orders and provided three fact patterns to illustrate its interpretation. The IRS stated that "[w]hether the operations of a trade or business are considered essential or non-essential will often vary from jurisdiction to jurisdiction," and that employers should determine whether they are operating essential or non-essential business by looking to the governmental order affecting is operations. *Id.*

StenTam alleges that this commonsense explanation of what governmental order means established eligibility requirements and narrowed the ERC program for taxpayers by

determining that governmental orders do not "qualify unless the issuing authority had 'jurisdiction over the employer's operations'" and by excluding orders that impacted an employer's customer base and supply chains that may have been out of state. (MSJ, 9:13-18.) First, the IRS's interpretation of "governmental orders" did not set eligibility requirements or narrow the ERC program. Congress, not the IRS, determined, for example, that a governmental order had to suspend an eligible employer's business operations and that a voluntary suspension of business operations also wouldn't qualify. Congress also determined that if a business was not subject to a governmental order that suspended its business but a necessary supplier in another jurisdiction was, that business would not qualify for the ERC because *its* business operations had not been suspended.[3] This result is the one engineered by Congress when it drafted the law. Congress did not intend for every business touched by the pandemic to qualify for the ERC. Had it intended that result, it would have written, or amended, the law that way. The IRS has not added eligibility requirements or narrowed the ERC program in its interpretation of the statute's use of governmental orders.

### 2. Partial suspension.

The existence of a relevant governmental order alone is not sufficient under the statute for an employer to establish eligibility. Employers must also show that their business operations were fully or *partially suspended* by a governmental order. The IRS explained its interpretation of "partially suspended" in FAQs 11-18. There, the IRS explained that an employer "may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by governmental order." (SOF ¶ 15: AR 0971-72.) And, the IRS explained, that: "a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if the gross receipts from that portion of the business operations is

---

[3] But under the IRS's interpretation, that same employer may still be eligible for the ERC if, under the facts and circumstances, its business operations are fully or partially suspended because of the supplier's inability to deliver (FAQ 12) or if the suspension of its supplier's business caused a significant decline in its business under the gross receipts test. (SOF ¶ 15: AR 0972-73.)

1    not less than 10 percent of the total gross receipts" or  "the hours of service performed by

2    employees in that portion of the business is not less than 10 percent." (FAQ 11.)

3        StenTam reads the IRS's explanation of partially suspended with reference to a

4    "nominal portion" that in turn references 10 percent and decries the setting of a threshold or

5    requirement. (MSJ, 9:23-10:16.) But StenTam is misreading the IRS's explanation and

6    misunderstands the import of the 10 percent. Rather than setting a threshold or a requirement,

7    what the IRS has explained is that in its interpretation, partial suspension means something

8    between a full suspension and no suspension. To give taxpayer's guidance then on how it

9    will evaluate claims for refund, what the IRS has done is establish a framework that

10   taxpayers can rely on. The 10 percent is not determinative for whether an employer has been

11   partially suspended. Instead, if an employer's business has been partially suspended by a

12   governmental order that has impacted more than 10 percent of its gross receipts or employee

13   hours, the IRS will deem that employer eligible for the ERC (FAQs 11, 17, 18). (SOF ¶ 15:

14   AR 0971-72, 0978-84.) Effectively, this is a safe harbor; taxpayers whose gross receipts or

15   hours have been impacted at that level can rely on the IRS not denying their ERC claim on

16   that basis. Properly understood, it isn't an eligibility requirement. Even if a taxpayer cannot

17   demonstrate that at least 10 percent of its business has been impacted, it can still be eligible

18   for the ERC if under the "facts and circumstances" the business was partially suspended.

19   (*Id.*) The IRS's interpretation leaves open the real possibility that a business's operations

20   could have been partially suspended, under the facts and circumstances, even if only

21   suffering, say, a six percent reduction in gross receipts. Properly understood, the IRS's

22   interpretation of the statute provides taxpayers with the benefits of a safe harbor—it does not

23   impose a threshold or place a limitation on receiving the credit.

24        As discussed, to be eligible for the ERC, the statute requires that an employer must

25   have had its business operations fully or partially suspended due to a governmental order.

26   Thus, Congress, and not the IRS, has decided that businesses that have voluntarily suspended

27   their own operations are not eligible for the credit (FAQ 14). (SOF ¶ 15: AR0974.) Likewise,

28   employers whose businesses have been impacted because their customer base was told to

stay home have not had their operations suspended due to a governmental order (FAQ 13). (SOF ¶ 15: AR 0973-74.) The Notice tracks the plain meaning of the statute in this regard.

Likewise, in FAQ 12 the IRS explains that "an employer may be considered to have a full or partial suspension of operations due to a governmental order if, under the facts and circumstances, the business's suppliers are unable to make deliveries of critical goods or materials due to a governmental order that causes the supplier to suspend its operations." (SOF ¶ 15: AR 0972-73.)

In FAQ 15 the IRS explains that if an employer's workplace is closed by a governmental order but the employer can continue operations comparable to its operations before the closure, the employer's business is not considered to have been fully or partially suspended. (SOF ¶ 15: AR 0974-77.) Even still, the IRS qualified this response, acknowledging that an employer could be considered to have a partial suspension due to the governmental order if it was required to suspend certain operations for certain purposes. *Id.* This interpretation again makes sense and is consistent with the limitation in the statute.

In addition, Congress drafted the statute to provide more than one way employers could be eligible for the ERC. Apart from eligibility based on a full or partial suspension due to a governmental order, taxpayers can also establish eligibility if they satisfy the "gross receipts test" delineated in the statute. So no matter whether a governmental order directly or indirectly impacted a business, and no matter if it was able to pivot to comparable operations, if it suffered a significant decline in gross receipts, it could be eligible for the ERC.

### 3.    *Substantiation*

In FAQ 70 the IRS describes the types of records an eligible employer would need to create and maintain to substantiate its ERC claim. (SOF ¶ 15: AR 1044-45.) A taxpayer's obligation to maintain records to demonstrate its entitlement to the ERC does not emanate from Notice 2021-20. All the substantiation and record-keeping requirements that StenTam complains of are requirements that the Internal Revenue Code and its implementing Treasury Regulations (26 C.F.R. § 31.6001-1) impose on taxpayers seeking employment-related refunds. Section 6001 of the Code requires every taxpayer to "keep such records, render such

statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe." Treas. Reg. § 31.6001-1(c) requires employers claiming credits to keep a complete and detailed record with respect to the tax, interest, addition to the tax, additional amount, or assessable penalty to which the claim relates. Under the Treasury Regulations, records relating to claims must be retained for at least four years from the date due. Treas. Reg. § 31.6001-1(e)(2), (FAQ 71). *See also Stahl v. United States*, 626 F.3d 520, 522 (9th Cir. 2010) (taxpayer bears the burden of proving its entitlement to a refund).

The plain text of Notice 2021-20 confirms that the Notice neither adds to, nor alters in any way, taxpayers' obligations to maintain records to substantiate its entitlement to ERCs under the relevant statute and regulations—it simply reiterates the statutory requirement to do so. The Notice merely provides that a taxpayer "will adequately substantiate" its eligibility for the ERC if it maintains certain records. Nowhere does the Notice state that a taxpayer must maintain those specific records, much less that it is subject to penalties if it fails to do so. Likewise, the Notice merely restates the applicable Treasury Regulation's four-year record retention requirement.

### C.    Congress further modifies ERC requirements.

On March 11, 2021, just shy of a year after Congress first created the ERC, Congress once again extended and modified it as well as codified it in I.R.C. § 3134. This time, among other changes, Congress prospectively: (1) made the ERC available for eligible employers that paid qualified wages between June 30, 2021, and January 1, 2022; (2) applied the credit against taxes imposed under other sections of the I.R.C. (§§ 111(b), 3221(a)); (3) expanded the type of eligible employer to "recovery startup business"; (4) modified the definition of qualified wages for "severely financially distressed employers"; (5) modified the definition of qualified wages to exclude certain wages; (6) provided that the ERC shall not apply to so much of the qualified wages paid by an eligible employer as are taken into account as payroll costs in connection with certain covered loans and grants; and (7) extended the limitation on the time period for assessment from three years to five years. (SOF ¶ 12.)

Finally, on November 15, 2021, Congress terminated the ERC for most employers

(excepting recovery startup businesses) in the fourth calendar quarter of 2021. (SOF ¶ 13.)

Throughout all the modifications, Congress did not amend or otherwise modify the statutory language of an eligible employer to address the IRS's interpretations of the terms "governmental order" or "partial suspension" in Notice 2021-20 or other IRS guidance. Congress also did not amend the statute to relieve taxpayers of their preexisting statutory duty to substantiate any ERC claims or keep records in support of such claims. And Congress did not withdraw its direction to the IRS to issue guidance "to prevent the avoidance of the purposes of the limitations" of the ERC.

### D.      StenTam and this lawsuit.

StenTam describes itself as a "multifaceted tax advisory and technology firm that assists businesses with tax credits and financial solutions." (SOF ¶ 22.) Its clients are businesses, and it helps them file ERC claims. (SOF ¶ 23.) StenTam is paid on a contingency basis from the proceeds of its clients' successful ERC claims. (SOF ¶ 24.) StenTam initiated this action on May 14, 2024, and moved for summary judgment on December 6, 2024, challenging the issuance and substance of Notice 2021-20. (SOF ¶¶ 26, 28.) Although StenTam's complaint alleges five counts, counts four and five have been dismissed (ECF 43). Accordingly, it moves for summary judgment on the remaining counts: one through three. Count one alleges that Notice 2021-20 is a substantive rule, also known as a legislative rule, that is subject to the APA's notice-and-comment procedures. (SOF ¶ 31.) Count two alleges that Notice 2021-20 violates the APA because it is an arbitrary and capricious agency action. (SOF ¶ 32.) Count three alleges that Notice 2021-20 exceeded statutory authorization by imposing thresholds and obligations that were not authorized under the CARES Act. Based on these allegations, StenTam seeks to vacate Notice 2021-20 in its entirety nationwide even though it objects to only three of the 14 subject matters covered, representing just 10 of 71 FAQs. StenTam challenges the IRS's interpretation of the terms "governmental order" and "partial suspension," and the IRS's guidance on how to substantiate eligibility for the ERC. StenTam seeks to enjoin the IRS from applying its interpretation of those terms generally and specifically as the IRS has explained their

application in FAQs 10-18 and 70 of the Notice. (SOF ¶ 33.)

## III.   STANDARD OF REVIEW

The usual "genuine dispute of material fact" standard for summary judgment does not apply in APA actions. *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083–84 (E.D. Cal. 2011). Put another way, in the context of reviewing an agency's decision, there are normally no "disputed facts that the district court must resolve." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). The district court's only task is to determine whether the evidence in the record permitted the agency to make the decision it did, as a matter of law. *See* 5 U.S.C. § 706; *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997); *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (when reviewing final agency action, the district court is not managing a "garden variety civil suit," but "sits as an appellate tribunal" resolving legal questions). A court will set aside a final agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

## IV.   ARGUMENT

StenTam is not entitled to the extraordinary relief it seeks because it lacks standing and cannot identify a waiver of the United States' sovereign immunity, and even if it could, Notice 2021-20 is a valid interpretive rule that is not arbitrary and capricious and was within the IRS's statutory authority.

### A.   StenTam lacks standing to assert, and the Court lacks jurisdiction over, the challenge to Notice 2021-20.

#### 1.   StenTam lacks Article III standing.

Although this Court previously found that StenTam had standing to challenge the IRS's moratorium on the processing of new claims, that challenge has now been dismissed. (ECF No. 43.) StenTam now pursues only its claims against Notice 2021-20. But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). StenTam must therefore establish that it has standing both to challenge the

Notice and to obtain the relief it seeks—vacatur and an injunction.

To establish such standing, StenTam must demonstrate (1) that it suffered a concrete and actual or imminent injury in fact that (2) is fairly traceable to the challenged action and (3) will likely be redressed by a favorable decision. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992). This it cannot do.

StenTam has alleged that Notice 2021-20 will cause "the deprivation of payment for services, delayed receipt of those payouts, and increased compliance costs." (MSJ 2:24–25.) Even though this Court found similar allegations of economic harms sufficient to establish an injury for standing to challenge the moratorium, any such injury is neither traceable to the Notice nor redressable by its vacatur.

In challenging Notice 2021-20 StenTam claims it has been injured by how the IRS interpreted the statute and how the IRS applied that interpretation to its clients' refund claims. But Notice 2021-20 is merely guidance issued so that the public can have the benefit of knowing how the IRS is interpreting the relevant ERC statutory provisions. The Notice, as explained in Part __ below, lacks the force of law. The Notice itself does not require StenTam or its clients to do anything or prevent them from doing anything. If a taxpayer's ERC claim is denied because the IRS determined the client is ineligible under the IRS's interpretation of the statute, that denial flows from the statute. Thus any economic harm to StenTam from the denial of its clients' ERC claims is because of the operation of the statute, not the Notice. For this reason, StenTam cannot establish that its alleged injury is traceable to the Notice (and not the statute) or would be redressed by vacating the Notice or enjoining the IRS. StenTam thus lacks standing to challenge the Notice. *See Arizona Yage Assembly v. Garland*, 595 F. Supp. 3d 869, 880 (D. Ariz. 2022) (plaintiffs lacked standing to challenge agency guidance because it did not require them to do anything, or prevent them from doing anything, and therefore did not cause an actual or imminent injury).

### 2.    *StenTam lacks prudential standing.*

Likewise, StenTam lacks prudential standing because it falls outside the zone of interests of the ERC statute. This "prudential" inquiry asks "whether the statute grants the

plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 196-97 (2017). Courts "presume that a statute ordinarily provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 197 (cleaned up). In challenging the moratorium, StenTam alleged it was injured because it would not be paid if the IRS was not processing ERC claims. Now, it alleges it isn't being paid because the IRS's interpretation of the statute is to its clients' detriment. But "t[o] demonstrate prudential standing in an APA case, the alleged injury must be 'within the zone of interests to be protected or regulated' by the statute in question." (PI Order at 12:4–6 (quoting *Port of Astoria v. Hodel*, 595 F.2d 467, 474 (9th Cir. 1979)). And the zone of interests for this case, under the APA, is not that of the APA itself, but "the zone of interests to be protected or regulated by the statute that [the plaintiff] says was violated." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767-68 (9th Cir. 2018) (cleaned up).

To establish prudential standing, StenTam must show that its alleged injury ("the deprivation of payment for services, delayed receipt of those payouts, and increased compliance costs") is within the zone of interests to be protected or regulated by the ERC statute. The ERC is a refundable employment tax credit created to encourage employers to keep employees on their payroll during the COVID-19 pandemic. There is nothing in the enacting laws or I.R.C. § 3134 that subjects StenTam to regulation or explicitly protects its interest in its clients' claims being approved so that it can get paid quickly, or at all, for providing tax advisory services on a contingency basis. *But cf.* I.R.C. §§ 6107, 6109(a)(4), 6511, 6532(a), 6694, 6695, 6713, 7422 (provisions in the Code specifically addressing preparers, demonstrating Congress's ability to address them when it intends to). StenTam's services and its accounts payable are not within the zone of interests Congress meant to protect. *See*, *e.g.*, *Hand v. Bibeault*, 400 F. App'x 526, 528 (11th Cir. 2010) ("An attorney whose only interest in a case derives from her contingency fee arrangement with the plaintiff or from a statutory-fee provision does not herself have standing as a separate party to the suit."); *Smith v. S. Side Loan Co.*, 567 F.2d 306, 307 (5th Cir. 1978) ("Clearly, an attorney's interest in recovering a contingent fee is not within the zone of interests . . . .");

13

3.    *The Court lacks jurisdiction because there is no waiver of the United States' sovereign immunity.*

Aside from StenTam's lack of standing, no waiver of immunity provides jurisdiction here. "It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. A waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (cleaned up).

StenTam's complaint does not identify the statute it claims waives the United States' sovereign immunity for the relief it seeks. It cites 28 U.S.C. § 1331, but this is a "grant[] of general jurisdiction and cannot be construed as authorizing suits of this character against the United States, else the exemption of sovereign immunity would become meaningless." *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 n.3 (9th Cir. 2007). Presumably, StenTam is relying on the APA's sovereign immunity waiver in 5 U.S.C. § 702. But APA review is precluded under section 702 because there is an adequate alternative statutory remedy to challenge Notice 2021-20—a refund suit. There is thus no waiver of sovereign immunity, and the Court thus lacks jurisdiction.

Even though the APA waives the government's immunity for suits seeking certain injunctive and declaratory relief regarding agency action, the APA does not apply, and sovereign immunity is not waived, if the challenged agency action is not a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704; *see also U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016); *Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 419-23 (1965). This is because "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

The Code provides an adequate alternative means to challenge the Notice—a refund suit under I.R.C. § 7422. Congress intended for the ERC to be subject to the requirements in § 7422. *See* I.R.C. § 3134(b)(3). Once again, whether there is a waiver of the United States'

14

sovereign immunity for StenTam's remaining claims is distinct from whether a waiver was found previously in the context of its preliminary injunction motion. Now, the only reason StenTam challenges the Notice is because it alleges that the Notice is being used to deny refund claims. (MSJ, 14:26-15:1.) But the only way to challenge the denial of a refund claim is by a refund suit and, where available, a refund suit is an exclusive remedy. *United States v. Clintwood Elkhorn Min. Co*., 553 U.S. 1, 7 (2003). Because StenTam's clients may bring a refund suit if the IRS disallows their ERC claims, there is an adequate alternative remedy to challenge Notice 2021-20. StenTam's APA claims are thus foreclosed even if the alternative remedy available is not the remedy it would prefer. *Cf. Garcia v. McCarthy*, No. 13-cv-03939-WHO, 2014 WL 187386, at *11-14 (N.D. Cal. Jan. 16, 2014), *aff'd*, 649 Fed. Appx. 589 (9th Cir. 2016) ("alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'") (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009).

Courts have routinely held that the APA is inapplicable when challenging the IRS's tax determinations because Congress has established separate specific statutory schemes for making such challenges. *See*, *e.g.*, *QinetiQ U.S. Holdings, Inc. & Subs. v. Comm'r*, 845 F.3d 555, 561 (4th Cir. 2017) ("APA's general procedures for judicial review … were not intended by Congress to be superimposed on the Internal Revenue Code's specific procedures for de novo judicial review of the merits"). As the Ninth Circuit has recognized, "There are few statutory schemes more complex, comprehensive, or subject to greater congressional scrutiny than the Internal Revenue Code." *Adams v. Johnson*, 355 F.3d 1179, 1185 (9th Cir. 2004). The comprehensive statutory scheme, together with 5 U.S.C. §§ 702 and 704, prevent StenTam from using the APA to circumvent the statutory requirements that a tax refund be pursued in a refund suit that can be brought only after meeting the statutory prerequisites. *See*, *e.g.*, *Larson v. United States*, 2016 WL 7471338, at *8 (S.D.N.Y. Dec. 28, 2016), *aff'd*, 888 F.3d 578 (2d Cir. 2018) ("ability to seek relief through [tax refund suit] statutory scheme forecloses judicial review via the APA for the same relief"); *see also Bob Jones Univ. v. Simon,* 416 U.S. 725 (1974) (refund suits offer taxpayers a full opportunity to

15

litigate the legality of IRS decisions). And because any taxpayer that brings a refund suit can argue that the IRS incorrectly interpreted the provisions of the ERC in Notice 2021-10, such a suit provides an adequate remedy.

**B.      The IRS's issuance of Notice 2021-20 did not violate the APA.**

       *1.      The IRS properly issued Notice 2021-20 because it is an interpretive rule that need not undergo notice-and-comment rulemaking.*

Under Section 553(b) of the APA, federal agencies that intend to promulgate a binding rule are generally required to use notice-and-comment rulemaking. But there are exceptions to this general requirement. As relevant here, agencies need not use notice-and-comment rulemaking when issuing interpretive rules. 5 U.S.C. § 553(b)(4)(A). Notice 2021-20 is valid, without having resulted from notice-and-comment, because it is an interpretive rule.

Agencies are generally required to use notice-and-comment rulemaking to issue legislative rules because, broadly speaking, a legislative rule creates new laws, rights, or obligations. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Hemp Indus. Ass'n v. Drug Enf't Admin.,* 333 F.3d 1082, 1088 (9th Cir. 2003). By contrast, "the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers,'" *Perez*, 575 U.S. at 97, (quoting *Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 99 (1995)), or to explain more specifically what the substantive law means, *see Hemp*, 333 F.3d at 1088. As the Supreme Court has observed, distinguishing between legislative and interpretive rules is "the source of much scholarly and judicial debate." *Perez,* 575 U.S. at 96. In distinguishing between interpretive and legislative rules, the Ninth Circuit has determined that legislative rules have the "force of law" while interpretive rules do not. There are three ways a rule can have the "force of law": (1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule. *Hemp*, 333 F.3d at 1088. As explained below, applying these factors shows that Notice 2021-20 is not a

16

legislative rule subject to notice-and-comment because it does not have the force of law, but merely offers the public the IRS's interpretation of the statutory limitations on claiming the ERC.

### a) Adequate Legislative Basis

The Ninth Circuit has instructed that "if there is no legislative basis for enforcement action on third parties without the rule, then the rule necessarily creates new rights and imposes new obligations. This makes it legislative." *Id*. But as here, where the statute does contain a standard for the approval of claims apart from the IRS's interpretation, the rule is interpretive. If Notice 2021-20 did not exist, the IRS would still have a duty to approve or deny a claim for refund under I.R.C. § 3134 using its own interpretation of its terms and, in any refund suit, the courts would still determine whether the IRS's interpretation was correct or not. Notice 2021-20 simply provides the IRS's interpretation of the terms "governmental order" and "partially suspended" to the public. But Notice 2021-20 does not suggest that these definitions are binding on taxpayers when seeking judicial review of any denied refunds—it does not suggest its interpretations carry the "force of law." Whether Notice 2021-20 exists or not, the statute will control whether a refund is warranted. Because the statute provides an adequate legislative basis for enforcement, this factor weighs against Notice 2021-20 having the force of law.[4]

### b) Explicit Invocation of Authority

The second factor looks to the IRS's own treatment of the Notice. Here, we should start with the title of the Notice itself: "*Guidance* on the Employee Retention Credit Under Section 2301 of The Coronavirus Aid, Relief, and Economic Security Act." Notice 2021-20, 2021 WL 807026, at *1 (emphasis added). From there, the first section of the Notice states

---

[4] StenTam points out that the IRS has relied on a failure to comply with Notice 2021-20 in denying some ERC claims. (MSJ,14:26-27, 15:24-25.) Because the Notice explains how the IRS interprets the law in evaluating claims, this isn't surprising. Even more, one would hope that the IRS is indeed evaluating ERC claims consistent with the explanations it has offered the public. Still, the reasons offered in the letters StenTam identified don't change the legal analysis and cannot give anything the force of law. Even without the Notice, the statute provides an adequate legislative basis for an enforcement action.

its purpose: "This notice provides *guidance* on the employee retention credit []." *Id*.

(emphasis added). The next sentence begins, "The *guidance* provided in this notice addresses

the employee retention credit []." *Id*. (emphasis added). Through the entirety of the Notice,

the IRS consistently refers to the information provided as guidance.[5] Moreover, the nature of

the Notice is consistent with this characterization—it is a summary and collection of 71

FAQs and IRS responses with frequent references to the CARES Act as its source of

authority. Most of the questions and responses had been previously posted on the IRS's

website at various points between passage of the first legislation and issuance of the Notice.

(SOF ¶¶ 7-9.) Finally, the Notice itself makes clear that the IRS did not invoke any

delegation of legislative authority in issuing the Notice.[6] Notice 2021-20, 2021 WL 807026,

at *15. Because the IRS was clear that Notice 2021-20 was issued as guidance and there was

no invocation of legislative authority, this factor weighs against Notice 2021-20 having the

force of law. *See Hemp*, 333 F.3d at 1090 ("Since the DEA is not holding the rule out as

having the force of law, the rule would merely be clarifying the enforceable statutory

coverage").

---

[5] StenTam points out that in subsequent publications, the IRS calls the Notice a "rule." (MSJ, 15:3-6.) Again, rules can be legislative or interpretive. In this case, Notice 2021-20 is an interpretive rule. Referring to it as such is not inconsistent with the United States' position. Similarly, StenTam argues that the IRS has referred to the Notice as "law." (MSJ, 15:17-18.) In fact, the IRS does refer to the Notice's "guidance" several times in a long list of sources under the sub-heading "Law" in an IRS memorandum. This is unremarkable because the Notice provides the IRS's interpretation of the operative law.

[6] StenTam argues that the IRS's compliance with the Paperwork Reduction Act of 1995 ("PRA") and Congressional Review Act ("CRA") is an invocation of statutory authority for rulemaking. (MSJ, 15:7-16.) But the CRA requires the submission of nearly all rules to Congress and does not distinguish between legislative and interpretive ones. *See* 5 U.S.C. § 804(3). And contrary to StenTam's representation, the PRA applies to any collection of information; the section it cites merely describes the requirements for rules that go through notice-and-comment rulemaking. *See generally* 44 U.S.C. § 3507. Because these acts are not limited to notice-and-comment rulemaking, the IRS interprets them as potentially applying to all published guidance. *See* C.C.D.M. 32.2.3.5.2.1.8, 32.2.8.2. In any event, nothing provides that complying with these acts, even if not required, is enough to convert an interpretive rule into a legislative one.

c) Effectively Amends Prior Rule

The final factor examines whether the rule effectively amends a prior legislative rule. Because of the novel nature of the ERC, there were no prior legislative rules in existence when the IRS issued its Notice. For the same reason, the Notice cannot be said to have effected a substantial change in the law. StenTam argues that the Notice changed the statute by narrowing eligibility criteria, requiring employers to substantiate their claims, and imposing new record-keeping obligations. To be sure, the Notice explains the IRS's understanding of which businesses impacted by the pandemic fit within the definition of "eligible employer" because of governmental orders and partial suspensions—terms that might otherwise have been too vague to alert businesses to whether they were eligible for the credit. But the mere fact that an agency has issued interpretations of expansive terms does not transform the resulting guidance into a legislative rule. *See*, *e.g.*, *Gill v. United States Dep't of Justice*, 913 F.3d 1179, 1187-89 (9th Cir. 2019) (functional standard was standardized guidance with no legal effect and therefore interpretive rule even though it created binding norm by establishing 16 exclusive categories agencies had to use in defining "suspicious activity"); *Lane v. Salazar*, 911 F.3d 942, 949 (9th Cir. 2018) (Bureau of Prison's new interpretation of term "threat" was interpretive rule not subject to notice-and-comment); *L.A. Closeout, Inc. v. Dep't of Homeland Sec.*, 513 F.3d 940, 942 (9th Cir. 2008) (internal memorandum providing agency's construction of regulation in a certain factual situation did not require notice and comment); *Erringer v. Thompson,* 371 F.3d 625, 631-32 (9th Cir. 2004) (manual provisions governing creation of local coverage determinations by Medicare contractors did not have force of law and were therefore interpretive); *Reno Sparks Indian Colony v. U.S. E.P.A,* 336 F.3d 899, 909 (9th Cir. 2003) (rule clarifying meaning of terms "rest of state" and "entire state" did "not refer to a single baseline area for Clean Air Act purposes but to more than 250 distinct hydrographic areas," and was interpretive because those terms did not change existing substantive law). And as discussed (*supra* pp. 8-9), taxpayers have long been required by statute and duly promulgated regulations to substantiate any claim to a credit they make and maintain those records. A claim for the ERC

is no different.

Notice 2021-20 does not have the force of law and thus is not a legislative rule subject to notice-and-comment rulemaking. Rather, Notice 2021-20 is a valid interpretive rule properly excluded from the requirements of notice-and-comment rulemaking. StenTam's citations to out-of-circuit authority do not compel the opposite conclusion, and none applies the Ninth Circuit's three-factor test for determining whether a rule has the force of law. *See*, *e.g.*, *Children's Hosp. of the King's Daughters, Inc. v. Azar,* 896 F.3d 615, 620 (4th Cir. 2018) (finding rule addressing treatment of payments received from private insurers was legislative because the statute contemplated payments only from Medicaid and uninsured patients); *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 45-47 (D.D.C. 2018) (on motion to dismiss where court had to accept plaintiff's allegations as true, it was plausible that procedural rule effected a substantial change in the existing law); *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014) (DOL letters were legislative rules because they changed the regulatory scheme for herding operations by changing the duties of employers including setting wage rates); *Mann Constr., Inc. v. U.S.*, 27 F.4th 1138, 1143 (6th Cir. 2022) (IRS Notice 2007-83 is legislative rule because it imposed affirmative duty to report participation in covered transaction or face civil and criminal penalties); *Texas v. Cardona*, No. 4:23-CV-00604-0, 2024 WL 3658767, at *44 (N.D. Tex. Aug. 5, 2024) (document interpreting Title IX to prohibit sexual discrimination on the basis of sexual orientation and gender identity was legislative because the prohibition was not within Title IX's text); *Sweet v. Sheahan*, 235 F.3d 80, 92 (2d Cir. 2000) (regulations were legislative because they resulted from an invocation of explicit statutory authority and were promulgated after notice-and-comment process); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 508 (D. Md. 2019) (on motion to dismiss, as pled, changes made to the Foreign Affairs Manual could be legislative rule because they included a factor that was not explicit in statute).

Even *Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996), which superficially seems to involve facts like those here, is distinguishable. StemTam argues that the IRS's use of the 10 percent safe harbor in the Notice with respect to a partial suspension of operations is like the

1   USDA's decision to require an 8-foot perimeter fence to house big cats. (MSJ, 12:17-18:2.)

2   But the regulation USDA was "interpreting" for its 8-foot fence requirement covered

3   housing for animals and only required that any structure "be constructed of such material and

4   of such strength as appropriate." *Id.* The Seventh Circuit concluded that there was no

5   standard for fencing in the regulation or the statute that needed explaining, so any standard

6   setting constituted legislative rulemaking that required notice and comment. *Id.* But the court

7   explained it was "not saying that an interpretive rule can never have a numerical

8   component"; indeed, "a rule that translates a general norm into a number may be justifiable

9   as interpretation." *Id.* at 171. That is the situation here. The IRS's selection of 10 percent is

10  based on its interpretation of what Congress meant by a partial suspension—that no less than

11  a nominal portion (10%) of the employer's business was suspended. And unlike the USDA's

12  8-foot fence requirement in *Hoctor*, the IRS did not say that a taxpayer cannot qualify for the

13  ERC if they have been impacted less than 10 percent. Instead, the IRS  provided that number

14  as a safe harbor while still allowing the possibility for eligibility for those whose percentage

15  might be less under the facts and circumstances (*supra* pp. 6-7).

16      The Seventh Circuit presciently recognized both the challenge faced here by the IRS

17  and the necessity of its Notice:

18      "Every government agency that enforces a less than crystalline statute
        must interpret the statute, and it does the public a favor if it announces
19      the interpretation in advance of enforcement, whether the
        announcement takes the form of a rule or of a policy statement which
20      the Administrative Procedure Act assimilates to an interpretive rule. It
        would be no favor to the public to discourage the announcement of
21      agencies' interpretations by burdening the interpretive process with
22      cumbersome formalities."

23  *Id.* at 167. Notice 2021-20 is a valid interpretive rule that does not have the force of law. As

24  such, it is properly excepted from notice-and-comment rulemaking.

25          2.      *Notice 2021-20 is not arbitrary and capricious.*

26      Under the "arbitrary and capricious" standard, a court may not set aside an agency

27  decision that is rational, based on consideration of the relevant factors, and within the scope

28  of the authority delegated to the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

21

*Ins.*, 463 U.S. 29, 42 (1983). Although the court's inquiry is thorough, this "standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). "Where the agency's line-drawing does not appear irrational and the [party challenging the agency action] has not shown that the consequences of the line-drawing are in any respect dire . . . [courts] will leave that line-drawing to the agency's discretion." *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007) (citation omitted).

StenTam's chief objection is to the IRS's interpretation of the term "partially suspended" and the resulting 10 percent safe harbor. StenTam argues this number is an arbitrary threshold and the IRS has not explained why anything less than 10 wasn't selected instead. (MSJ, 17:4-12.) But "when lines have to be drawn they are bound to appear arbitrary when judged solely by bordering cases." *10 East 40th St. Bldg., Inc. v. Callus*, 325 U.S. 578, 584 (1945); *accord Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting) ("When a legal distinction is determined . . . a point has to be fixed or a line has to be drawn . . . Looked at by itself without regard to the necessity behind it the line or point seems arbitrary."). That is particularly true "[w]here any classification is based on a percentage or an amount," in which case "it is necessarily somewhat arbitrary." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 553 (1949) (upholding requirement that 4.999% shareholder, but not 5.000% shareholder, is subject to security and liability requirements).

In any event, the IRS's interpretation of "partially suspended" is reasonable. The IRS's interpretation of that term, to mean a nominal amount falling somewhere between 0 and 100, and its resulting decision to deem employers eligible if they suffered 10 percent or greater impact to their business, reflect reasoned analysis (*supra* pp. 6-8). *See Massachusetts, Dep't of Pub. Welfare v. Sec'y of Agric.*, 984 F.2d 514, 522 (1st Cir. 1993) (when "agency exercises [line-drawing] authority in a reasonable way, neither the fact that there are other possible places at which the line could be drawn nor the fact that the administrative scheme

1   might occasionally operate unfairly from a particular participant's perspective is sufficient,

2   standing alone, to undermine the scheme's legality") (citing *Knebel v. Hein*, 429 U.S. 294

3   (1977)). And the 10 percent line isn't the limit or threshold that StenTam makes it out to be.

4   Rather, it exists only as a safe harbor; taxpayers can still establish eligibility if, under the

5   facts and circumstances, they demonstrate their business was partially suspended even if it

6   was to a lesser degree.[7]

7          StenTam objects that the 10 percent safe harbor and explanation of comparable

8   operations are unreasonable because both fail to address the "cumulative impact of multiple,

9   smaller disruptions on an employer." (MSJ, 17:14-15.) On the one hand, StenTam criticizes

10  the IRS for interpreting the statute too much; on the other, StenTam criticizes the IRS for not

11  reading more into the statute. Still, the answer to StenTam's question lies first in the statute,

12  which provides that employers who suffered a cumulative burden were eligible to claim the

13  ERC if it resulted in a significant decline in gross receipts. Or, second, as explained in the

14  Notice, if under the facts and circumstances, the employer also can show a partial

15  suspension.

16         StenTam also objects that the Notice is internally inconsistent. (MSJ, 17:25-18:13)

17  But these claimed inconsistencies have a common through line that stems from the statute.

18  The statute focuses ERC eligibility on *business operations* and not on customer behavior. So,

19  for instance, employees having to wear face masks may impact business operations, but

20  requirements that customers wear masks are not considered. Those positions are not

21  contradictory and are consistent with the statute's language. Similarly, orders that were

22  otherwise directed at business operations (operational hours, space, etc.) would also be

23  considered but not stay-at-home orders to the public.

24         As discussed, (*supra* pp. 5-9), the IRS's interpretations are reasonable, based on

25  relevant factors, and were within the specific authority granted by Congress. Notice 2021-20

26

27  ───────────────────────

    [7] StenTam objects that the Notice does not allow for a case-by-case determination of

28  compliance with the statute's partial suspension requirement. (MSJ, 17:19-23.) This is
    incorrect. An employer can demonstrate eligibility if it can show, under the facts and
    circumstances, it was partially suspended (*supra* p. 7). That is done on a case-by-case basis.

1  is not arbitrary and capricious.

2          3.       *The IRS had authority to issue Notice 2021-20.*

3          StenTam argues that the IRS did not have the authority to issue the Notice. But, as

4  noted above, the IRS issued the notice to comply with the statutory mandate that it issue

5  "such forms, instructions, regulations, and other guidance as are necessary . . . *to prevent the*

6  *avoidance of the purposes of the limitations* under this section." I.R.C. § 3134(m)(3)

7  (emphasis added). StenTam does not dispute that the IRS has some statutory authority to

8  issue guidance about the ERC. Yet StenTam argues that the IRS exceeded its statutory

9  authority in Notice 2021-20 because it didn't confine its guidance to advance payments and

10 instead modified the statute's eligibility requirements. (MSJ, 20:13-14.) To argue that the

11 IRS exceeded its statutory authority in issuing Notice 2021-20, StenTam must

12 mischaracterize Section 3134. Citing I.R.C. § 3134(m)(1) in part, StenTam acknowledges

13 that Congress gave the IRS the authority to issue forms, instructions, and guidance as

14 necessary to allow the advance payment of the ERC and suggests that the authority ended

15 there. But StenTam stopped reading the statute too soon. Congress authorized the IRS to

16 issue guidance not just about advance payments, but also "to prevent the avoidance of the

17 purposes of the limitations" of the ERC.

18         That the IRS followed a statutory mandate for providing guidance does not convert

19 the guidance to a legislative rule. Again, the United States is not arguing that the IRS

20 interpretation has the force of law or is entitled to deference.[8] And even if the I.R.C. § 3134

21 did not provide the required congressional authority, there is ample other authority for the

22 IRS's issuance of non-binding interpretive guidance. *See* I.R.C. § 7803(a)(2) (authorizing the

23 IRS to "administer, manage, conduct, direct, and supervise the execution and application of

24 the internal revenue laws or related statutes"); I.R.C. § 7805(a) (authorizing the Treasury to

25 "prescribe all needful rules and regulations for the enforcement of [the Internal Revenue

26

27 [8] Because the United States is not asking the Court to afford deference to its interpretation,
   the Supreme Court's recent decision in *Loper Bright* (*Loper Bright Enters. v. Raimondo*, 144
28 S. Ct. 2244 (2024)), related to the level of deference to be afforded agency interpretations, is
   not relevant here.

Code]").[9]

      StenTam also argues that the Notice is inconsistent with congressional intent. But rather than examine the history of congressional amendments to the ERC statute and compare that with the timeline of IRS guidance, StenTam weaves a narrative of other government agency actions, different congressional stimulus programs, and a reminder of the overall disruption caused by the pandemic. (MSJ, 21-22.) Yet such an examination reveals that had Congress disagreed with the IRS's interpretations of the statute, specifically its interpretations of governmental orders, partial suspension, and substantiation, then it could have responded legislatively to make that clear. It didn't then and still hasn't (*supra* pp. 9-10). Congress is presumed to legislate with an awareness of agencies' historical and extant interpretations of the law and, if Congress does not overrule those interpretations, courts should leave them in place. *See United States v. Bailey*, 34 U.S. (9 Pet.) 238, 256 (1835) (Story, J.); *Voisine v. United States*, 579 U.S. 686, 695-96 (2016) (citing *Bailey*). This presumption applies with special force here given the attention that Congress was paying to the ERC and its frequent legislative amendments to the law, especially after the publication of Notice 2021-20. StenTam cannot dispute that had Congress disagreed with the IRS's interpretations of the relevant statutory provisions that it could have acted. StenTam agrees that "Congress's amendments are evidence of legislative intent." (MSJ, 22: fn 16.). Congress approved of the Notice, the IRS's interpretations, and its exercise of authority.

---

[9] StenTam states without explanation that an "IRS rule that substantially narrows that statutory scheme implicates the major questions doctrine." (MSJ, 20:7-8.) The Supreme Court has adopted a two-prong framework for analyzing the major questions doctrine. *See State v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) ("First, we ask whether the agency action is "unheralded" and represents a "transformative expansion" in the agency's authority in the vague language of a long-extant, but rarely used, statute. Second, we ask if the regulation is of "vast economic and political significance" and "extraordinary" enough to trigger the doctrine. If both prongs are met, the major questions doctrine applies, and we should greet the agency's assertion of authority with "skepticism" and require the agency to identify "clear congressional authorization" for its action.") (citing *West Virginia v. EPA,* 597 U.S. 697, 724-25 (2022)). StenTam has failed to articulate how the major questions doctrine is implicated here. The doctrine is not because the IRS issued Notice 2021-20 consistent with the authority Congress granted it.

**C.    The APA alone does not authorize universal vacatur of agency rules.**

This Court should deny the relief that StenTam seeks because it has failed to establish that the Notice is invalid. But even if the Court is inclined to provide StenTam relief, then it should exercise its discretion to tailor appropriate relief in this case that is limited to StenTam and to the discrete parts of the Notice to which it objects.

StenTam seeks a nationwide vacatur of Notice 2021-20 and an affirmative injunction prohibiting the IRS from applying its interpretation of the ERC as it relates to governmental orders, partial suspension, and substantiation. (ECF No. 41-1). But this Court should not grant such expansive relief. StenTam fails to articulate any reason that the entire Notice should be vacated when it takes issue with only three of the Notice's 14 subject matters and just 10 of 71 FAQs.

Likewise, StenTam does not explain why the relief it seeks should extend beyond it, this district, or this circuit. Any relief should not because the Notice is valid and because there are millions of taxpayers, not a party to this case, whose point of view StenTam does not necessarily represent. Indeed, many of the Notice's interpretations are taxpayer friendly, including some of those that StenTam complains about (interpreting a supply chain exception, providing a safe harbor for partial suspension). And even if not every piece of guidance benefits a taxpayer, in general, providing the taxpaying public with guidance on how the IRS interprets the law is beneficial and should not be discouraged.

Denying the broad relief of a nationwide vacatur is also consistent with the APA. Section 706(2) of the APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" unsupported or unlawful in various respects. Some courts have mistakenly read that language as establishing a particular remedy—"setting aside" agency action—and have equated that remedy to "vacatur" of the agency action. Section 706(2), properly construed, simply provides a standard of review that directs a court to decline to give effect to an unlawful agency action in deciding this case and granting relief to the parties before it. That reading enables application of the "set aside" instruction in all cases in which it applies—including this one, which otherwise should

proceed under the I.R.C. rather than the APA itself. As Justice Gorsuch has observed, "When a district court orders the government not to enforce a rule against the plaintiffs in the case before it, the court redresses the injury that gives rise to its jurisdiction in the first place. But when a court goes further than that, ordering the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

In the Ninth Circuit, the power to issue an order with nationwide effect does not equate to a requirement to do so. Courts retain the discretion to tailor relief to the circumstances. *See*, *e.g.*, *California v. Azar*, 911 F.3d 558, 584-85 (9th Cir. 2018) (reversing preliminary injunction against agency rules as to non-plaintiff states); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 649 (9th Cir. 2011) (overturning order enjoining agency enforcement of rate cap as to non-party hospices). And even though the Ninth Circuit has allowed for nationwide injunctions, it has noted the Supreme Court's cautions that apply to such relief. *See, e.g.*, *L.A. Haven Hospice*, 638 F.3d at 644 ( "Our Supreme Court has cautioned that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.") (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

## V.    CONCLUSION

Notice 2021-20 is a valid interpretive rule. The United States is entitled to judgment in its favor.

DATED this 6th of January, 2025

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Amy Matchison*
AMY MATCHISON
Trial Attorney, Tax Division
U.S. Department of Justice

27