Peter A. Arhangelsky, Esq. (SBN 025346)
peter.arhangelsky@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 800
Phoenix, AZ  85016
Tel: (602) 445-8017
*Attorney for Plaintiff Stenson Tamaddon, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STENSON TAMADDON LLC, | No. 2:24-cv-01123-SPL |
| Plaintiff, | **PLAINTIFF'S NOTICE OF APPEAL OF ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT** |
| v. | |
| UNITED STATES INTERNAL REVENUE SERVICE, et al., | |
| Defendants. | Hon. Steven P. Logan |

Plaintiff, Stenson Tamaddon, LLC appeals to the United States Court of Appeals for the Ninth Circuit from the Order Denying Plaintiff's Motion for Summary Judgement entered on June 20, 2025 (Dkt. 49).  A copy of that Order is attached hereto as Exhibit A.

The representation statement required by Federal Rule of Appellate Procedure 12 and Ninth Circuit Rule 3-2 is attached to this Notice as Exhibit B.

Dated:  July 8, 2025.

Respectfully submitted,

*/s/ Peter A. Arhangelsky*
Peter A. Arhangelsky
GREENBERG TRAURIG, LLP
*Attorney for Plaintiff*

**Service List:**

| | |
|---|---|
| Amy Talburt Matchison<br>US Dept of Justice<br>Tax Division<br>PO Box 683<br>Ben Franklin Station<br>Washington, DC 20044<br>202-307-6531<br>Fax: 202-307-0054<br>Email: amy.t.matchison@usdoj.gov | Attorneys for Defendants |
| Kenton Harold Dale McIntosh<br>US Dept of Justice<br>Tax Division<br>PO Box 683<br>Ben Franklin Station<br>Washington, DC 20044-0683<br>202-514-3768<br>Email: kenton.mcintosh@usdoj.gov | Attorneys for Defendants |

# Exhibit A

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Stenson Tamaddon LLC,                    )    No.  CV-24-01123-PHX-SPL
                                         )
                    Plaintiff,           )
                                         )    **ORDER**
vs.                                      )
                                         )
United States Internal Revenue           )
Service, et al.,                         )
                                         )
                    Defendants.          )
                                         )

    Before the Court is Plaintiff Stenson Tamaddon LLC's Motion for Summary Judgment (Doc. 39) and Statement of Facts (Doc. 40); Defendant United States of America's Response and Cross Motion for Summary Judgment (Doc. 44), Statement of Facts (Doc. 45), and Controverting Statement of Facts (Doc. 46); Plaintiff's Reply (Doc. 47); and Defendant's Reply (Doc. 48). The Court now rules as follows. [1]

I.      **FACTUAL BACKGROUND**

    A.      **The Employee Retention Credit Program**

    This case arises from the Employee Retention Credit ("ERC") program implemented by the Internal Revenue Service ("IRS") pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") of 2020, Pub. L. 116-136, § 2301, 134

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Stat. 281, 347 (2020) (codified at 26 U.S.C.§ 3134).[2] (Doc. 40 ¶¶ 1–2). Neither party disputes the following background facts.

The ERC is a "refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate impacts on small business from the unprecedented challenges the pandemic posed." (*Id.* ¶ 3). It "provides a tax credit to employers whose business operations were adversely affected by COVID-19, but who still paid qualified wages, including some health plan expenses, to their employees." (*Id.* ¶ 26). Section 2301 of the CARES Act established the ERC for wages paid between March 12, 2020 and January 1, 2021. (*Id.* ¶ 27). The ERC was later extended to qualified wages for calendar quarters in 2021. (*Id.*). However, the subsequent Infrastructure Investment and Jobs Act terminated the ERC for most employers retroactively, so the ERC was not available for employers other than recovery startup businesses in the fourth quarter of 2021. (*Id.*); Pub. L. No. 117-58, § 80604, 135 Stat. 429, 1341 (2021) (codified at 26 U.S.C. §3134(n)). The ERC statute originally limited the credit payable to eligible employers to 50% of the qualified wages in a given quarter, but Congress then increased the credit to 70% of qualified wages for 2021 quarters. (Doc. 40 ¶ 28); 26 U.S.C. § 3134(a). Employers potentially eligible for the ERC could qualify in a few different ways:

> (A) In general.--The term "eligible employer" means any employer--
>
>> (i) which was carrying on a trade or business during the calendar quarter for which the credit is determined under subsection (a), and
>>
>> (ii) with respect to any calendar quarter, for which--
>>
>>> (I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group

---

[2] Citations throughout this Order are made to the statute as codified for the sake of convenience, though this Court understands that when the Notice at issue was released, the CARES Act had not yet been codified. (*See* Doc. 46 at 3 n.1).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19),
>
> (II) the gross receipts (within the meaning of section 448(c)) of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019, or
>
> (III) the employer is a recovery startup business (as defined in paragraph (5)).

26 U.S.C. § 3134(c)(2)(A).

"The CARES Act authorized the Secretary of the Treasury to 'issue forms, instructions, regulations, and guidance as are necessary' for the IRS to facilitate the ERC program." (Doc. 40 ¶ 37 (quoting Pub. L. 116-136, 134 Stat. 281, at §2301(l), and as amended, I.R.C. §3134(m))). However, the Act did not exempt the IRS from the APA's notice-and-comment rulemaking process. (Doc. 40 ¶ 41); *see* 5 U.S.C. § 553. In March 2021, the IRS published "Notice 2021-20," a 102-page document in a "question and answer" format that purports to "provide[] guidance on the employee retention credit . . . ." (Doc. 40 ¶ 44; Doc. 1-1 at 1; Doc. 38-2 at 21–44).

Plaintiff contends that the Notice "defined various terms in Section 3134, identified factors or elements necessary to claim the credit, set minimum thresholds for recovery of ERC, and imposed new, related record-keeping requirements—all of which resulted in the ERC being restricted to a lesser number of businesses than originally contemplated by Congress." (Doc. 1 ¶ 49). It therefore argues that the Notice created substantive duties and restrictions that carry the force of law. (*Id.* ¶¶ 108, 112). In short, the parties' primary dispute in this case is whether Notice 2021-20 was a mere interpretive document, as the Government argues, or improper legislative rulemaking that should have been subject to the APA's notice-and-comment procedures.

## B.    Stenson Tamaddon

Plaintiff Stenson Tamaddon LLC ("StenTam") is a "multifaceted tax advisory and technology firm that assists businesses with tax credits and financial solutions." (*Id.* ¶ 14).

3

It "operates as a consultant under the ERC program by helping businesses file ERC claims," and it is then "compensated from the proceeds of credits refunded to its clients." (*Id.* ¶ 15). It also defends claims that are challenged by the IRS, and if a claim is disallowed, StenTam does not receive compensation for its services on that submission. (*Id.*). StenTam contends that it "has dedicated significant resources to ensuring compliance with all policy positions the IRS releases with respect to the ERC," and that it must "adjust its business practices to account for the new developments," which comes with considerable costs. (*Id.* ¶ 16). Accordingly, its position, which the Government disputes, is that it "is directly injured by IRS positions that unlawfully narrow or limit the availability of ERC for businesses." (*Id.* ¶ 17).

## II.     PROCEDURAL HISTORY

On May 14, 2024, StenTam filed the instant action asserting various claims against the United States Internal Revenue Service, the United States of America, the United States Department of Treasury, Daniel Werfel in his official capacity as Commissioner of the IRS, and Janet Yellen in her official capacity as Secretary of the Treasury.[3] (Doc. 1). The Complaint asserts five causes of action: (1) violation of the APA's notice-and-comment rulemaking requirement (Doc. 1 at 24); (2) arbitrary and capricious agency action in violation of the APA (*id.* at 27); (3) unlawful agency action in excess of statutory authority in violation of the APA (*id.* at 29); (4) ultra vires action in violation of the APA (*id.* at 32); and (5) a claim for writ of mandamus against Defendants Yellen and Werfel (*id.* at 35).

On May 30, 2024, StenTam moved for a preliminary injunction on Counts IV and V of its Complaint, requesting that this Court enjoin the IRS from continuing its moratorium on the ERC program. (Doc. 14 at 7, 23). After conducting a hearing on the

---

[3] The Government asserts that the real party in interest is the United States, as the Department of Treasury and IRS are "not separately suable entities," and the IRS Commissioner and Secretary of the Treasury are sued only in their official capacities. (Doc. 44 at 8 n.1). This Court agrees, and it will therefore construe this action as one against the United States. *See Balser v. Dep't of Just., Off. of U.S. Tr.*, 327 F.3d 903, 907 (9th Cir. 2003) ("[T]he district court properly construed the Balsers' action against 'The Department of Justice, Office of United States Trustee' as one against the United States.").

matter, this Court ultimately denied the preliminary injunction, holding that although StenTam had Article III standing to pursue the two claims at issue, "the serious questions raised [were] not enough to warrant preliminary injunctive relief outside a stronger showing on the balance of equities and public interest." (Doc. 34 at 39).

On December 17, 2024, Counts IV and V of the Complaint (challenging the IRS's moratorium on processing new ERC claims) were dismissed by the parties' stipulation, as IRS had lifted its moratorium on processing new claims. (Doc. 35 ¶ 78; Docs. 41, 43). Accordingly, the only three claims at issue for purposes of these cross motions for summary judgment are the APA claims in Counts I, II, and III of the Complaint.

### III.  **LEGAL STANDARD**

In an action challenging agency action under the APA, the usual Rule 56 summary judgment standard does not apply. *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1084 (E.D. Cal. 2011). "[T]here are normally no 'disputed facts that the district court must resolve.'" *US Citrus Sci. Council v. United States Dep't of Agric.*, 312 F. Supp. 3d 884, 894 (E.D. Cal. 2018) (quoting *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985)). Rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental*, 753 F.2d at 769. The administrative record "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989) (internal citation omitted).

### IV.  **DISCUSSION**

The parties submit arguments on four main topics, each of which will be addressed in turn: (1) constitutional and prudential standing, (2) whether the Notice is an interpretive rule under the APA, (3) whether the Notice is arbitrary and capricious, and (4) whether issuance of the Notice was beyond the IRS's statutory authority.

#### A.  **Standing**

As a preliminary matter, the Government argues that StenTam lacks standing to

5

challenge Notice 2021-20 and to seek vacatur and an injunction. (Doc. 44 at 18–19). Although this Court previously found that StenTam had both constitutional and prudential standing to challenge the moratorium on processing new ERC claims (Doc. 34), "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." (Doc. 44 at 18 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))).

### 1.    Constitutional Standing

The constitutional minimum required to establish standing consists of three elements: a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). The Government argues that any injury to StenTam "is neither traceable to the Notice nor redressable by its vacatur." (Doc. 44 at 19). Specifically, it argues that the Notice "itself does not require StenTam or its clients to do anything or prevent them from doing anything," so if a taxpayer's ERC claim is denied based on the IRS's interpretation of the statute, "that denial flows from the statute" itself, not the Notice. (*Id.*). Thus, it argues that any injury is not traceable to the Notice itself, and it would not be redressed by vacating the Notice or enjoining the IRS. (*Id.*).

StenTam first points out that the Government does not challenge that it has suffered an injury in fact. (Doc. 47 at 8).[4] Accordingly, it focuses its response on traceability and redressability. As to the traceability prong, the Government argues that any injury to

---

[4] The Government raised challenges to the injury-in-fact prong in its Reply (Doc. 48). The Court need not consider these arguments raised for the first time in a reply brief. *See, e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Engstrom v. Oregon City Sch. Dist. No. 62*, No. 3:24-CV-01489-IM, 2025 WL 106123, at *3 (D. Or. Jan. 15, 2025) ("Arguments raised for the first time in a reply brief are also usually deemed waived."); *Ayala v. U.S. Dep't of Agric.*, No. 11-CV-00415-BAM, 2012 WL 2930863, at *8 (E.D. Cal. July 18, 2012) ("As a general rule, issues raised for the first time in a reply brief are waived.") (citing cases). Regardless, this Court agrees that StenTam has demonstrated an injury in fact, as (if StenTam is correct on the merits,) the Notice was used "to deny ERC claims for StenTam clients," resulting in a loss of funds. (*Id.* at 7); *see also* (Doc. 34 at 6–7).

StenTam is not traceable to the Notice because "[i]f a taxpayer's ERC claim is denied because the IRS determined the client is ineligible under the IRS's interpretation of the statute, that denial flows from the statute." (Doc. 44 at 19). Thus, it argues that any economic harm to StenTam is caused by the operation of the statute, not the Notice. (*Id.*). However, StenTam argues that this Court should find that the traceability prong has been satisfied with respect to these claims for the same reason it was satisfied as to StenTam's fourth and fifth claims. (Doc. 47 at 8). Regarding StenTam's two now-dismissed claims challenging the IRS's moratorium on processing new ERC claims, this Court held that "Defendant IRS's argument [] goes to the merits of Plaintiff's overall claim, and not whether Plaintiff's alleged injury is causally related to Defendant IRS's actions." (Doc. 34 at 9).

Here, too, the Court finds that the Government's standing argument is inextricably intertwined with its argument on the merits: *if* the Notice carries the force of law, and a taxpayer's ERC claim is denied because the IRS determined the client is ineligible *based on the Notice guidelines*, then the denial does not merely flow from the statute, but rather the IRS's binding interpretation of it. Of course, if it is the case that the Notice does *not* carry the force of law, then the Government's argument here would ultimately be correct. However, the Court cannot resolve the issue of standing *without* addressing the merits of StenTam's claims. It is sufficient, for the purposes of the traceability inquiry here, that StenTam has demonstrated that its economic injuries are causally linked to the IRS's alleged misconduct, i.e., issuing the Notice without following the APA's notice-and-comment rulemaking procedures. That StenTam may not ultimately prevail on the merits of this claim does not defeat standing. *See, e.g.*, *E. Bay Sanctuary Covenant v. Bide*n, 993 F.3d 640, 665 (9th Cir. 2021) ("[A] plaintiff can have standing despite losing on the merits.").

The Government's redressability argument is premised on the same conflation of the standing inquiry with the merits inquiry—it argues that "vacating the Notice or enjoining the IRS" would not change anything because StenTam's alleged economic

injuries flow from the statute, not the Notice. (Doc. 44 at 19). For the same reason its traceability argument is unavailing, its redressability argument must also fail.

### 2.    Prudential Standing

In addition to challenging StenTam's constitutional standing as to the three APA claims, the Government also challenges StenTam's prudential standing, arguing that its alleged injury in not "within the zone of interests to be protected or regulated by the ERC statute." (Doc. 44 at 20). As this Court has previously explained, "[t]o demonstrate prudential standing in an APA case, the alleged injury must be 'within the zone of interests to be protected or regulated' by the statute in question." (Doc. 34 at 12 (quoting *Port of Astoria v. Hodel*, 595 F.2d 467, 474 (9th Cir. 1979))). The benefit of the doubt goes to the plaintiff on prudential standing issues. *See id.*

The Court agrees with StenTam that the Government's prudential standing challenge is a "nearly verbatim" recitation of its argument on the moratorium claims at the preliminary injunction stage. (Doc. 47 at 10; *see also* Doc. 19 at 17). That argument failed because the Court found that the CARES Act "intentionally created the ERC program for the benefit of Plaintiff's clients," and "professional tax preparation services are essential in carrying out Congress' intent with respect to these clients." (Doc. 34 at 12). The same reasoning applies to StenTam's prudential standing with respect to its APA claims; accordingly, the Government's prudential standing argument must fail.

### B.    <u>Sovereign Immunity</u>

Next, the Government argues that even if StenTam could establish constitutional and prudential standing as to its APA claims, the Court lacks jurisdiction because there is no waiver of the United States' sovereign immunity. (Doc. 44 at 21). The APA explicitly waives sovereign immunity for certain suits seeking injunctive or declaratory relief that "stat[e] a claim that an agency . . . acted or failed to act in an official capacity or under color of legal authority . . . ." 5 U.S.C. § 702. However, the Government argues that "APA review is precluded under section 702 because there is an adequate alternative statutory remedy to challenge" the Notice, i.e., a tax refund suit under I.R.C. § 7422. (Doc. 44 at 21).

8

As with the prudential standing argument, this Court has already rejected substantially the same sovereign immunity argument the Government once again proffers. Specifically, the Court held that while taxpayers who have filed an ERC claim may bring a refund suit, "this is incorrect for third parties who may be affected by Defendant IRS's handling of the ERC program. Nothing in § 7422 indicates that third parties have standing to bring refund suits on behalf of others, and courts outside the Ninth Circuit have explicitly stated as such." (Doc. 34 at 18). While StenTam's clients may have an adequate alternative remedy in the form of refund suits, StenTam itself cannot pursue relief except via the APA. Furthermore, StenTam emphasizes that it "pursues no tax remedies in this case," but is rather challenging the IRS's alleged promulgation of legislative rules under the APA. (Doc. 47 at 12). In other words, this is not a typical tax refund suit, but a challenge to agency action that is appropriately brought under the APA. (*Id.*). The Government's contention that "the APA is inapplicable when challenging the IRS's tax determinations" is irrelevant—it is the IRS's allegedly improper rulemaking, done without notice and comment, that StenTam is challenging here. To that end, the Notice is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) ("[T]he test for finality is independent of the analysis for whether an agency action is a legislative rule rather than an interpretive rule.").

Thus, the Government's sovereign immunity argument fails. The Court will now consider the merits of StenTam's three APA claims.

### C.    Legislative Rulemaking or Interpretive Rule

Section 553 of the APA governs legislative rulemaking by agencies. *See* 5 U.S.C. § 553. The statute sets forth various procedural requirements that agencies must follow when effectuating new rules; specifically, it requires that an agency (1) provide *notice* of the proposed rulemaking through publication in the Federal Register, and (2) allow interested persons an opportunity to *comment* on the proposed rulemaking. *Id.* §§ 553(b)–(c). However, unless an organic statute provides otherwise, section 553 exempts certain

9

categories of agency action from the notice-and-comment requirements. *Id.* §§ 553(b)(4)(A)–(B). The exemption at issue in this case allows agencies to issue "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" without notice and comment. *Id.* § 553(b)(4)(A).

Here, the parties' primary dispute is whether the Notice is a legislative (subject to notice and comment) or interpretive (exempted from notice-and-comment procedures) rule. The term "interpretive rule," as the Supreme Court has noted, "is not further defined by the APA, and its precise meaning is the source of much scholarly and judicial debate." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see also New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) ("Somewhere along a spectrum, a rule transitions from being interpretive to being legislative. But, in a refrain now frequently recited, the point at which a rule crosses that line is a question 'enshrouded in considerable smog.'") (citation omitted). Interpretive rules are generally "issued by an agency to advise the public of its construction of the statutes and rules it administers," and they notably "do not have the force and effect of law." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995). The Ninth Circuit has further explained, "[i]n general terms, interpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule," whereas legislative rules "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). "An agency action is 'not in accordance with law' if it is a legislative rule masquerading as an interpretive rule." *League of Cal. Cities v. FCC*, 118 F.4th 995, 1012 (9th Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)); *see also Perez*, 575 U.S. at, 109 (Scalia, J., concurring) ("An agency may use interpretive rules to *advise* the public by explaining its interpretation of the law. But an agency may not use interpretive rules to *bind* the public by making law, because it remains the responsibility of the court to decide whether the law means what the agency says it means."); *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 359 (D.C. Cir. 2017) ("The APA leaves to agencies the decision of how to establish policy. If the agency so chooses, it may forego

notice-and-comment procedures and announce through a policy statement its intentions for future adjudications. It is not up to the court to second-guess the agency's decision to proceed in that manner, so long as the policy statement is not, in truth, a legislative rule.").

Under the Ninth Circuit's framework, a rule has the force of law, and is therefore legislative, when: (1) in the absence of the rule, there would not be an adequate legislative basis for enforcement action, (2) the agency has explicitly invoked its general legislative authority, or (3) the rule effectively amends a prior legislative rule. *Hemp*, 333 F.3d at 1087; *see also Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). The Court will now analyze each of these three prongs with respect to Notice 2021-20.

### 1.    Adequate Legislative Basis

The Court looks to the text of the Notice[5] in determining whether, in its absence, there would be an adequate legislative basis for enforcement action. The Government notes that "StenTam seeks to vacate Notice 2021-20 in its entirety nationwide even though it objects to only three of the 14 subject matters covered, representing just 10 of 71 FAQs." (Doc. 44 at 17).[6] To summarize, StenTam raises three primary objections to the Notice: (1) that it limited "eligible employers" under the statute by stating that "[h]ousehold employers are not considered to operate a trade or business and, therefore, are not eligible for the employee retention credit with respect to their household employees," (Doc. 1-1 at 22); (2) that it narrowed the scope of suspensions caused by governmental orders that would qualify an employer for the ERC; and (3) that it imposed new recordkeeping requirements on employers. (*See* Doc. 40 ¶ 63 ("Notice 2021-20 includes a series of rules that alter the ERC statute, taxpayer obligations, change the ERC eligibility criteria, and narrow the universe

---

[5] Referred to interchangeably as the "FAQ," given that the document is written in question-and-answer format.

[6] On this Court's count, it appears that StenTam is objecting to 12, not 10, FAQs, encompassing four, not three, topics covered by the FAQ: "Eligible Employers" (FAQ Question 6), "Governmental Orders" (FAQ Question 10), "Full or Partial Suspension of Trade or Business Operations" (FAQ Questions 11–18), and "Substantiation Requirements" (FAQ Questions 70–71). (*See* Doc. 40 ¶¶ 64–85; Doc. 1-1 at 22–103).

of eligible employers under the law . . . .")).

*i.    Limiting Eligible Employers*

The IRS's answer to FAQ Question 6 stated:

> Household employers are not considered to operate a trade or business and, therefore, are not eligible for the employee retention credit with respect to their household employees. However, household employers who are also employers operating a trade or business and who generally report employment taxes attributable to their household employees on the same federal employment tax return used to report the employment taxes attributable to the employees of the trade or business, may be eligible for the employee retention credit, but only with respect to the trade or business employees and their qualified wages paid with respect to the trade or business.

(Doc. 1-1 at 22). The relevant portion of the CARES Act being interpreted here states that an "eligible employer" means an employer that, among other requirements, "was carrying on a trade or business during the calendar quarter for which the credit is determined." 26 U.S.C. § 3134(c)(2)(A)(i). To that end, the Notice is purporting to interpret the term "trade or business." "This is not a case of pure delegation of authority to the agency to determine a standard." *Erringer v. Thompson*, 371 F.3d 625, 631 (9th Cir. 2004). Rather, there is an existing standard—the requirement that the employer "was carrying on a trade or business" —contained within the statute. *See id.* (holding that the Program Integrity Manual ("PIM") guidelines at issue in that case interpreted an existing "reasonable and necessary" standard contained in the Medicare statute, and that the statute itself therefore provided an adequate legislative basis for enforcement, which weighed against a finding that the PIM had the force of law); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (noting that "[t]he distinction between an interpretative rule and substantive rule . . . likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." (citation omitted)); *Am. Min. Cong.*, 995 F.2d at 1110 ("A statute or legislative rule that actually establishes a duty or a right is likely to be relatively specific (and the agency's refinement will be interpretive), whereas an agency's authority to create rights and duties will typically be relatively broad (and the agency's actual establishment of rights

and duties will be legislative).”). The “carrying on a trade or business” language in the statute is not so “vague or vacuous” that it does not supply the necessary substance for deriving an interpretive, as opposed to legislative, rule. *See Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (2010) (citations omitted). There is a clear “congressional edict” contained within the language of the statute, and the IRS is only advising the public of its construction of that statutory language. *See Chief Prob. Officers of California v. Shalala*, 118 F.3d 1327, 1333 (9th Cir. 1997); *Guernsey*, 514 U.S. at 99. The IRS’s chosen interpretation does not drift so far from the language of the statute itself to think that it is not drawn from, and therefore merely interpreting, that statutory language. *See, e.g.*, *Warshauer v. Solis*, 577 F.3d 1330, 1338 (11th Cir. 2009) (“[T]he Secretary’s interpretation is drawn directly from the plain language of the statute.”).

The Court therefore finds that even in the absence of the Notice, there was an adequate legislative basis for the IRS to limit eligible employers in the manner it did.

*ii.   Governmental Orders and Partial Suspension*

The Notice also clarifies the part of the statute that limits eligible employers to those whose trade or business operations were “fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19).” 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

FAQ 10 interprets “orders from an appropriate governmental authority” as limited to either orders from the federal government or “from a State or local government that has jurisdiction over the employer’s operations.” (Doc. 1-1 at 26). This excludes “government orders that may have imposed substantial effects on an employer’s stream of commerce, including customers in other jurisdictions.” (Doc. 40 ¶ 65). StenTam argues that this inappropriately limits eligible employers in a way that undermines Congress’s intentions when it passed the statute. However, the Notice provides a natural interpretation of the plain meaning of the statutory text, “appropriate” meaning “especially suitable or compatible: fitting.” *See Appropriate*, Merriam-Webster Online Dictionary,

13

https://www.merriam-webster.com/dictionary/appropriate (last visited June 12, 2025). The "fitting" governmental authority would be the one having jurisdiction over an employer's operations. Congress could have written "orders from the federal government or from any State or local government that have a substantial effect on an employer's stream of commerce," but it did not. While StenTam clearly disagrees with the IRS's interpretation of what constitutes an "*appropriate* governmental authority," there is no reason to think that the statute, which quite specifically and narrowly points to "orders from an *appropriate* governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)," does not provide an adequate legislative basis for enforcement even in absence of the Notice. 26 U.S.C.§ 3134(c)(2)(A)(ii)(I) (emphasis added).

In addition to challenging the "appropriate governmental authority" interpretation, StenTam also challenges the Notice's interpretation of the term "partially suspended." In FAQ 11, the IRS sets forth a "nominal portion" standard for considering whether a business is eligible under the "partially suspended" prong of the statute. (Doc. 1-1 at 28); 26 U.S.C.§ 3134(c)(2)(A)(ii)(I). StemTam contends that this is a "novel standard for determining eligibility" that impermissibly and arbitrarily limits the intended scope of the statute. (Doc. 39 at 14). The Government, by contrast, argues that this "partially suspended" guidance "reflects a safe harbor and allows for a facts and circumstances eligibility determination." (Doc. 48 at 12). On StemTam's reading of the IRS's guidance, a business is eligible "*only if* 'more than a nominal portion of its business operations are suspended by a governmental order.'" (Doc. 40 ¶ 66 (quoting Doc. 1-1 at 28)). But the text of the Notice says something different:

> An employer that operates an essential business is not considered to have a full or partial suspension of operations if the governmental order allows all of the employer's operations to remain open. However, an employer that operates an essential business may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order

14

1   (Doc. 1-1 at 28). The guidance goes on to explain the "nominal portion" criterion:

2           Solely for purposes of this employee retention credit, a portion
3           of an employer's business operations will be deemed to
            constitute more than a nominal portion of its business
4           operations if either (i) the gross receipts from that portion of
            the business operations is not less than 10 percent of the total
5           gross receipts (both determined using the gross receipts of the
            same calendar quarter in 2019), or (ii) the hours of service
6           performed by employees in that portion of the business is not
            less than 10 percent of the total number of hours of service
7           performed by all employees in the employer's business (both
            determined using the number of hours of service performed by
8           employees in the same calendar quarter in 2019).

9   (*Id.* at 29). The Government emphasizes that, based on the plain language of the Notice,

10  (1) "the IRS will consider the 'facts and circumstances' in evaluating whether more than a

11  nominal portion of an employer's operations were suspended," and (2) that "'if' an

12  employer's business has been partially suspended by a governmental order that has

13  impacted more than 10 percent of its gross receipts or employee hours, the IRS *will deem*

14  that employer eligible for the ERC." (Doc. 48 at 13). It therefore characterizes this ten-

15  percent provision as a "safe harbor." (*Id.*). This Court agrees: StenTam's addition of the

16  word "*only*" to the text of the answer (Doc. 40 ¶ 66) makes it seem like an exclusionary

17  rule, whereas the text itself provides a baseline for business operations that will *always* be

18  deemed to constitute a more-than-nominal impact on an employer's business or hours, but

19  it still contemplates the IRS exercising discretion in determining if other employers might

20  nonetheless qualify based on additional "facts and circumstances." In short, the "nominal

21  effects" test within the Notice simply does not say what StenTam contends it says.

22          StenTam, however, argues that the IRS's argument that the "nominal effects" test

23  merely provides a "safe harbor" to what is an ultimately discretionary decision "lacks

24  support and is contrived for litigation," arguing that it "is belied by the IRS's routine use

25  of Notice 2021-20 to deny ERC claims." (Doc. 47 at 15). It cites examples of public

26  statements, individual adjudications, statements from IRS agents, and IRS legal

27  memoranda to argue that the Notice is being held out "as a binding legal standard." (*Id.* at

28  16–17). On one hand, the Court is concerned by the prospect of something labeled as a

15

1   "policy statement" being practically applied as though it were a binding rule. *See, e.g.*, *U.S.*
2   *Tel. Ass'n v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994) (holding that a schedule of fines
3   created by the FCC and claimed to be a "general statement of policy" was actually a
4   legislative rule where, in application, it departed from the schedule in only eight of over
5   300 cases). On the other hand, the fact that an agency has consistently acted in accordance
6   with the dictates of its policy statement, which is meant to be "an indication of an agency's
7   current position on a particular regulatory issue," *id.*, is "not particularly probative whether
8   the rule is substantive," *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599
9   (5th Cir. 1995). After all, one "would expect agency employees to consider all sources of
10  pertinent information in performing that task, whether the information be contained in a
11  substantive rule, an interpretive rule, or a statement of policy. Indeed, what purpose would
12  an agency's statement of policy serve if agency employees could not refer to it for
13  guidance?" *Id.* The Government makes a similar point: "[O]ne would hope that the IRS is
14  indeed evaluating ERC claims consistent with the explanations it has offered the public."
15  (Doc. 44 at 24 n.4). So long as the agency ultimately retains its discretion with respect to
16  application of this "nominal effects" test, this weighs against a finding that it constitutes a
17  legislative rule. *See Gill v. United States Dep't of Just.*, 913 F.3d 1179, 1186–87 (9th Cir.
18  2019) (holding that a "Functional Standard" that created categories for agencies to use in
19  defining "suspicious activity" was not a legislative rule because it still allowed analysts to
20  exercise ultimate discretion over whether to disseminate a Suspicious Activity Report).

21      StenTam also argues that the ten-percent threshold is an arbitrary and legislative
22  choice made by the agency, but its reliance on *Hoctor v. United States Department of*
23  *Agriculture*, 82 F.3d 165 (7th Cir. 1996), is unavailing. In that case, the court sought to
24  determine "whether a rule for the secure containment of animals" promulgated by the
25  Department of Agriculture without notice and comment was "nevertheless valid because it
26  is merely an interpretive rule." *Id.* at 167. The court found that the rule, which required
27  animal enclosures to be at least eight feet high, was a substantive rule that should have been
28  promulgated to notice and comment, as it was an "arbitrary" standard. *Id.* at 170 ("There

16

is no way to reason to an eight-foot perimeter-fence rule as opposed to a seven-and-a-half foot fence or a nine-foot fence or a ten-foot fence."). However, the court specifically cautioned that it was "not saying that an interpretive rule can never have a numerical component." *Id.* at 171; *see also United States v. McIntosh*, 124 F.4th 199, 209 n.6 (3d Cir. 2024) (citing cases where agencies numerically interpreted qualitative regulatory terms). The *Hoctor* court continued that "[e]ven in a nontechnical area the use of a number as a rule of thumb to guide the application of a general norm will often be legitimately interpretive. Had the Department of Agriculture said in the internal memorandum that it could not imagine a case in which a perimeter fence for dangerous animals that was lower than eight feet would provide secure containment, and would therefore presume, subject to rebuttal, that a lower fence was insecure, it would have been on stronger ground." *Hoctor*, 82 F.3d at 171. The case at hand is more akin to this hypothetical scenario posed by the *Hoctor* court: the ten-percent threshold is "subject to rebuttal" because the IRS, in evaluating the "facts and circumstances" when considering whether a business has been "partially suspended." *Id.*; (Doc. 1-1 at 28). As the Government puts it, "unlike the USDA's 8-foot fence requirement in *Hoctor*, the IRS did not say that a taxpayer cannot qualify for the ERC if they have been impacted less than 10 percent," but rather, "the IRS provided that number as a safe harbor while still allowing the possibility for eligibility for those whose percentage might be less under the facts and circumstances." (Doc. 44 at 28).

Other "partial suspension" FAQs challenged by StenTam comport with the plain text of the statute. FAQ 14, for example, states that "[a]n employer that voluntarily suspends operation of a trade or business or voluntarily reduces hours due to COVID-19 is not eligible for the employee retention credit on the basis of a full or partial suspension of its operations." (Doc. 1-1 at 31). On this Court's view, this is the most obvious and natural interpretation of the "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)" language in the ERC statute. 26 U.S.C. § 3134(c)(2)(A). A business

17

voluntarily suspending its own operations has not been suspended *due to orders from an appropriate governmental authority* but rather has suspended operations of its own volition. Similarly, the "comparable operations" rule in FAQs 15 and 16 are a natural extension of the statutory requirement that business operations are suspended *due to a government order* as opposed to the business's voluntary suspension of operations: if a business has the capability to continue its operations in a modified manner but chooses not to, it is voluntarily suspending its own operations, not being ordered to do so. And StenTam's argument that "these rules eliminate ERC for employers suffering indirect but foreseeable effects on business operations" (Doc. 40 ¶ 72) is belied by the fact that there is a second prong of the statute that allows businesses to qualify based on a decline in gross receipts, rather than suspension due to a government order. 26 U.S.C. § 3134(c)(2)(A)(II).

In sum, the Court does not find that the portions of the Notice limiting eligible employers by explaining that statutory "full or partial suspension of operations" language constitute a legislative rule.

### iii.    Recordkeeping Requirements

Finally, StenTam argues that there is no legislative basis for the recordkeeping "substantiation requirements" set forth in FAQ 70 and 71. This portion of the Notice requires that an employer substantiate its eligibility for the ERC by creating and maintaining relevant records, and it also requires that an employer "keep all records of employment taxes for at least 4 years after the date the tax becomes due or is paid, whichever comes later." (Doc. 1-1 at 101–02). The Government contends that these substantiation requirements do not emanate from the Notice, but rather "are requirements that the Internal Revenue Code and its implementing Treasury Regulations (26 C.F.R. § 31.6001-1) impose on taxpayers seeking employment-related refunds." (Doc. 44 at 15); 26 U.S.C. § 6001. To that end, it argues that the Notice "neither adds to, nor alters in any way, taxpayers' obligations to maintain records to substantiate its entitlement to ERCs under the relevant statute and regulations—it simply reiterates the statutory requirement to do so." (Doc. 44 at 16). StenTam does not address the Government's argument regarding 6 U.S.C.

18

§ 6001 and 26 C.F.R. § 31.6001-1 in its Reply (Doc. 47).

To the extent that the substantiation requirements set forth in the Notice track existing statutory and regulatory recordkeeping requirements, FAQs 70 and 71 cannot be said to be imposing any new "duty or right" on taxpayers, nor can it be said that they lack an adequate legislative basis for enforcement. *See Am. Min. Cong.*, 995 F.2d at 1110. Even in the absence of FAQs 70 and 71, taxpayer-employers have an existing burden to prove their entitlement to the ERC. *See Stahl v. United States*, 626 F.3d 520, 522 (9th Cir. 2010). FAQs 70 and 71 merely "clarify," but do not create anew, an existing and underlying statutory duty to maintain records proving an employer's entitlement to a tax credit by specifying the documents that would effectively prove the employer's entitlement to the ERC, specifically. *See, e.g.*, *Bharathm Ram Nagaiah v. Allen*, No. 23-2077-KSM, 2025 U.S. Dist. LEXIS 99498, at *40 (E.D. Pa. May 27, 2025) (finding that a policy memorandum was an interpretive, not legislative, rule where it merely "changed the order of operations when evaluating a visa application, stated what USCIS thought of the statutes and rules which it administers, and *reminded affected parties of existing duties*." (emphasis added)).

### iv.    Conclusion

Much of StenTam's argument regarding the "adequate legislative basis" factor is centered around its contention that the IRS lacks legislative authority to "modify" ERC eligibility requirements. (Doc. 47 at 22). But this is the key point at which their argument unravels. Many Courts have struggled with where to draw the line between "construing" or "interpreting" legislation versus "modifying" or "supplementing" it. *See Chamber of Com. of U.S. v. Occupational Safety & Health Admin.*, 636 F.2d 464, 469 (D.C. Cir. 1980) ("It is clear to us that the Administration has attempted through this regulation to supplement the Act, not simply to construe it, and therefore the regulation must be treated as a legislative rule."). Perhaps finding that line is more art than science. But here, the IRS does not appear to be making additions to the statute, but simply trying to parse the precise meaning of the specific statutory language that Congress itself has chosen. *See Doe v.*

1    *United States*, 129 F.4th 1362, 1366 (Fed. Cir. 2025) (holding that Department of Labor

2    regulations at issue were interpretive rules that merely "serve to 'inform the public on how

3    DOL will apply the FLSA."). After all, Congress, in writing a statute, cannot anticipate

4    every hypothetical question that will arise once that statute takes effect. It is therefore

5    incumbent upon the agency, which has the expertise and authority to oversee

6    implementation of that statute, to issue interpretive guidance as novel applications of the

7    statute arise. But given that the interpretive statements carry no binding effect, if a party

8    disagrees with the IRS's interpretation as applied to their case, they retain an adequate

9    remedy to challenge it—a tax refund suit.

10        To be sure, the provisions of Notice 2021-20 have had an impact on StenTam's

11    clients, and therefore a downstream effect on StenTam's own business. But a "substantial

12    impact" on regulated parties, let alone third parties, is not itself a basis for finding a rule

13    not to be interpretive if it is otherwise exempt under the APA. *Chief Prob. Officers of

14    California v. Shalala*, 118 F.3d 1327, 1335 (9th Cir. 1997); *see also* Robert A. Anthony,

15    *"Interpretive" Rules, "Legislative" Rules and "Spurious" Rules: Lifting the Smog*, 8

16    Admin. L.J. Am. U. 1, 9 n.29 (1994) ("[A]n agency may have the practical power to treat

17    a rule as binding . . . whether the rule was issued legislatively or not. If the rule was not

18    issued legislatively (that is, by use of APA procedures including notice-and-comment), by

19    definition it does not have the force of law and is not legally binding. But it can have

20    practical binding effect.") (citation omitted). The D.C. Circuit provided the following

21    explanation of the purpose of interpretive rules:

22              It is true that while the Notice is interpreting statutory
          language, it also, inevitably, has a significant practical effect
23              on interested parties' behavior. A statement seeking to interpret
          a statutory or regulatory term is, therefore, the quintessential
24              example of an interpretive rule. . . . If we were to require an
          agency to promulgate every regulatory or statutory
25              interpretation arrived at in the course of adjudicating specific
          cases, agencies would be condemned to inactivity, since
26              interpretation of the statutory and regulatory framework under
          which an agency must act is the *sine qua non* of reasoned
27              agency action. While we have said that interpretive rules
          'cannot go beyond the text of a statute,' we do not, of course,
28              mean to imply that an interpretive statement may only

> paraphrase statutory or regulatory language. Indeed, a mere paraphrase would hardly be interpretive at all. Accordingly, an interpretive statement may 'suppl[y] crisper and more detailed lines than the authority being interpreted' without losing its exemption from notice and comment requirements under § 553.

*Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993) (citations omitted). Here, the entire purpose of the Notice is to "supply crisper and more detailed lines" for employers to determine whether they will likely qualify for the ERC. *Id.*; *see also Gunderson v. Hood*, 268 F.3d 1149, 1155 (9th Cir. 2001) ("The fact that these statutes are not precise in their definitions of explosives means that there is a genuine ambiguity arising from the wording of the regulation. Clarifying such regulatory ambiguities is 'precisely the function of an interpretative rule.'"); *see also Hoctor*, 82 F.3d at 170 ("[U]nless a statute or regulation is of crystalline transparency, the agency enforcing it cannot avoid interpreting it, and the agency would be stymied in its enforcement duties if every time it brought a case on a new theory it had to pause for a bout, possibly lasting several years, of notice and comment rulemaking. Besides being unavoidably continuous, statutory interpretation normally proceeds without the aid of elaborate factual inquiries. When it is an executive or administrative agency that is doing the interpreting it brings to the task a greater knowledge of the regulated activity than the judicial or legislative branches have, and this knowledge is to some extent a substitute for formal fact-gathering."). So long as the agency's clarification does not impose new rights and duties, it is more interpretive than legislative. *See, e.g.*, *Bharathm*, 2025 U.S. Dist. LEXIS 99498, at *42 (holding that a policy memorandum was an interpretive rule where it "d[id] not add to the statute, amend the statute, or create new duties for visa applicants," but rather "announced [the agency's] interpretation of the governing statute and regulation . . . .").

## 2. Invoking General Legislative Authority

This is the most straightforward of the three *Hemp* factors to apply to this matter. "The second prong requires us to look at the agency's own treatment of the rule, which is relevant, if not dispositive." *Erringer*, 371 F.3d at 631. At no point has the IRS invoked its

1    general legislative authority in issuing the Notice. To the contrary, "[t]hrough the entirety

2    of the Notice, the IRS consistently refers to the information provided as guidance." (Doc.

3    44 at 25). And as explained above, there is no reason to think that the Notice provisions do

4    not interpret the specific language of the statue, rather than flowing from the agency's

5    general legislative authority. *Cf. Erringer*, 371 F.3d at 631–32. This factor therefore weighs

6    against a finding that the Notice carries the force of law. *See also, e.g.*, *LeadIC Design USA*

7    *LLC v. United States Citizenship & Immigr. Servs.*, 766 F. Supp. 3d 946, 954–55 (N.D.

8    Cal. 2025).[7]

9                    **3.  Effectively Amending a Prior Legislative Rule**

10            StenTam argues that, although there are no prior legislative rules interpreting the

11   [ERC statute], the interpretive rule is itself "effectively amending" the ERC statute. (Doc.

12   47 at 21). However, it is clear that "[a] rule does not . . . become an amendment merely

13   because it supplies crisper and more detailed lines than the authority being interpreted. If

14   that were so, no rule could pass as an interpretation of a legislative rule unless it were

15   confined to parroting the rule or replacing the original vagueness with another." *Am. Min.*

16   *Cong.*, 995 F.2d at 1112. Furthermore, this Court has already determined with respect to

17   the first *Hemp* factor that there is an adequate legislative basis for the Notice, and that it is

18   interpreting the statute rather than imposing extra-statutory obligations. Accordingly, this

19   argument fails.

20           In sum, StenTam has not met its burden to show that the Notice carried the force of

21   law and was therefore a legislative, rather than interpretive, rule. The Court acknowledges

22   the practical binding effect the Notice may have had on employers, but a *practical* binding

23   effect is not equivalent to a *legally* binding effect. Having determined the Notice was an

24   interpretive rule not subject to notice and comment, the Court will now proceed to

25   ───────────────

26           [7] The Court is also unconvinced by StenTam's argument that, by citing the
     Paperwork Reduction Act and Congressional Review Act, the IRS "invoked statutory
27   authority applicable to proposed rulemaking." (Doc. 39 at 20). As the Government
     contends, "nothing provides that complying with these acts, even if not required, is enough
28   to convert and interpretive rule into a legislative one," and StenTam provides no authority
     to the contrary. (Doc. 44 at 25).

1    StenTam's argument that the ERC eligibility requirements set forth in the Notice are

2    nonetheless arbitrary and capricious.

3            **D.    <u>Arbitrary/Capricious</u>**

4            Under § 706(2)(A) of the APA, a reviewing court must "hold unlawful and set aside

5    agency action, findings, and conclusions" that it finds to be "arbitrary, capricious, an abuse

6    of discretion, or otherwise not in accordance with law." "Even if a regulation is a

7    permissible interpretive rule, we may still strike the rule down under the APA's arbitrary-

8    and-capricious standard . . . ." *League of Cal. Cities*, 118 F.4th at 1013–14. Under this

9    standard, the reviewing court's "scope of review is narrow and deferential." *Arrington v.*

10   *Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). The Court "may not substitute its own policy

11   judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. The Court's

12   review of an agency decision "is based on the administrative record and the basis for the

13   agency's decision must come from the record." *Nat'l Ass'n of Home Builders v. Norton*,

14   340 F.3d 835, 41 (9th Cir. 2003). A court will "uphold a decision of less than ideal clarity

15   if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

16   *v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted).

17           "An agency action is arbitrary and capricious only if [1] the agency relied on factors

18   Congress did not intend it to consider, [2] entirely failed to consider an important aspect of

19   the problem, or [3] offered an explanation that runs counter to the evidence before the

20   agency or is so implausible that it could not be ascribed to a difference in view or the

21   product of agency expertise." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir.

22   2017) (internal quotation marks and citations omitted). Accordingly, StenTam argues that

23   the IRS's positions in the Notice are arbitrary and capricious because the IRS (1) "relied

24   on factors Congress had not intended it to consider," (2) "ignored important aspects of the

25   problem," and (3) "fashioned rules that were not supported by transparent and reasoned

26   decision-making." (Doc. 39 at 22).

27           StenTam likens this case to *CIC Services, LLC v. IRS*, 592 F. Supp. 3d 677 (E.D.

28   Tenn. 2022), *on reconsideration*, No. 3:17-CV-110, 2022 WL 2078036 (E.D. Tenn. June

23

1    2, 2022), in which the Eastern District of Tennessee struck down an IRS notice as (1) an
2    invalid legislative rule that should have been subject to notice-and-comment procedures
3    and (2) arbitrary and capricious. The notice in that case was interpreting IRS regulations
4    that defined types of transactions that taxpayers and material advisors must report to the
5    IRS. *Id.* at 680–81. The notice "expressed concern that 'micro-captive transactions' had
6    the potential for tax avoidance or evasion and classified these transactions as 'transactions
7    of interest'" within the meaning of the relevant regulation. *Id.* at 681. It therefore subjected
8    taxpayers and material advisors to potential penalties for failing to make those required
9    disclosures. *Id.* In finding that the notice was arbitrary and capricious, the court stated that
10   "the administrative record fails to include relevant data and facts supporting the IRS's
11   decision to designate micro-captive arrangements as transactions of interest, and, thus,
12   reportable transactions." *Id.* at 685. The IRS had simply claimed to be "aware" of micro-
13   captive transactions and "believed" they had the potential for tax avoidance or evasion. *Id.*

14          The present case is distinguishable from *CIC Services*. First, the notice in that case
15   purported to interpret (but was ultimately found to be a legislative rule) a regulation
16   promulgated by the IRS, not an organic statute itself. *Id.* at 680–81. Here, the Notice is an
17   interpretive document directly explaining the language of the ERC statute, rather than
18   functionally amending an existing regulation. Second, the notice in *CIC Services* was
19   issued in response to a specific concern that micro-captive transactions would give rise to
20   tax avoidance or evasion, a claim that could be—and should be—supported by specific
21   facts and data, such as explaining how it became "aware" of these transactions, whether
22   any taxpayers were under audit or in litigation because of this issue, and how, exactly, these
23   transactions have the potential for tax avoidance or evasion. *Id.* at 686.

24          But here, there are no facts or data that the IRS could have relied upon in issuing its
25   Notice. The Government argues that "the IRS simply set forth its interpretation of statutory
26   terms. No facts or data are required—or would even be relevant—for that analysis." (Doc.
27   48 at 17–18 n.8). There is natural logic to the Government's position—after all, some
28   agency determinations "cannot be reduced entirely to determinations of fact or law," but

1    "can only be described as determinations of *policy*." Gary Lawson, *Federal Administrative*
2    *Law* 582 (5th ed. 2009). Determining whether an agency's *policy* determinations are
3    arbitrary and capricious is a less straightforward inquiry than the question at issue in *CIC*
4    *Services*, where it was primarily the IRS's factual determinations being challenged. As this
5    Court has already determined, the IRS had an adequate legislative basis for each of its
6    interpretive decisions based on the plain text of the ERC statute. And the Court, when
7    conducting arbitrary and capricious review under the APA, "is not to ask whether a
8    regulatory decision is the best one possible or even whether it is better than the
9    alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), *as revised*
10   (Jan. 28, 2016). Certainly, StenTam would contend that the interpretations proffered in the
11   Notice are not the "best ones possible" or "better than the alternatives"—but its
12   disagreement on these matters of policy does not render the IRS's interpretive
13   determinations arbitrary and capricious.

14       To that end, the IRS cannot be said to have "offered an explanation that runs counter
15   to the evidence before the agency or is so implausible that it could not be ascribed to a
16   difference in view or the product of agency expertise." *Zinke*, 856 F.3d at 1257. StenTam's
17   arguments against the Notice can almost entirely be ascribed to a "difference in view." And
18   this Court would be hard-pressed to find how the Notice in any way ran "counter to the
19   evidence before the agency" where there was no identifiable factual evidence to consider—
20   just the text of the statute. And because the Notice was based on the text of the statute, it
21   also cannot be said that the agency "relied on factors Congress did not intend it to
22   consider." *Id.*

23       Finally, regarding the second *Zinke* factor, StenTam argues that the IRS "entirely
24   failed to consider" important aspects of the problem. *Id.*; (Doc. 39 at 22). Specifically, it
25   argues that the agency "does not explain why a reduction in business hours in a partial
26   suspension but a reduction in resources or customers is not," or "why a governmental order
27   that required businesses to adopt social distancing measures could render a business
28   eligible, but an order that prevents customers from even visiting that same business would

not similarly qualify," or "why 'partial suspensions' were limited to the physical business space but not indirect burdens imposed on businesses by government orders." (Doc. 39 at 23). But StenTam's argument that the IRS "utterly failed to consider" this issue is belied by the administrative record. In fact, the IRS received multiple inquiry letters that were circulated by its office regarding these very issues. (*See* Doc. 38-10 at 88; 106–109).

StenTam's other specific concerns are easily dismissed. For example, it reiterates its concern over the ten percent "nominal portion" test, contending that the IRS "chose that number arbitrarily." (Doc. 39 at 22). However, StenTam's argument is once again undermined by the fact that the ten percent standard is not an exclusionary cut-off point, but rather a safe harbor above which the IRS *will* consider there to have been a more-than-nominal disruption to business. And as to its ten-percent determination, it is true that any classification based on a percentage or amount "is necessarily somewhat arbitrary." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 553 (1949); (Doc. 44 at 29). That does not mean, however, that the agency's determination is arbitrary and capricious within the meaning of the APA.

To be sure, this Court does not wish to shirk its duty under the APA to "decide all relevant questions of law" at issue in this case. 5 U.S.C. § 706. But to the extent that the parties' arguments present more questions of *policy* than questions of law or fact, the Court cannot substitute its own political will for the judgment of Congress or the agency to which Congress has delegated the task of effectuating the ERC program. And because this Court cannot say that the interpretive judgments made by the IRS in this case were arbitrary or capricious, StenTam's claim must fail.

### E.    Beyond Statutory Authority

StenTam's last remaining claim is that issuance of the Notice was beyond the IRS's statutory authority. (Doc. 39 at 25–29). To the extent that StenTam argues that the IRS "lacked authority to issue legislative rules on eligibility," this Court has already determined that the Notice was an interpretive, not legislative, rule. (*Id.* at 25). The interpretive rule determination also cuts against StenTam's broader argument that "[b]ecause the Notice

adopts substantive positions inconsonant with Congressional intent, the agency acted beyond its authority." (*Id.* at 26).

Its argument under *Loper Bright* is irrelevant, as the agency's interpretation does not "depart[] from or change[] the statutory text" as StenTam contends it does. (*Id.* at 29); (Doc. 44 at 31 n.8 ("Because the United States is not asking the Court to afford deference to its interpretation, the Supreme Court's recent decision in *Loper Bright* . . . is not relevant here.")). Similarly, StenTam's argument that the Notice implicates the major questions doctrine is irrelevant—the Notice carries no force of law and is entitled to no deference. (Doc. 39 at 24–25). This claim, too, must fail.

**V.    CONCLUSION**

Given the pressure the IRS was under to issue guidance to the general public regarding the ERC program—a program that was swiftly passed in response to the COVID-19 pandemic—it is understandable why the agency exercised its discretion to issue that guidance in the form of an interpretive FAQ, rather than undergoing the months-long notice-and-comment process as StenTam might have wished for it to do. *See Clarian Health*, 878 F.3d at 359 ("The APA leaves to agencies the decision of how to establish policy. If the agency so chooses, it may forego notice-and-comment procedures and announce through a policy statement its intentions for future adjudications. It is not up to the court to second-guess the agency's decision to proceed in that manner, so long as the policy statement is not, in truth, a legislative rule."); (Doc. 38-10 at 88–92; 106–109 (letters addressed to the IRS seeking further guidance on implementation of the ERC program)); (Doc. 48 at 6 ("[T]he public . . . began clamoring for IRS guidance from the start.")).

Nevertheless, in many ways, this case presents a close call. It remains a difficult legal task for any Court to parse the difference between legislative and interpretive rules, and it is difficult to set aside an inclination to make that determination based on the *practical* effect an interpretive rule has on parties rather than deciding—as the Court must—whether it carries true *legal* effect. The Court is sympathetic to the financial toll the IRS's decisions, even interpretive choices that do not carry the force of law, may have on

StenTam and its clients. But if agencies cannot interpret statutes in a meaningful way—a way that does more than superfluously "paraphrase statutory or regulatory language" without supplying "crisper and more detailed lines than the authority being interpreted," then this would fundamentally undermine the fact that Congress deliberately chose to write an "interpretive rule" exception into the notice-and-comment procedures set forth in the APA. *See Orengo Caraballo*, 11 F.3d at 195; *see also, e.g.*, *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used.") (Roberts, J.). And just because StenTam disagrees with the interpretations that the IRS has supplied in Notice 2021-20 does not render them legislative, arbitrary and capricious, or beyond statutory authority.

Accordingly,

**IT IS ORDERED** that Plaintiff Stenson Tamaddon LLC's Motion for Summary Judgment (Doc. 39) is **denied**, Defendant United States of America's Cross Motion for Summary Judgment (Doc. 44) is **granted**, and this action is terminated **with prejudice**. The Clerk of Court shall enter judgment accordingly.

Dated this 18th day of June, 2025.


Honorable Steven P. Logan
United States District Judge

28

Exhibit B

Peter A. Arhangelsky, Esq. (SBN 025346)
peter.arhangelsky@gtlaw.com
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 800
Phoenix, AZ  85016
Tel: (602) 445-8017
*Attorney for Plaintiff Stenson Tamaddon, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STENSON TAMADDON LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>UNITED STATES INTERNAL<br>REVENUE SERVICE, et al.,<br><br>                    Defendants. | No. 2:24-cv-01123-SPL<br><br>**REPRESENTATION STATEMENT OF PLAINTIFF STENSON TAMADDON, LLC**<br><br>Hon. Steven P. Logan |

## <u>REPRESENTATION STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 12(b) and Ninth Circuit Rule 3-2(b), Plaintiff, Stenson Tamaddon, LLC provides the following list of parties to this action, and identifies their counsel by name, firm, address, telephone number, and email address.

/ / /

/ / /

/ / /

/ / /

/ / /

 / / /

/ / /

/ / /

**Plaintiff-Appellant:**

Stenson Tamaddon, LLC
200 East Van Buren, 3rd Floor
Phoenix, AZ 85004

*Counsel for Appellant:*
Peter A. Arhangelsky, Esq (SBN 025346)
GREENBERG TRAURIG, LLP
Phoenix, AZ 85016
Tel: (602) 445-8017
Email: peter.arhangelsky@gtlaw.com

**Defendant-Appellee**:

United States Internal Revenue Service
1111 Constitution Avenue NW
Washington, DC 20224

*Counsel for Appellee*:
Amy Talburt Matchison
US Dept of Justice - Tax Division
PO Box 683
Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-6531
Email: amy.t.matchison@usdoj.gov

Kenton Harold Dale McIntosh
US Dept of Justice
Tax Division
PO Box 683
Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-3768
Email: kenton.mcintosh@usdoj.gov

2

Dated:  July 8, 2025.

Respectfully submitted,

*/s/ Peter A. Arhangelsky*
Peter A. Arhangelsky
GREENBERG TRAURIG, LLP
*Attorney for Plaintiff*

**Service List:**

| | |
|---|---|
| Amy Talburt Matchison<br>US Dept of Justice<br>Tax Division<br>PO Box 683<br>Ben Franklin Station<br>Washington, DC 20044<br>202-307-6531<br>Fax: 202-307-0054<br>Email: amy.t.matchison@usdoj.gov | Attorneys for Defendants |
| Kenton Harold Dale McIntosh<br>US Dept of Justice<br>Tax Division<br>PO Box 683<br>Ben Franklin Station<br>Washington, DC 20044-0683<br>202-514-3768<br>Email: kenton.mcintosh@usdoj.gov | Attorneys for Defendants |

GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

3